# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL;

EASTERN RHODE ISLAND
CONSERVATION DISTRICT;

CHILDHOOD LEAD ACTION
PROJECT;

CODMAN SQUARE
NEIGHBORHOOD DEVELOPMENT
CORPORATION;

GREEN INFRASTRUCTURE
CENTER; and

NATIONAL COUNCIL OF
NONPROFITS,

*Plaintiffs*,

v.

DEPARTMENT OF AGRICULTURE;

BROOKE ROLLINS, in her official
capacity as Secretary of Agriculture;

DEPARTMENT OF ENERGY;

CHRIS WRIGHT, in his official
capacity as Secretary of Energy;

DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official
capacity as Secretary of the Interior;

ENVIRONMENTAL PROTECTION
AGENCY;

Case No. 1:25-cv-00097-MSM-PAS

LEE ZELDIN, in his official capacity as EPA Administrator;

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT;

SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development;

OFFICE OF MANAGEMENT AND BUDGET;

RUSSELL VOUGHT, in his official capacity as OMB Director; and

KEVIN HASSETT, in his official capacity as Director of the National Economic Council,

*Defendants.*

## FIRST AMENDED COMPLAINT

From its very first day in office, the Trump administration has engaged in concerted efforts to strangle the flow of federal funding on which Americans of all walks of life rely. Defendants here have specifically targeted funding appropriated by two laws passed during the prior presidential administration: the Inflation Reduction Act and the Infrastructure Investment and Jobs Act, also known as the Bipartisan Infrastructure Law. They have implemented broad, non-individualized freezes of funds appropriated by those laws, and in doing so, have acted arbitrarily, capriciously, without statutory authority, and contrary to law, in violation of the Administrative Procedure Act. The result of Defendants' unlawful funding freeze has been real and irreparable harm to the recipients of that funding in this District and

across the country, as well as to the people and communities they serve. The Court's intervention is required to stop further damage.

## PARTIES

1.      **Plaintiff Woonasquatucket River Watershed Council (WRWC)** is a nonprofit based in Providence, Rhode Island. Its mission is to create positive environmental, social, and economic change by revitalizing the Woonasquatucket River, its Greenway, and its communities. It pursues that mission through conservation work, habitat and waterway restoration, community education and skills training programs, and environmental monitoring, among other things.

2.      **Plaintiff Eastern Rhode Island Conservation District (ERICD)** is a conservation district serving Bristol and Newport Counties in Rhode Island. ERICD's mission is to promote and improve long-lasting and environmentally friendly practices that protect natural resources such as soil, water, and air. It works with a variety of people and groups including farmers, landowners, municipalities, schools, and others in the community.

3.      **Plaintiff Childhood Lead Action Project (CLAP)** is a locally based, nationally recognized 501(c)(3) nonprofit dedicated to the mission of eliminating childhood lead poisoning in Rhode Island. Since 1992, CLAP has worked to provide community input in every major lead poisoning prevention initiative in Rhode Island, spearheaded multiple campaigns to craft and implement groundbreaking lead poisoning prevention policy, and educated over 35,000 parents, tenants, homeowners, health workers, and others about lead dangers and resources.

4. **Plaintiff Codman Square Neighborhood Development Corporation (CSNDC)** is a nonprofit community development corporation based in Boston. CSNDC responds to the needs of its neighborhood community, particularly in the areas of affordable housing development, economic development, and community organizing.

5. **Plaintiff Green Infrastructure Center (GIC)** is a nonprofit based in Charlottesville, Virginia with offices and staff in Rhode Island. GIC helps local governments, communities, conservation groups, and developers evaluate their green infrastructure assets—that is, the interconnected network of waterways, wetlands, woodlands, greenways, parks, farms, ranches, and open spaces that contribute to people's health and quality of life—and make plans to conserve them.

6. **Plaintiff National Council of Nonprofits (NCN)** is the largest network of nonprofit organizations in North America, with more than 30,000 organizational members located in this District and across the country. NCN supports nonprofits in advancing their missions by identifying emerging trends, sharing proven practices, and promoting solutions that benefit charitable nonprofits and the communities they serve. NCN brings this case on behalf of its members.

7. **Defendant Department of Agriculture** is a federal agency headquartered in Washington, D.C. Its subagencies include the United States Forest Service and the Natural Resource Conservation Service.

8. **Defendant Brooke Rollins** is Secretary of Agriculture. She is sued in her official capacity.

9.     **Defendant Department of the Interior** is a federal agency also headquartered in Washington, D.C. Its subagencies include the National Park Service.

10.    **Defendant Doug Burgum** is Secretary of Interior. He is sued in his official capacity.

11.    **Defendant Department of Energy** is a federal agency headquartered in Washington, D.C.

12.    **Defendant Chris Wright** is Secretary of Energy. He is sued in his official capacity.

13.    **Defendant Environmental Protection Agency** is a federal agency headquartered in Washington, D.C.

14.    **Defendant Lee Zeldin** is Administrator of the EPA. He is sued in his official capacity.

15.    **Defendant Department of Housing and Urban Development** is a federal agency headquartered in Washington, D.C.

16.    **Defendant Scott Turner** is Secretary of Housing and Urban Development. He is sued in his official capacity.

17.    **Defendant Office of Management and Budget** is a federal agency headquartered in Washington, D.C.

18.    **Defendant Russell Vought** is the Director of OMB. He is sued in his official capacity.

19.    **Defendant Kevin Hassett** is Director of the National Economic Council and Assistant to the President for Economic Policy. He is sued in his official capacity.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*.

21.    Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this District.

## LEGAL FRAMEWORK

22.    The Inflation Reduction Act (IRA), Pub. L. 117-169, 136 Stat. 1818 (2022), is a landmark piece of legislation that aims to fight inflation, expand domestic manufacturing, lower energy costs, and reduce carbon emissions, among other notable goals.

23.    Among other things, the IRA authorizes and appropriates billions of dollars in funding for grants, loans, and other forms of federal financial assistance in order to advance these goals.

24.    Those programs are administered by various agencies. The Department of Agriculture, for example, administers billions of dollars in IRA funding, including $19.5 billion handled by the Natural Resources Conservation Service to help farmers, ranchers, and other landowners protect natural resources and enhance production, $13.2 billion to build electrification infrastructure, and $2.4 billion to relieve

thousands of distressed direct and guaranteed Farm Service Agency loan borrowers.[1] As of January 13, the EPA has awarded $38.4 billion in funds appropriated by the IRA, representing 93% of grant funding made available by the law.[2] And HUD has awarded more than $1.4 billion of IRA grant funding in housing investments under the Green and Resilient Retrofit Program, which protects residents in affordable housing by supporting energy and water efficiency, lowering polluting emissions, reducing housing operating and utility costs, and making homes more resilient to natural hazards.[3]

25.   The Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58, 135 Stat. 429 (2021), also referred to as the Bipartisan Infrastructure Law, or BIL, was enacted and signed into law in November 2021. It too funds a wide variety of critical projects and initiatives that are administered by different agencies.

26.   Among many other examples, EPA has awarded nearly $69 billion in IIJA funds to create jobs, lower energy costs, save families money, support clean

---

[1] Dep't of Agric., *Fact Sheet: Celebrating Two Years of the Inflation Reduction Act* (Aug. 16, 2024), https://perma.cc/X37S-NKKC.

[2] Press Release, Env't Prot. Agency, *New Report Celebrates EPA's Unprecedented Successes Under Biden-Harris Administration's Investing in America Agenda* (Jan. 13, 2025), https://perma.cc/DY67-J3U2.

[3] Dep't of Housing & Urban Dev., *HUD Successfully Delivers More Than $1.4 Billion in Housing Investments from President Biden's Inflation Reduction Act* (Nov. 19, 2024), https://perma.cc/EH7E-GUA7. This program also provided up to $4 billion in loans. Matthew Goldstein, *Federal Agency Pauses Program for Energy-Efficient Upgrades in Affordable Housing*, N.Y. Times (Mar. 13, 2025), https://perma.cc/5A5C-WW6C.

energy manufacturing, and help communities burdened by pollution.[4] This includes funding to ensure that water systems are safe and more resilient to natural disasters and cyber-attack threats; to improve air quality and create jobs at U.S. ports; and to eliminate the Superfund cleanup backlog. Interior has awarded IIJA funds to close open mine portals (protecting homes from landslides), clean up orphaned oil and gas wells, and support the federal wildland firefighting workforce.[5] And Energy has deployed its $97 billion in IIJA funding[6] to upgrade America's power grid to withstand wildfires, extreme weather, and other natural disasters; develop technology to improve the extraction of rare earth minerals; and deploy cybersecurity technology to protect electric utility systems.[7]

27.    In addition to the appropriations for grants funding created by the IRA and IIRA, the regulations that govern the administration of grants by the defendant agencies set out specific conditions and procedures for terminating and suspending grants. 2 C.F.R §§ 200.339-200.343 (2024).

---

[4] Press Release, Env't Prot. Agency, *New Report Celebrates EPA's Unprecedented Successes Under Biden-Harris Administration's Investing in America Agenda* (Jan. 13, 2025), https://perma.cc/DY67-J3U2.

[5] Dep't of Interior, *Fact Sheet: Through President Biden's Investing in America Agenda, the Interior Department is Helping Create Good Jobs in the Clean Energy Economy*, https://perma.cc/3D48-LX4Z (last visited Mar. 13, 2025).

[6] Dep't of Energy, *Infrastructure Program and Funding Announcements*, https://perma.cc/9GHB-2XBT (last visited Mar. 13, 2025).

[7] Dep't of Energy, *Infrastructure Programs at Department of Energy*, https://perma.cc/9WAU-H8UH (last visited Mar. 13, 2025); Dep't of Energy, *Rare Earth Security Activities*, https://perma.cc/QG69-S3ZC (last visited Mar. 13, 2025); Dep't of Energy, *Rural And Municipal Utility Advances Cybersecurity Grant And Technical Assistance Program*, https://perma.cc/7GWT-5BPX (last visited Mar. 13, 2025).

## FACTUAL ALLEGATIONS

*The Unleashing American Energy Executive Order and OMB Memo M-25-11*

28.    On January 20, 2025, President Trump signed an executive order entitled *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353. That order laid out, in Section 2, a nine-part "policy of the United States":

    a.    "to encourage energy exploration and production on Federal lands and waters";

    b.    "to establish our position as the leading producer and processor of non-fuel minerals, including rare earth minerals";

    c.    "to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory";

    d.    "to ensure that all regulatory requirements related to energy are grounded in clearly applicable law";

    e.    "to eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice";

    f.    "to safeguard the American people's freedom to choose from a variety of goods and appliances, including but not limited to lightbulbs, dishwashers, washing machines, gas stoves, water heaters, toilets, and shower heads, and to promote market competition and innovation within the manufacturing and appliance industries";

g.  "to ensure that the global effects of a rule, regulation, or action shall, whenever evaluated, be reported separately from its domestic costs and benefits";

h.  "to guarantee that all executive departments and agencies (agencies) provide opportunity for public comment and rigorous, peer-reviewed scientific analysis"; and

i.  "to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law."

29.    In Section 7, entitled "Terminating the Green New Deal," the executive order states: "All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations . . . and shall review their processes, policies, and programs for issuing grants, loans, contracts, or other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order."

30.    Section 7 further provides: "No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt."

31.    OMB adopted such review recommendations the next day, issuing a "Memorandum to the Heads of Departments and Agencies" numbered M-25-11. Ex. A. The subject line: "Guidance Regarding Section 7 of the Executive Order *Unleashing American Energy*." The memo was from Matthew J. Vaeth, the then-acting director of OMB, and Kevin Hassett, the Assistant to the President for Economic Policy and Director of the National Economic Council.

32.    The memo stated: "The directive in section 7 of the Executive Order entitled *Unleashing American Energy* requires agencies to immediately pause disbursement of funds appropriated under the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58). This pause only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order. This interpretation is consistent with section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and the policy outlined in section 2 of th[e] order'" (alteration in original).

33.    The memo continued: "For the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2. Agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget."

34.    OMB has limited statutory authority to establish governmentwide financial management policies for executive agencies and to provide them with

guidance on financial management matters. 31 U.S.C. § 503(a). OMB lacks statutory authority to direct executive agencies to undertake a blanket freeze of even a subset of funding appropriated by the IRA and IIJA. *Cf. Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239, 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025) (finding that OMB likely lacked statutory authority to direct broad halts of federal funding and explaining that OMB's statutory responsibilities to "provid[e] overall direction and establishing financial management policies do not clearly confer the power to halt all finances, full-stop, on a moment's notice").

*Defendants Have Broadly Frozen Funds Appropriated by the IRA and IIJA*

35.    Since the *Unleashing American Energy* order, Defendants have broadly frozen funding appropriated under the IRA and IIJA. They have halted payment of these funds—and halted other activities related to the payment of these funds, such as failing to take steps necessary to finalize the obligation of awarded grants and maintaining access to online portals through which grantees can draw on open awards—en masse and on a non-individualized basis.

36.    In doing so, numerous agencies have said outright what they were doing and why.

37.    For example, at EPA, on January 27, the acting chief financial officer sent a memorandum entitled "Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Pause." Ex. B at 1. The memo—which, it explained, was "being provided based on instruction from OMB—stated that "all disbursements for unliquidated obligations funded by any line of accounting including funds

appropriated by the [IRA and IIJA] are paused." *Id.* Likewise, "[i]n accordance with the Executive Order *Unleashing American Energy*, unobligated funds (including unobligated commitments) appropriated by the [IRA and IIJA] are paused." *Id.* According to the memo, "[t]his pause will allow for the review of processes, policies and programs as required by Section 7 of the Order." The memo further explains that "[a] process has been established at OMB for their review and approval of obligations and disbursements based on the Order." *Id.* at 2.[8]

38.    EPA officials have acted accordingly to carry out the freeze on IRA and IIJA-appropriated funds. Officials sent grant recipients an e-mail on January 28 with the subject "Pause EPA Grants." That e-mail stated: "Dear Grant Recipient, EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." Ex. C.

39.    In a subsequent memo (undated, but issued after February 3), EPA's acting deputy administrator described "EPA's mission and our moral

_____

[8] On February 4, EPA's CFO issued an "Update on Inflation Reduction Act and Infrastructure Investment and Jobs Act Pause" in response to court orders in other cases, directing that "federal financial assistance shall not be paused based on . . . the President's Executive Orders, while ongoing litigation proceeds or until otherwise directed by a Court." Ex. D at 1. Nonetheless, as alleged below, EPA has continued to freeze payments on IRA and IIJA funds. In any event, the court order to which that update referred has since expired.

responsibility to be good stewards of our environment for generations to come." Ex. E at 1. Expressing concerns about "the need for oversight of funds provided to [EPA] in the Inflation Reduction Act," and "potential waste, fraud, and abuse of hard-earned American taxpayer dollars," the memo directs EPA to "immediately initiate and conduct an internal review of all relevant grant programs, grant awards, grants that have not yet been awarded and obligated to specific individuals or entities (e.g., notices of funding opportunities), and issued grants." *Id.* at 1–2. "This includes a review of payments on all grant programs and awards where Agency personnel suspect that the grant is unlawful or contrary to Agency policy priorities, or suspect that the grant program implementation or payment might be fraudulent, abusive, duplicative, or implemented in a way that failed to safeguard Agency dollars." *Id.* at 2.

40.    On February 7, EPA's Budget and Planning e-mail address sent an e-mail with the subject: "RE: Additional information on IIJA and IRA - program review pause."[9] The e-mail stated: "Pursuant to the review of financial assistance programs announced by the Acting Deputy Administrator on February 6, the following accounts are temporarily paused for new obligations or disbursements for assistance agreements, loans, rebates, interagency agreements, procurements, and no-cost actions pending a review for compliance with applicable administrative rules and policies."

---

[9] Brad Johnson, *Trump EPA Again Freezes All Biden-Era Programs*, Hill Heat (Feb. 10, 2025), https://perma.cc/4CAN-3U52.

41.     As reflected in a March 7 letter from Senator Sheldon Whitehouse to EPA Administrator Lee Zeldin, EPA has recently informed senior staff that "all [funding] actions greater than $50,000 now require approval from an EPA DOGE Team member." *See* Ex. F. This process requires the program office to complete and sign an "EO Compliance Review Form" for every funding action to facilitate that review. *Id.* That form requires an explanation of how the funding action "complies with Executive Order requirements." *Id.* at 6. These actions are consistent with the "freeze first, ask questions later" approach Defendants have adopted to releasing funding.

42.     The Department of the Interior initiated a review of funding under the IRA and IIJA following the *Unleashing American Energy* executive order,[10] and has "frozen billions in grants and loans stemming from those two bills" pending that review.[11] As one example, the National Park Service, a component of Interior, has refused to release funding appropriated by the IRA and IIJA. In communications with grant recipients, the National Park Service has stated that "NPS FA [financial assistance] agreements that include BIL or IRA funding" will remain frozen.[12] As a

---

[10] Sec'y of the Interior, Order No. 3418, *Unleashing American Energy* (Feb. 3, 2025), https://perma.cc/6CUZ-A89U.

[11] Austin Corona, *Will Trump Review Lead to Smaller Monuments, More Mines on Public Lands? What to Know*, Ariz. Republic (Feb. 28, 2025), https://perma.cc/BYF8-QWMZ.

[12] *See also* Ex. G at 1 (email from Department of the Interior grant officer referring a grantee to OMB Memo M-25-11 "regarding the funding pause").

result, members of Plaintiff NCN and others have been unable to access funds on open grants administered by the Department of the Interior.

43.    The Department of Agriculture has likewise broadly frozen IRA and IIJA funding following the *Unleashing American Energy* executive order. Only on February 20 did it announce that "the first tranche of funding that was paused due to the review of funding in the Inflation Reduction Act (IRA)" would be released—a mere $20 million out of the many billions of dollars in IRA funding that the agency administers.[13] That statement acknowledges both the agency's broad freeze of IRA funding and the immense scope of USDA funding that remains under a blanket freeze. In short, the announcement confirms Plaintiff NCN's members' experiences that USDA is taking precisely the "freeze first, ask questions later" tactic that they challenge.

44.    Indeed, Agriculture grant recipients have received e-mails explicitly linking the freeze to recent executive orders, including *Unleashing American Energy*, and stating that "USDA leaders have been directed to assess whether grants, loans, contracts, and other disbursements align with the new administration's policies." Ex. H. This is consistent with reporting that IRA grant recipients under USDA were "shut out of the federal grant portal that is used to distribute money."[14] The USDA

---

[13] Press Release, Dep't of Agric., *Secretary Rollins Releases the First Tranche of Funding Under Review* (Feb. 20, 2025), https://perma.cc/UD67-F97T.

[14] Jeremy Herbet al., *'People Are Just Flipping Out': Billions in Federal Funding Remain Frozen Despite Court Orders to Keep the Taps Open*, CNN (Feb. 13, 2025), https://perma.cc/PHT3-GAJQ.

has given no indication that any further "tranches" of funding have been released from the blanket freeze.

45.     This blanket freeze has affected numerous programs at Agriculture. For example, the IRA provides $1.5 billion in funding for the Urban and Community Forestry Program. Pub. L. 117-169, § 23003(a), 136 Stat. 1818, 2026 (2022). That program is administered by the U.S. Forest Service, a component of the Department of Agriculture. The Urban and Community Forestry Program provides grants to support efforts by states and partner organizations to plant and maintain community trees, forests, and green spaces, including in disadvantaged areas. Because of the freeze, Plaintiffs WRWC and GIC, other members of Plaintiff NCN, and countless others have been unable to access funds on open grants through that program.

46.     As another example, the IRA appropriates nearly $5 billion in funding until fiscal year 2026 for the Regional Conservation Partnership Program. Pub. L. 117-169, § 21001(a)(4). That program is administered by the Natural Resource Conservation Service, a component of the Department of Agriculture. The Regional Conservation Partnership Program provides funding for public-private conservation projects by landowners and communities. In an email to program grant recipients dated March 11, NRCS stated that it would begin to authorize payments on existing grants "except for IRA/BIL funded agreements." As a result, members of Plaintiff NCN and others have been unable to access funds on open grants through that program.

47.    As to the Department of Energy, the then-Acting Secretary announced on January 20 that the agency would conduct a review of all its activities—specifically including "Funding Actions" such as actions relating to "loans, loan guarantees, [and] grants"—"to ensure all such actions are consistent with current Administration policies and priorities, including budgetary priorities." Ex. I at 1-2.

48.    Reporting indicates that IRA grant recipients under Energy were "shut out of the federal grant portal that is used to distribute money."[15] Reporting has also revealed that the Department of Energy froze grants related to the IRA and IIJA, ultimately requiring review and approval by a political appointee before disbursement.[16] As that reporting explains, because there are "easily thousands of transactions a week that a political appointee would suddenly now have to approve," payments from these funding lines "just won't get made or may be made late." *Supra* note 15.

49.    As one example of the effect of that freeze: The IIJA appropriates $3.5 billion in funding for the Weatherization Assistance Program. Pub. L. 117-58, § 40551, 135 Stat. 448, 1075-76 (2021). That program is administered by the Department of Energy and enables low-income families to permanently reduce their energy bills by making their households more energy efficient. As a result of the freeze, members of Plaintiff NCN and others have been unable to access funds on open grants through that program.

---

[15] Jean Chemnick, *Effects of Trump's Spending Freeze Ripple Across Energy Projects*, Politico (Feb. 6, 2025), https://perma.cc/NCT2-9AYS.

[16] *Id.*

50.    HUD, too, has frozen IRA appropriations under its Green and Resilient Retrofit program. *See supra* n.3. HUD has claimed that the program is, in the words of one news report, "being reviewed to ensure it was carried out consistent with the housing agency's core mission to promote affordable housing." *Id.*[17] But HUD has communicated to grant recipients that the freeze was due to the *Unleashing American Energy* executive order. As a result of this freeze, CSNDC and others have been unable to access funds on open grants through that program.

51.    Because of these broad freezes, funding appropriated by the IRA and IIJA for particular grant programs has halted. The handful of examples described above are merely evidence of a much wider freeze; Defendants have broadly frozen numerous other sources of funding appropriated by the IRA and IIJA.

52.    On information and belief, OMB has acted in concert with the other agency defendants to freeze funding appropriated by the IRA and IIJA.

53.    First, OMB has directed agencies to freeze funds "for objectives that contravene the policies established in section 2" of the *Unleashing American Energy* executive order, without legal basis, and without explaining how an agency should determine what "contravene[s]" those policies.

---

[17] Earlier reporting suggested that HUD was halting this program indefinitely, before HUD issued this statement regarding a "review." *See, e.g.*, Jesse Bedayn, *Affordable Housing Threatened as Trump Halts $1 Billion Slated for Extending Life of Aging Buildings*, Associated Press (March 12, 2025), https://apnews.com/article/trump-doge-affordable-housing-preservation-crisis-de27d7846271779157550fcec0a78ea6. Whatever the precise terminology HUD employs, the impact is the same: an indefinite halt to this congressionally appropriated funding.

54. Second, OMB has directed agencies that they "may disburse funds as they deem necessary after consulting with the Office of Management and Budget." On information and belief, to the extent that agencies have consulted with OMB about the disbursement of funds they deem necessary, OMB has acted unreasonably and without basis in withholding that consent, and requiring the agencies to continue withholding funds.

55. Officials affiliated with DOGE (encompassing the Department of Government Efficiency, the U.S. DOGE Service, and/or the DOGE Service Temporary Organization) have helped or directed EPA to freeze funding appropriated by the IRA and IIJA. On information and belief, officials affiliated with DOGE have done the same at other defendant agencies. DOGE lacks any statutory authority to itself freeze this funding.

*Defendants' Freezes of These Funding Lines Are Final Agency Action*

56. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

57. Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

58. Each Defendant's freeze on funding appropriated by the IRA and IIJA is final agency action subject to the Court's review.

59.     The freeze of funds appropriated by the IRA and IIJA marks the consummation of the agencies' decisionmaking process because it immediately suspends the processing and payment of funding appropriated by the IRA and IIJA.

60.     The freeze of funds appropriated by the IRA and IIJA is also an action by which rights or obligations have been determined or from which legal consequences will flow because it halts the processing and payment of funding appropriated by the IRA and IIJA that would otherwise be paid.

## PLAINTIFFS' INJURIES

61.     Defendants' freeze of funding appropriated by the IRA and IIJA has caused, and if not enjoined will continue to cause, serious and irreversible harm to Plaintiffs' members and many others.

62.     Countless states, localities, businesses, and nonprofits—including Plaintiffs and other members of NCN—have been awarded grants and other financial assistance through the IRA and IIJA. That money funds vital programs ranging from wildfire prevention efforts to lead pipe remediation to efforts to control and contain invasive species to important scientific and ecological research to reforestation efforts and much more.

63.     Many of the recipients of such funding—and, in particular, nonprofit recipients such as Plaintiffs and other NCN members—rely on those sources of funding in order to hire and pay staff, carry out what are frequently multiyear projects for the benefit of the communities where they operate, and plan for the future.

64.    Defendants' freeze has already seriously damaged those nonprofits' ability to carry out their core missions and led them to have to halt ongoing projects.

65.    For example, WRWC has a $1 million grant (as a subgrantee) funded by the U.S. Forest Service—but it has been frozen since January because the grant was funded under the IRA. That freeze has completely halted WRWC's planned project of building capacity for urban forestry along the Woonasquatucket Greenway, and also disrupted WRWC's operations more broadly.

66.    ERICD has a nearly $350,000 grant from EPA (as a subgrantee) that is funded under the IRA. Those funds were intended to support education and outreach efforts to reduce food waste and its negative impacts on the environment, including setting up the first municipal composting site in Rhode Island. But because ERICD's grant has been frozen on and off for weeks, it hasn't been able to carry out the work it planned. ERICD is also a subgrantee of a USDA grant funded by the IRA—and that grant has remained completely frozen since January. ERICD planned to use that money to hire another full-time staff person to help farmers use technology and data to grow more efficiently and sustainably. But because of the freeze, ERICD has not been able to hire that staff person, and so fewer farmers receive help.

67.    CLAP is unable to access a critical $500,000 grant administered by the EPA that it needs in order to carry out an initiative to combat childhood lead poisoning in Providence, Rhode Island. That initiative was to include trainings for contractors and other workers on lead-safe practices that are needed to keep those workers healthy and to avoid contaminating the homes in which they work with lead

particles. CLAP also intends to use the grant to fund efforts to coordinate local and state officials to ensure landlords are operating in compliance with lead-safety laws. CLAP is a small organization that lacks the resources to carry out these projects on anything like the same scale if their already awarded EPA grant remains frozen. Already, they have had to defer hiring an extra staff member because of the freeze. As a result, CLAP has been significantly hampered in its ability to carry out its vital mission, to the detriment of CLAP itself and the community it serves.

68.     CSNDC has been awarded a $750,000 grant from HUD, funded under the IRA. CSNDC has planned to use these funds to rehab and renovate a thirty-one-unit affordable housing unit for older residents, including upgrading ventilation systems and better weatherizing the units to increase energy efficiency. These improvements will not only help the environment; they will also save CSNDC money it can then put towards other initiatives, and it will improve air quality for vulnerable, low-income seniors in an area with high asthma rates. But even though the grant has been awarded, the grant agreement has been fully negotiated, and CSNDC has executed the agreement, HUD has refused to take any further steps, including executing the finalized agreement and disbursing funds—because of the funding freeze. As a result, CSNDC will not be able to complete the project on the scale it had planned, losing money for its mission and impacting its senior residents' health.

69.     GIC, one of NCN's members that operates in Rhode Island and several other states, receives both IRA and IIJA funding. Those grants make up fully

80 percent of their budget. Their IRA funding comes through the Department of Agriculture and goes toward efforts to plant and maintain community trees, forests, and green spaces, including in disadvantaged areas.

70.    GIC has had to stop work as a result of the Department of Agriculture's freeze on funding. They hired new staff specifically to complete IRA-funded work but now have had to furlough some staff and, if the funds remain frozen, will need to lay off not only their new hires but the rest of their staff as well. They have been unable to plan for the future and do not know, for example, whether they will have the money to pay for trees they need to order now to have ready for planting seasons in the fall. They worked hard to build trust in communities that are frequently skeptical of government programs in order to be able to successfully carry out long-term projects; the freeze has shattered that trust.

71.    Another NCN member carries out research and conservation work to protect giant sequoias and other large trees. They rely on funds from both the IRA and IIJA from the Department of Interior. Because of Defendants' funding freeze, they have been unable to draw on IRA-appropriated funds through a grant supporting work to research and monitor bark beetles that can infest and kill giant sequoia trees.

72.    If the freeze continues, the group is likely to have to postpone the project until next year, even as bark beetles are currently in the process of attacking ancient trees that cannot be replaced. Halting that data collection will have cascading impacts on their scientific progress as well. And because of the funding freeze, the

group has already had to postpone hiring a new full-time employee to add to their staff of four, as well as hiring up to six part-time contractors. Not being able to add that extra capacity has a meaningful impact on the amount of work the group is able to do to fulfill its mission.

73.    Another NCN member is dedicated to watershed protection and restoration in a Western state. They too receive funds appropriated under the IRA and IIJA for a number of different projects but have seen funds administered by the Department of Agriculture frozen as a result of Defendants' actions.

74.    That freeze has already put on hold a land-management project to clear vegetation in order to reduce the risk of wildfires and improve habitat and water quality in the area. Keeping that project on ice increases the danger of wildfires this summer and threatens local water quality. It is also already hurting the group. They hired new staff in reliance on a grant of IRA funds they cannot currently access. As a result, they do not know how much longer they will be able to continue paying their new employee or when their work might resume.

75.    Yet another NCN member, which engages hundreds of youth and young adults in programs to improve access to outdoor recreation, restore natural habitats, protect waterways, and respond to community needs and natural disasters, has approximately $621,000 in federal grants from Interior frozen.

76.    As a result, that organization can no longer use those funds as planned to support an invasive plant management team that would work with national parks in the central United States. That will result in potentially thousands of acres not

being managed, with negative impacts for visitors to public lands, hunting and fishing, and wildlife populations due to loss of habitat. And the organization cannot make up for that delay: If they are ever able to manage these invasive species in the future, it will be more difficult and more expensive because they will have spread more.

77.    And yet another NCN member runs a weatherization training center, which helps weatherize the homes of low-income Americans in an effort to lower their utility bills when they are struggling to make ends meet, which helps them stay in their homes and also improves air quality and health and safety in the home. That member typically trains over 200 people in about 40 classes per year. But the funding for that weatherization program comes entirely from IIJA funds awarded by the Department of Energy, and those funds have been frozen since January.

78.    As a result, that member has had to stop offering weatherization training, which means that people living in poverty are less safe in their homes and less able to make ends meet. Because of the funding freeze, that member has also had to pause all work on a two-year program to gain expertise in offering training to weatherization departments, which would ultimately enable them to weatherize more homes. And the member has had to cancel a planned conference, undermining their relationships with speakers and attendees from their community.

79.    These stories are just a few examples of a much broader picture of instability, confusion, and irreparable harm created by Defendants' actions.

## CLAIMS FOR RELIEF

### Count One
### Violation of the Administrative Procedure Act—706(2)(A)
### Arbitrary and Capricious
### (Against All Defendants)

80.    Plaintiffs reallege all paragraphs above as if fully set forth here.

81.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

82.    Defendants' freeze on funding appropriated by the IRA and IIJA is arbitrary and capricious in multiple respects. Several examples follow.

83.    First, Defendants' funding freeze fails to account for the catastrophic practical consequences that it has already produced and, if not stopped, will continue to produce. In this and other respects, Defendants "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

84.    Second, Defendants' funding freeze fails to account for the substantial reliance interests in the ordinary processing and disbursement of funding authorized by the IRA and IIJA that the freeze radically disrupts. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

85.    Third, Defendants' funding freeze contradicts Defendant OMB's own directive. That directive instructs agencies that the order to pause funding in the

*Unleashing American Energy* executive order does not apply to all funding authorized by the IRA and IIJA but only "to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." Defendants, however, have continued to pause funding authorized by the IRA and IIJA well outside that scope. By freezing funding without reason and in contravention of the administration's own interpretation of the executive order, Defendants have acted arbitrarily and capriciously.

86. Defendants Department of Agriculture, Department of Energy, Department of the Interior, Department of Housing and Urban Development, EPA, and their leaders have acted arbitrarily and capriciously by halting funding appropriated by the IRA and IIJA.

87. In addition or in the alternative, on information and belief, Defendants OMB, Director Vought, and Director Hassert have acted arbitrarily and capriciously by withholding purportedly necessary approvals to the other Defendants to release funding appropriated by the IRA and IIJA.

### Count Two
### Administrative Procedure Act–706(2)(C)
### In Excess of Statutory Authority
### (Against All Defendants)

88. Plaintiffs reallege all paragraphs above as if fully set forth here.

89. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

90. "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

91. No statutory provision authorizes Defendants Department of Agriculture, Department of Energy, Department of the Interior, or EPA to freeze funding appropriated by the IRA and IIJA.

92. Defendants Department of Agriculture, Department of Energy, Department of the Interior, Department of Housing and Urban Development, EPA, and their leaders therefore have acted in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in withholding those funds.

93. In addition or in the alternative, on information and belief, Defendants OMB, Director Vought, and Director Hassett have acted in excess of statutory authority by withholding purportedly necessary approvals to the other Defendants to release funding authorized by the IRA and IIJA.

94. OMB's organic statute gives it responsibilities for establishing financial management policies and requirements for executive agencies, *see* 31 U.S.C. §§ 503(a), 504, which can include providing guidance to agencies on understanding executive orders.

95. But no statutory provision authorizes OMB, Director Vought, or Director Hassett to require executive agencies to freeze funding authorized by the IRA and IIJA.

### Count Three
### Administrative Procedure Act–706(2)(A)
### Contrary to Law
### (Against All Defendants)

96.     Plaintiffs reallege all paragraphs above as if fully set forth here.

97.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

98.     The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

99.     The IRA and IIJA appropriate money for specific purposes and expressly direct that the money be put to those purposes.

100.    By freezing funds appropriated under the IRA and IIJA and refusing to direct that money to the purposes Congress specified in those laws, Defendants are acting contrary to law.

101.    The regulations that govern the administration of grants by Defendants Department of Agriculture, Department of Energy, Department of the Interior, Department of Housing and Urban Development, and EPA set out specific conditions and procedures for terminating and suspending grants.

102.    Defendants have not followed the procedures set out in those governing regulations and have frozen grants in circumstances in which the regulations would not allow those grants to be terminated or suspended. By doing so, Defendants are acting contrary to law.

103.     In addition or in the alternative, on information and belief, Defendants OMB, Director Vought, and Director Hassert have acted contrary to law by withholding purportedly necessary approvals to the other Defendants to release funding appropriated by the IRA and IIJA.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter the following relief:

a.     Declare unlawful and set aside Defendants' freeze on funding appropriated by the IRA and IIJA as arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and not in accordance with law under 5 U.S.C. § 706(2)(A);

b.     For the same reasons, declare and hold unlawful OMB Memo M-25-11 insofar as it directs agencies to freeze any funding authorized by the IRA and IIJA;

c.     Issue preliminary and permanent relief, including a stay under 5 U.S.C. § 705, barring Defendants, their officers, employees, and agents from continuing to carry out the freeze on funding appropriated by the IRA and IIJA and requiring the processing and disbursement of funding previously frozen;

d.     Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate;

e.     Grant such other relief as the Court deems necessary, just, and proper.

Dated: March 17, 2025               Respectfully submitted,

/s/ Miriam Weizenbaum

Miriam Weizenbaum (RI Bar No. 5182)
DeLuca, Weizenbaum, Barry & Revens

199 North Main Street
Providence, RI 02903
(401) 453-1500
miriam@dwbrlaw.com

Kevin E. Friedl* (Admitted only in New
York; practice supervised by D.C. Bar
members)
Jessica Anne Morton* (DC Bar No.
1032316)
Robin F. Thurston* (DC Bar No. 1531399)
Skye L. Perryman* (D.C. Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

 *admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On March 17, 2025, I caused the foregoing and accompanying exhibits to be served by certified mail on Defendants, the Attorney General, and the U.S. Attorney's Office for the District of Rhode Island at the below addresses. On the same day, I further caused these documents to be served via email on Alex Haas, Diane Kelleher, and John Griffiths, Assistant Directors, Federal Programs Branch, Department of Justice, and on Kevin Hubbard, Civil Chief, U.S. Attorney's Office for the District of Rhode Island.

Department of Agriculture and
Secretary Brooke Rollins
Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

Department of Energy and
Secretary Chris Wright
1000 Independence Ave., SW
Washington, DC 20585

Department of the Interior and
Secretary Doug Burgum
1849 C Street, N.W.
Washington DC 20240

Environmental Protection Agency
and Administrator Lee Zeldin
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Department of Housing and Urban
Development and Secretary Scott
Turner
451 Seventh Street, S.W.
Washington, DC 20410

Office of Management and Budget
and Director Russell Vought
725 17th Street, NW
Washington, DC 20503

Attorney General Pam Bondi
Department of Justice
950 Pennsylvania Avenue, NW,
Washington, DC 20530

Director Kevin Hassett
National Economic Council
1600 Pennsylvania Ave NW
Washington, DC 20500

United States Attorney's Office
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

/s/ Miriam Weizenbaum
Miriam Weizenbaum