## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WOONASQUATUCKET RIVER WATERSHED COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00097-MSM-PAS |
| DEPARTMENT OF AGRICULTURE, *et al.*, | |
| *Defendants*. | |

### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Since taking office, the Trump administration has cut off federal funding for vital services and projects in this District and across the country. A series of unprecedented and sweeping executive orders and agency directives have halted duly authorized payments and processing of grants, loans, reimbursements, and other financial assistance. That funding is critical to sustain programs that touch nearly every aspect of American life.

Without regard for the consequences, the administration has pulled the rug out from under those programs and the communities that rely on them. The full extent of the harm caused by those efforts is still unfolding and "difficult to fully grasp," but already they have led to "chaos" and "far-reaching effects." *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (*NCN I*); *see also New York v. Trump*, No. 1:25-cv-39, 2025 WL 715621, at *14 (D.R.I. Mar. 6, 2025) (finding that precipitous halt to federal funding "threaten[s] the loss of

essential services to protect the health, safety, and welfare of the States' residents"), *appeal pending*, No. 25-1236 (1st Cir.).[1]

This case concerns one important part of that broader assault that continues to harm Plaintiffs here, along with countless others: the freeze on billions of dollars in funding appropriated by two laws passed by Congress during the prior administration, the Inflation Reduction Act and the Infrastructure Investment and Jobs Act (also known as the Bipartisan Infrastructure Law). These laws support projects that keep children safe from lead exposure, renovate homes of low-income Americans to keep them safe from mold and carbon monoxide exposure, help family farms make the most of technology to stay in business, conserve irreplaceable natural resources, promote resilience in the face of natural disasters, support local economies, and much more. But—without regard for the importance of that work, and the many people who rely on it—the administration has chosen to broadly and indiscriminately put a stop to it all.

Defendants the Departments of Agriculture, Energy, Interior, and Housing and Urban Development, EPA, and those agencies' leadership, with assistance from Defendant the Office of Management and Budget, have each acted to halt funding authorized by the IRA and IIJA. In doing so, they have acted unlawfully. Their freeze

---

[1] Already, numerous courts have considered these attacks on funding, found them to be likely unlawful, and ordered preliminary relief. *E.g.*, *New York v. Trump*, 2025 WL 715621; *California v. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825 (D. Mass. Mar. 10, 2025) *(California)*, *appeal pending*, No. 25-1244 (1st Cir.); *Aids Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025); *Massachusetts v. Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) *(Massachusetts v. NIH)*; *NCN I*, 2025 WL 368852.

of IRA and IIJA funding is blatantly arbitrary and capricious, including because it fails to account for the significant reliance interests of grantees and other recipients who reasonably expect—and need—to be able to draw on open awards of funding in order to provide services. That freeze is also being undertaken without statutory authority and is contrary to law, including the regulations that govern the handling of federal grants. Plaintiffs therefore are highly likely to show that Defendants' actions to interrupt congressionally mandated funding violate the Administrative Procedure Act. Those actions are causing, and if not enjoined will continue to cause, serious and irreparable harms to Plaintiffs, Plaintiff National Council of Nonprofits' members, and countless others nationwide. Those factors, plus the public interest, strongly favor an immediate injunction to stop Defendants' devastating and unlawful acts.[2]

## BACKGROUND

### A. Congress enacts the Inflation Reduction Act and Infrastructure Investment and Jobs Act to fund important services and programs.

The Inflation Reduction Act (IRA), Pub. L. 117-169, 136 Stat. 1818 (2022), and the Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58, 135 Stat. 429 (2021), also referred to as the Bipartisan Infrastructure Law, or BIL, are significant pieces of legislation passed during the previous presidential administration. Each law appropriates and allocates billions of dollars for federal programs and projects that Congress determined were important and in the national interest. Those projects are

---

[2] Pursuant to Local Civil Rule 7(c), Plaintiffs respectfully request oral argument, and estimate that each party would require approximately half an hour.

wide-ranging and include promoting domestic energy security, combating climate change, conservation initiatives, modernizing and expanding American infrastructure, programs to promote health and safety, and expanding broadband access. Congress chose to pursue many of these objectives by way of grants, loans, and other financial assistance programs to nonprofit organizations and others who would play a key role in carrying out the actual work on the ground.

## B. President Trump directs an immediate freeze on funding appropriated by the IRA and IIJA.

From day one, the new presidential administration has engaged in an unprecedented effort to restrict and disrupt the orderly flow of federal financial assistance—including assistance that has already been awarded and on which recipients reasonably rely in order to conduct business, provide services, and otherwise undertake the projects for which they receive funding. *See Aids Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378 (preliminarily enjoining freeze on foreign aid programs); *Massachusetts v. NIH*, 2025 WL 702163, at *1 (preliminarily enjoining cuts to biomedical research); *New York v. Trump*, 2025 WL 357368 (D.R.I. Jan. 31, 2025) (issuing temporary restraining order to halt freeze on essentially all federal financial assistance programs); *Nat'l Council of Nonprofits v. Office of Management & Budget*, 2025 WL 314433 (D.D.C. Jan. 28, 2025) (issuing administrative stay to halt that freeze).

Plaintiffs here seek relief as to one particular—and highly significant—part of the administration's overall assault on federal funding: the ongoing freeze on the processing and payment of funding appropriated under the IRA and IIJA.

President Trump directed that such funds be halted in a day-one executive order, *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025). Section 7(a) of that order commands "[a]ll agencies" to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]." *Id.* at 8357. It further tells agencies to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." *Id.*

Section 2, in turn, sets out nine policy objectives, such as "encourag[ing] energy exploration and production on Federal lands and waters" and "ensuring that an abundant supply of reliable energy is readily accessible." *Id.* at 8353. The order goes on to state that:

> No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

*Id.* at 8357.

The order provides no explanation why it targets those two laws in particular and likewise does not explain why an immediate halt to the congressionally authorized spending in those statutes is necessary.

**C. Defendants act to freeze IRA and IIJA funding.**

Following the *Unleashing* order, Defendants took steps to broadly halt the processing and payment of funding appropriated under the IRA and IIJA.

The day after the *Unleashing* order, Defendant OMB issued a memorandum, M-25-11, titled *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy*. Ex. A, ECF No. 21-1. That memo directs agencies—including the Departments of Agriculture, Energy, Interior, HUD, and EPA—to "immediately pause" disbursement of IRA and IIJA funds "that may be implicated by" or "that contravene" the policies in Section 2 of the *Unleashing* order. It further states that "[a]gency heads may disburse funds as they deem necessary *after consulting with the Office of Management and Budget*." Ex. A, ECF No. 21-1 (emphasis added).

Defendants the Departments of Agriculture, Energy, Interior, HUD, and EPA have broadly frozen funding appropriated under the IRA and IIJA—including, in many instances, funding that in no way implicates or contravenes any of the policies listed in Section 2 of the *Unleashing* order.

In numerous instances, Defendants have openly announced these decisions. The Department of Agriculture, for example, has explained: that it will not process reimbursements "due to the recent executive orders issued under the Trump Administration," *see* Ex. J; that "payments on contracts funded through the Inflation Reduction Act are currently on pause"; that "President Trump signed an Executive Order that placed a freeze on spending authorized by the [IRA] and the [IIJA]"; and that "USDA leaders have been directed to assess whether grants, loans, contracts, and other disbursements align with the new administration's policies," Ex. K.

Last month, Secretary of Agriculture Brooke Rollins announced that the Department would "release the first tranche of funding that was paused due to the

review of funding in the Inflation Reduction Act"—a mere $20 million out of the billions in IRA funding that agency administers. Press Release, Dep't of Agric., *Secretary Rollins Releases the First Tranche of Funding Under Review* (Feb. 20, 2025), https://perma.cc/UD67-F97T. Agriculture has continued to withhold other IRA-appropriated funds. *See, e.g.*, Ex. M ¶ 7; Ex. N ¶¶ 14–15; Ex. O ¶¶ 12–13.

The week after the *Unleashing* order, EPA issued a memorandum—"based on instruction from OMB"—directing a freeze on IRA and IIJA funds "to allow for the review of processes, policies, and programs as required by Section 7" of that order. Ex. B, ECF No. 21-2. Following that memo, EPA sent grant recipients an email stating that "EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order" and that therefore "[t]he agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time." Ex. C, ECF No. 21-3. The message further stated that "EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." *Id.*

A subsequent memo cited purported concerns about "the need for oversight of funds provided to [EPA] in the Inflation Reduction Act" and "potential waste, fraud, and abuse of hard-earned American taxpayer dollars." Ex. E, ECF No. 21-5. The memo also described "EPA's mission and our moral responsibility to be good stewards of our environment for generations to come." The memo therefore ordered an immediate review of grant payments "where Agency personnel suspect that the grant is unlawful or contrary to Agency policy priorities, or suspect that the grant

7

program implementation or payment might be fraudulent, abusive, duplicative, or implemented in a way that failed to safeguard Agency dollars." *Id.*

Further correspondence with grant recipients confirmed that IRA and IIJA funding lines were "temporarily paused . . . pending a review for compliance with applicable administrative rules and policies."[3] Consistent with those admissions, EPA has continued to withhold disbursement of IRA and IIJA funding. *E.g.*, Ex. P ¶¶ 7, 12–15; Ex. Q ¶¶ 9–11.

At the Department of Interior, Secretary Burgum initiated a review of funding under the IRA and IIJA soon after the *Unleashing* order and froze funding pending that review. Sec'y of the Interior, Order No. 3418, *Unleashing American Energy* (Feb. 3, 2025), https://perma.cc/6CUZ-A89U; Austin Corona, *Will Trump Review Lead to Smaller Monuments, More Mines on Public Lands? What to Know*, Ariz. Republic (Feb. 28, 2025), https://perma.cc/BYF8-QWMZ. In communications with grant recipients, Interior officials have answered questions about the inaccessibility of funds by referring them to OMB Memo M-25-11, Ex. G, ECF No. 21-7, and have also informed grantees that financial assistance agreements administered by the National Park Service, a subagency of Interior, will remain frozen if they "include BIL or IRA funding." Ex. R ¶ 12. Consistent with those statements, grantees with IRA or IIJA funding administered by Interior and its subagencies have been unable to access their awarded funds. *E.g.*, Ex. S ¶¶ 4–5; Ex. R ¶¶ 5, 11–13.

---

[3] Brad Johnson, *Trump EPA Again Freezes All Biden-Era Programs*, Hill Heat (Feb. 10, 2025), https://perma.cc/4CAN-3U52.

Energy likewise halted the processing and payment of much IRA and IIJA funding. Energy issued a memorandum announcing "a review under varying criteria . . . to ensure all [program and administrative] actions are consistent with current Administration policies and priorities, including budgetary priorities." Ex. I at 1, ECF No. 21-9. The memo stated that "[t]he reviews are necessary to facilitate a comprehensive review of the Department's ongoing activities and to align these efforts with Congressional authorizations and the Administration's priorities, to ensure that resources are allocated efficiently, and that the Department's initiatives are in line with the statutory mission of DOE and the priorities of the Administration." *Id.* As to "Funding Actions" in particular, Energy announced a freeze on all activities "until a review of such takes place to ensure compliance with Congressional authorization and Administration policy." *Id.* at 2. Consistent with those statements, grantees with Energy IIJA funding have been unable to access these awards. *E.g.*, Ex. T ¶¶ 11–12.

HUD, too, has frozen IRA appropriations under its Green and Resilient Retrofit program and specifically cited the *Unleashing* order in correspondence with grant recipients whose funds it refuses to release. Am. Compl. ¶ 50; Ex. L ¶ 10.

### D. Related litigation against Defendants' unlawful freeze has not ended that freeze with respect to Plaintiffs and others similarly situated.

In January, a coalition of 22 states and the District of Columbia filed suit in this District, seeking to challenge implementation of an OMB memo that commanded a near-immediate halt to all federal financial assistance. Compl., *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Jan. 28, 2025). The states subsequently filed an amended

complaint that also expressly challenged the *Unleashing* order and the related OMB Memo M-25-11. Am. Compl., *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Feb. 13, 2025).

Judge McConnell issued a temporary restraining order barring the defendant federal agencies and officers from "affect[ing] a pause, freeze, impediment, block, cancellation, or termination" of federal financial assistance. *New York v. Trump*, 2025 WL 357368, at *5 (Jan. 31, 2025). In a subsequent order, that Court made clear the broad scope of the preliminary relief it had ordered and further emphasized that its order applied to any funding freeze "based on the President's 2025 Executive Orders," specifically including "Section 7(a) of the *Unleashing* Executive Order," as well as the related OMB Memo M-25-11. *New York v. Trump*, 2025 WL 440873, at *1–2 (D.R.I. Feb. 10, 2025).

After further briefing and a hearing, Judge McConnell replaced the temporary restraining order with a preliminary injunction. *New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025). As relevant here, that Court concluded that "the Agency Defendants' implementation of a categorical federal funding freeze, under . . . Section 7(a) of the *Unleashing* EO," constituted "final agency action" subject to review under the Administrative Procedure Act. *Id.* at *8; *see generally* 5 U.S.C. § 704. That Court found that the plaintiff states were likely to succeed on their claims that the freeze was contrary to law, *New York v. Trump*, 2025 WL 715621, at *9–11, as well as arbitrary and capricious, *id.* at *11–12. It also detailed at length the irreparable harm that was likely to result without preliminary relief. *Id.* at *13–15. Finding that these

two factors supported a stay, and that the public interest and balance of equities likewise "weigh[] heavily" in favor of relief, the Court issued a preliminary injunction. *Id.* at *15–16. Unlike the temporary restraining order, its preliminary injunction ordered relief "to the States" but did not specifically order relief as to other parties, such as Plaintiffs, their members, and similarly situated parties. Defendants have appealed the grant of a preliminary injunction. *See New York v. Trump*, No. 25-1236 (1st Cir.).

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The first factor—likelihood of success—is the "most important." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). At this preliminary stage, however, courts "need not conclusively determine the merits of the underlying claims" but only assess "probable outcomes." *Id.* at 93 (internal citations omitted).

The second factor—irreparable injury—operates "as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Thus, "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode*

*Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010)).

In addition to issuing injunctions under Rule 65, courts hearing APA cases "may 'issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings' when doing so is 'necessary to prevent irreparable injury.'" *Nat'l Council of Nonprofits v. Office of Management & Budget*, 2025 WL 597959, at *11 (D.D.C. Feb. 25, 2025) ("*NCN II*") (quoting 5 U.S.C. § 705) (alteration omitted). "Both provisions [Rule 65 and § 705] provide a mechanism for issuing injunctive relief and operate under the same four-factor test." *Id.*

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their claims that Defendants' widespread freeze on funding appropriated by the IRA and IIJA is arbitrary and capricious, undertaken without statutory authority, and contrary to law. Defendants have no legal basis on which they can unilaterally institute a non-individualized, across-the-board freeze on funds duly appropriated by Congress. And even if they had that authority—which they do not—Defendants' actions were both substantively unreasonable and unsupported by any reasonable explanation.

#### A.    Defendants' freezing of IRA and IIJA funds constitutes final agency action.

The Administrative Procedure Act makes reviewable "final agency action." 5 U.S.C. § 704. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations

have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). Plaintiffs are likely to show that each of the Defendant agencies' freezes of the IRA and IIJA funding that they are charged to administer constitute final agency action.

First, Defendants' sweeping halts to the ordinary payment and processing of funding appropriated by the IRA and IIJA marks the "consummation of the agenc[ies'] decisionmaking process" because there are no further steps the agencies need take to determine whether they will freeze that funding. *See New York v. Trump*, 2025 WL 715621, at *9 (finding that "the implementation [by individual agencies of] IIJA and IRA funding pauses likely marked the consummation of each agency's decision to comply with the *Unleashing* EO, the *Unleashing* Guidance, or both"); *see also Louisiana v. Biden*, 622 F. Supp. 3d 267, 291-92 (W.D. La. 2022) (collecting over a dozen cases in which courts found that agencies' pause or delay to particular programs was final agency action).

The mere possibility that the agencies may change course in the future and *un*freeze and make available the money does not alter the fact that the agencies have frozen it *now*. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (holding that the mere fact that agency may change course in the future "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"); *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (holding that agency's decision to stay a regulation marked the consummation of the agency's

13

decisionmaking process as to whether the rule should presently take effect, notwithstanding that the agency might lift the stay in the future).

Second, Defendants' freezing of IRA and IIJA funding constitutes action "by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett*, 520 U.S. at 178, because its direct result (and express purpose) is to cut off access to funding for grantees and others who would otherwise have a right to apply for, draw on, or otherwise access those funds. *See New York v. Trump*, 2025 WL 715621, at *9 (finding that funding freeze "commanded in the … *Unleashing* EO" resulted in "legal consequence" in the form of "the abrupt, categorical, and indefinite pause of obligated federal funds"); *NCN I*, 2025 WL 368852, at *11 ("By any measure, Defendants' action [ordering a blanket freeze on federal financial assistance] led to legal consequences and constituted final agency action.").

## B. Defendants' funding freezes are arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable *and* reasonably explained.'" *Ohio v. EPA*, 603 U.S.

279, 292 (2024) (emphasis added) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Defendants' freezes are neither reasonable nor reasonably explained. As another court in this District explained, "[r]ather than taking a deliberate, thoughtful approach" to addressing potential waste or fraud, for example, "the Defendants abruptly froze billions of dollars of federal funding for an indefinite period. It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences . . . ." *New York v. Trump*, 2025 WL 715621, at \*12. Or, as another court put it, in considering a similar agency action: "Defendants essentially adopted a 'freeze first, ask questions later' approach that 'entirely failed to consider [multiple] important aspect[s] of the problem.'" *NCN II*, 2025 WL 597959, at \*14 (second quote from *State Farm*, 463 U.S. at 43).

First, Defendants' actions to halt the ordinary disbursement of funding on open grants, loans, and other awards appropriated under two duly enacted statutes— seemingly for no reason other than hostility to the statutes at issue—is "likely substantively unreasonable in violation of the APA." *New York v. Trump*, 2025 WL 715621, at \*12 (citing *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between claims that agency action "was substantively unreasonable" and claims that "the agency has failed to adequately address all of the relevant factors or to adequately explain its [decision]"); *see also NCN II*, 2025 WL 597959, at \*14 (holding that the OMB funding freeze "was not—and could never be—rational").

15

As laid out Section II below and in the attached declarations, Defendants'
sudden and indefinite halt to billions of dollars in IRA and IIJA funding has caused
and continues to cause serious irreparable harm to Plaintiffs, Plaintiff NCN's
members, and countless others across the country. Plaintiffs are likely to establish
on the merits that Defendants' actions were fundamentally arbitrary, especially with
respect to the freezing of already awarded grants and other financial assistance.
Defendants are *un*likely to be able to show that their actions met baseline standards
of rationality, particularly given that Defendants could simply have carried out their
review of IRA and IIJA spending while allowing financial assistance programs to
continue in the ordinary course, rather than abruptly "cut[ting] the fuel supply to a
vast, complicated, nationwide machine—seemingly without any consideration for the
consequences of that decision." *NCN I*, 2025 WL 368852, at *11; *see also id.*
("If Defendants intend to conduct an exhaustive review of what programs should or
should not be funded, such a review could be conducted without depriving millions of
Americans access to vital resources.").

Second, none of the Defendant agencies has ever offered an adequate
explanation for their actions. *See Ohio v. EPA*, 603 U.S. at 292 (emphasizing that
agency action must be both reasonable "and reasonably explained"); *see also
Massachusetts v. NIH*, 2025 WL 702163, at *16 ("A fundamental requirement of
administrative law is that an agency set forth its reasons for decision; an agency's
failure to do so constitutes arbitrary and capricious agency action.") (brackets and
quotation marks omitted). This is true both for the OMB Memo M-25-11

16

implementing the *Unleashing* order and the subsequent actions by the grant-making agencies.

Defendants' various public statements and memoranda, *see supra* at 6–9, fall far short of "reasonably explain[ing]" their indefinite withholding of duly authorized IRA and IIJA funding. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Massachusetts v. NIH*, 2025 WL 702163, at *17 (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original). But there is no reasoning to be found. A vague reference to the *Unleashing* order, the "Green New Deal," or "administration priorities" does not suffice: "[F]urthering the President's wishes cannot be a blank check for [an agency] to do as it pleases." *NCN I*, 2025 WL 368852, at *11. The agencies have utterly failed to explain why a widespread pause, with all the grave harm it entails, is the best way— or even just a reasonable way—to accomplish their stated goals.

The agencies also do not explain how their intentional blanket freezes on funding that Congress appropriated for specific ends that it judged important could possibly *improve* the agencies' alignment with congressional authorization, *see* Ex. I at 1, instead of actively undermining it. Nor do they explain how freezing funds intended to promote the resilience of infrastructure, reduce pollution, promote affordable housing, and improve national security would support the agencies' missions, instead of directly conflicting with them. *See Massachusetts v. NIH*, 2025 WL 702163, at *20 ("In short, the [Defendants] fail[ed] to consider the impact the [Freezes] would have on . . . the purpose of the entire regulatory regime.").

The agencies' lack of reasoning is underscored by OMB Memo M-25-11, which limits the reach of the *Unleashing* order. That memo clarifies that the freeze on IRA and IIJA-appropriated funds "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." Ex. A, ECF No. 21-1. And the subset of "objectives that contravene the policies established in section 2," *id.*, is narrow: the "policy" in section 2 of the executive order is to encourage energy exploration, establish the United States's position as a leader regarding minerals, ensure an abundant supply of reliable energy, protect consumers' freedom to choose various appliances and vehicles, and abide by procedural regulatory requirements. *See* 90 Fed. Reg. at 8353–54.

Even if an executive order could undo the IRA and IIJA's appropriation of funds (which it cannot), the reach of that order, as defined by OMB Memo M-25-11, is limited. Very little—if any—IRA and IIJA appropriations contravene these policy goals, and significant portions actively further those goals.[4] Agencies cannot freeze funding outside the scope defined by memorandum and reasonably say they are doing so in furtherance of the administration's priorities. The agencies do not even attempt to explain this irrationality.[5] And even if the agencies had abided by the terms of

---

[4] *See, e.g.*, Dep't of Energy, *Infrastructure Programs at Department of Energy*, https://perma.cc/9WAU-H8UH (last visited Mar. 13, 2025); Dep't of Energy, *Rare Earth Security Activities*, https://perma.cc/QG69-S3ZC (last visited Mar. 13, 2025).

[5] As explained above, several agencies note that they have enacted the freeze in partnership with or at the behest of OMB. To the extent that OMB (or Director Hassett) is involved in or directing the freezes, or is withholding consent for an agency to release funds appropriated under the IRA or IIJA, OMB is likewise acting arbitrarily and capriciously. OMB has offered no explanation for those actions, particularly in contravention of OMB and Director Hassett's own limiting

Memo M-25-11—which they have not—that alone would not render their action reasonable or reasoned, given the myriad other deficiencies underlying the freezes.

To the extent that agencies contend that they enacted a broad funding freeze to root out alleged waste and fraud, they offer no reasoning to support the sledgehammer approach they selected. EPA, for example, requires a further review— that is, a freeze—when it "suspect[s]" that a grant payment might be fraudulent or abusive. But a suspicion as to a *particular* grant payment cannot substantiate a freeze on *every disbursement* under the IRA or IIJA. And "[t]he desire to review programs for efficiency or consistency . . . does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid." *Aids Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378, at *10 (D.D.C. Mar. 10, 2025).

In addition to having no reasoned basis for freezing funds appropriated under the IRA and IIJA generally, the agencies failed to anticipate, acknowledge, or address the harm that would result—or to weigh that harm against whatever reasoning the agencies could muster. *Cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). An agency action that completely fails to consider its most direct and obvious practical consequences is by definition arbitrary and capricious. *Cf. Ohio v. EPA*, 603 U.S. at 293–94 (holding that EPA likely acted

---

construction of *Unleashing American Energy*. But to the extent that any IRA and IIJA appropriations actually do "contravene" section 2 of that executive order, OMB offers no reasoned basis on which they should be withheld.

arbitrarily and capriciously where it purportedly did not consider the specific question of how the number of states participating in an emissions-limitation plan would "affect what measures maximize cost-effective downwind air-quality improvements"). The agencies here failed to consider the effects of suddenly cutting off even one grant, to say nothing of the magnitude of their freeze on billions of dollars in appropriated funds all at once.

Defendants also violated the fundamental administrative law requirement that an agency must "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking." *Id.* Here, the agencies appear to have made no effort to consider alternatives—such as whether to make the pause one of short, finite duration (rather than the indefinite freeze they chose, which multiplies the harm caused and makes it impossible for grantees to plan for the future) or to review the purposes and performance of specific funding programs *before* attempting to cut them off.

The freezes are arbitrary and capricious for the additional, independent reason that they do not account for grantees' weighty reliance interests in receiving already awarded funds. "When an agency changes course, as [Defendants] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). Here, that required Defendants, before

abruptly changing course with respect to funds appropriated under the IRA and IIJA, "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. But they did none of those things.

Defendants' "failure to provide a reasoned explanation is 'even more egregious in light of the drastic change' from the existing policies under which the grant awards had been authorized." *California*, 2025 WL 760825, at *3 (quoting *Massachusetts v. NIH*, 2025 WL 702163, at *18); *Citizens Awareness Network, Inc. v. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995) ("An agency changing its course must . . . supply a reasoned analysis for the change."). The Freezes "fail[] to contemplate the budgets" of grant recipients, formulated "before the [Freezes'] sudden implementation." *Massachusetts*, 2025 WL 702163, at *20; *see also* Ex. M ¶ 13; Ex. S ¶ 10; Ex. T ¶ 16–17, 19–21; Ex. R ¶ 17; Ex. O ¶¶ 15, 17–18; Ex. N ¶¶ 9–10; Ex. Q ¶¶ 11, 14; Ex. P ¶¶ 6–7, 16; Ex. L ¶¶ 12, 14–15; Ex. V ¶¶ 7–8, 10–11.[6] They "fail[] to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed." *Massachusetts v. NIH*, 2025 WL 702163, at *20; *see also* Ex. M ¶¶ 10–11; Ex. S ¶¶ 2, 7–9; Ex. T ¶¶ 14–15, 20–21; Ex. R ¶¶ 16, 18, 20–21; Ex. O

---

[6] Even at the merits stage, an association may establish standing even though its members are anonymous. *See Advocs. for Highway & Auto Safety*, 41 F.4th 586, 594 (D.C. Cir. 2022) (holding that "anonymity is no barrier to standing on this record") (internal citation omitted). Give the harassment that litigants have experienced in similar litigation over funding freezes, *see, e.g.*, X, https://perma.cc/C69L-39D6 ("we're engaged in a war that will decide the trajectory of our civilization, and NGO's [sic] are a major front . . . TO ARMS."), some member declarations have been submitted in redacted form to protect members' anonymity. The redacted information is "not material." *See Guidance Regarding Motions Filed Pursuant to LR Gen 102 in Civil Cases*, https://perma.cc/6869-NEF9 (last visited Mar. 16, 2025).

¶ 15; Ex. N ¶¶ 17–19; Ex. Q ¶ 15; Ex. P ¶¶ 20–21, 27; Ex. L ¶¶ 8, 13; Ex. V ¶¶ 6, 12–13. And they fail to consider the communities that will ultimately be harmed by not having access to important benefits and services such as ventilation that will make their air quality safer, training to prevent lead poisoning, weatherization that will reduce their housing costs, develop more efficient agricultural practices for local family farmers, and a clean, protected natural environment. *See, e.g.*, Ex. T ¶ 15; Ex. M ¶ 9; Ex. S ¶ 6; Ex. R ¶¶ 15–16, 19; Ex. O ¶¶ 16–17; Ex. N ¶¶ 10–12; Ex. Q ¶¶ 4, 13, 16–17; Ex. P ¶¶ 22–26, 28–30; Ex. L ¶¶ 8, 13, 15; Ex. V ¶¶ 6, 14–15. Any one of these failures would support a finding that the Freezes run afoul of the APA; taken together, the question is beyond dispute.

### C. Defendants lack statutory authority to broadly freeze IRA and IIJ funding.

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "An agency," in other words, "'*literally has no power to act*'— including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (emphasis added). Under the APA, courts must hold unlawful final agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

Defendants Departments of Agriculture, Energy, Interior, HUD, and EPA, lack statutory authority to broadly halt the disbursement of funding appropriated by the IRA and IIJA. Neither the *Unleashing* order nor the related OMB memo cite any statutory provision that would give Defendants that authority. So far as the record

reveals and Plaintiffs are aware, Defendants themselves also have not identified any such provision in their public statements concerning the freeze. *See* Am. Compl. ¶¶ 38–41 & nn.8–9, 11.

Nor could these agencies seek to base their authority here on their general statutory purposes or missions. *See, e.g.*, 7 U.S.C. § 2201 (establishing Department of Agriculture and describing its "general design and duties"); 43 U.S.C. § 1457 (tasking Secretary of Interior with "the supervision of public business relating to [an enumerated list of] subjects and agencies"). The overall purposes and goals of an agency, "[c]ommendable though these goals may be," do not authorize the agency to act as a "roving commission" with "default authority" to take whatever actions it determines would advance its general goals. *Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001); *see also City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)).

Likewise, Defendant OMB lacks statutory authority to direct agencies to freeze these funds (or to achieve the same result by withholding purportedly necessary approvals to the disbursements of funds, *see* Am. Compl. ¶¶ 34, 52–54). OMB has limited statutory authority to establish government-wide financial management policies for executive agencies and to provide them with guidance on financial management matters. 31 U.S.C. § 503(a). OMB lacks statutory authority to direct executive agencies to undertake a blanket freeze of even a subset of funding

appropriated by the IRA and IIJA. *Cf. NCN II*, 2025 WL 597959, at \*15 (finding that OMB likely lacked statutory authority to direct broad halts of federal funding and explaining that OMB's statutory responsibilities to "provid[e] overall direction and establishing financial management policies do not clearly confer the power to halt all finances, full-stop, on a moment's notice").[7]

Defendants' lack of authority is particularly apparent in light of the sweeping and unprecedented nature of the power they seek to exercise. The Supreme Court has emphasized repeatedly in recent years that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (quoting *Ala. Ass'n of Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021)). That rule, the Court has held, applies equally in cases involving regulatory obligations and "in cases involving benefits." *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023).

There can be no doubt that the power Defendants claim here—to precipitously halt disbursement of many billions of dollars in duly appropriated funding under two major recent statutes—is one of "vast economic and political significance." *OSHA*, 595 U.S. at 117; *see also NCN II*, 2025 WL 597959, at \*16 (holding that OMB likely lacked

---

[7] To the extent Defendants may seek to shift the blame for the freeze to officials affiliated with various DOGE entities, *see* Am. Compl. ¶¶ 39, 52, it is plain that those entities lack statutory authority to themselves determine whether federal funds are disbursed—as the government itself recently acknowledged. *See* Defs.' Mot. for Partial Reconsideration at 14, *CREW v. U.S. DOGE Service*, No. 1:25-cv-00511 (D.D.C. Mar. 14, 2025) ("USDS and the USDS Temporary Organization have no statutory basis and thus no statutory authorities. Their existence and authorities are purely a creature of several executive orders—none of which confer any authority to direct the actions of agencies or agency employees.").

authority to order funding freeze in part because "[t]he scope of power OMB seeks to claim is 'breathtaking,' and its ramifications are massive"). The disruption and hardship the freeze has already caused, and the sheer scale and breadth of funding Defendants are refusing to release, amply demonstrate the major significance of their actions. *See infra* Section II. "Given these circumstances, there is every reason to 'hesitate before concluding that Congress' meant to confer on [Defendants] the authority [they] claim[]." *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quoting *Brown v. Williamson*, 529 U.S. 120, 1296 (2000)).

### D. Defendants' freeze of IRA and IIJA funding is contrary to law.

The APA further directs courts to hold unlawful final agency action "found to be . . . otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That reference to "law," the Supreme Court has held, "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original). Plaintiffs are likely to prevail on their claim that Defendants' broad halt to funding appropriated by the IRA and IIJA is contrary to those two statutes, to the statutes governing programs that are funded by the IRA and IIJA, and to Defendants' own regulations governing the administration of federal grants.

The IRA and IIJA each authorize and appropriate billions of dollars in funding for specific grants, loans, disbursements and other federal financial assistance programs. *E.g.*, Pub. L. 117-58, § 40551, 135 Stat. 429, 1075 (provision of IIJA providing $3.5 billion over several years for weatherization assistance program

established by 42 U.S.C. § 6861); Pub. L. 117-169, § 23003(a), 136 Stat. 1818, 2026 (provision of IRA providing $1.5 billion over several years for the Urban and Community Forestry Assistance Program established by 16 U.S.C. § 2105(c)). Many of these appropriations extend across multiple fiscal years.

For some of these programs, the IRA and IIJA provide more specific commands to agencies, such as that the Secretary of Agriculture, in allocating funding to support public-private conservation efforts via the Regional Conservation Partnership Program, "shall prioritize" the funding of projects intended to "improv[e] soil carbon, reduc[e] nitrogen losses, or reduc[e] . . . emissions, associated with agricultural production." Pub. L. 117-169, § 21001(a)(4), 136 Stat. 1818, 2016-17. The programs funded through the IRA and IIJA in turn are governed by statutory provisions that determine the purposes to which the money can be used and give further direction to the agencies that administer that funding. *E.g.*, 42 U.S.C. § 6863(d)(2) (directing that certain amounts appropriated for weatherization assistance "shall be granted" to tribal organizations serving low-income members).

By implementing broad and indefinite halts on the disbursement of funding Congress allocated in the IRA and IIJA, and for reasons completely unrelated to the purposes for which Congress allocated that money, Defendants seek to override the judgments Congress made in duly enacted statutes. "But '[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.'" *New York v. Trump*, 2025 WL 715621, at *11 (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d

1225, 1235 (9th Cir. 2018)). Accordingly, Plaintiffs here "have substantiated a likelihood of success on the merits that the Agency Defendants acted 'not in accordance with the law'—in violation of the APA." *Id.*[8]

Defendants' sweeping and indefinite freezes of IRA and IIJA funding also cannot be squared with the regulations that govern the Defendant agencies' administration of federal grants. The bulk of those regulations are set out in 2 C.F.R. § 200.0 *et seq.* Those rules dictate things like how agencies must announce new funding opportunities, *id.* § 200.204, what information about grants they must make publicly available, *id.* § 200.212, and how they audit grants, *id.* § 200.501.

As relevant here, those regulations also control how agencies are to measure grantees' performance, and they require agencies to make those measures of performance clear to grantees at the outset, *id.* § 200.301 (directing agencies to "establish program goals and objectives during program planning and design" and "clearly communicate the specific program goals and objectives in the Federal award"). The regulations further direct grantees to monitor and report on their success *in meeting those specified performance goals. Id.* § 200.329. The rules also control under what circumstances the agency can suspend grants, terminate grants,

---

[8] To be sure, the Impoundment Control Act (ICA) provides the executive branch with limited authority to delay or even cancel spending (actions that the ICA calls "deferrals" and "recissions," respectively). *See* 2 U.S.C. §§ 683, 684. But Defendants have not sought to use the specific procedures set out in the ICA and have not claimed that the specific conditions under which that statute allows deferrals and rescissions exist here. So the ICA does not render Defendants' actions valid and "in accordance with law," 5 U.S.C. § 706(2)(A), assuming it even could. *Cf. New York v. Trump*, 2025 WL 715621, at *10 (finding plaintiffs were likely to succeed "in proving that the Executive's actions were contrary to law when bringing about a deferral of budget authority without sending a special message to Congress as the ICA requires").

or "[w]ithhold further Federal funds (new awards or continuation of funding)." *Id.* § 200.339. And they require that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340.

Rather than following these regulations, Defendants have ignored them. They have frozen funding based not on an individualized assessment of how particular grants have performed or after taking into consideration the terms of particular grant agreements, *see id.* §§ 200.339–200.340, but on the irrelevant fact that money for those grants was appropriated under the IRA and IIJA. Defendants thus have acted without regard for and actually contrary to their own regulations governing how grants are administered, including in what circumstances agencies may "[w]ithhold . . . continuation of funding." *Id.* § 200.339. For this reason too, Plaintiffs are likely to demonstrate as this case proceeds that Defendants' sweeping freezes to IRA and IIJA funding are "not in accordance with law." 5 U.S.C. § 706(2)(A).

## II. Without Preliminary Relief, Plaintiffs and Their Members Will Likely Suffer Irreparable Injury

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989). "To establish irreparable harm, . . . a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business"; rather, "[i]t is usually enough if the plaintiff shows that its legal remedies are inadequate." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (citations omitted). Thus, "[i]f the plaintiff suffers

a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Id.* at 19. Additionally, "'[o]bstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide injury for purposes of irreparable harm.'" *Massachusetts v. NIH*, 2025 WL 702163, at *30 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)) (internal quotation marks, citation, and alterations omitted).

The record is replete with examples of just such harms. As Plaintiffs and their members attest, Defendants' intentional funding freezes will require (and in some cases have already required) Plaintiffs and their members to reduce planned hiring or even furlough or lay off staff, shuttering planned projects and curtailing the amount of work these organizations are able to accomplish in support of their missions. *See, e.g.*, Ex. M ¶ 11; Ex. S ¶¶ 7–9; Ex. T ¶14; Ex. R ¶¶ 17–18, 20; Ex. O ¶¶ 15–18; Ex. N ¶¶ 15, 17, 20; Ex. Q ¶ 15; Ex. P ¶ 20–22; Ex. L ¶¶ 12–13; Ex. V ¶¶ 6, 11–12; *see also, e.g.*, *California v. Dep't of Educ.*, 2025 WL 760825, at *4 (finding irreparable injury where universities were forced to cancel certain projects or lose full-time employees). As in *California*, the record shows that the freezes here have "upended months, if not years, or work required to implement programs that rely on these grants," and have "impacted budgets . . . and existing projects or projects already in progress." *Id.* at *4 (internal quotation marks and citations omitted).

The Freezes have endangered, for example, Plaintiff Childhood Lead Action Project's (CLAP) plan to undertake a multi-front campaign to reduce childhood lead

29

poisoning in Providence, an effort that was supposed to be funded by a grant that EPA has now frozen. Ex. P ¶ 22. CLAP has been forced to delay planned trainings, meaning that "lead-safe repairs on local homes may have been delayed." *Id.* ¶ 26. And CLAP's staff has been forced to devote unexpected time to managing the uncertainty created by the Freezes—diverting resources from other mission-critical activities. *Id.* ¶ 27. "These challenges have resulted in a delay in the progress [CLAP] reasonably expected to make towards improving lead hazard awareness, increasing local compliance with lead safety rules, and ultimately preventing childhood lead exposure during recent months." *Id.* ¶ 28. "Even if [CLAP's] access to grant funding is fully restored today, as an organization and a community, we can never get this time back." *Id.* The resulting consequences could not be starker. "Childhood lead exposure can cause permanent damage in a single day, and only gets worse the longer it continues." *Id.* ¶ 24.

One NCN member organization runs trainings on how to "weatherize the homes of low-income Americans in an effort to lower their utility bills when they are struggling to make ends meet, which helps them stay in their homes." Ex. T ¶ 5. This process "also includes a lot of important health and safety factors," such as ensuring appropriate ventilation to prevent mold, avoid carbon monoxide, and improve air quality. *Id.* ¶ 6. But because of Defendant Department of Energy's intentional freeze on payments, this member has not been able to offer its trainings, limiting the

number of low-income Americans whose health and pocketbooks would benefit from efficiently weatherizing their homes. *Id.* ¶ 13.[9]

Plaintiff Codman Square Neighborhood Development Corp., a nonprofit community development corporation based in Boston, similarly planned to use its grant funds to improve the ventilation of an affordable housing development for elderly residents in a neighborhood with high asthma rates. Ex. L ¶¶ 7–9, 13. But because of the Freezes, that grant—and the project it would enable—are on hold. *Id.* ¶¶ 12–13.

"The potential loss of human capital and talent . . . poses yet another harm incapable of run-of-the-mill legal relief." *Massachusetts v. NIH*, 2025 WL 702163, at *28. For example, as a result of the Freezes, Plaintiff Woonasquatucket River Watershed Council, a local nonprofit group, has been forced to halt its training programs in forest management and tree stewardship, which has resulted in lost job opportunities for the community along the Woonasquatucket Greenway—and has also been unable to hire for new positions, limiting the amount of work it can accomplish. Ex. M ¶¶ 10–11. Plaintiff Green Infrastructure Center, a nonprofit based in Virginia and with offices, staff, and projects in Rhode Island, has already had to furlough some staff and estimates that it is only 45 days away from layoffs. Ex. N ¶¶ 17–18. Plaintiff Eastern Rhode Island Conservation District has already had to

---

[9] This member recently received second-hand reports that the program through which it receives funding may resume payments. The member, however, remains unable to access funds through its grant and has received no information from the Department of Energy indicating that funding will resume. There is also no indication that the Department has withdrawn its memo ordering a halt to all "Funding Activities." Ex. I at 2, ECF No. 21-9.

stop grant-supported work developing smart agricultural practices for local farmers, using technology and data to help them grow more efficiently and sustainably. Ex. Q ¶ 13. It estimates that it has about a month left before needing to lay off staff, exacerbating the problem, and making it unlikely that the Conservation District can accomplish other aspects of its organizational mission, such as helping address flooding after major storms. *Id.* ¶¶ 15, 17.

The Freezes will likewise harm the environment, reducing habitats for animals, diminishing the resilience of forests against fungus, bacteria, and insects that can kill trees, and affecting the people who live nearby. Ex. M ¶ 9; Ex. O ¶ 16. For example, 8,300 hours on planned invasive plant management at one NCN member organization "just won't happen now"—and "[i]f [they] are ever able to manage these invasive species in the future, it will be more difficult and more expensive because they will have spread more: [the organization] can't readily make up for this delay." Ex. S ¶ 6.

Another NCN member likely must postpone a planned project monitoring bark beetle attacks on vulnerable and irreplaceable giant sequoia trees, making it more difficult for national parks to manage the trees effectively. Ex. R ¶¶ 5–10, 19. Halting these projects impairs the organization's mission to study such old trees and ancient forests, including gathering information on threats to trees and how to protect them, *id.* ¶¶ 2-3, and also "is incredibly harmful . . . for scientific progress more generally" because other researchers rely on data these organizations collect for their own research, creating "cascading impacts on their scientific progress," *id.* ¶¶ 16, 21.

Defendants' intentional freezes have also cut off funds for the Green Infrastructure Center to plan and manage trees in disadvantaged communities in need of the benefits provided by healthy trees of "cleaner air and water, cooler summer temperatures, reduced flooding and erosion, and increased property values." Ex. N ¶¶ 12–13. And another NCN member—based in Rhode Island—has had to halt a planned food-waste reduction and composting project, which means that because of the freeze more food waste is dumped into the landfill, producing additional methane, a known contributor to global warming. Ex. V ¶¶ 14–15.

Those freezes will also irreparably harm Plaintiffs and NCN members' relationships with their communities. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (finding a "significant and irreparable" injury where, even if an organization's affiliates survived, "the community connections they have developed are likely to erode"); *see also K-Mart*, 875 F.2d at 915 (noting that "harm to goodwill, like harm to reputation," is not readily measurable and thus likely to be found irreparable).

For example, the Green Infrastructure Center invested significant time working with the Mississippi Band of Choctaw Indians in order to establish the trust necessary to sign an agreement to help the tribe manage their forests for years into the future. Ex. N ¶¶ 12, 22. With their grant money frozen, however, the Center cannot follow through on that project, and they expect that the "whole relationship and the trust [they] built won't recover if this continues." *Id.* ¶ 22. Similarly, the freezes caused the NCN member organization that offers weatherization services to

have to cancel a planned conference that would have built relationships with state, local, and tribal officials as well as others in the broader nonprofit sector. Ex. T ¶¶ 17–18. Having to cancel has already "undermine[d] those relationships and makes it harder to rebuild." *Id.* ¶ 18.

Another NCN member organization explains that halting a project—that is supported by a frozen grant—to remove vegetation to reduce the risk of wildfire and improve water quality will "lead to the loss of trust from landowners interested in carrying out restoration and stewardship on their properties," which "endangers [the organization's] credibility and effectiveness, puts our local landowners at risk, and reduces our long term ability to achieve our organizational and shared mission, which benefits all residents within our service area." Ex. O ¶¶ 14, 16.

"These harms, and many more, do not only impact the Plaintiff[s], but the communities and people they serve." *Massachusetts v. NIH*, 2025 WL 702163, at *31. *See, e.g.*, Ex. P ¶ 24 (explaining that the delay in implementing planned lead safety projects "means that there are families who would have been reached and helped sooner," who "won't be reached in time to prevent significant harm [to children], or may never be reached at all"); Ex. L ¶¶ 8, 12–13 (explaining that being unable to provide housing updates—such as new ventilation and air quality systems—will impact vulnerable, low-income seniors in a neighborhood with high asthma rates); Ex. T ¶¶ 5–6, 15 (explaining that canceling weatherization trainings "means that fewer people in poverty are getting their homes weatherized," so "they are less safe in their homes, and less able to make ends meet"); Ex. S ¶ 6 ("This means that

potentially thousands of acres will not be managed, with negative impacts for visitors to public lands, hunting and fishing, and wildlife populations due to loss of habitat."); Ex. M ¶¶ 5, 10 (describing community education programs and skills and job training initiatives); Ex. R ¶ 21 (describing "cascading impacts" to scientific research partners); Ex. O ¶ 5 (noting that "[o]ne of the big goals of [their] work is to improve fish and wildlife populations that are enjoyed by conservationists and also pursued by hunters and anglers in [their] area"); Ex. N ¶ 10 (noting storm recovery plans to help restore a town's "primary economic driver"); Ex. Q ¶¶ 16–17 (describing impact on local farmers and emergency flooding relief); Ex. V ¶ 6 (describing estimated community impact from its now-paused grant project, including creating or maintaining 36 direct jobs and 32 construction jobs and conserving 569 million gallons of water). In other words, "[e]ach day that the pause continues to ripple across the country is another day that Americans are being denied access to programs" they need. *NCN I*, 2025 WL 368852, at *13.

These irreparable harms represent only a small sampling of the injuries faced by IRA and IIJA grant recipients in Rhode Island and across the country. *See* Ex. U ¶¶ 2, 5, 9–10. "And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again." *New York v. Trump*, 2025 WL 715621, at *13. "[T]here is no [legal] remedy that can compensate Plaintiff[s] for the disruptions and discord resulting from the abrupt [freeze] of these grants." *California*, 2025 WL 760825, at *4.

### III. The Balance of Equities and Public Interest Strongly Favor a Preliminary Injunction

Just as another court in this District found in a case addressing the impact of the Freezes on state plaintiffs, "the balance of equities weighs heavily in favor of granting the [Plaintiffs'] preliminary injunction motion." *New York v. Trump*, 2025 WL 715621, at *15. "[T]here is 'substantial public interest in having governmental agencies abide by the federal laws.'" *Massachusetts v. NIH*, 2025 WL 702163, at *32 (quoting *Newby*, 838 F.3d at 12) (internal quotation marks omitted). Conversely, of course, "there is no public interest in upholding unlawful agency action," because "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Id.* (internal quotation marks and citation omitted). Thus, "Defendants are not harmed where [an] order requires them to disburse funds that Congress has appropriated." *New York v. Trump*, 2025 WL 715621, at *16.

This Court need look no further. But if it did, it would find the scales solidly tipped in favor of Plaintiffs. "Courts have consistently held there is a strong public interest in health and safety," *Massachusetts v. NIH*, 2025 WL 702163, at *32, and Plaintiffs have marshaled strong evidence that the ill effects of the Freezes extend well beyond Plaintiffs and their members, affecting the safety of their homes, their communities' ability to withstand natural disasters, access to food from local farms, and a clean and safe environment. *See supra* Section II.

On the other side of the scale? Little more than vague, unsubstantiated, and post hoc murmurings about "waste" and "efficiency." But it is Defendants' conduct that is creating waste and inefficiency as planned programs lie fallow and recipients

are forced to divert resources from their missions in order to deal with the disruption created by the sudden halt in previously reliable sources of funding. Defendants' hollow words about waste and fraud cannot outweigh the concrete harms caused by their own actions. *See NCN II*, 2025 WL 597959, at *19 ("Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated, Plaintiffs have more than met their burden here.").

## IV.    Relief Should Extend to All Recipients of IRA and IIJA Funding Administered by Defendants

"[I]n drafting equitable relief, courts must consider 'what is necessary, what is fair, and what is workable.'" *Massachusetts v. NIH*, 2025 WL 702163, at *33 (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). "[T]here are appropriate circumstances during which nationwide injunctions are not only appropriate, but necessary." *Id.* This case presents just such circumstances.

First, it would be impracticable, if not impossible, to limit relief in this case just to Plaintiffs and their members. Plaintiff NCN represents 30,000 members nationwide, and unknown hundreds if not thousands of those members are recipients of funding through the IRA and IIJA. *See id.* (explaining that broad relief may be necessary "where the plaintiffs are dispersed throughout the United States"). Artificially limiting the scope of relief in this case to Plaintiffs and their members would require Defendants to somehow identify which funding streams were going to NCN members. That task that would be made even more formidable by the fact that some NCN members receive grant funding not directly from Defendants but as

37

subgrantees from other organizations that are themselves the direct recipients from the agencies. *See, e.g.*, Ex. N ¶ 9; Ex. Q ¶ 9.

Second, "there are certainly other similarly situated nonparties" who are being harmed in the same way as Plaintiffs and by the same unlawful actions. *Massachusetts v. NIH*, 2025 WL 702163, at \*33–44. It is thus appropriate that they receive the same measure of relief as Plaintiffs here. *See id.*; *HIAS, Inc.*, 985 F.3d at 326 ("[A] nationwide injunction may be appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs.").

Third, the nature of this case also weighs in favor of broad relief. "The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Massachusetts v. NIH*, 2025 WL 702163, at \*34 (citing, among others, *Gailius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998)). Given that final relief in this case would apply "to all who . . . have been subject to" Defendants' unlawful conduct, it is appropriate that preliminary relief be so extensive as well. *Id.*; *see also District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 47, 49 (D.D.C. 2020) (explaining that "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed" and that "[t]he same reasoning has force in the preliminary injunction context" (internal citation omitted)).

Moreover, a stay under 5 U.S.C. § 705 provides for a court reviewing agency action to "issue all necessary and appropriate process to . . . preserve the status or

rights pending conclusion of the review proceedings." This, too, contemplates setting aside the agency action itself, rather than providing limited relief to only the parties who happen to appear in court.[10]

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter a preliminary injunction as set forth in the attached proposed order.

Dated:  March 17, 2025              Respectfully submitted,

/s/ Miriam Weizenbaum

Miriam Weizenbaum (RI Bar No. 5182)
DeLuca, Weizenbaum, Barry & Ravens
199 North Main Street
Providence, RI 02903
(401) 453-1500
miriam@dwbrlaw.com

Kevin E. Friedl* (Admitted only in New York; practice supervised by DC Bar members)
Jessica Anne Morton* (DC Bar No. 1032316)
Robin F. Thurston* (DC Bar No. 1531399)
Skye L. Perryman* (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org

---

[10] Plaintiffs respectfully submit that, if the Court enters a preliminary injunction, it should also either waive any bond requirement under Rule 65(c) or set the amount at $0. Defendants could not plausibly claim to suffer any cognizable form of "costs and damages" merely from having to administer funding appropriated by the IRA and IIJA as Congress directed, so no security is required here.

rthurston@democracyforward.org
sperryman@democracyforward.org

\* admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On March 17, 2025, I caused the foregoing and accompanying declarations and proposed order to be served by certified mail on Defendants, the Attorney General, and the U.S. Attorney's Office for the District of Rhode Island at the below addresses. On the same day, I further caused these documents to be served via email on Daniel Schwei, of the Department of Justice, who has represented himself as the appropriate contact for this case.

Department of Agriculture and
Secretary Brooke Rollins
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

Department of Energy and
Secretary Chris Wright
1000 Independence Ave., SW
Washington, DC 20585

Department of the Interior and
Secretary Doug Burgum
1849 C Street, N.W.
Washington DC 20240

Environmental Protection Agency
and Administrator Lee Zeldin
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Department of Housing and Urban
Development and Secretary Scott
Turner
451 Seventh Street, S.W.
Washington, DC 20410

Office of Management and Budget
and Director Russell Vought
725 17th Street, NW
Washington, DC 20503

Attorney General Pam Bondi
Department of Justice
950 Pennsylvania Avenue, NW,
Washington, DC 20530

Director Kevin Hassett
National Economic Council
1600 Pennsylvania Ave NW
Washington, DC 20500

United States Attorney's Office
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

/s/ Miriam Weizenbaum
Miriam Weizenbaum