UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WOONASQUATUCKET RIVER WATERSHED COUNCIL, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-97 (MSM) |
| DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## Table of Contents

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 4

I.   Executive Actions Regarding Funding ..................................................... 4

II.  Other Related Litigation .......................................................................... 6

III. Procedural History of This Action ........................................................... 8

STANDARD OF REVIEW .................................................................................. 11

ARGUMENT ....................................................................................................... 11

I.   Plaintiffs' Claims Are Not Properly Before this Court ......................... 11

   A.  Plaintiffs Have Not Proven Any Injuries for Several Defendants ................. 11

   B.  Plaintiffs Have Engaged in Improper Claim Splitting, As They Are
       Already Litigating a Previously Filed Funding Case ...................................... 14

II.  Plaintiffs Never Define the Agency Actions They Seek to Challenge, But
     Their Claims Would Not Be Cognizable However Formulated ........................... 19

   A.  Plaintiffs Cannot Challenge an Amorphous "Freeze" Comprising an
       Unknown and Undefined Set of Agency Actions ............................................ 19

   B.  Regardless of How Plaintiffs Try to Characterize Their Claims, They Are
       Not Cognizable ................................................................................................. 22

       1.  Plaintiffs Cannot Seek Relief Against the President's Executive
           Order, Which Is Plainly Lawful ................................................................ 23

       2.  The APA Permits Challenges Only to Discrete Actions, Not Broad
           Programmatic Attacks to Overall Agency Programs ................................. 26

       3.  Plaintiffs Also Have Not Established This Court's Jurisdiction Over
           Grant-Specific Challenges ......................................................................... 29

III. Plaintiffs' Challenges Are Meritless ...................................................... 34

   A.  Congress Has Afforded Defendants Broad Discretion Over the Relevant
       Grant Programs, Which Provides Ample Authority to Temporarily
       Pause Funding .................................................................................................. 35

       1.  Defendants Have Broad Authority to Select Recipients Under the

IRA and IIJA Grant Programs ..................................................... 36

    2.  This Statutory Discretion Allows Defendants to Temporarily Pause Funding for Particular Recipients ..................................................... 41

    3.  Temporary Pauses in Funding are Historically Common ......................... 43

  B.  A Temporary Pause in Funding Is Not Arbitrary and Capricious ................. 46

    1.  Arbitrary and Capricious Review is Inappropriate .................................... 46

    2.  A Pause on Funding Pending a Decision Whether to Continue That Funding or Redirect It Elsewhere Is Rational ........................................... 47

IV. The Balance of the Equities Independently Forecloses Relief ........................... 52

  A.  Plaintiffs Have Not Proven Irreparable Injury in the Absence of a Preliminary Injunction ..................................................................... 52

  B.  The Public Interest Weighs Squarely Against Relief ................................. 54

V. Any Injunctive Relief Should be Narrowly Tailored to Permit Lawful Agency Activity, and Should Be Stayed Pending Appeal ..................................... 56

CONCLUSION .......................................................................................... 61

## INTRODUCTION

On January 20, 2025, the President issued an Executive Order setting forth his vision for energy policy, which the President viewed as an important aspect of "restor[ing] American prosperity" and "rebuild[ing] our Nation's economic and military security[.]" *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353, § 1 (Jan. 20, 2025).  Consistent with the actions of past Presidents, to implement the President's declared policy, the Executive Order directed agencies to temporarily pause certain funding, to the extent permissible by law, pending a review to ensure that the funding was being spent in ways that promoted, rather than undermined, the President's declared policies.  Plaintiffs now challenge that temporary pause on funding, essentially arguing that they—nonprofit entities awarded discretionary grants—are entitled to continue receiving federal funds, even if those funds are being used in ways that conflict with the President's agenda.

There are countless problems with Plaintiffs' request for emergency relief.  At its most fundamental level, Congress afforded the Defendant agencies with broad discretion to select among eligible recipients of funding, and therefore Defendants are likewise entitled to temporarily pause funding for current recipients to determine whether they wish to redirect that funding elsewhere.  Plaintiffs' contrary theory— that this Court should compel agencies to continue funding existing grants, even when those grants conflict with the President's priorities—would raise significant separation of powers concerns.  But there are also more prosaic defects with Plaintiffs' request for an emergency preliminary injunction.

For starters, Plaintiffs bring suit against seven agencies or their related

officials, but Plaintiffs have not proven that three of those Defendant agencies are actually causing them any harms. As the attached declaration from the Department of Energy reflects, that agency is not pausing the types of funds about which Plaintiffs complain. Plaintiffs' declarant asserting otherwise is anonymous, and therefore their assertions cannot be verified, which fails to carry Plaintiffs' burden of proof at this stage. Additionally, with respect to the Office of Management and Budget (OMB) and the Director of the National Economic Council (NEC), Plaintiffs' submitted declarations make no effort to establish any injury attributable to those agencies. At the outset, then, Plaintiffs' motion cannot possibly justify relief against three of the Defendant agencies here.

Moreover, Plaintiffs cannot obtain any relief through this suit, given that many (if not all) of the Plaintiffs here are already pursuing a similar challenge in the United States District Court for the District of Columbia. *See Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239 (D.D.C. filed Jan. 28, 2025). Thus, the doctrine against claim splitting precludes Plaintiffs from bringing another suit (and another round of emergency litigation) here.

Even apart from those problems, Plaintiffs' motion fails at the threshold for additional reasons. In particular, Plaintiffs claim to be challenging a "funding freeze" being implemented by numerous different agencies. But Plaintiffs never identify the full scope of agency actions that they believe comprise this allegedly unlawful "freeze," which makes it impossible to litigate their claims, particularly given that the APA permits judicial review only over discrete agency actions. Plaintiffs cannot

directly challenge the President's Executive Order under the APA; their references to other agency actions are too amorphous to be cognizable; and even if Plaintiffs' suit were construed as challenges to specific funding denials, Plaintiffs have not established this Court's jurisdiction over any such claims. Plaintiffs' failure to identify the specific agency actions they are challenging is reason enough to deny their motion. But even if the Court were inclined to recharacterize Plaintiffs' challenges, it is simply impossible to convert them into cognizable APA claims.

Even if the Court were to overlook all of the above defects, Plaintiffs' claims also fail on the merits. Plaintiffs contend that Defendants lack statutory and regulatory authority to pause grant funding, but Plaintiffs wholly overlook that the statutory grant programs themselves afford Defendants with broad discretion to decide which recipients are entitled to funding. That same discretion is what allows Defendants to temporarily pause funding and evaluate whether the funds should be redirected elsewhere, as agencies commonly do. And pausing funding to decide whether those funds are being spent in the most cost-effective manner is eminently rational given the finite resources available to agencies to promote the public good.

Finally, the balance of the equities also weighs squarely against entering the intrusive relief Plaintiffs request. Many of Plaintiffs' claimed harms are not factually proven, and certainly they have not shown that a temporary delay in receiving funds would frustrate their work over the long-term. In contrast, Plaintiffs' requested relief would constitute an extraordinary intrusion into the Executive's lawful prerogatives, effectively turning this Court into an overseer of half a dozen federal agencies'

funding programs.

At an absolute minimum, any relief entered here should be significantly limited to expressly preserve agencies' lawful authorities to act under their own authorizing statutes, regulations, and grant terms—authorities that Plaintiffs' motion never purports to challenge. Any relief here should also be immediately stayed pending any appeal that is authorized. The proper course, however, is to deny Plaintiffs' motion for a preliminary injunction entirely.

## BACKGROUND

### I.    Executive Actions Regarding Funding

On January 20, 2025, the President issued various Executive Orders (EOs), some of which directed temporary pauses in certain funding. Particularly relevant here is the *Unleashing American Energy* EO, Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025). In the *Unleashing American Energy* EO, the President declared that it is "in the national interest to unleash America's affordable and reliable energy and natural resources," *id.* § 1, and thus the President articulated several energy-related goals, *id.* § 2. For example, the President declared that it "is the policy of the United States" to "protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation;" and to "eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice, which is essential for economic growth and innovation, by removing regulatory barriers to motor vehicle access[.]" *Id.* § 2(c), (e). The President further declared that the United States should "ensure that no Federal funding be employed in a manner contrary to the principles

outlined in this section, unless required by law." *Id.* § 2(i).

To accomplish these policies, the *Unleashing American Energy* EO directed (among other things) that, to the extent permissible by law, agencies should pause disbursements for funds appropriated under the Inflation Reduction Act (IRA) and the Infrastructure Investment and Jobs Act (IIJA), pending a review process:

> All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program, and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order. Within 90 days of the date of this order, all agency heads shall submit a report to the Director of the NEC and Director of OMB that details the findings of this review, including recommendations to enhance their alignment with the policy set forth in section 2. No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

*Id.* § 7(a). The *Unleashing American Energy* EO expressly directed, for all provisions, that they should be "implemented in a manner consistent with applicable law[.]" *Id.* § 10(b).

The following day, OMB issued guidance regarding the *Unleashing American Energy* EO. *See* OMB Memorandum M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/ (filed at ECF No. 21-1). In particular, OMB stated that Section 7's pause on

disbursement "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." *Id.* Additionally, OMB stated that "[a]gency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.*

Six days later, OMB issued Memorandum M-25-13, which directed agencies to "complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders," and further directed that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders[.]" OMB Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, at 2 (Jan. 27, 2025) (attached hereto).

## II.    Other Related Litigation

Separate from this case, the National Council of Nonprofits (NCN) is one of several plaintiffs in another lawsuit challenging the Executive's funding decisions currently pending in the United States District Court for the District of Columbia. *See Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239 (D.D.C.).  That case was filed on January 28, 2025, in the wake of OMB Memo M-25-13's issuance, and NCN sought relief in that case based on the alleged withholding of grant funding from its members. *See Nat'l Council of Nonprofits*, ECF No. 1 ¶ 32.  Those plaintiffs obtained an administrative stay of OMB Memo M-25-13, *see Nat'l Council of Nonprofits*, ECF No. 13 (Jan. 28, 2025), after which OMB elected to rescind the challenged Memo.

Nonetheless, the plaintiffs continued with their claims, arguing that they "are not challenging a piece of paper" but instead "are challenging the Memo's freeze on federal funding." *See Nat'l Council of Nonprofits*, Pls.' TRO Reply (ECF No. 24) at 3.

The Court in *National Council of Nonprofits* entered a temporary restraining order against not only Memo M-25-13 itself, but also enjoining OMB "from implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards," and directed that OMB provide notice of the injunction to agencies. *Nat'l Council of Nonprofits*, TRO (ECF No. 30) at 29. Following preliminary-injunction proceedings, the Court again enjoined OMB "from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards," and required OMB to provide notice to agencies. *Nat'l Council of Nonprofits*, PI Order (ECF No. 52) at 1. Based on concessions the plaintiffs made in those proceedings, however, that Court's Orders did not prohibit implementation of any pauses directed by the President's Executive Orders.

Separate from *National Council of Nonprofits*, a group of 22 States, the District of Columbia, and the Governor of Kentucky in his official capacity filed suit in this District, challenging what they describe as a "Federal Funding Freeze." *See New York v. Trump*, No. 1:25-cv-39 (D. R.I.), Am. Compl. (ECF No. 114) ¶ 1. On March 6, 2025, Chief Judge McConnell entered a preliminary injunction ordering (among other things):

> The Agency Defendants are enjoined from pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, including funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress. This includes, but is by no means not limited to, Section 7(a) of Executive Order 14154, Unleashing American Energy.

*New York,* ECF No. 161 at 44 ¶ 2. The United States has appealed that preliminary injunction, and also sought a stay of the injunction from the United States Court of Appeals for the First Circuit. *See New York*, ECF No. 162; *New York v. Trump*, No. 25-1236 (1st Cir.).

On March 26, 2025, the First Circuit denied the United States' motion to stay the injunction, "address[ing] only the narrow question of whether the Defendants have met their burden to show that they are entitled to judicial intervention that is 'not a matter of right,' as a stay pending appeal is 'an intrusion into the ordinary processes of administration and judicial review,'" and concluding that Defendants had not carried their burden at that stage of making a "strong showing" as to the necessary factors. *New York v. Trump*, No. 25-1236 (1st Cir. Mar. 26, 2025), slip op. at 28-29. The United States' appeal of the preliminary injunction remains pending.

## III.    Procedural History of This Action

Plaintiffs here are several nonprofit entities, as well as the National Council of Nonprofits which again "brings this case on behalf of its members." *See* Am. Compl. (ECF No. 21) ¶¶ 1-6. At least some of the nonprofit Plaintiff entities here are themselves members of the National Council of Nonprofits. *Cf. id.* ¶ 62 (describing

injuries to "Plaintiffs and other members of NCN").

Plaintiffs originally filed suit on March 13, 2025, and filed an Amended Complaint on March 17, 2025, bringing claims against seven different agencies and related officials:  the Department of Agriculture (USDA); Department of Energy (DOE); Department of the Interior (Interior); Environmental Protection Agency (EPA); Department of Housing and Urban Development (HUD); Office of Management and Budget (OMB); and the Director of the National Economic Council (NEC) in his official capacity.  *Id.* ¶¶ 7-19.  Plaintiffs allege that Defendants "have implemented broad, non-individualized freezes of funds appropriated by" the IRA and IIJA, *id.* at 2, which they claim are (1) arbitrary and capricious; (2) in excess of statutory authority because "[n]o statutory provision authorizes Defendants . . . to freeze funding appropriated by the IRA and IIJA"; and (3) contrary to law because Defendants are "refusing to direct . . . money to the purposes Congress specified" in the IRA and IIJA, and "have frozen grants in circumstances in which the regulations would not allow those grants to be terminated or suspended." *Id.* ¶¶ 82, 91, 100-02.

Plaintiffs' Amended Complaint lists several instances of specific grants that they contend are improperly paused, but Plaintiffs say that these "handful of examples . . . are merely evidence of a much wider freeze" and thus are not the full scope of their challenge.  *Id.* ¶ 51.  Accordingly, without defining the full scope of the "freeze" they seek to challenge, Plaintiffs ask the Court to "[d]eclare unlawful and set aside Defendants' freeze on funding appropriated by the IRA and IIJA." *Id.*, Prayer for Relief, ¶ (a).  They also request injunctive relief "barring Defendants, their

officers, employees, and agents from continuing to carry out the freeze on funding appropriated by the IRA and IIJA and requiring the processing and disbursement of funding previously frozen[.]" *Id.*, Prayer for Relief, ¶ (c).

Consistent with those requests, Plaintiffs have now filed a motion for a preliminary injunction, likewise seeking relief against "the ongoing freeze on the processing and payment of funding appropriated under the IRA and IIJA." PI Mot. (ECF No. 26) at 4. Plaintiffs again describe various actions that they contend are part of their challenged "freeze," such as the President's *Unleashing American Energy* Executive Order, OMB Memorandum M-25-11 implementing that Order, and several agency-specific actions. *Id.* at 5-9. Plaintiffs contend that, based on these actions, they are not receiving funding appropriated under the IRA and IIJA in connection with several specific grant programs in which they participate. *Id.*; *see also id.* at 29-35 (discussing, *e.g.*, a lead poisoning grant from EPA, weatherization grants from DOE, and forestry and agricultural grants from USDA). Plaintiffs' requested relief is not limited to funding for their specific grant programs, however, and instead Plaintiffs request a preliminary injunction applicable to all funding appropriated under the IRA and IIJA. Specifically, they request that the Court order (among other things):

- "Defendants are ENJOINED from freezing, halting, or pausing on a non-individualized basis the processing and payment of funding appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act;"

- Defendants must "take immediate steps to resume the processing, disbursement, and payment of funding appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act, and to release funds previously withheld or rendered inaccessible

because they were appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act;" and

- "Defendants are ENJOINED from implementing, giving effect to, or reinstating under a different name the directive to freeze funding appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act in the Unleashing American Energy executive order or OMB Memorandum M-25-11[.]"

Prop. Order (ECF No. 26-14) at 1-2.

Consistent with the briefing schedule ordered by this Court, *see* Text Order of Mar. 18, 2025, Defendants now oppose Plaintiffs' motion.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## ARGUMENT

### I.   Plaintiffs' Claims Are Not Properly Before this Court

#### A.   Plaintiffs Have Not Proven Any Injuries for Several Defendants

At the outset, Plaintiffs have failed to prove that three of the seven Defendant agencies are causing them any injuries.   Because Plaintiffs "bear[] the burden of

establishing" jurisdiction "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), at the preliminary-injunction stage that requires actual proof of harms caused by each Defendant. *See Pietrangelo v. Sununu*, No. 21-cv-124, 2021 WL 1254560, at *5 (D.N.H. Apr. 5, 2021) (noting that "several circuit courts have held that the merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction, including standing" (internal quotation marks omitted)); *cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]").

Here, Plaintiffs have failed to establish any injuries associated with DOE, OMB, and the Director of the National Economic Council. With respect to DOE, the only specific injury addressed is in a redacted declaration, from an anonymous member of NCN, claiming that their funding has been frozen since January which prevents them from performing various training activities in connection with the Weatherization Assistance Program. *See* Redacted Decl., Ex. T (ECF No. 26-11) ¶¶ 1, 4, 12-13. As the attached declaration from DOE reflects, however, there is no ongoing pause of funding for the Weatherization Assistance Program since at least February 2025. *See* Decl. of Christopher Johns (attached hereto) ¶¶ 5-6; *cf.* PI Mot. at 31 n.9 (alluding to possibility of resumed funding for this program). Given the redacted nature of Plaintiffs' declaration, it is not possible for DOE to fully investigate the facts regarding this entity. *See* Johns Decl. ¶ 7. But based on DOE's review of

the redacted Exhibit T, it appears that the entity is a subrecipient (not a direct grantee) of DOE funding, and thus the entity should contact the direct grantee to raise any concerns about any alleged improper pause of funding. *Id.* ¶¶ 7-8. DOE remains willing to work with any direct grantee that believes their Weatherization Assistance Program funding is being improperly withheld to achieve an appropriate resolution. *Id.* ¶ 8.[1]

As for OMB, Plaintiffs' Amended Complaint alleges that "[o]n information and belief, OMB has acted in concert with the other agency defendants to freeze funding appropriated by the IRA and IIJA," including by "requiring the agencies to continue withholding funds." Am. Compl. ¶¶ 52, 54. But those allegations on information and belief are not competent evidence of harm. *Cf. Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 6 & n.9 (1st Cir. 1998). And Plaintiffs' declarations fail to identify any injury attributable specifically to OMB's actions. To the contrary, the only declaration that even mentions OMB is another redacted declaration, which vaguely states that "I understand from our government partners that they believe our IRA funds are still frozen under the authority of OMB Memo M-25-11," which "does not make sense to me." Redacted Decl., Ex. R (ECF No. 26-9) ¶ 13. Even if that statement were

_____

[1] Plaintiffs filed several declarations in redacted form without seeking leave to do so. Contrary to Plaintiffs' assertions, Defendants disagree that the redactions are "not material," PI Mot. at 21 n.6, as the identity of the specific entities claiming harm is necessary for, among other reasons, crafting appropriately tailored relief. *See* Part V, *infra*. In any event, for jurisdictional purposes, Plaintiffs' failure to submit declarations proving the specific entities suffering injury—and instead submitting declarations that make it impossible for Defendants to fully dispute the claimed injury—highlights that Plaintiffs have not carried their burden of factually proving jurisdiction sufficient to obtain emergency preliminary relief.

accurate, however, it is difficult to see why the injury would be attributable to OMB Memo M-25-11, as opposed to either the *Unleashing American Energy* EO (which OMB Memo M-25-11 implements) or the particular agency that is allegedly withholding the relevant funding. *See id.* ¶ 5 ("This grant is from the Department of the Interior, through the National Park Service."). Thus, Plaintiffs have not proven any injuries specifically attributable to OMB itself. Plaintiffs likewise do not establish any injuries caused by the Director of the National Economic Council in his official capacity, who is mentioned only once in the Amended Complaint, *see* Am. Compl. ¶ 31, and even there without any detail as to his alleged unlawful actions.[2] Accordingly, at the outset, Plaintiffs' motion should be construed as being directed only against USDA, Interior, EPA, and HUD—and not the three other agency defendants for which Plaintiffs have failed to prove any ongoing injuries.

**B.    Plaintiffs Have Engaged in Improper Claim Splitting, As They Are Already Litigating a Previously Filed Funding Case**

Regardless of the relevant universe of agency defendants, Plaintiffs here

---

[2] Plaintiffs also have not demonstrated that the Director of the National Economic Council can properly be considered an "agency" subject to APA review. Components of the Executive Office of the President that are not statutorily created and whose sole function is to advise and assist the president, like NEC, are typically not agencies under the APA. *See* Exec. Order No. 12,835, *Establishment of the National Economic Council*, 58 Fed. Reg. 6,189 (Jan. 27, 1993); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 (D.C. Cir. 1985) (an EOP component is not an agency if its "sole function is to advise and assist the President"); *Armstrong v. Bush*, 924 F.2d 282, 286 n. 2 (D.C. Cir. 1991) (suggesting the determination may be different when "components of the EOP . . . have statutory responsibility," which NEC does not); *Citizens for Resp. & Ethics in Washington v. Off. of Admin.*, 566 F.3d 219, 222-23 (D.C. Cir. 2009) (holding that the EOP Office of Administration was not an agency under FOIA, which has an even broader definition of "agency"). Thus, Plaintiffs have not established jurisdiction over the NEC Director for this reason too.

cannot proceed with their claims at all because they have engaged in improper claim splitting. Specifically, the National Council of Nonprofits and its members are already litigating a case in the United States District Court for the District of Columbia (D.D.C.) challenging the same alleged harms from the "federal funding freeze." *See National Council of Nonprofits v. OMB*, No. 1:25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025). Thus, the doctrine of claim splitting precludes this subsequent suit on the same subject matter.

Courts have clarified that claim splitting is a distinct doctrine from res judicata, though the two are closely related. "The difference is that the claim-splitting doctrine, unlike res judicata, applies where the second suit . . . has been filed before the first suit has reached a final judgment." *Laccinole v. Diversified Consultants, Inc.*, No. 1:19-cv-149, 2020 WL 1862969, at *2 (D.R.I. Apr. 14, 2020) (McElroy, J.). Claim splitting borrows the res judicata framework to ask "'not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit.'" *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017) (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011)); *see also Laccinole*, 2020 WL 1862969, at *3. And "[t]here is no reason why the doctrine against splitting claims, which is thus only one application of the general doctrine of res judicata, should not apply to claims against the Government." *Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849, 852 (1st Cir. 1947).

Application of the rule against claim splitting is especially appropriate here. This case involves the same plaintiff (National Council of Nonprofits), represented by

the same counsel, in yet another challenge to an alleged categorical pause in grant funding—with yet another request for emergency, expedited relief.  That is precisely the type of tactic the doctrine of claim splitting was designed to prevent.  *See Laccinole*, 2020 WL 1862969, at *2 ("The doctrine of claim splitting is also meant to protect parties from the vexation of concurrent litigation over the same subject matter." (cleaned up)).

Assuming the D.D.C. case were to reach final judgment, moreover, it would undoubtedly preclude this second suit.  *See Vanover*, 857 F.3d at 841.  The First Circuit employs the "transactional approach" to determine whether a successive cause of action is precluded by the first.  *See Mass. Sch. of Law at Andover, Inc., v. Am. Bar Ass'n,* 142 F.3d 26, 38 (1st Cir. 1998).  "Under this approach, a cause of action is defined as a set of facts which can be characterized as a single transaction or series of related transactions."  *Id.*  The essential inquiry is whether "the causes of action arise out of a common nucleus of operative facts."  *Id.*

The D.D.C. action, like this one, seeks to challenge an alleged "nationwide funding freeze."  *Nat'l Council of Nonprofits*, 2025 WL 597959, at *15; *cf.* PI Mot. at 2 ("This case concerns *one important part of that broader assault that continues to harm Plaintiffs here* . . . the freeze on billions of dollars in funding appropriated by two laws passed by Congress during the prior administration[.]" (emphasis added)).  The alleged injuries giving rise to the claims in both cases are identical—*i.e.*, the alleged withholding of the exact same grant funding from NCN and its members.  *Compare, e.g.*, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *6 ("Plaintiffs have marshalled

significant evidence indicating that the funding freeze would be economically catastrophic—and in some circumstances, fatal—to their members."), *with* PI Mot. at 29 (claiming similar irreparable harms from "Defendants' intentional funding freezes"). And both cases involve essentially the same underlying claims for relief— about the purported lack of statutory authority to implement a freeze, and the freeze being arbitrary and capricious (though the D.D.C. case also contains an additional claim under the First Amendment). *Compare Nat'l Council of Nonprofits*, 2025 WL 597959, at *12-16 (analyzing claims), *with* PI Mot. at 12-27 (similar claims). Thus, the claims in the two cases are plainly similar and arise out of the same core set of facts—*i.e.*, the alleged withholding of grant funding based on a purported "funding freeze."

To be sure, there are some differences between the lawsuits. The D.D.C. action focuses primarily on OMB Memorandum M-25-13, whereas this case focuses on funding appropriated under the IRA and IIJA. As Plaintiffs in the D.D.C. case have emphasized, however, their claims are not solely limited to OMB Memo M-25-13, and instead they seek to challenge a broader funding freeze. *See* Pls.' Reply re TRO, *Nat'l Council of Nonprofits*, No. 25-cv-239 (D.D.C.), ECF No. 24 at 3 ("Plaintiffs are not challenging a piece of paper. They are challenging the Memo's *freeze on federal funding*." (emphasis added)); *see also Nat'l Council of Nonprofits*, 2025 WL 597959, at *8 n.7. A component of that same "freeze" is being challenged in this case too, as Plaintiffs themselves admit—Plaintiffs characterize the challenged freeze in this case as arising out of the same "series of unprecedented and sweeping executive orders

and agency directives [that] have halted duly authorized payments and processing of grants, loans, reimbursements, and other financial assistance."  PI Mot. at 1.

In any event, claim splitting does not require that the claims in the two suits be identical, as long as the underlying facts and claims are sufficiently related— which the challenged "freezes" here clearly are.  *See Laccinole*, 2020 WL 1862969, at *3 ("It is of no moment that each Complaint alleges a different telephone call or calls. These subsequent calls are connected, related transactions, concerning a debt and efforts to collect that debt."); *see also Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir. 1991) ("As long as the new complaint grows out of the same 'transaction or series of connected transactions' as the old complaint, the causes of action are considered to be identical for res judicata purposes." (cleaned up)).  NCN is seeking to remedy the exact same injury in both suits (alleged withholding of members' grant funding), based on the same underlying legal theories, as part of their overall challenge to a purported "funding freeze."  Even if the claims are not identical, they are sufficiently related that a final judgment in the D.D.C. action would plainly preclude NCN's claims here seeking to challenge similar conduct.

Finally, it is not entirely clear whether all of the named Plaintiff entities in this case are members of NCN, such that they would be considered direct participants in the D.D.C. case.  At least two of the specific Plaintiff entities (WRWC and GIC) are members of NCN according to their declarations, *see* Exs. M-N (ECF Nos. 26-4, 26-5), though the other three Plaintiff entities (ERICD, CLAP, and CSNDC) do not expressly say one way or the other.  *See* Exs. L, P, Q (ECF Nos. 26-3, 26-7, 26-8).

Even if those three entities are not formal members of NCN, and do not have any relationship to the D.D.C. action so as to be considered bound by its judgment, *see Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), that would at most allow those three entities' claims to proceed—not the claims of NCN or the other two Plaintiffs who are participants in the D.D.C. action. But again, it is Plaintiffs' burden to prove their entitlement to a preliminary injunction, which they have not done by submitting a record that is ambiguous as to whether any particular Plaintiff's claims are even properly before this Court.

For present purposes, then, although claim splitting frequently results in dismissal, *see Adams v. California Dep't of Health Servs.,* 487 F.3d 684, 694 (9th Cir. 2007), at this preliminary stage the Court need only conclude that, as a result of their filing a second complaint challenging the same general "funding freeze," it is unlikely that NCN and its members will prevail on the merits of their claims and thus their motion for preliminary relief should be denied (or, at minimum, should be significantly narrowed to only three entities and their funding).

## II.    Plaintiffs Never Define the Agency Actions They Seek to Challenge, But Their Claims Would Not Be Cognizable However Formulated

### A.    Plaintiffs Cannot Challenge an Amorphous "Freeze" Comprising an Unknown and Undefined Set of Agency Actions

This Court should deny Plaintiffs' motion for the straightforward reason that it fails to identify the agency actions it seeks to challenge. Defendants cannot possibly defend against challenges to an unknown universe of agency actions, nor can the Court properly evaluate such amorphous claims. Plaintiffs' failure to properly define their claims is an independent reason to deny their motion.

-19-

As noted, Plaintiffs never define exactly what agency actions they are challenging.  Specifically, Plaintiffs purport to seek relief against "the freeze on billions of dollars in funding appropriated by two laws passed by Congress during the prior administration, the Inflation Reduction Act and the Infrastructure Investment and Jobs Act[.]" PI Mot. at 2.  But Plaintiffs never identify the specific agency actions that they believe comprise this allegedly unlawful "freeze."

In fact, Plaintiffs admit the challenged "freeze" is comprised of many different actions by numerous different agencies.  *See, e.g.*, PI Mot. at 2 ("Defendants the Departments of Agriculture, Energy, Interior, and Housing and Urban Development, EPA, and those agencies' leadership, with assistance from Defendant the Office of Management and Budget, have each acted to halt funding authorized by the IRA and IIJA. In doing so, they have acted unlawfully."); *id.* at 5-9 (listing different agency actions).  Even when Plaintiffs identify specific agency actions that are part of the alleged freeze, Plaintiffs emphasize that their claims are not limited to such identified actions—instead those actions are only a "handful of examples" that "are merely evidence of a much wider freeze[.]" Am. Compl. ¶ 51.

Plaintiffs' failure to define the exact scope of their challenge is an independent reason to deny relief.  For APA claims, "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action.'" *Colo. Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) (quoted approvingly in *Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 88 (1st Cir. 2016)).  Plaintiffs cannot possibly have met that burden if they fail to identify the

full scope of agency actions being challenged. Nor can Defendants realistically be expected to defend the statutory basis for an undefined universe of agency decisions, let alone explain the reasoned decision-making behind each of those unknown decisions. Although the First Circuit's recent stay decision in *New York v. Trump* stated that "we are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once," slip op. at 35, that does not eliminate Plaintiffs' burden to actually identify the specific "discrete final agency actions" that they are challenging—which Plaintiffs here have expressly declined to do. *See* Am. Compl. ¶ 51.

Moreover, Plaintiffs' motion essentially confirms that their claims can be analyzed only on a program- or grant-specific basis. For example, their argument that the "freeze" is contrary to law depends on the particulars of the statutory framework and appropriations provisions governing each grant program. *See* PI Mot. at 25-26 (discussing statutory framework for weatherization assistance funds, forestry programs, and conservation partnerships). Determining whether a pause on disbursement is lawful necessarily requires examining the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program. Thus, the Court must evaluate the specifics of each alleged withholding, which cannot be done in the abstract or in an across-the-board manner.

In similar circumstances where Plaintiffs have sought broad relief that cannot

be evaluated without reference to more specific and concrete factual and legal contexts, courts have concluded that Plaintiffs' claims are not ripe. *See, e.g.*, *Reddy v. Foster*, 845 F.3d 493, 505 (1st Cir. 2017) ("Until the dispute ripens, and more facts come to light, we cannot perform the requisite claim-specific analysis as to any claim that may be brought, as we have before us only hypothetical claims, the details of which are not known." (cleaned up)); *Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc. v. Healey*, 844 F.3d 318, 330 (1st Cir. 2016) (rejecting claims that are "too contingent on as-yet-unknown features of as-yet-unspecified claims to be fit for adjudication at this time"). Equally here, Plaintiffs' claim—that the Executive cannot lawfully pause any funding appropriated by the IRA and IIJA—is too amorphous for resolution and cannot be decided without reference to more specific factual and legal contexts. Thus, Plaintiffs' motion should be denied because it does not present a ripe claim and does not even identify the full range of agency actions being challenged.

### B. Regardless of How Plaintiffs Try to Characterize Their Claims, They Are Not Cognizable

Even if the Court were willing to overlook Plaintiffs' unwillingness to define the full scope of what they are challenging, and instead focus on those agency actions that Plaintiffs do specifically mention, Plaintiffs' claims would still fail at the outset. First, Plaintiffs cannot directly challenge the *Unleashing American Energy* EO, which is plainly lawful. Beyond that EO, Plaintiffs' challenges are tantamount to impermissibly broad, programmatic challenges to entire agency operations—not challenges to discrete agency action, which is what the APA requires. Finally, even

if Plaintiffs' claims were viewed in their narrowest form—*i.e.*, as challenging the withholding of funding under specific grant programs—there is serious doubt as to whether such claims could proceed in this Court.  For all of these reasons, too, Plaintiffs' motion should be denied.

### 1.    Plaintiffs Cannot Seek Relief Against the President's Executive Order, Which Is Plainly Lawful

Plaintiffs assert that the challenged "freeze" of IRA and IIJA-appropriated funding began on January 20, 2025, when "President Trump directed that such funds be halted in a day-one executive order."  PI Mot. at 5 (citing the *Unleashing American Energy* EO).  Thus, their motion seeks to prohibit Defendants from "implementing, giving effect to, or reinstating under a different name the directive to freeze funding appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act in the *Unleashing American Energy* executive order[.]"  ECF No. 26-14 at 2.[3]

Plaintiffs cannot obtain their requested relief foreclosing agencies from relying on or implementing the President's Executive Order.  To obtain such relief, Plaintiffs would need to demonstrate that an agency could *never* permissibly rely on the Executive Order to pause funding.  But Plaintiffs do not even attempt to make that showing across every grant program that involves IRA and IIJA-appropriated funding.  *See also* Part III.A.1, *infra* (explaining that many IRA and IIJA-appropriated programs allow for pauses in funding).

_____

[3] Plaintiffs do not seek relief directly against the President's Executive Order.  For good reason: the President is not a named defendant; injunctive relief could not properly be issued against the President; and the President is not an "agency" subject to APA review.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).

Contrary to Plaintiffs' characterization, the *Unleashing American Energy* EO does not impose a categorical pause on all IRA and IIJA-appropriated funding. Plaintiffs wholly ignore that the EO directs agencies to implement the pause on funding "in a manner consistent with applicable law." § 10(b). And OMB Memo M-25-11 likewise acknowledges that "[a]gency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget"—a statement flatly at odds with Plaintiffs' characterization of the EO as commanding a categorical pause on all IRA and IIJA-appropriated funding.

Given that Plaintiffs' attacks on the EO rest on a mischaracterization, they cannot demonstrate that the EO is unlawful in all its applications. As a Judge on the Fourth Circuit recently observed in a similar challenge, there are "serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it" to the extent that Plaintiffs are challenging an overall Executive Order rather than "any particular agency action implementing the Executive Order[.]" Order Staying Preliminary Injunction, *Nat'l Ass'n of Diversity Ofcrs. in Higher Educ. v. Trump*, No. 25-1189, Doc. 29 at 9 (Mar. 14, 2025) (Rushing, J., concurring). That is equally true here, where Plaintiffs seek to preclude *any* implementation of the *Unleashing American Energy* EO regardless of the agency or grant program at issue.

Ultimately, the *Unleashing American Energy* EO represents the President instructing subordinate agencies to pause certain funding, to the extent they have authority to do so, and to the extent such funding implicates the President's energy policies. Such Presidential instructions to subordinate agencies are plainly lawful.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1; *id.*, § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Building & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)) (citation omitted).

There should therefore be no dispute that the President may issue policy guidance to federal agencies, including in the form of Executive Orders that direct agency officials in the performance of their duties. Nor can there be any dispute that the President may properly exercise this constitutional authority by directing subordinates generally to pause or terminate federal funding programs that do not accord with the President's policy priorities, to the extent they have authority to do so under governing law. And as discussed further below, federal agencies often have broad discretion to determine how to implement funding programs, including to terminate grants or contracts based on policy preferences. *See* Part III.A, *infra*. Because agencies may often terminate funding awards for policy-based reasons, so too may the President "control and supervise" agencies' decisions in this area. *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). The *Unleashing American Energy* EO is fully consistent with these principles, and Plaintiffs cannot enjoin agencies'

reliance on that EO across all contexts and grant programs.

### 2.    The APA Permits Challenges Only to Discrete Actions, Not Broad Programmatic Attacks to Overall Agency Programs

Apart from seeking to enjoin agency reliance on the *Unleashing American Energy* EO, to the extent Plaintiffs' challenge to the "freeze" is intended to challenge various agency directives regarding funding, that is an impermissible programmatic attack on ongoing agency activities—not a claim directed at discrete agency action, as the APA requires. The high-level, ongoing operation of an overall funding program is not the type of discrete, final agency action subject to challenge under the APA.

The APA permits review only over "final agency action," 5 U.S.C. § 704, which means that the action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Additionally, these final agency actions must be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999), like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013); *see also Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 490-91 (5th Cir. 2014) ("The Tribe's complaint is structured as a blanket challenge to *all* of the Government's actions with respect to *all* permits and leases granted for natural resource extraction on a significantly large amount of land

covering several national parks in Texas. The fact that the Tribe is not seeking wholesale reform of every single mineral permit, lease, or sale granted by these agencies but only those related to the lands on which the Tribe claims aboriginal title, does not diminish the scale of the relief sought by the Tribe.").

Here, Plaintiffs mention various agency documents and directives apart from the *Unleashing American Energy* EO, such as: OMB Memorandum M-25-11; an ongoing review by the Secretary of Agriculture that has allegedly resulted in only $20 million of IRA and IIJA-appropriated funding being released; a February 7 memorandum from EPA instructing a review of existing grants; a February 3 directive from the Secretary of the Interior; and a January 20, 2025 memorandum from the then-Acting Secretary of Energy. *See* PI Mot. at 5-9; *see also* ECF Nos. 21-1, 21-2, 21-3, 21-5, 21-9. These agency documents, however, reflect over-arching policy initiatives, not discrete agency actions pertaining to specific funding streams. "Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Nat'l Wildlife Fed'n*, 497 U.S. at 891. And here, Plaintiffs' challenges are "to the way the Government administers these programs and not to a particular and identifiable action taken by the Government." *Alabama-Coushatta Tribe*, 757 F.3d at 491.

In this respect, Plaintiffs' challenge—to an undefined "freeze" of funds, spanning across multiple agencies and numerous different funding streams, but untethered to any specific funding decision—is exactly the type of broad, programmatic challenge that the Supreme Court has rejected. *See Nat'l Wildlife*

*Fed'n*, 497 U.S. at 893 ("[T]he flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA[.]").  Just as in *National Wildlife Federation* the challengers could not escape that result by characterizing their challenge as being to a "land withdrawal review program," because that was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM," *id.* at 890, the same is true for the alleged "freeze" that Plaintiffs seek to challenge here. There is no singular "freeze," but rather that is the name Plaintiffs attribute to the thousands of individual decisions made by agencies about whether particular grants or other funding should be paused.

It is no answer that requiring Plaintiffs to proceed on a program-by-program, grant-by-grant basis would make it more difficult for them to obtain comprehensive relief.  "The case-by-case approach that this requires is understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of our Nation's wildlife and the streams and forests that support it.  But this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894.  Indeed, one of the reasons for requiring Plaintiffs to proceed in this case-by-case manner is to avoid injecting courts into the day-to-day oversight and supervision of agencies' compliance:

> If courts were empowered to enter general orders compelling compliance
> with broad statutory mandates, they would necessarily be empowered,
> as well, to determine whether compliance was achieved—which would
> mean that it would ultimately become the task of the supervising court,

rather than the agency, to work out compliance with the broad statutory
mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67.  That concern is particularly apt here.  Given the broad-
ranging nature of Plaintiffs' claims, it is impossible for this Court to grant relief
without becoming an overseer of a wide swath of the Executive Branch's ongoing
funding activities, contrary to what the APA and the separation of powers
contemplate.

### 3.    Plaintiffs Also Have Not Established This Court's Jurisdiction Over Grant-Specific Challenges

Finally, even if this Court were to view Plaintiffs' claims in the narrowest
possible terms—*i.e.*, as challenging the withholding of specific grant funds from
particular Plaintiffs—there would still be substantial doubt about this Court's ability
to hear such claims.

For one thing, many of the specific Plaintiffs here appear to be subrecipients
of grants, not the prime recipient that was awarded the grant directly by the agency.
For example, the Woonasquatucket River Watershed Council states that they have
"a grant of $1 million" that is currently frozen, but they "are actually a subgrantee
and were contracted to receive these funds through another nonprofit group that has
a grant directly from the U.S. Forest Service."  Lehrer Decl. (ECF No. 26-4) ¶ 7.
Similarly, Green Infrastructure Center, Inc. "participates in the Urban and
Community Forestry Program," whose "funding has been awarded as grants to states
and then to us as state subrecipients."  Firehock Decl. (ECF No. 26-5) ¶¶ 7, 9, 15; *see
also, e.g.*, ECF No. 26-6 ¶ 13; Churgin Decl. (ECF No. 26-8) ¶ 9; ECF No. 26-11 ¶ 11.

As subrecipients, however, it is far from clear that these entities have any

rights to enforce against the United States or the grantor agencies, as opposed to against the prime grant recipients with whom they have a direct relationship. *Cf. Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 692-94 (7th Cir. 2013) (holding that co-applicant was not a grantee, did not have "a legitimate claim of entitlement to the grant," and their "entitlement to grant funds existed only by contract with" the prime grantee). And from an equitable perspective, if the primary grant recipient is not bringing suit to resume work on their overall grant, it is difficult to see why an agency should be compelled to fund the work of a subrecipient on the grant.

Even setting aside this subrecipient issue, Plaintiffs have not made any effort to establish this Court's jurisdiction over claims challenging funding withholdings. Fundamentally, Plaintiffs are seeking to obtain money from the United States. But a suit for money damages cannot be brought under the APA, *see* 5 U.S.C. § 702 (waiving sovereign immunity only for an action "seeking relief other than money damages"), and here, depending on the specific terms and conditions of the individual grant agreements, at least some of Plaintiffs' claims may be contractual in nature and thus not subject to APA suit. *Cf. Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (holding that "grant agreements [are] contracts when the standard conditions for a contract are satisfied"); *Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) ("An NSF grant agreement includes the essential elements of a contract and establishes what would commonly be regarded as a contractual relationship between the government and the grantee."); *see generally A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995) (explaining that

contractual claims must be pursued under the Tucker Act, not through an APA suit).

Plaintiffs' requested relief highlights that, at bottom, they are seeking to compel the United States to continue disbursing funds under their existing grant agreements. *See* ECF No. 26-14 (requesting an order compelling Defendants to "take immediate steps to resume the processing, disbursement, and payment of funding appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act, and to release funds previously withheld or rendered inaccessible"). That is exactly the type of remedy one would expect in a contract action:

> Stripped of its equitable flair, the requested relief seeks one thing: The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements. In even plainer English: The Conference wants the Government to keep paying up. Thus the Conference seeks the classic contractual remedy of specific performance. But this Court cannot order the Government to pay money due on a contract. Such a request for an order that the government must perform on its contract is one that must be resolved by the Claims Court.

*U.S. Conf. of Catholic Bishops v. Dep't of State*, No. 1:25-cv-465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (citations omitted). Although courts cannot order specific performance against the United States, *Coggeshall Development Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989), to the extent actions by the United States interfered with Plaintiffs' contractual rights, Plaintiffs may seek a money damage remedy under the Tucker Act. Nor can Plaintiffs avoid that result by styling their claims as ones arising under the APA. *See Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (although "Diaz attempts to couch his claims in the language of equitable and declaratory relief," such as seeking "an order directing that his proposal be funded," a plaintiff "cannot manufacture an APA claim

by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"); *cf. Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, No. 24A831, 2025 WL 698083, at *2 (U.S. Mar. 5, 2025) (Alito, J., dissenting from denial of application to vacate order) (explaining that "the relief here more closely resembles a compensatory money judgment rather than an order for specific relief that might have been available in equity," and "[s]overeign immunity thus appears to bar the sort of compensatory relief that the District Court ordered here").[4]

Even if Plaintiffs' claims are not contractual in nature, there may still be independent remedial schemes that bar their claims from proceeding in this Court. For example, Plaintiffs invoke funding provided in connection with DOE's Weatherization Assistance Program.  *See* PI Mot. at 25-26.  But that program requires that any judicial challenges be brought exclusively in the Court of Appeals. *See* 42 U.S.C. § 6869.

Additionally, even if Plaintiffs could pursue APA relief in district court as to their funding denials, the APA itself would likely preclude review, as many funding

---

[4] The Court's conclusion that APA claims could proceed in *Massachuetts v. Nat'l Institutes of Health*, --- F. Supp. 3d ----, No. 25-CV-10338, 2025 WL 702163 , at *7 (D. Mass. Mar. 5, 2025), is not to the contrary.  There, the Court characterized the plaintiffs as "not request[ing] the Court to examine any contract or grant agreement created between the parties," *id.* at *6, but here Plaintiffs' claims are expressly bound up with the underlying terms of the grant agreements, *i.e.*, the terms under which agencies can evaluate and terminate Plaintiffs' grants. *See, e.g.*, PI Mot. at 27-28 (arguing that federal regulations govern "how agencies are to measure grantees' performance, and they require agencies to make those measures of performance clear to grantees at the outset," but "Defendants have ignored" those regulations and "have frozen funding based not on an individualized assessment of how particular grants have performed or after taking into consideration the terms of particular grant agreements"); Am. Compl. ¶¶ 101-02.

decisions are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *see, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").  A federal agency's decision to pause funding for one recipient, and potentially redirect that funding to a different recipient, is presumptively unreviewable.  *See Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Brown Jackson, J.) ("[T]his Court has little doubt that HHS's decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable."); *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) ("Insofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge[.]"); *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'" (quoting *Alan Guttmacher Inst. v. McPherson*, 597 F.Supp. 1530, 1536-37 (S.D.N.Y. 1984))).

Plaintiffs make no effort to demonstrate that any of their alleged funding denials overcome these barriers to review. Thus, even if Plaintiffs' claims here are viewed in their narrowest form—*i.e.*, as challenging the withholding of specific funds owed to them under particular grants—Plaintiffs have not carried their burden of establishing this Court's jurisdiction over their claims.

## III.    Plaintiffs' Challenges Are Meritless

On the merits, the Executive Branch's actions here were lawful. As discussed above (Part II.B.1, *supra*), there can be no reasonable dispute that, to effectuate his discretion and policy objectives, the President may direct agencies to take actions to pause or freeze funding pursuant to the authority those agencies possess under their organic statutes and regulations. Plaintiffs do not take issue with that legal proposition, which by itself confirms the legality of the *Unleashing American Energy* EO and agencies' subsequent actions to implement that EO.

Plaintiffs instead argue that (1) Defendants cannot lawfully pause funding, because they lack statutory authority to do so and because such pauses are contrary to the underlying statutes and regulations governing the grants; and (2) Defendants' pauses on funding were arbitrary and capricious. As discussed above, it is impossible to address or evaluate these claims in the abstract—*i.e.*, based solely on a generalized "freeze" spanning numerous agencies, rather than with reference to specific agency actions or particular funding decisions. In any event, even if these claims were cognizable, they would still fail.

## A.    Congress Has Afforded Defendants Broad Discretion Over the Relevant Grant Programs, Which Provides Ample Authority to Temporarily Pause Funding

At the outset, Plaintiffs are effectively seeking to preclude Defendants from implementing *any* pause in grant funding appropriated under the IRA and IIJA.  *See* Prop. Order (ECF No. 26-14) at 1 (requesting an order compelling Defendants to "take immediate steps to resume the processing, disbursement, and payment of funding appropriated under the Inflation Reduction Act and Infrastructure Investment and Jobs Act").  To obtain such sweeping relief, however, Plaintiffs would have to prevail on a facial challenge—proving that there are no circumstances in which Defendants could lawfully pause IRA or IIJA-appropriated grant funding.  *See generally Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [action] would be valid," or by showing that the action lacks "a plainly legitimate sweep." (cleaned up)).  Plaintiffs cannot make that showing here.

Specifically, Plaintiffs contend that there is no statute authorizing Defendants to broadly pause funding, and that any such pause violates the IRA, IIJA, and underlying grant program statutes.  But as discussed further below, each of the IRA and IIJA grant programs identified by Plaintiffs affords the relevant Defendant agency with significant discretion over allocating funding among eligible recipients. Plaintiffs do not identify any statutory language *requiring* that Defendants fund their particular programs, let alone that Defendants do so on any particular timeline. Thus, Congress vested Defendants with discretion over ensuring the proper allocation

and use of federal funds within certain boundaries, and Plaintiffs do not even attempt to identify a single program where Defendants allegedly transgressed a boundary set forth in the IRA, IIJA, or grant program statute.

Because the relevant grant programs themselves—along with the IRA and IIJA appropriations measures—confer discretion on Defendants to select among permissible recipients for funding, Plaintiffs cannot establish that it violates any law to pause their funding to consider whether their particular grants are indeed the best uses of such funding. Indeed, terminating a recipient because their grant "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), is expressly contemplated by the general regulations on grants. Thus, Plaintiffs' claims that Defendants lack authority to pause funding are meritless.

### 1.   Defendants Have Broad Authority to Select Recipients Under the IRA and IIJA Grant Programs

Plaintiffs' statutory claims are all premised on Defendants lacking authority to pause grant funding, both in their organic statutes and under the IRA and IIJA. But Plaintiffs' statutory analysis ignores the discretion that Congress afforded the Defendant agencies in the grant programs themselves. In particular, Defendants have ample discretion to select recipients for particular grant funding, including authority to terminate one recipient and select a different recipient that better aligns with the President's priorities. That discretion highlights that Plaintiffs cannot obtain the sweeping relief they seek here against all such pauses in funding.

To start, there can be no dispute that, in the absence of specific Congressional direction, the Executive has broad discretion to determine how best to allocate grant

funding.  Indeed, in *Lincoln v. Vigil* itself, the Executive "discontinued the direct clinical services to Indian children in the Southwest," 508 U.S. at 188, even though Congress was aware of those services and had previously directed a pilot program for such services.  *See id.* at 186-87.  Nonetheless, because "the appropriations Acts for the relevant period do not so much as mention the Program," and the organic statutes "speak about Indian health only in general terms," there was no "legally binding obligation[]" to continue the services; thus, "[t]he decision to terminate the Program was committed to the Service's discretion."  *Id.* at 193-94.  Although it is certainly possible that, for any particular grant program, Congress may have "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes," in the absence of such directives agencies are free to "allocate[] funds . . . to meet permissible statutory objectives" and courts have "no leave to intrude."  *Id.* at 193; *see also* Part II.B.3, *supra*.

Here, even a brief review of the relevant funding frameworks demonstrates that Defendants have ample discretion to decide whether to fund particular grant recipients.  For example, Plaintiffs invoke the Urban and Community Forestry Assistance Program, *see* PI Mot. at 25-26, for which Plaintiff Green Infrastructure Center, Inc. (GIC) is a subrecipient of an IRA-funded grant.  *See* Firehock Decl., Ex. N (ECF No. 26-5) ¶ 7.  The relevant language governing that program, however, affords the Secretary significant discretion over how to achieve the program's purposes:

> The Secretary is authorized to provide financial, technical, and related assistance to State foresters or equivalent State officials for the purpose of encouraging States to provide information and technical assistance to units of local government and others that will encourage cooperative

efforts to plan urban forestry programs and to plant, protect, and maintain, and utilize wood from, trees in open spaces, greenbelts, roadside screens, parks, woodlands, curb areas, and residential developments in urban areas. In providing such assistance, the Secretary is authorized to cooperate with interested members of the public, including nonprofit private organizations.

16 U.S.C. § 2105(c). And the relevant IRA language likewise imposes few constraints on the Secretary, appropriating certain funds "to provide multiyear, programmatic, competitive grants to a State agency, a local governmental entity, an agency or governmental entity of the District of Columbia, an agency or governmental entity of an insular area . . . , an Indian Tribe, or a nonprofit organization through the Urban and Community Forestry Assistance program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2105(c)) for tree planting and related activities." Pub. L. No. 117-169, § 23003(a)(2), 136 Stat. 1818, 2026 (Aug. 16, 2022). Nothing in this statutory language demonstrates that GIC is legally entitled to any of the funding, or that the Secretary would be violating any statutory command by terminating GIC's funding and re-directing those funds to a new recipient whose activities the Secretary believes better promotes the President's energy agenda.

Similarly, Plaintiffs invoke the Weatherization Assistance Program administered by the Secretary of Energy. *See* PI Mot. at 25-26. Setting aside that this funding is not currently paused, *see* Part I.A, *supra*, there would be no legal defect even if there was a pause. Specifically, the relevant plaintiff entity does not appear to be a State or other entity that directly provides weatherization services to low-income individuals, and instead the entity "provide[s] training and technical assistance to community action staff" regarding weatherization assistance. Redacted

-38-

Decl., Ex. T (ECF No. 26-11) ¶ 4.  For those activities, Congress has given the Secretary of Energy complete discretion over whether to fund them at all.  *See* 42 U.S.C. § 6866 ("The Secretary may provide technical assistance to any such project . . . utilizing in any fiscal year not to exceed up to 20 percent of the sums appropriated for such year under this part."); *see also* 10 C.F.R. § 440.23(e) ("The Secretary may reserve from the funds appropriated for any fiscal year an amount not to exceed 20 percent to provide, directly or indirectly, training and technical assistance to any grantee or subgrantee.").  Plaintiffs do not point to anything in the governing statutes, or in the IRA or IIJA appropriations laws, requiring the Secretary to fund such training activities.  *See* IIJA, Pub. L. No. 117-58, § 40551, 135 Stat. 429, 1075 (Nov. 15, 2021) (providing a lump-sum appropriation).  Nor do Plaintiffs identify any legal requirement that funding be provided on a particular timetable; to the contrary, the IIJA-appropriated funding will "remain available until expended."  *Id.*

Plaintiffs also invoke the Regional Conservation Partnership Program, 16 U.S.C. § 3871 *et seq.*, of which another anonymous member of NCN is a subrecipient. *See* Redacted Decl., Ex. O (ECF No. 26-6) ¶ 13; PI Mot. at 26.  But again, nothing in the statutory language entitles any particular recipient to funding, and the IRA itself merely directs that the Secretary prioritize the funding of certain activities:

> [T]he Secretary shall prioritize partnership agreements under section 1271C(d) of the Food Security Act of 1985 (16 U.S.C. 3871c(d)) that support the implementation of conservation projects that assist agricultural producers and nonindustrial private forestland owners in directly improving soil carbon, reducing nitrogen losses, or reducing, capturing, avoiding, or sequestering carbon dioxide, methane, or nitrous oxide emissions, associated with agricultural production.

Pub. L. No. 117-169, § 21001(a)(4)(B)(ii), 136 Stat. 1818, 2016-17 (Aug. 16, 2022).

Plaintiffs do not suggest that, in order to effectuate that prioritization, the anonymous NCN member *must* be awarded funds, or that the Secretary has no lawful discretion to award funds to a different recipient that might accomplish the above objectives while also advancing the President's broader energy agenda.

Finally, Plaintiffs mention the HUD Green and Resilient Retrofit Program, pursuant to which Plaintiff Codman Square Development Corporation (CSDC) was initially selected for an award but the award has not yet been finalized. *See* Latimore Decl., Ex. L (ECF No. 26-3) ¶¶ 9-11. The Green and Resilient Retrofit Program was both authorized and funded through the IRA, which makes funding available for loans "to fund projects that improve energy or water efficiency, enhance indoor air quality or sustainability, implement the use of zero-emission electricity generation, low-emission building materials or processes, energy storage, or building electrification strategies, or address climate resilience, of an eligible property[.]" IRA, Pub. L. No. 117-169, § 30002(a)(1), 136 Stat. 1818, 2027 (Aug. 16, 2022). Once again, nothing in that statutory language entitles CSDC to any particular funding, or even compels HUD to fund the type of activities in which CSDC seeks to engage. *See* Latimore Decl. ¶¶ 7-8.

Moreover, as CSDC acknowledges, HUD never entered into a finalized grant agreement with them—HUD only initially awarded them the grant, subject to further approvals and signed agreements. *See id.* ¶¶ 9-11. Plaintiffs do not identify any unequivocal command that HUD must finalize grant agreements with those entities initially selected for an award. *Cf. SUWA*, 542 U.S. at 63 ("[T]he only agency action

that can be compelled under the APA is action legally *required*.").  Thus, the Secretary remains legally free to decline to finalize CSDC's award, and instead direct those funds to a different project that the Secretary believes better promotes the President's energy-related policies.

### 2. This Statutory Discretion Allows Defendants to Temporarily Pause Funding for Particular Recipients

In all of the above examples, the statutory provisions creating the grant program, and appropriating funding for the grant program, vest the relevant agency with discretion to choose among eligible recipients.  To be sure, the above examples contain *some* constraints on the relevant agency's discretion—*e.g.*, the Urban and Community Forestry Assistance Program must involve planting trees; the Weatherization Assistance Program must involve increasing the energy efficiency of low-income housing; the Regional Conservation Partnership Program must prioritize certain conservation partnerships; and the Green and Resilient Retrofit Program must involve loans for improving the energy efficiency of certain public housing. Within those broad confines, however, the enabling legislation (and the relevant appropriations laws) themselves afford the relevant agencies with discretion to decide how the funding should be allocated among eligible recipients.

That discretion is precisely what defeats Plaintiffs' claim that the statutory grant programs and/or the IRA and IIJA legally foreclose the relevant pauses on funding.  *See* PI Mot. at 22-26.  As discussed, Plaintiffs point to nothing in those statutory frameworks that withdraws agency discretion to select among eligible recipients for funding.  And that discretion is what allows agencies to pause ongoing

-41-

funding and decide whether to redirect the funds to a different eligible recipient.

Indeed, Plaintiffs appear to concede the point, recognizing that agencies have discretion to pause, terminate, and redirect funding on an individualized basis. *See* PI Mot. at 28 (contending that Defendants "have frozen funding based not on an individualized assessment of how particular grants have performed or after taking into consideration the terms of particular grant agreements"). In evaluating an agency's statutory authority, however, it makes no difference whether the agency acts categorically or on a case-by-case basis—in both scenarios the agency is acting pursuant to the same authority to pause funding and consider redirecting it elsewhere. *Cf. NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion."); *Allbaugh*, 295 F.3d at 33 (upholding Executive Order in which "the President directs his subordinates how to proceed in administering federally funded projects"). And again, in *Lincoln v. Vigil* itself, the agency acted in a categorical manner—*i.e.*, terminating an entire program—which the Supreme Court nonetheless held was lawful and not subject to judicial review. 508 U.S. at 194 ("The decision to terminate the Program was committed to the Service's discretion.").

There is no need for the Court to search for a statute specifically authorizing Defendants to pause funding and redirect it to a different recipient. *See* PI Mot. at 22-23 (asserting that Defendants have not pointed to any such statute). That authority is implicit in the grant programs and appropriations laws themselves, because they direct the agencies to administer the grant programs in a manner that accomplishes

certain broad objectives but otherwise leave the agencies with complete discretion over how to allocate the funding. In such circumstances, the agencies plainly have statutory authority to pause funding and evaluate whether that funding is being put to the best use. Indeed, such actions are not only permissible but presumptively unreviewable. *See* Part II.B.3, *supra*.

Nor do the relevant grant regulations alter that analysis. *Cf.* PI Mot. at 27-28. To the contrary, the general grant regulations expressly allow agencies to terminate grants "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Plaintiffs wholly ignore this provision, instead focusing on irrelevant regulations such as performance reports, *id.* § 200.329, and penalties for when a grantee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." *Id.* § 200.339. The relevant pauses here are not based on any defect in grantee performance or compliance; they are based on the agency's desire to review whether federal funds are being spent in a manner that best promotes the President's and the agencies' agenda. Nothing in the regulations forecloses such a pause, and § 200.340(a)(4) fully supports ensuring that federal money is spent in a manner that "effectuates . . . agency priorities."

### 3.    Temporary Pauses in Funding are Historically Common

Plaintiffs' argument—that agencies cannot temporarily pause funds to evaluate whether such funds are being spent in the best manner—is also contrary to historical practice. The President and agencies have long instituted temporary pauses on funding to re-evaluate that funding, including for policy concerns.

-43-

On the first day of his Administration, for example, President Biden directed agencies to "pause work on each construction project on the southern border wall" and to "pause immediately the obligation of funds related to construction of the southern border wall," pending "consideration of terminating or repurposing contracts with private contractors engaged in wall construction" for other purposes. Procl. No. 10,142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021), §§ 1(a)(i), (ii), 2. Ultimately, President Biden elected to spend the appropriated funding on other purposes that he determined were consistent with the underlying appropriations laws but more in line with his policy objectives.

Similarly, President Obama directed that certain Recovery Act funds should not be spent on particular purposes, and even "[w]here executive departments or agencies lack discretion under the Recovery Act to refuse funding" for those projects, the department or agency should nonetheless "delay funding of the project for 30 days[.]" *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531 (Mar. 20, 2009), § 2(d)(i). This direction of agencies' spending decisions, including to pause funding over which the President has policy concerns, is indistinguishable from the types of pauses that Plaintiffs seek to challenge here.

Finally, courts and other entities have likewise acknowledged that temporary pauses in obligations or payments of appropriations are quite common. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how

Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The GAO, itself an entity within the Legislative Branch, has also approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981); *see also* GAO, *Principles of Federal Appropriations Law*, § 2-50 (4th ed. 2016).

Based on these authorities, there is nothing unlawful about agencies exercising their discretion to temporarily pause funding, evaluate whether that funding best promotes the President's agenda, and if not redirect that funding elsewhere. *See also Allbaugh*, 295 F.3d at 32 (noting that subordinate "officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law," including in the context of federal grants). Here, the relevant statutes and appropriations laws afford the agencies with statutory discretion to select among eligible recipients. Plaintiffs therefore cannot demonstrate that each and every pause involving IRA or IIJA funds is necessarily unlawful.[5]

---

[5] This case does not involve any impoundment issues, *cf.* PI Mot. at 27 n.8, because the Executive has only temporarily paused certain funding—not declined to spend any appropriated funding. An agency might determine to "lift" the pause and continue funding the original recipient. Or an agency might decide that its priorities are better served by directing the remaining funding to a different recipient. In either scenario, however, the Executive would still be spending the full amount appropriated by Congress.

**B.**     **A Temporary Pause in Funding Is Not Arbitrary and Capricious**

**1.**     **Arbitrary and Capricious Review is Inappropriate**

As a threshold matter, for many of the reasons discussed above, Plaintiffs' claims are not pled in a way that would allow for the Court to engage in arbitrary capricious review.  First, Plaintiffs do not direct their claims at a discrete agency action to be reviewed; instead, they launch an amorphous, broad-based programmatic attack.  As a result, it is entirely unclear what the object of the inquiry should be— *i.e.*, the *Unleashing American Energy* Executive Order, OMB Memo M-25-11, a specific agency directive, or a particular agency decision as to a particular grant (or set of grants).  Plaintiffs' claims are simply too unbounded to even allow for a meaningful examination of the relevant agency actions.

Additionally, many of Plaintiffs' arguments appear to be a backdoor attempt to obtain arbitrary and capricious review of the President's *Unleashing American Energy* Executive Order.  *See* PI Mot. at 17-18.  But requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA.  *Franklin*, 505 U.S. at 800-01; *cf. Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) ("the State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA"), *aff'd*, 698 F.3d 171 (4th Cir. 2012).  Moreover, subjecting agencies to this review would require them to question and explain the President's reasoning, which is plainly not their role.

*Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law.").

Finally, without knowing the specific agency actions being challenged, it is impossible raise all possible defenses, such as whether the challenged action is "final agency action" under the APA, or even subject to judicial review. As discussed above, funding decisions typically are not subject to review because they are committed to agency discretion by law, and specific funding instruments may have other remedies available to a dissatisfied grantee. *See* Part II.B.3, *supra*; 5 U.S.C. § 704 (authorizing judicial review over final agency action "for which there is no other adequate remedy in a court"). Any of these defenses would preclude the type of arbitrary-and-capricious review that Plaintiffs seek here as to a still-undefined universe of agency actions comprising the purported "freeze."

### 2. A Pause on Funding Pending a Decision Whether to Continue That Funding or Redirect It Elsewhere Is Rational

Notwithstanding the lack of clarity as to what it is that the Court is supposed to determine is arbitrary and capricious, whatever Plaintiffs challenge, such actions are likely to satisfy such review. Given the finite resources available to Defendant agencies, it is perfectly rational to pause funding pending a further determination whether to continue that funding or redirect it elsewhere.

The scope of review under the "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004).

Section 7 of the *Unleashing American Energy* EO rationally grounds the pause on funding in particular objectives: "prioritiz[ing] cost-effectiveness, American workers and businesses, and the sensible use of taxpayer money, to the greatest extent." *Unleashing American Energy* EO § 7(b). Those objectives build on the President's earlier declarations of energy policy, *see id.* § 2, all of which were designed to "unleash America's affordable and reliable energy and natural resources," in an effort to "restore American prosperity" and thereby "rebuild our Nation's economic and military security, which will deliver peace through strength." *Id.* § 1. To accomplish these goals, the President emphasized that agencies should "ensure that no Federal funding [is] employed in a manner contrary to the principles outlined in this [EO], unless required by law." *Id.* § 2(i). Similarly, OMB Memo M-25-11 rationally implements these same objectives by emphasizing to agencies the President's requirements, while confirming that the only funding that need be paused are those funds that may be implicated by the President's declared policies. *See* OMB Memo M-25-11.

Plaintiffs' primary argument is that "Defendants could simply have carried out their review of IRA and IIJA spending while allowing financial assistance programs to continue in the ordinary course." PI Mot. at 16. While Defendants *could* have done this, it was also perfectly rational not to; the question under arbitrary and capricious

review is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). The Administration reached a policy judgment that safeguarding taxpayer dollars was a higher priority than providing uninterrupted funding to the IRA and IIJA recipients. *Cf. State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."). The agencies' actions are neither arbitrary nor capricious; pausing funds pending a review for effectiveness and consistency with the President's energy policy is rational and directly relates to saving taxpayer dollars and accomplishing the President's articulated goals.

Plaintiffs' suggested alternative that a review precede any pause also overlooks the obvious problem that government resources—*i.e.*, taxpayers' dollars—are finite, and any funds that are disbursed are unlikely to ever be recouped and thus cannot be redirected and put to more valuable uses. Weighing the costs of a temporary pause in funding, versus the potential benefits of being able to redirect funding to purposes that the Administration believes will better serve the public, is a judgment entrusted to the Executive and not the courts. *Cf. Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1437 (D.C. Cir. 1983) ("When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference.").

As to the individual agency Defendants, Plaintiffs apparently understand the

"various public statements and memoranda," PI Mot. at 17, they have selectively attached as exhibits to be the object of the arbitrary and capricious inquiry. But again, setting aside whether these even constitute agency action within the meaning of the APA,[6] let alone *final* agency action, these documents are rational for the same reason as OMB Memo M-25-11—they are implementations of the President's orders. Plaintiffs' Exhibits A, B, and C are all efforts to give notice of and comply with the *Unleashing American Energy* EO, which cannot be subjected to arbitrary and capricious review. And, as has already been discussed, pausing spending to safeguard taxpayer dollars is eminently reasonable. Plaintiffs' Exhibit D contains instructions from an agency on compliance with a court order, which likewise is not an "agency action" subject to APA review. Plaintiffs' Exhibit E is an EPA directive that identifies concerns about whether past funds had been misused and properly overseen, and thus directed an internal review of funding decisions—a perfectly rational step to guarantee that, going forward, the agency would "ensure the effective implementation and use of taxpayer dollars." ECF No. 21-5 at 2. Plaintiffs' motion does not specifically challenge any of the reasoning or conclusions set forth in EPA's February 7 directive attached as their Exhibit E. And Exhibit F is a congressional letter, not an agency document at all. *See* ECF No. 21-6.

---

[6] Under the APA, an "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Press releases and emails from frontline operational staff uninvolved in policymaking do not seem to fit that bill, absent some articulated connection to a specific funding decision. And of course, any such challenge to specific funding decisions would raise other problems discussed above.

Throughout, Plaintiffs contend that Defendants failed to properly account for grantees' reliance interests in their continued receipt of funding.  *See, e.g.*, PI Mot. at 19-20.  But again, those reliance interests are contrary to the very objectives articulated by the President and his subordinates—*i.e.*, ensuring that every dollar spent achieves maximum value for American taxpayers, consistent with the President's broader energy policies.  And in any event, none of the policies here commanded an unequivocal pause for all funding; they all contained exceptions at least for funding required by law to continue.  There is nothing irrational about articulating broad policy goals, and then deferring to agencies and individual program offices within those agencies to implement those policies to the maximum extent possible, as consistent with law and any reliance interests identified as to particular grants.

Finally, Plaintiffs contend that the agencies' actions were arbitrary and capricious because their actions did not align with the *Unleashing American Energy* EO itself.  *See* PI Mot. at 18-19.  But such an argument is foreclosed to Plaintiffs, as the EO specifically states it does not create any private right of enforcement.  *Unleashing American Energy* § 10(d) ("This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.").

Ultimately, Plaintiffs' arbitrary and capricious arguments fail, even assuming they are properly before the Court.  They cannot subject an Executive Order to APA

review, nor can Plaintiffs disregard the rationality of pausing spending, pending a determination about whether such funding could be redirected to a purpose more consistent with the President's policies.  Plaintiffs may prefer to continue receiving funding while that review is ongoing, but it was certainly rational for the President and his subordinate agencies to conclude that it better conserved taxpayer dollars to pause funding pending that review.  Thus, Plaintiffs' claims all fail on the merits.

## IV.    The Balance of the Equities Independently Forecloses Relief

### A.    Plaintiffs Have Not Proven Irreparable Injury in the Absence of a Preliminary Injunction

"Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991) ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Public Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))).  "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II*, 370 F.3d at 162.  Plaintiffs' motion can be denied solely on the basis that they have failed to demonstrate irreparable harm.  *See id.* ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.").

As already discussed, Plaintiffs have failed to demonstrate any injury—let alone irreparable injury—for several of the Defendant agencies here. *See supra* Part I. Moreover, their claimed injuries are substantially smaller if narrowed, at most, to the three Plaintiff entities here who may not be members of NCN and therefore do not already have a pending suit in D.D.C. *Id.*

In any event, even Plaintiffs' broader arguments do not rise to the level of irreparable harm. They essentially argue that, if they do not continue to receive their grant funding, they will not be able to perform the work contemplated by those grants. *See* PI Mot. at 28-35. But the relevant question here is largely one of timing. To the extent relief is denied but Defendants ultimately elect to continue Plaintiffs' funding after Defendants' review is complete, Plaintiffs have not demonstrated that they would, at that point, be unable to accomplish the grant's objectives. *Cf.* 2 C.F.R. § 200.329(e) (requiring reports on significant developments, including "problems, delays, or adverse conditions which will impact the recipient's or subrecipient's ability to meet milestones or the objectives of the Federal award"). Thus, even if the temporary pause might hypothetically result in a delay in Plaintiffs' ability to perform certain work under the grant, Plaintiffs have not proven that it would undermine their grant work as a whole. Alternatively, to the extent Defendants ultimately elect to terminate Plaintiffs' funding, that only highlights the lack of irreparable harm—because Plaintiffs would not be entitled to continued receipt of that funding anyway.

Additionally, Plaintiffs' invocation of reputational harms is wholly speculative.

*See* PI Mot. at 33-34.  Plaintiffs do not explain how a preliminary injunction could possibly redress any such harms, particularly given that Defendants would retain the undisputed authority to terminate Plaintiffs' grants under their own authorities.  *Cf. Tennessee v. Becerra*, 117 F.4th 348, 369 (6th Cir. 2024) (rejecting argument that state would suffer reputational injury as "too speculative," because state "d[id] not provide the requisite facts and affidavits supporting its theory of reputational harm" (citation omitted)).

Finally, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding denials.  Their declarations do not establish the need for broad relief in a single lawsuit—untethered to a defined set of discrete agency actions—as opposed to proceeding in the ordinary course of APA review over specific funding decisions.  The availability of alternate remedies likewise weighs against Plaintiffs' claimed irreparable harm here.

## B.    The Public Interest Weighs Squarely Against Relief

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction.  These final two factors merge in cases where relief is sought from the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In arguing that the public interest weighs in their favor, Plaintiffs primarily rely on the notion that they are likely to prevail on the merits and that there is no public interest in the perpetuation of unlawful agency action.  *See* PI Mot. at 36.  But that is just a repackaged version of their merits arguments, which fail for reasons

already discussed.

Meanwhile, contrary to Plaintiffs' assertions that Defendants will not suffer harm if a preliminary injunction is granted, an injunction here would effectively disable OMB from implementing the President's priorities consistent with its legal authorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets omitted); *see also Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021). Additionally, where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds are unlikely to be retrievable afterwards.

Plaintiffs seek exceptionally broad relief, not limited to remedying the alleged harms they suffer. *See* Pls.' Proposed Order, ECF No. 26-1 (asking the Court to release *all* IRA and IIJA funding and to enjoin Defendants from "implementing, giving effect to, or reinstating under a different name [OMB Memorandum M-25-11]"). Given the breadth of relief that Plaintiffs seek, the harms to the Government would be tremendous. A broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide agencies' spending decisions. Indeed, agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's operative Executive Orders or other policy priorities for fear of risking contempt. Thus, the balance of

equities weighs in favor of the Government and relief should be denied.

## V. Any Injunctive Relief Should be Narrowly Tailored to Permit Lawful Agency Activity, and Should Be Stayed Pending Appeal

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).    Additionally, "'preliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'" *In re Microsoft Corp. Antitrust Litig*, 333 F.3d 517, 525 (4th Cir. 2003) (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)).    Therefore, the scope of equitable relief available here should be constrained by what would be available to Plaintiffs at final judgment under the APA.    *See Pac. Radiation Oncology, Ltd. Liab. Co. v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (preliminary relief must be "of the same nature as that to be finally granted").    If the Court is inclined to grant Plaintiffs' motion, it must do so consistent with the APA and the forms of relief it provides.    Thus, any relief should be narrowly tailored to apply only to Plaintiffs and to leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

As an initial matter, there is no basis for extending relief to non-parties in this suit, or to funding streams for which Plaintiffs have not shown harm to themselves or their members.    Plaintiffs purport to seek relief on behalf of "similarly situated nonparties," PI Mot. at 38, but they have made no effort to comply with Rule 23's requirements for pursuing such class-wide relief.    And the fact that NCN has so many

members that "it would be impracticable, if not impossible, to limit relief in this case just to Plaintiffs in their members," PI Mot. at 37, gets the analysis backwards—Plaintiffs are not entitled to *any* emergency injunctive relief, *see Munaf*, 553 U.S. at 689-90, and if Plaintiffs have not pled their claims in a way that allows for appropriately tailored relief, the result should be to deny relief entirely, not expand relief to operate on a universal basis.

Accordingly, any preliminary injunction should explicitly confirm that all obligations in the injunctive order apply only with respect to awards involving the Plaintiffs and their members (and really, at most, only those three Plaintiff entities not already pursuing claims in the D.D.C. action). *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Plaintiffs' requested order to release *all* funding appropriated under the IRA and IIJA, regardless of recipient, would not serve the purpose of preserving the current positions of the parties until a trial on the merits can be held, nor would it be consistent with basic principles of equity. Pls.' Proposed Order, ECF No. 26-1.

Second, Plaintiffs' proposed order, *id.*, invokes 5 U.S.C. § 705 as an authority for requesting broad relief. However, Section 705 provides in relevant part that, "to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to *postpone the effective date of an agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added). But here, it is not possible for the Court to "postpone" the

effective date of actions that have already been in effect.  To "postpone" means "to defer to a future or later time; to put off; delay."  Webster's New International Dictionary 1682 (1928) (def. 1); *see* Black's Law Dictionary 1389 (3d ed. 1933) ("To put off; defer; delay").  Section 705 thus requires that any postponement be contemporaneous with or predate the effective date of the challenged agency action; otherwise, there would be no way for a court to postpone that effective date.  Section 705 does not authorize an interim form of vacatur; instead, courts reviewing agency action must apply the traditional equitable principles governing the propriety and scope of any preliminary relief.  *See*, *e.g.*, *Winter*, 555 U.S. at 20, 24; *see also* H.R. Rep. No. 79-1980, at 43 (1946) (explaining that the authority granted by Section 705 "is equitable" and "would normally, if not always, be limited to the parties complainant").  And even if postponement were available, postponing the effective date on a universal basis would not be "necessary to prevent irreparable injury" to Plaintiffs.  5 U.S.C. § 705.  For these reasons, Section 705 does not provide a basis for any of Plaintiffs' requested relief in their proposed order.

Third, any order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to Defendants' and the Executive Branch's abilities to exercise their lawful statutory authority and discretion.  *See, e.g.*, *New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025) ("The Court's order does not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms[.]"); *see also New York v. Trump*, No. 25-1236 (1st Cir. Mar. 26, 2025),

slip op. at 40 n.16 (emphasizing that "the preliminary injunction clearly refers to a 'categorical pause or freeze of funding,' which, by its terms, could not apply to a pause or freeze based on an individualized determination under an agency's actual authority to pause such funds"); *id.* at 43. Likewise here, the Court should not enjoin agencies from exercising the authorities granted to them under applicable statutes, regulations, and grant agreements.

Additionally, the Court should decline to grant an injunction prohibiting Defendants from "implementing, giving effect to, or reinstating under a different name OMB Memo M-25-11." Pls.' Proposed Order, ECF No. 26-1. Foreclosing further executive action on the matter would be contrary to the limited relief available under the APA. And this particular aspect of Plaintiffs' requested relief is especially vague as to how OMB is supposed to determine whether a subsequent action is equivalent to "reinstating under a different name" the OMB Memo in this case. When granting equitable relief under the APA, "ordinarily the appropriate course is *simply to identify a legal error and then remand* to the agency" for further action consistent with that determination. *N. Air Cargo v. U.S. Postal Serv., 674 F.3d 852, 861* (D.C. Cir. 2012) (emphasis added). When there is a finding of arbitrary and capricious action, then "further consideration of the issue by the agency" is the required remedy. *State Farm*, 463 U.S. at 46. But an overbroad preliminary injunction like the one Plaintiffs request would prohibit the agency from engaging in "further consideration." *Id.*; *cf. Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 49 (D.D.C. 2022) (declining to "preclude an agency from reaching a similar result on the same issue of

substantive policy, as long as the second decision result[s] from a new procedural process distinct enough that it can fairly be considered a new 'action.'").

By requesting the exact opposite of the remedy that is typically available under the APA, Plaintiffs' proposed injunction also runs counter to the rule that "'preliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'" *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 525 (quoting *De Beers Consol. Mines*, 325 U.S. at 220). To avoid this defect, any preliminary relief here should make clear that it does not prohibit OMB from issuing new policies effectuating the President's priorities. Failure to include that clarification would only highlight the intrusive nature of Plaintiffs' requested injunction, prohibiting OMB from assisting the President in implementing his agenda. *Cf. Sherley*, 689 F.3d at 784.

Finally, in light of the extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Furthermore, Federal Rule of Civil Procedure 65(c) mandates "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). As "it is the policy of the United States to demand that parties seeking injunctions

against the Federal Government must cover the costs and damages incurred if the Government is ultimately found to have been wrongfully enjoined or restrained," Presidential Memorandum, *Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)*, available at [https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/](https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/) (March 11, 2025), Defendants respectfully request that the Court require Plaintiffs to provide as security a bond commensurate with the dollar value of grant funds required to be released by any preliminary injunction the Court may enter.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: March 27, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director

*/s/ Daniel Schwei*
DANIEL SCHWEI
Special Counsel (N.Y. Bar)
ANDREW F. FREIDAH
EITAN R. SIRKOVICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel.:  (202) 305-8693
Fax:  (202) 616-8460
Email:    daniel.s.schwei@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on March 27, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 305.


<u>/s/ *Daniel Schwei*</u>
Daniel Schwei