## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL, *et al.*,

*Plaintiffs,*

v.

DEPARTMENT OF AGRICULTURE,
*et al.*,

*Defendants.*

Case No. 1:25-cv-00097-MSM-PAS

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

Defendants have—without authority or justification—frozen billions of dollars in funding that was appropriated under the Inflation Reduction Act and the Infrastructure Investment and Jobs Act and awarded to recipients. They did so without regard for the damage their freezes would cause, including the jobs lost, local economies impacted, unsafe homes unremediated, access to local food denied, disaster recovery efforts stymied, and environmental problems left unaddressed. In opposing a preliminary injunction, Defendants barely defend these actions; they certainly do not deny them. Instead, they seek to escape the Court's review with a flurry of threshold arguments. But Defendants largely ignore the many recent decisions in other funding cases—including by the First Circuit—rejecting their arguments. They are no more persuasive here. Nor are Defendants' half-hearted claims on the merits, irreparable injury, and the public interest. The Court should order immediate relief to halt the ongoing harm caused by Defendants' actions.

1

## ADDITIONAL FACTUAL BACKGROUND

Since Plaintiffs filed their motion, facts have continued to develop. First, two of the named Plaintiffs and one of Plaintiffs' declarants (a member of the National Council of Nonprofits) have been notified that they may soon be able to access some of their funds. Woonasquatucket River Watershed Council received notice from the nonprofit through which it is a subgrantee that the group can now access its grant funding from the U.S. Forest Service (within the Department of Agriculture). *See* Ex. W ¶ 4. But that same notice made clear that funding is still uncertain, warning subgrantees, for example, not to undertake activities such as tree planting that would be impacted if funding is suddenly frozen again. *Id.* ¶¶ 5–6. Even if these funds are flowing—WRWC has not yet received them, *id.* ¶ 7—"the uncertainty created by the government's action . . . remains and creates serious challenges for WRWC's ability to plan and carry out long-term projects," *id.* ¶ 10.

Green Infrastructure Center, which participates in the same grant program as WRWC, has received notices from some, but not all, of the states through which GIC is a subgrantee, that they were again able to access their U.S. Forest Service funding, and that GIC could therefore resume its work. *See* Ex. X ¶¶ 3, 5, 7–8, 10–11. Some of these notices, however, informed GIC that "these federal funds continue to be reviewed," and that "they have no assurance that funding resumptions will continue." *Id.* ¶¶ 6, 8 (alteration omitted). Already, because the freeze continued for so long, GIC "ha[s] lost the spring planting season and will have to wait until fall 2025 for planting the trees." *Id.* ¶ 12. And even though some funding has resumed—for now—staff must

2

"redo and reschedule all the prior work, wasting thousands of dollars of staff time and diverting resources away from other parts of [GIC's] mission." *Id.*

The NCN member that conducts weatherization training heard on March 25 from the state through which it is a subgrantee that, for the first time in two months, the Department of Energy had accepted the state's claims for payment of IIJA-funded grants. *See* Ex. Y ¶ 4. That member has not yet received funds. *Id.* ¶ 5. And it fears DOE could freeze funding again at any time. *Id.* ¶ 6.

These fears are well founded. Just since Plaintiffs filed this motion, the NCN member dedicated to protecting its local watershed learned that a $740,000 grant through the National Fish Passage Program was frozen. Ex. Z ¶ 3. That program is funded through the IIJA, and run through the Department of the Interior. *Id.* When this member went to submit a reimbursement, the payment portal indicated the grant was "on hold." *Id.* ¶ 8. The grant status report in the payment portal stated: "Agency Review:  Yes"; "Threshold Amount: $1"; "Default Action: Hold"; and "Reason for Review: IRA/BIL HOLD." *Id.*

## ARGUMENT

A preliminary injunction is warranted. Defendants raise numerous threshold challenges to the Court's ability to grant relief, but none strikes true. On the merits, Plaintiffs have shown they are likely to succeed on each of their three claims. They have put forward undisputed evidence of ongoing irreparable harm from Defendants' conduct. And the public interest strongly favors immediate relief.

## I.    Defendants' Conduct Is Reviewable by This Court in This Case

### A. Plaintiffs challenge discrete final agency action: Defendants' intentional halt to funding appropriated under the IRA and IIJA.

Plaintiffs challenge Defendants' respective freezes of funding appropriated by the IRA and IIJA. *See, e.g.*, Am. Compl., ECF No. 21 ¶¶ 35, 51, 58. Defendants Department of Agriculture, Energy, Interior, HUD, and EPA, as well as their leadership, have halted the disbursement and processing of the IRA and IIJA funding that they administer. Am. Compl. ¶¶ 35–51. Defendants OMB, Vought, and Hassert have ordered executive agencies to freeze at least some categories of IRA and IIJA funding. *E.g.*, Am. Compl. ¶¶ 31–34, 94–95. In addition or in the alternative, on information and belief, Defendants OMB, Vought, and Hassert have also withheld purportedly necessary approvals to the other Defendants to release funding appropriated by the IRA and IIJA. *E.g.*, Am. Compl. ¶¶ 30, 33, 52–54, 87.

As Plaintiffs' motion showed, those actions to intentionally freeze IRA and IIJA funding constitute "final agency action" subject to judicial review under the APA, *see* 5 U.S.C. § 704, because they mark the "consummation of [Defendants'] decisionmaking process" and produce "legal consequences," *see* Mot. at 12–14 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Another court in this District recently reached the same conclusion. *New York v. Trump*, No. 1:25-cv-39, 2025 WL 715621, at *8–9 (D.R.I. Mar. 6, 2025). And just last week, the First Circuit found no cause to disturb that finding in denying the government's motion for a stay pending appeal. *New York v. Trump*, --- F.4th ---, 2025 WL 914788, at *12 (1st Cir. Mar. 26, 2025) ("*New York* Stay Op."). Likewise, courts

considering challenges to similar funding freezes have held that those freezes are final agency action. *See Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (holding that "a nationwide pause on federal financial assistance" was final agency action) ("*NCN II*"); *Aids Vaccine Advoc. Coal. v. Dep't of State*, No. 25-cv-00400, 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025) (explaining that "the final agency action Plaintiffs challenge is the Secretary of State's" implementation of an executive order "by suspending congressionally apportioned foreign aid"); *cf. also Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (compiling other examples of programmatic "pauses" that constituted final agency action). Defendants barely acknowledge these decisions, even as they ask the Court to depart from them.

Defendants cannot—and do not—deny that freezing funds appropriated under the IRA and IIJA in a programmatic sweep is final agency action. So they feign confusion (at 19–22) about the agency action being challenged. They complain (at 20) that Plaintiffs' challenge involves "numerous different agencies." Quite so: As Plaintiffs have shown, *each defendant agency* has implemented a freeze, each of which is a parallel agency action. Defendants next fault Plaintiffs (at 20, 27) for citing various agency memoranda and e-mails. But, as Defendants' own citation makes clear, Plaintiffs do not cast those documents as the "final agency actions" they challenge, but rather "evidence" of those actions: Defendants' ongoing holds on IRA and IIJA funding. *See* Am. Compl. ¶ 51 (quoted in Opp'n at 20).

Failing to persuade, Defendants try to recast Plaintiffs' claims in three

different ways. They begin (at 23–26) by arguing that a challenge to the President's executive order is improper—even as they acknowledge (at 23 n.3) that Plaintiffs are not bringing such a challenge. Because Plaintiffs unambiguously challenge *Defendants'* actions to halt the processing and payment of funding appropriated under the IRA and IIJA. Agency actions implementing presidential directives are routinely subject to judicial review; this matter is no different. Defendants' lengthy discourse on the reviewability and supposed legality of the *Unleashing American Energy* order has no relevance here.

Second, Defendants suggest (at 26–29) that Plaintiffs are not attacking a discrete final agency action, but instead launching a "programmatic attack on ongoing agency activities." Opp'n at 26. In Defendants' retelling, the broad freezes they implemented are not broad at all, but instead merely the coincidental result of "thousands of individual decisions made by agencies about whether particular grants or other funding should be paused." Opp'n at 28. Defendants ask this court to credulously accept "a remarkable—and unfathomable—coincidence," *NCN II*, 2025 WL 597959, at *7 (declining to do so), that is inconsistent with both the facts Plaintiffs have alleged and the way that other courts have conceptualized similar freezes. *See, e.g.*, *New York v. Trump*, 2025 WL 715621 at *8–9.

Defendants' position is contradicted by their own statements, too, which candidly acknowledge that the defendant agencies have implemented sweeping, non-individualized freezes on funding appropriated under the IRA and IIJA. The Department of Agriculture, for example, has openly said that it has "paused . . .

funding in the Inflation Reduction Act," Press Release, Dep't of Agric., *Secretary Rollins Releases the First Tranche of Funding Under Review* (Feb. 20, 2025), https://perma.cc/UD67-F97T; it has told grantees that "payments on contracts funded through the Inflation Reduction Act are currently on pause," Ex. K, ECF No. 26-2; and its online payment system reflects that the "default action" for IRA or IIJA grants over the "threshold amount" of "$1" is "BIL/IRA HOLD," Ex. Z. Other agency defendants have been similarly open about what they are doing and why. See Mot. at 5–9 and sources cited therein. And, of course, the *Unleashing American Energy* executive order directed these agencies to freeze IRA and IIJA funding, categorically—an order to which, Defendants say here, they were "duty-bound to give effect." Opp'n at 45. Notably, Defendants even now never deny that they are broadly freezing IRA and IIJA funds. In fact, they admit it (at 43):

> The relevant pauses here are not based on any defect in grantee performance or compliance; they are based on the agency's desire to review whether federal funds are being spent in a manner that best promotes the President's and the agencies' agenda.

Defendants' position is flatly contradicted by the First Circuit's recent decision in *New York v. Trump*. The court in that case noted that the record there—just like the record here—"included numerous notices and emails authored by Agency Defendants that support the finding that their funding freezes were categorical in nature, rather than being based on 'individualized assessments of their statutory authorities and relevant grant terms.'" *New York* Stay Op., 2025 WL 914788, at *13. And it underscored that courts need not blind themselves to reality when assessing the evidence before them. *Id.* (emphasizing that "in reviewing the record, a court is

'not required to exhibit a naiveté from which ordinary citizens are free'" (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)); *see also Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 368852, at *7 (D.D.C. Feb. 3, 2025) ("*NCN I*") (rejecting government's appeal to presumption of good faith "when their own actions contradict their representations").

Defendants' reliance on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), and *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), is misplaced for the reasons the First Circuit set out in *New York v. Trump*. Far from a challenge to agencies' general, ongoing operations, the plaintiffs in *New York v. Trump* challenge a set of "discrete final agency actions": "the decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds." *New York* Stay Op., 2025 WL 914788, at *11.; *see also Lujan*, 497 U.S. 871, 890 n.2 (noting that an agency's action in "applying some particular measure across the board . . . can of course be challenged under the APA"). So too here.

Third and finally, Defendants (at 29) suggest the Court construe Plaintiffs' claims "as challenging the withholding of specific grant funds from particular Plaintiffs." But the APA does not require review of individual actions implementing a policy where the policy itself is reviewable, nor does the amended complaint allege a challenge to individual withholdings.

### B. Plaintiff NCN's ongoing challenge to one funding freeze does not preclude its challenge to the different illegal freezes at issue here.

Defendants argue that the Court should not even consider the unlawful conduct challenged here because Plaintiff NCN is currently litigating a different

lawsuit in a different court challenging a different final agency action. *See NCN v. OMB*, No. 25-cv-239 (D.D.C.). That case involves a challenge to OMB Memo M-25-13, which, before it was stayed and then preliminarily enjoined, directed all executive agencies to halt essentially all federal financial assistance by January 28. *See* ECF No. 31-1. Plaintiffs in this case do not challenge Memo M-25-13. They challenge Defendants' different actions to withhold funding appropriated under the IRA and IIJA. Freezes based on executive orders issued by President Trump are expressly not at issue in *NCN v OMB*. And those actions are entirely separate from Memo M-25-13 (and, indeed, Defendants here could not be acting in reliance on Memo M-25-13 because the directive in that memo has been enjoined and—OMB claims—rescinded). NCN's ongoing litigation with respect to Memorandum M-25-13 therefore is no bar to Plaintiffs challenging entirely separate agency actions in this suit. The mere fact that the administration is currently engaged in so many different harmful and unlawful actions is not the defense it apparently believes.

At the outset, Defendants get the burden wrong on their claim-splitting argument, asserting (at 19) that, as part of "Plaintiffs' burden to prove their entitlement to a preliminary injunction," Plaintiffs must submit an "[un]ambiguous record as to whether any particular Plaintiff's claims are even properly before this Court." Defendants provide no citation for this statement, at little wonder. "Claim preclusion, like issue preclusion, is an affirmative defense," and so "it is incumbent on the defendant to plead and prove such a defense." *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008); *see also, e.g.*, *Unicolors, Inc. v. Macy's, Inc.*, Case No. 14-

8611, 2015 WL 1020101, at *2 (C.D. Cal. Mar. 6, 2015) (emphasizing that the defendant seeking dismissal bore "[t]he burden of establishing improper claim splitting"). Defendants do not and could not meet their burden here.[1]

"Federal courts borrow from the *res judicata* test to determine if the claim-splitting doctrine applies. That is, whether the first suit, if it were final, would preclude the subsequent suits." *Laccinole v. Diversified Consultants, Inc.*, No. 19-cv-149, 2020 WL 1862969, at *3 (D.R.I. Apr. 14, 2020) (citations omitted). "The First Circuit employs the 'transactional approach' to determine whether successive causes of action are the same as the first." *Id.* (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998)). Under the transactional approach, the inquiry is whether "the causes of action arise out of a common nucleus of operative facts." *Andover*, 142 F.3d at 38.

The analysis here is straightforward: As set forth above, the plaintiffs in *NCN v. OMB* sued OMB and its Director to challenge the issuance and implementation of OMB Memo M-25-13. The *NCN* plaintiffs alleged that OMB Memo M-25-13 violated the Administrative Procedure Act because it was arbitrary and capricious, in excess of statutory authority, and contrary to the First Amendment. *See* Compl., *NCN v. OMB*, No. 25-cv-239 (D.D.C. Jan. 28, 2025), ECF No. 1. The claims required a close analysis of that particular memo, *see NCN II*, 2025 WL 597959, at *6, 9, 12, 16, and

---

[1] Although Defendants bear the burden on their claim-splitting defense, Plaintiffs take this opportunity to clarify that, of the individual named plaintiffs, only Codman Square Neighborhood Development Corp. is not a member of NCN.

sought relief against OMB and its Director, who together issued the memo.[2]

Here, by contrast, Plaintiffs challenge entirely separate agency actions, by a much broader set of defendants, to freeze a different category of funds—i.e., funding appropriated under the IRA and IIJA. Plaintiffs' challenge to the ongoing freezes of IRA and IIJA funding plainly do not "arise out of" the same "nucleus of operative facts" at issue in *NCN v. OMB. See Andover*, 142 F.3d at 38; *cf Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 415 (2020) (holding that broadly similar trademark cases involving "different marks, different legal theories, and different conduct—occurring at different times" "lacked a 'common nucleus of operative facts'"). Plaintiffs do not allege (and Defendants do not claim) that the ongoing freezes of IRA and IIJA funding were prompted by Memo M-25-13 or are in any other way factually related to that memo. None of Plaintiffs' claims for relief here depend on the existence of Memo M-25-13 or the circumstances in which it was issued. And the fact that the district court in *NCN v. OMB* has enjoined the directive in that memo, and the government has purportedly withdrawn it, *see NCN II*, 2025 WL 597959, at *3, 19–20, only confirms that Defendants' ongoing freezes of IRA and IIJA funding are factually distinct from that memo, *see New York v. Trump*, 2025 WL 715621, at *8–9 (distinguishing between and separately analyzing Memo M-25-13 and "the Agency Defendants' acts implementing funding pauses under . . . the

---

[2] Defendants strain the record to the point of breaking in arguing (at 17) that the *NCN* case challenged not OMB Memo M-25-13, but rather "a broader funding freeze." The very line from Plaintiffs' briefing that Defendants quote makes clear that the challenge is to "*the Memo's* freeze" (emphasis added).

*Unleashing* EO and the OMB's *Unleashing* Guidance").[3]

Defendants' contrary argument largely rests on *legal*—not factual—similarities between this case and *NCN v. OMB*. *See* Opp'n at 17 (comparing the legal claims in each case). But any overlap in the law applicable to each case does not show that the causes of action "arise out of" the same "nucleus of operative *facts*." *See Andover*, 142 F.3d at 38 (emphasis added). That different actors have engaged in similar unlawful conduct on different occasions does not mean that all such violations must (or even, as a practical matter, could) be pursued in the same suit. And the fact that the administration's various attacks on different funding streams may cause similar *types* of harm does not mean those harms (or the causes thereof) are factually indistinguishable—let alone that the "causes of action" in this case and *NCN v. OMB* arise from the same core facts. *See id.*; *contra* Opp'n at 15 (arguing—incorrectly—that plaintiffs in each case are "challenging the same alleged harms").[4]

Defendants seek to avoid this conclusion by recasting (at 15–17) both suits as challenges to a general "federal funding freeze." But they offer no basis on which the

---

[3] That the plaintiffs in *New York v. Trump* chose to challenge these separate actions in a single case does not mean that their separate challenges arise out of the same nucleus of operative facts or that the states would have been barred from pursuing their challenges in separate cases.

[4] The two cases on which Defendants rely (at 18) are worlds away from this one. *Kale v. Combined Insurance Co. of America* involved a party challenging the termination of his employment in two separate suits that differed only in the legal theories presented. 924 F.2d 1161, 1166 (1st Cir. 1991). *Laccinole* involved a pro se plaintiff challenging the same month-long campaign of debt collection calls by filing 22 separate actions. 2020 WL 1862969, at *1. These obviously distinguishable situations are no help to Defendants here, where Plaintiffs challenge separate actions by different groups of actors to freeze different categories of federal funding.

Court could endorse applying such a high level of abstraction in considering different freezes undertaken through different agency actions, by different actors. *Cf. Hiser v. Franklin*, 94 F.3d 1287, 1292 (9th Cir. 1996) ("Although Hiser's [second] challenge implicates the same right of 'access to the courts' as was addressed in [his first challenge], it is based on a different set of operative facts and is not merely an alternative remedy or theory of recovery." (internal citation omitted)). The claims in *NCN v. OMB*—concerning the freeze on nearly all financial assistance ordered in Memo M-25-13—were clearly based on a different set of facts than the claims here.

Contrary to Defendants' assertions and selective quotations, the court in *NCN v. OMB* has never understood that case to encompass *other* funding freezes beyond Memo M-25-13, nor did plaintiffs in that case seek relief as to other funding freezes. Indeed, the court made clear from the day the case was filed that "anything that was terminated pursuant to other executive orders," as opposed to Memo M-25-13, "is fodder for another lawsuit." Ex. AA at 29:3–5; *cf. Apparel Art Int'l, Inc. v. Amertex Enters. Ltd.*, 48 F.3d 576, 586 (1st Cir. 1995) ("Under a generally accepted exception to the res judicata doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action."). It has never wavered from that view. *See, e.g.*, Ex. BB at 39:11–14 ("[I]f an agency were to independently determine that a funding source should be terminated under the EOs, that would be beyond the scope of any injunction or TRO.").

Setting aside the record in *NCN*, Defendants' claim-splitting arguments cannot even survive a close reading of the rest of their brief *here*: Defendants seek (at

13) to have OMB dismissed from this case—leaving not one agency defendant in common with *NCN* and thus making clear the lack of factual overlap. Although they express concern for judicial efficiency if NCN is able to participate in two separate challenges to separate agency actions, that concern rings hollow when Defendants also suggest (at 28, 54) that every single grant recipient is required to bring its own, individual lawsuit. And Defendants cannot seriously argue (but do, at 31), that Plaintiffs should have brought these claims in *NCN v. OMB*, while simultaneously maintaining that they should have brought them in the Court of Federal Claims.

Finally, even if the Court were inclined to accept Defendants' arguments, that would not require denying preliminary relief. An allegation of claim-splitting is not, as Defendants imply, a jurisdictional bar, but instead raises equitable questions of docket management. *See Laccinole*, 2020 WL 1862969, at *2. This Court can consider the equities in exercising its discretion. *See Connectu LLC v. Zuckerberg*, 522 F.3d 82, 89 n.5 (1st Cir. 2008); *cf. Conservation L. Found., Inc. v. Longwood Venues & Destinations, Inc.*, 415 F. Supp. 3d 240, 242–43 (D. Mass. 2019) (applying *Connectu* and finding that even if claims were wrongly split, the equities counsel against dismissal where there was no prejudice to defendants and the plaintiff sought to enforce a public interest as a private attorney general). Given the weakness of Defendants' arguments, the irreparable harm Plaintiffs and their members continue to face, and the  public interest, the equities weigh strongly in favor of proceeding to resolve (and grant) Plaintiffs' request for preliminary relief.

14

### C. Defendants' apparent partial resumption of funding to a few programs does not obviate the need for preliminary relief.

The need for immediate relief is not lessened by the apparent partial resumption of some IRA and IIJA funding. Defendants submit a declaration from a Department of Energy official stating that he is "not currently aware of any pause or freeze on payments under DOE Weatherization Assistance Program," ECF No. 31-2 ¶¶ 6–7, the program through which one of Plaintiffs' declarants draws funds as a subgrantee, *see* Ex. T, ECF No. 26–11. In addition, since this motion was filed, Plaintiffs WRWC and GIC have received notice that funding of a program through which they are subgrantees has partially resumed. Ex. W ¶ 4; Ex. X ¶¶ 5, 7–8, 10.

That apparent partial release of some IRA and IIJA funding—where the record evidence shows the freezes continue broadly—does not lessen the need for the requested preliminary relief. Plaintiffs Childhood Lead Action Project, Eastern Rhode Island Conservation District, and Codman Square Neighborhood Development Corporation, as well as all non-party declarants besides the one participating in the weatherization program, remain unable to access funding and have received no notice that their funding will resume. Individual members of NCN continue to discover grants that have been frozen. Ex. Z ¶ 3. The *Unleashing American Energy* order has not been rescinded, nor have any of the other agency statements or memoranda Plaintiffs have cited reflecting Defendants' continued freezes of IRA and IIJA funding. While Defendants have provided a declaration from one agency, they have notably failed to provide any similar evidence with respect to any of the other agency defendants, and even now do not deny that those agencies continue to freeze IRA and

IIJA funding. The evidence also establishes that just because a grant is available now does not mean it will remain so. Childhood Lead Action Project, for example, has seen access to its funding turn off, then on, then off, then on, then off again. Ex. P, ECF No. 26-7 ¶¶ 11–15.

Under bedrock principles of voluntary cessation, the government cannot hope to avoid the Court's review just by "suspend[ing] its challenged conduct [or, here, at most a tiny fraction of its challenged conduct] after being sued." *FBI v. Fikre*, 601 U.S. 234, 241 (2024). To establish that judicial intervention is no longer warranted, "a defendant must prove no reasonable expectation remains that it will return to [its] old ways," which the Supreme Court has emphasized is a "formidable burden." *Id.* (quotation marks omitted). And that rule "holds for governmental defendants no less than for private ones." *Id.*

Defendants could not possibly make that showing given that record evidence already described, including their ongoing commitment to targeting IRA and IIJA funding. *See New York v. Trump*, 2025 WL 715621, at *6 (holding that the government had not "met [its] heavy burden of illustrating that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur'" (quoting *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010))); *NCN II*, 2025 WL 597959, at *10 ("It is true that some of Plaintiffs' members are now receiving federal funds again, but that does not render their case, or their request for injunctive relief, moot.").

Defendants' declaration from a Department of Energy official does not change

the analysis for that agency. It avers that "since February 24, 2025, for obligations with ongoing work, DOE is proceeding with payments in the normal course." ECF No. 31-2 ¶ 5. But that statement is contradicted by the actual experience of the declarant in Plaintiffs' Exhibit T, who reported on March 11 that their IIJA funding had been frozen since January 30 and that they had "not received any communications about the cause of this freeze or if or when it will end." Ex. T, ECF No. 26-11, ¶ 12. It was not until March 25 that the state agency through which that declarant is a subgrantee told them that, for the first time in two months, the Department of Energy had accepted their claims for payment of IIJA grants. Ex. Y ¶ 4. Thus, whatever the Department of Energy's intentions may have been, it has continued to block access to IRA and IIJA funding even after February 24, when it claims to have resumed processing payments.[5]

### D. Defendants OMB and Director Hassett have injured Plaintiffs.

Defendants urge the Court (at 13-14) to "construe[]" Plaintiffs' motion to exclude OMB and National Economic Council Director Hassett, arguing that Plaintiffs have not shown these defendants contributed to their injuries. The Court should decline the invitation. OMB and Director Hassett—along with the OMB Director, whose involvement in the freezes the government notably does not dispute—were responsible for issuing OMB Memo M-25-11. That memo directed executive agencies to freeze certain IRA and IIJA funding. Ex. A, ECF No. 21-1. And

---

[5] Defendants' focus on the weatherization declarant's status as a subgrantee (at 12–13) is a red herring. As that declaration and its supplement make clear, there is no concern that the direct grantee (the state in which the declarant's organization is located) is failing to pass funds on to the subgrantee.

the record shows other agencies relied on it in withholding funds. *See* Ex. G, ECF No. 21-7 ; Ex. R, ECF No. 26-9, ¶ 13 .

Not only that, both the OMB memo and the *Unleashing American Energy* order purport to authorize OMB and Director Hassett to withhold approvals to the other Defendants to release IRA and IIJA funds. *Unleashing American Energy* § 7, 90 Fed. Reg. 8353, 8357; Ex. A, ECF No. 21-1. Neither party has disputed that they have done so. Defendants could have filed a declaration to that effect (as they did for DOE) but elected not to do so. In any event, because those two are properly parties here, and because Defendants might seek to evade the Court's preliminary relief if OMB and Director Hassett (and OMB Director Vought) seemed to retain the unilateral ability to keep the freezes in effect, preliminary relief should not exclude those three Defendants.

Finally on this point, Defendants half-heartedly suggest (at 14 n.2) that perhaps the Director of the National Economic Council cannot be sued under the APA. But none of their cited cases actually stand for that proposition, and all involved claims under FOIA or other records laws not at issue here. The Director has been sued, and preliminarily enjoined, under the APA in other cases. *See Louisiana v. Biden*, 585 F. Supp. 3d 840 (W.D. La. 2022) (enjoining all defendants, including then-NEC Director Brian Deese), *vacated on other grounds*, 64 F.4th 674 (5th Cir. 2023). And both the *Unleashing American Energy* order and OMB Memo M-25-11 claim for Director Hassett a significant authority to unilaterally withhold federal funding that goes far beyond merely advising the President. *See, e.g.*, *Soucie v. David*, 448 F.2d

1067, 1073 (D.C. Cir. 1971) (in assessing whether defendant was an "agency" under the APA, looking to whether it wielded "substantial independent authority in the exercise of specific functions"). Indeed, one of Defendants' own cases makes clear that a defining question is whether the entity can "issue guidelines or other types of directives"—precisely what Director Hassett has done here. *CREW v. Office of Admin.*, 566 F.3d 219, 223 (D.C. Cir. 2009).

**E. No other barrier exists to the Court's review.**

In a last attempt to avoid the substance of Plaintiffs' claims, Defendants raise two further objections. First, they say (at 30–32) that this APA action is really a contract case that belongs in the Court of Federal Claims. Second, they say (at 32–33) that the decision "to pause funding for one recipient" is a choice "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus unreviewable under the APA. The First Circuit has already found both arguments unpersuasive in a recent decision. *See California v. Dep't of Educ.*, --- F.4th ---, 2025 WL 878431 (1st Cir. Mar. 21, 2025), *stay application pending*, No. 24A910 (U.S. filed Mar. 26, 2025) ("*California Stay Op.*"). So have many other courts. Those arguments fail here too.[6]

Defendants begin by mischaracterizing (at 30) the relief Plaintiffs seek as "money damages" (which are unavailable under the APA, *see* 5 U.S.C. § 702). But "as the Supreme Court has made clear, '[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as

---

[6] Defendants note (at 32) that 42 U.S.C. § 6869 requires claims relating to the Weatherization Assistance Program be filed in a court of appeals. But that provision governs challenges to the denial of applications, which are not at issue here.

money damages.'" *California* Stay Op., 2025 WL 878431, at *2 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)). Plaintiffs here do not "seek damages owed on a contract or compensation for past wrongs. Rather, they want [Defendants] to once again make available already-appropriated federal funds." *id.* at *2 (internal citation omitted). That is a claim for equitable relief, not money damages, and so may be pursued under the APA, as many courts have recently held. *See, e.g.*, *id.*; *Am. Ass'n of Colls. for Teacher Ed. v. McMahon*, No. 1:25-cv-00702, 2025 WL 863319, at *4 (D. Md. Mar. 19, 2025), *appeal pending*, No. 25-1281 (4th Cir.); *Aids Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378, at *8–9 (D.D.C. Mar. 10, 2025); *Massachusetts v. NIH*, No. 25-cv-10338, 2025 WL 702163, at *7–8 (D. Mass. Mar. 5, 2025).

The government's related argument about the Tucker Act fares no better. Under the Tucker Act, 28 U.S.C. §§ 1346(a), 1491, "plaintiffs wishing to file a suit against the United States involving a contract where the relief sought is over $10,000 must do so in the Court of Federal Claims." *Massachusetts v. NIH*, 2025 WL 702163, at *4 (quotation marks and brackets omitted). Defendants suggest (at 30) that "at least some of Plaintiffs' claims may be contractual in nature and thus not subject to APA suit." That suggestion is wrong. The crux of Plaintiffs' challenge is not that Defendants violated the terms of any specific contract; it is that their mass freezes are arbitrary and capricious, undertaken without statutory authority, and contrary to law. Just as in *California v. Department of Education*, "[Plaintiffs'] claims are, at their core, assertions that [Defendants] acted in violation of federal law—not [their] contracts." Stay Op., 2025 WL 878431, at *2. "Indeed, it would be quite extraordinary

to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached." *Aids Vaccine Coal.*, 2025 WL 752378, at *9; *see also Massachusetts v. NIH*, 2025 WL 702163, at *6.

The government's Tucker Act theory suffers from other fatal flaws. Plaintiffs are not seeking money damages, further underscoring that their claims are not contractual in nature and can be pursued here. *See California* Stay Op., 2025 WL 878431, at *2 (holding that lack of request for money damages showed claims were not contractual); *Massachusetts v. NIH*, 2025 WL 702163, at *5 (same); *Aids Vaccine Coal.*, 2025 WL 752378, at *8–9 (same).[7] Moreover, "[t]he narrow circumstances in which the Court of Federal Claims may issue injunctive relief per the Tucker Act do not exist here, which is to say, [the] equitable relief [Plaintiffs seek] is not incident of, or collateral to, an award of money damages." *Am. Ass'n of Colls.*, 2025 WL 863319, at *5 (citing 28 U.S.C. § 1491(a)(2)). That matters because courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). Defendants can hardly claim that Plaintiffs are exclusively required to press their claims for relief before a court that cannot grant that relief.

Ignoring the great weight of authority contrary to its position, the government

_____

[7] Rather than addressing this recent and relevant First Circuit authority, Defendants (at 31) point to an unpublished First Circuit case in which the pro se plaintiff—unlike Plaintiffs here—sought monetary damages and explicitly invoked the Tucker Act as a cause of action in his complaint addressing the rejection of a specific funding proposal (not a sweeping agency action). *See Diaz v. Johnson*, Case No. 19-1501, 2020 WL 9437887, at *1 (1st Cir. Nov. 12, 2020).

instead highlights (at 31) a single out-of-circuit case holding that a grantee's challenge to the pause and then the termination of its federal contracts belonged in the Court of Federal Claims. *U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 1:25-cv-00465, 2025 WL 763738, at *1 (D.D.C. Mar. 11, 2025) ("*USCCB*"), *appeal pending*, No. 25-5066 (D.C. Cir.). As an initial matter, that case did not address any of the above-cited decisions, including the majority decision in *Bowen*, 487 U.S. 879. (The court chose to cite the dissent from that case instead. *See USCCB*, 2025 WL 763738, at *5.) And it is inconsistent with the First Circuit's analysis in *California v. Department of Education*, 2025 WL 878431. On top of that, *USCCB* is distinguishable. It involved a single entity's request for reimbursement under and reinstatement of a specific set of federal contracts—a challenge the court concluded was essentially contractual. *Id.* Here, by contrast, Plaintiffs bring an APA challenge to the legality of sweeping and intentional freezes of IRA and IIJA funding by several agencies, and their claims do not depend on the terms of any particular grant agreement.

Changing gears, Defendants argue (at 32–33) that an agency's decision "to pause funding for one recipient, and potentially redirect that funding to a different recipient, is presumptively unreviewable" because that kind of choice is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). But Plaintiffs are not challenging a decision to redirect funding between different recipients of IRA and IIJA money; they are challenging Defendants' wholesale halt to the processing and disbursement of that funding. Defendants' claim also runs headlong into the First Circuit's ruling

in *California v. Department of Education*, which Plaintiffs do not address. As the First Circuit explained in that case, the category of actions exempted from judicial review as committed to agency discretion is exceedingly "narrow[]." 2025 WL 878431, at *3 (quoting *Dep't of Comm. v. New York*, 588 U.S. 752, 772 (2019)). And, as the court also explained, applicable statutes and regulations serve to cabin agencies' authority with respect to open grants and "thus create 'meaningful standards by which to judge the agency's action.'" *Id.* (quoting *Dep't of Comm.*, 588 U.S. at 772) (brackets omitted); *accord Am. Ass'n of Colls.*, 2025 WL 863319, at *6–7. Then-Judge Ketanji Brown Jackson reached much the same conclusion in *Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62, 76–78 (D.D.C. 2018), holding that HHS regulations "provide[d] standards" in that case "that can be used to evaluate HHS's decision." The government here misleadingly presents that case (at 33) as supporting its position while omitting the core of the court's analysis.

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A. Defendants' intentional funding freezes are arbitrary and capricious.

Plaintiffs' motion establishes how Defendants' sweeping, disruptive, and unjustified funding freezes are neither "reasonable" nor "reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024), and thus must be set aside as arbitrary and capricious. ECF No. 21 at 14–22. Defendants do not show otherwise.

Defendants first suggest (at 46–47) that an agency categorically cannot act arbitrarily and capriciously if it is just following (executive) orders. But the mere fact that an agency may be acting at the President's direction does not immunize its

conduct from normal arbitrary and capricious review. *See New York v. Trump*, 2025 WL 715621, at *11 (finding that funding freezes were likely arbitrary and capricious even though undertaken to "help[] the President achieve his policy priorities"); *NCN I*, 2025 WL 368852, at *11 ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases."). The breathtaking exception that Defendants propose appears nowhere in the APA's text and would eviscerate that law's foundational requirement of rational decisionmaking.

Next, Defendants contend that their freezes pass muster because they are meant to serve the goals of, among other things, "prioritiz[ing] cost-effectiveness, American workers and businesses, and the sensible use of taxpayer money." ECF No. 31, at 48 (quoting *Unleashing American Energy* § 7(b)). But merely announcing policy goals does not mean that any steps an agency might take to advance those goals are reasonable and reasonably explained. *See, e.g.*, *New York v. Trump*, 2025 WL 715621, at *12 (concluding that "Defendants have failed to offer rational reasons for finding that the policy objectives stated in the . . . Unleashing EO justified" their freezes of funding). Nor do the agencies actually provide any analysis of how the freezes supposedly advance this goal or other explanation.

Defendants argue (at 48–49) that it was "perfectly rational" to abruptly cut off access to IRA and IIJA funds rather than "providing uninterrupted funding to . . . recipients" because Defendants determined that "safeguarding taxpayer dollars was a higher priority." There are several problems with this reasoning. It makes little sense to "safeguard" appropriated funds from being disbursed as Congress directed,

and to grantees who are engaged in the work that Congress decided to subsidize. And if fiscal responsibility were the goal, there is no reason for targeting these two laws over the many others that authorize spending.

More fundamentally, Defendants' choice failed to account for the severe and predictable damage that has resulted. *See infra* Sec III; *see also* Mot. at 28–35. Even now, Defendants do not claim that they at any point actually considered this harm— let alone explained why it could possibly be justified. That alone is enough to show that Plaintiffs are likely to succeed on this claim. *See, e.g.*, *New York v. Trump*, 2025 WL 715621, at *12 (finding that defendants likely acted arbitrarily where they failed to "meaningfully consider . . . the plain implications of withholding trillions of dollars of federal financial assistance"); *NCN II*, 2025 WL 597959, at *14 (holding different funding freeze likely arbitrary where it "was made without grappling with its catastrophic effects").

Relatedly, Defendants do not claim they gave any thought at all to the significant reliance interests of grantees and other recipients of IRA and IIJA funds. Binding law required they do so. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Their failure to consider those interests provides yet another reason Plaintiffs are likely to succeed on the merits. *See, e.g.*, *California* Stay Op., 2025 WL 878431, at *4; *Massachusetts v. NIH*, 2025 WL 702163, at *21.

The argument Defendants offer now (at 51)–essentially, that they need not consider reliance interests that are contrary to the President's wishes—is inconsistent with precedent requiring them to consider those interests anyway.

*See, e.g.*, *Regents*, 140 S. Ct. at 1913. It is also an illegitimate post hoc rationalization that cannot sustain Defendants' conduct now. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Finally, Defendants point (at 51) to language in the *Unleashing American Energy* order stating that it does not create a private right of action, but Plaintiffs' motion does not challenge the legality of that order, and Plaintiffs' right of action is found in the APA, *see* 5 U.S.C. § 702, not the order.

**B. No statute authorizes Defendants to engage in the freezes.**

Plaintiffs' motion also showed that no statute empowers Defendants to categorically halt the processing and payment of funds appropriated under the IRA and IIJA. Mot. at 22–25. Because agencies "literally ha[ve] no power to act . . . unless and until Congress authorizes [them] to do so by statute," *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks omitted), Defendants must identify some statutory provision giving them the authority they claim here. They have failed to do so.[8]

Defendants do not identify any provision of any of their enabling statutes they

---

[8] Defendants contend (at 35, 37–40) that Plaintiffs have failed to show they are statutorily entitled to funding, or to funding on a particular timeline. This turns the analysis on its head. The question is not whether Congress has required that a specific Plaintiff receive funds, but whether Congress has authorized the agency action at issue. As for Defendants' related claims about Codman Square Neighborhood Development Corp., Defendants acknowledge (at 40) that HUD "initially awarded them the grant" and all that remains is to finalize the grant agreement. *See also* Ex. L, ECF No. 26-3, ¶¶ 9–11. Because Codman Square NDC has been awarded an IRA-funded grant and is being prevented from using it due to HUD's halt on the processing and payment of IRA funding, Codman Square NDC is no differently situated from the other Plaintiffs and declarants in this case who are likewise harmed by Defendants' ongoing unlawful freezes.

say would give them authority to categorically freeze open awards. They point only (at 36–40) to the IRA and IIJA themselves—and, specifically, to parts of these statutes authorizing agencies to provide funding through certain grant programs. But that is not what is at issue here. Plaintiffs have not challenged Defendants' decisions about what particular grants to award in the future; they dispute Defendants' authority to categorically halt the processing of and payment on grants and similar programs *that have already been awarded*. Nothing in any of the provisions Defendants cite confers that authority with respect to specific grant programs—let alone for the whole of the IRA and IIJA. And, as Plaintiffs have explained, Mot. at 23, general grants of responsibility in certain areas do not give agencies "default authority" to take whatever action they think appropriate.[9]

As Plaintiffs also previously laid out, *id.* at 24–25, the sweeping nature of the authority Defendants claim here means that, under recent binding precedent, Defendants must identify a clear statement giving them that authority. *See also NCN II*, 2025 WL 597959, at *16 ("When an agency seeks to 'exercise powers of vast economic and political significance,' the 'sheer scope of [an agency]'s claimed authority' can trigger heightened judicial scrutiny." (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)). Defendants offer no response at all.

Unable to locate any statutory provision authorizing their conduct, Defendants appear to suggest (at 33, 36–37) that no authorization is required because agencies generally have discretion to "allocat[e] . . . funds from a lump-sum appropriation."

---

[9] Defendants' argument also fails to answer Plaintiffs' point about OMB's (lack of) authority to direct agencies to broadly withhold funding. Mot. at 23–24.

*Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "*Lincoln*," however, "is materially distinguishable from the facts here." *See Am. Ass'n of Colls.*, 2025 WL 863319, at *6. It involved an agency's decision to discontinue a program for which "Congress never expressly appropriated funds" and that was instead paid for out of "yearly lump-sum appropriations" that were generally designated "for the benefit, care, and assistance of the Indians." *Lincoln*, 508 U.S. at 185–86. The discontinued program therefore "had no continuing legal entitlement" to future funding. *Am. Ass'n of Colls.*, 2025 WL 863319, at *6.

That case has no bearing here because Plaintiffs here do not challenge Defendants' allocation of money from a lump-sum appropriation as between various authorized purposes. They challenge Defendants' blanket halt to funding that Congress appropriated for specified purposes and that has been awarded to recipients who *do* have a continuing legal entitlement to receive it. The mere fact that Defendants have some discretion in awarding grants does not give them carte blanche with respect to those grants.

So the government tries to change the subject by claiming (at 43–45) that funding freezes are "historically common." Even if correct, that claim would do nothing to establish that Defendants acted with statutory authority. *See Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) ("No matter how consistent its past practice, an agency must still explain why that practice comports with the governing statute and reasoned decisionmaking."). It's also not correct. None of the examples Defendants offer (at 44–45) are anything like their categorical freezes.

28

President Biden's executive order involved a limited pause to a specific program—the very opposite of Defendants' sweeping "freeze first, ask questions later" policy. Likewise, President Obama's order sought to pause stimulus funding for "any casino or other gambling establishment, aquarium, zoo, golf course, or swimming pool," in recognition of an express statutory command that stimulus money not go to those projects. *Ensuring Responsible Spending of Recovery Act Funds*, 74 Fed. Reg. 12531, 12532 (Mar. 25, 2009) (quoting Pub. L. 111-5, § 1604, 123 Stat. 303 (2009)). Rather than seeking to carry out congressional priorities, Defendants' broad halt on duly appropriated funding seeks to thwart them.

Defendants' one case, *City of New Haven, Conn. v. United States*, 809 F.2d 900 (D.C. Cir. 1987), directly undermines their position. As other courts have recognized, that case explained that funding actions "designed to negate congressional budgetary *policies*," such as through blanket suspensions of payments, "were precisely the kind that Congress was determined to forestall" when it passed the Impoundment Control Act. *Aids Vaccine Coal.*, 2025 WL 752378, at *17 (quoting *New Haven*, 809 F.2d at 908). In other words, "the case Defendants cite to authorize a pause of appropriated funds stands for just the opposite proposition." *Id.* And *James R. Jones, House of Representatives*, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981), addressed minor programmatic deferrals necessary for ordinary administration of the budget—not anything like the sweeping and indefinite pause, for policy reasons, at issue here. If these are the best historical precedents Defendants can muster, that only further confirms that Plaintiffs are likely to succeed on the merits of this claim.

**C. Defendants' ongoing funding freezes are contrary to law.**

Plaintiffs are also likely to succeed on their claim that Defendants are acting contrary to law by commandeering duly authorized IRA and IIJA funding, and with no regard for the regulations governing federal grants. Mot. at 25–28.

Defendants' primary response (at 42) is that because they can freeze grants on an individual basis, there is no legal obstacle to them doing so categorically. Defendants fail to establish the premise of that argument—that they can freeze individual grants simply because the funding for those grants was appropriated by a particular statute. (Defendants say Plaintiffs concede this point, but that is incorrect.) They point to no statutory or regulatory provision that would authorize even individual freezes on that basis. All they cite (at 41–42) is their discretion "to select among eligible recipients for funding." But that limited discretion applies at the outset and does not authorize Defendants to take whatever actions they like with respect to recipients who have already been awarded funding.

And even assuming that Defendants could lawfully halt the processing or payment of any particular IRA- or IIJA-funded grant, that would not mean that they have acted consistent with law by doing the same thing across the board. Doing so is directly contrary to the judgments Congress made to fund particular important programs in the IRA and IIJA. And  the grant-specific processes required by regulation do not contemplate a sudden, across-the-board freeze. *See, e.g.*, 2 C.F.R. § 200.339 (providing for remedies when a particular grant recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of

the Federal award"). Defendants claim to free-floating authority to withhold promised payments cannot be squared with this regulatory framework.

Defendants' reliance on 2 C.F.R. § 200.340(a)(4) is misplaced. That provision says a grant may be terminated "*pursuant to the terms and conditions of the Federal award*, including . . . if an award no longer effectuates the program goals or agency priorities." First, Section 200.340 is about terminations, not indefinite pauses, making it irrelevant to these funds. Further, that provision makes clear that changing agency priorities are not themselves enough to cancel a grant—the terms and conditions of the award have to specifically provide that that is a valid reason for termination. *See also* 89 Fed. Reg. 30046, 30089 (April 22, 2024) (explaining that this provision means agencies may "specify the conditions upon which an award could be terminated *in the terms and conditions of the award*, including, for example, when an award no longer effectuates the program goals or agency priorities" (emphasis added)). In other words, invoking this provision would require assessing a grant on an individualized basis—something Defendants acknowledge they have not done in categorically freezing IRA and IIJA funding.

## III. Absent the Court's Intervention, Plaintiffs and Their Members Will Be Irreparably Harmed

As Plaintiffs documented extensively in their opening brief, ECF No. 21, at 28–35, and supporting materials, they and their members will likely suffer significant and irreparable injury without imminent judicial intervention. Plaintiffs put forward undisputed evidence that they will be forced to curtail their mission-oriented work, close projects, and furlough or lay off staff; that job opportunities will contract; that

invasive species and insects will damage the environment; that additional methane will contribute to global warming; that they will lose trust they built with their communities; and that the communities themselves will suffer. Plaintiffs also demonstrated how these injuries are closely analogous to injuries deemed irreparable by other courts in this Circuit. *See California v. Dep't of Educ.*, 2025 WL 760825, at \*4; *Massachusetts v. NIH*, 2025 WL 702163, at \*28–31; *New York v. Trump*, 2025 WL 715621, at \*13; *see also NCN I*, 2025 WL 368852, at \*13.

Defendants don't grapple with any of that and largely do not dispute Plaintiffs' showing of harm. At most, they suggest (at 53) that if at some point the freeze ever thaws, Plaintiffs would then be able to accomplish objectives for which they received funding. But this ignores, of course, the ample evidence showing that Plaintiffs suffer harm from the delay in funding itself, including but not only from the resulting uncertainty and inability to plan for the future. *See, e.g.*, Ex. L, ECF No. 26-3, ¶¶ 14–15; Ex. O, ECF No. 26-6 ¶ 17; Ex. Q, ECF No. 26-8, ¶ 15. Furthermore, in making this argument, Defendants focus narrowly on harms to the specific projects being funded by Plaintiffs' grants, largely ignoring the many other harms to Plaintiffs that the record amply documents.

Defendants next suggest (at 53–54) that Plaintiffs cannot be harmed because Defendants could always choose to make that harm even worse by terminating grants entirely. But that is nonsensical. And Defendants offer no citation to support the notion that speculation about future (and potentially unlawful and retaliatory) actions on their part preclude a plaintiff from obtaining relief against a very real

harm they are experiencing now.[10]

## IV. The Public Interest Strongly Favors Preliminary Relief

The public interest strongly favors preliminary relief. *See* Mot. at 36–37. First, "there is a 'substantial public interest in having governmental agencies abide by the federal laws.'" *Massachusetts v. NIH*, 2025 WL 702163, at *32 (quoting *Newby*, 838 F.3d at 12) (internal quotation marks omitted); *see also California* Stay Op., 2025 WL 878431, at *5 ("[G]iven our conclusions about the Department's failure to show a likelihood of success on the merits, its assertion that the public interest aligns with its interests in a stay are unavailing."). Second, the public has a strong interest in avoiding the cascading harms to grantees and their broader communities that will result (and already are resulting) from Defendants' unlawful actions, which impede upon the safety of people's homes, their communities' resilience from natural disasters, their access to food, and the health of their environment.

Defendants, once again, do not even mention, let alone address, these significant harms. Instead, they complain (at 55) that they are the ones at risk of injury. They say they would be irreparably harmed by an injunction preventing them "from effectuating statutes enacted by representatives of [the] people." Opp'n at 55 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). But Defendants do not explain which "statutes" they believe an injunction would prevent them "from effectuating." To the contrary, the injunctive relief sought here is

---

[10] Defendants, inexplicably, state (at 54) that they have "the undisputed authority to terminate Plaintiffs' grants under their own authorities." For the avoidance of doubt, Plaintiffs firmly dispute that Defendants have the authority to terminate their grants in the absence of demonstrated violations of those grant terms.

33

what will ensure that Defendants continue to effectuate Congress's directives in the IRA and IIJA.[11]

Defendants further claim (at 55) that the requested relief would have "a significant chilling effect on the President[] and his advisors[].'" Setting aside whether that is plausible on its own terms or whether being "chilled" from engaging in unlawful conduct is a bad thing, Defendants fail to explain how preliminary relief against agencies— not the President—could chill the President, particularly when another court in this District has already issued similar injunctive relief. Defendants' purely speculative concern "is not of a type and magnitude that grabs equities' emergency attention when compared to the harm that the [grant] recipients could well suffer." *California* Stay Op., 2025 WL 878431, at *5.

## V. Broad Relief Is Warranted, Without a Stay and Without Bond

The parties agree that the proper scope of relief here should be consistent with the APA. *See* Mot. at 38; Opp'n at 56. Because "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it," preliminary relief should also apply to all those currently subject to Defendants' unlawful freezes. *See Massachusetts v. NIH*, 2025 WL 702163, at *34 (citing, among others, *Gailius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998)). Such relief is

---

[11] Ironically, Defendants also rely on a First Circuit case for the same proposition— but in that case, the court found that an injunction against an agency action should be stayed where the agency action was "aimed at effectuating a congressional command to avoid licensing activity that may itself cause irreparable harm: the extinction of a marine mammal species." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021). In other words, almost the precise opposite of the situation before this Court.

particularly appropriate here given that, as Plaintiffs explained, Mot. at 37–38, it would be impracticable to limit an injunction to Plaintiffs and to NCN's many thousands of members across the country, some of whom receive funding as subgrantees through other entities, and because all recipients of IRA and IIJA funding are being similarly harmed by Defendants' unlawful conduct, *see, e.g.*, *Chicago Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 933871, at *10 (N.D. Ill. Mar. 27, 2025) (ordering broad preliminary relief "to ensure that [the plaintiff] is provided complete relief and to prevent broader impending violations against others who are similarly situated").

Defendants claim otherwise, arguing (at 56) that, under the APA, relief should be "narrowly tailored to apply only to Plaintiffs." But they do not cite any authority for that proposition or offer any reason this Court should depart from the reams of cases finding otherwise. *See, e.g.*, *id.*; *Massachusetts v. NIH*, 2025 WL 702163, at *33– 34; *NCN II*, 2025 WL 597959, at *19–20; *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 47, 49 (D.D.C. 2020).[12] Defendants are also incorrect in suggesting that the need for broad injunctive relief is somehow the fault of Plaintiffs, and not the natural result of Defendants' own sweeping and unreasoned actions. Permitting Defendants to benefit from the sheer scope of their unlawful conduct would not, in

---

[12] Defendants cite two Supreme Court cases, but neither applies here. The first conveys the unobjectionable principle that to receive a preliminary injunction, a plaintiff must meet the legal test for doing so—as Plaintiffs have done. *See* Opp'n at 57 (citing *Munaf*, 553 U.S. at 689–90). The second discusses the *lower* evidentiary standards that apply to a preliminary injunction, as opposed to a trial on the merits— a question that has nothing to do with scope of relief. *See id.* (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Defendants' words (at 57), "be consistent with basic principles of equity."

Rather than engage with any of this authority, Defendants cite (at 59–60) a stream of irrelevant cases. They quote lines from two cases about relief *at final judgment*, but the question those cases address about remanding to agencies is inapplicable at the preliminary injunction stage here. Opp'n at 59 (quoting *N. Air Cargo v. U.S. Postal Serv.*, 674 F. 3d 852, 861 (D.C. Cir. 2012), and *State Farm*, 463 U.S. at 46). *Public Employees. for Environmental Responsibility v. National Park Service* analyzed the doctrine of ratification, which is likewise inapplicable. 605 F. Supp. 3d 28, 49 (D.D.C. 2022). *In re Microsoft Corp. Antitrust Litigation* merely confirms that the point of a preliminary injunction is to maintain the status quo, which is precisely what Plaintiffs seek. 333 F.3d 517, 525 (4th Cir. 2003). And *Sherley v. Sebelius* was a case about notice-and-comment rulemaking that held that NIH was not required to specifically address certain comments, but Plaintiffs do not make a similar claim here. 689 F.3d 776, 784–85 (D.C. Cir. 2012).

Defendants also challenge (at 58) the propriety of a stay under 5 U.S.C. § 705, largely on the basis that, they say, there is no agency action to "postpone." Defendants' argument misses that Section 705 empowers courts not only to postpone agency action but also "to issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. *That* is what Plaintiffs seek here. So Defendants' exegesis of the word "postpone" is entirely beside the point. *See, e.g.*, *Maryland v. Dep't of Agriculture*, No. 25-0748, 2025 WL 800216, at *1, 25 (D. Md. Mar. 13, 2025), *appeal pending*, No. 25-1248 (4th Cir.). And

as Plaintiffs have explained, Mot. at 38–39, and the Fifth Circuit recently emphasized, "[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the plaintiff] or its members." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

Defendants next complain (at 59) that the proposed prohibition on "implementing, giving effect to, or reinstating under a different name OMB Memo M-25-11" is inappropriately vague. They ignore that several courts have entered parallel language, which is necessary and appropriate to avoid obvious attempts at evasion. *See, e.g.*, *California v. Dep't of Educ.*, 2025 WL 760825, at *5; *Massachusetts Fair Housing Ctr. v. HUD*, No. 25-cv-30041, 2025 WL 941380, at *1 (D. Mass. Mar. 26, 2025); *NCN II*, 2025 WL 597959, at *19. And that the First Circuit has already rejected an argument identical to theirs. *See New York* Stay Op., 2025 WL 914788, at *16 (explaining that the court "cannot agree that the Defendants have made the case that the preliminary injunction is vague" for the reasons Defendants urge here). Nor is it necessary that the Court's order specify that Defendants may "exercis[e] the authorities granted to them under applicable statutes, regulations, and grant agreements." Opp'n at 59. Of course they can, so long as in doing so, they comply with the Court's injunction against continuing to broadly freeze IRA and IIJA funding on a non-individualized basis.

Moving on from scope of relief, Defendants ask the Court (at 60) to stay any injunctive relief. As other courts have observed, such a request is "premature" before

Defendants have even had a chance to evaluate whatever order the Court may enter, and likely inconsistent with the requirements of Federal Rule of Appellate Procedure 8. *See NCN II*, 2025 WL 597959, at *19 n.14. Even if it were appropriate for the Court to consider Defendants' request now, it should be soundly rejected. "It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites." *Maryland v. Dep't of Agriculture*, 2025 WL 800216, at *26. Plaintiffs do not even attempt to explain why they would merit a stay when the First Circuit has recently denied two similar requests in analogous circumstances. *New York* Stay Op., 2025 WL 914788, at *17; *California* Stay Op., 2025 WL 878431, at *6.

Finally, this Court should reject Defendants' request (at 60–61) for a bond under Rule 65(c). Defendants are not harmed by administering funding appropriated by Congress, nor do they even attempt to calculate or substantiate the harm they claim. In the absence of any actual documented harm, it is difficult to understand this request as anything but an effort to "ensure that very few individuals could afford to sue the federal government." *Widakuswara v. Lake*, No. 25-cv-2390, 2025 WL 945869, at *11 (S.D.N.Y. Mar. 28, 2025); *see also NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action."). "In a case where the government is alleged to have unlawfully withheld [billions] of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of [a preliminary injunction]—to hold Plaintiffs hostage

for the resulting harm." *NCN II*, 2025 WL 597959, at *19.

## CONCLUSION

For all these reasons, and those in Plaintiffs' motion, the Court should enter a preliminary injunction.

Dated:  March 31, 2025                    Respectfully submitted,

/s/ Miriam Weizenbaum

Miriam Weizenbaum (RI Bar No. 5182)
DeLuca, Weizenbaum, Barry & Revens
199 North Main Street
Providence, RI 02903
(401) 453-1500
miriam@dwbrlaw.com

Kevin E. Friedl* (Admitted only in New
York; practice supervised by DC Bar
members)
Jessica Anne Morton* (DC Bar No.
1032316)
Robin F. Thurston* (DC Bar No. 1531399)
Skye L. Perryman* (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
jmorton@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

* admitted *pro hac vice*

## CERTIFICATE OF SERVICE

On March 31, 2025, I caused the foregoing and accompanying

materials to be served on all Defendants through the CM/ECF system.


/s/ Miriam Weizenbaum
Miriam Weizenbaum