UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WOONASQUATUCKET RIVER WATERSHED COUNCIL; <br><br> EASTERN RHODE ISLAND CONSERVATION DISTRICT; <br><br> CHILDHOOD LEAD ACTION PROJECT; <br><br> CODMAN SQUARE NEIGHBORHOOD DEVELOPMENT CORPORATION; <br><br> GREEN INFRASTRUCTURE CENTER; and <br><br> NATIONAL COUNCIL OF NONPROFITS, <br><br>    Plaintiffs, <br><br>    v. <br><br> U.S. DEPARTMENT OF AGRICULTURE; <br><br> BROOKE ROLLINS, in her official capacity as Secretary of Agriculture; <br><br> U.S. DEPARTMENT OF ENERGY; <br><br> CHRIS WRIGHT, in his official capacity as Secretary of Energy; <br><br> U.S. DEPARTMENT OF THE INTERIOR; <br><br> DOUG BURGUM, in his official capacity as Secretary of the Interior; | C.A. No. 1:25-cv-00097-MSM-PAS |

U.S. ENVIRONMENTAL )
PROTECTION AGENCY; )
 )
LEE ZELDIN, in his official capacity )
as Administrator of the Environmental )
Protection Agency; )
 )
U.S. DEPARTMENT OF HOUSING )
AND URBAN DEVELOPMENT; )
 )
SCOTT TURNER, in his official )
capacity as Secretary of Housing and )
Urban Development; )
 )
U.S. OFFICE OF MANAGEMENT )
AND BUDGET; )
 )
RUSSELL VOUGHT, in his official )
capacity as Director of the Office of )
Management and Budget; and )
 )
KEVIN HASSETT, in his official )
capacity as Director of the National )
Economic Council, )
 )
     Defendants. )
 )

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

       This is an administrative law case. In 2021 and 2022, Congress passed and the President signed two laws—the Infrastructure Investment and Jobs Act and the Inflation Reduction Act, respectively—appropriating billions of dollars for infrastructure, agriculture, energy, climate, and housing initiatives. The laws established that federal agencies would largely be responsible for administering these

funds. Since then, the agencies did just that through awards of grants and contracts—seemingly without much issue.

That swiftly changed in January 2025. An executive order and a memorandum from the Office of Management and Budget temporarily forbade agencies from administering any more IIJA and IRA money, at least while the agencies reviewed spending to ensure its consistency with presidential policy directives. So the agencies stopped providing money to the organizations spearheading these congressionally-supported initiatives, even when those same agencies had already awarded it.

It quickly became clear that these actions were part of a much larger effort that extended beyond IIJA and IRA funding—an effort now colloquially known as the federal "funding freeze." Next came a whirlwind of litigation. States and private organizations alike have sued a host of agencies to stop different parts of the freeze. So far, they have largely been successful in obtaining interim relief. But as the need for this suit shows, that relief has been piecemeal and often limited in scope.

Still unable to access their funds following other court orders, six nonprofits sued several federal agencies and their heads under the Administrative Procedure Act ("APA"). The Nonprofits bring three APA claims against the Government.[1] In

---

[1] For ease of reading, the Court uses the term "the Government" to describe the Defendants collectively. The "Agency Defendants" or "Agencies" in turn, refers to Energy, EPA, HUD, Interior, and USDA. That is not to say, of course, that OMB and the NEC Director are not agencies under the APA; as explained below, quite the contrary. Instead, the collective term "Agency Defendants" is meant to encompass the group of actors directly charged with administering IIJA and IRA funds. When necessary, the Court names Defendants with specificity. Finally, the Court refers to the Plaintiffs collectively as "the Nonprofits."

short, the Nonprofits argue that the Government—in summarily freezing billions of dollars in IIJA and IRA funding—ran afoul of three APA provisions: its requirement that agency actions (1) are not "arbitrary and capricious," (2) are not "in excess" of the authority that Congress granted the agencies, and (3) are not otherwise contrary to law. The Nonprofits now move for a preliminary injunction—a temporary court order requiring the agencies to turn the funding spigots back on, at least while their case is pending. (ECF No. 26.)

The Nonprofits' Motion is GRANTED. To summarize: the Court first sees no threshold jurisdictional issues. The Nonprofits have demonstrated standing against all seven defendants and the doctrine of claim-splitting does not narrow their case. *See* Part III.A. Next, the Court is confident that it has jurisdiction under the APA. Most importantly, the seven agency actions here are "final," allowing APA review, and the Nonprofits' claims are not simple contract actions for money damages, such that the Tucker Act would divest the Court of jurisdiction. *See* Part III.B.1.

Looking to the merits, the Court holds that the Nonprofits have demonstrated a strong likelihood of success on two of their three APA claims. First, they have adequately shown at least three ways that the sudden, indefinite freeze of all already-awarded IIJA and IRA money was arbitrary and capricious: it was neither reasonable nor reasonably explained, and it also failed to account for any reliance interests. *See* Part III.B.2. Second, the broad powers that OMB, the NEC Director, and the five Agencies assert are nowhere to be found in federal law. The Agencies likely possess narrower powers related to individualized funding pauses and terminations, but in

4

cases of vast economic and political significance—like this one—the Supreme Court has urged lower courts to be skeptical of agencies' sweeping claims of power. That is to say: those narrower powers cannot justify the broad exercise of authority that OMB, the NEC Director, and the Agencies asserted here. *See* Part III.B.3. Holding that these two claims are likely to be successful, the Court declines to address the third at this point. *See* Part III.B.4.

The Court further holds that the Nonprofits have adequately demonstrated irreparable harm in several forms, *see* Part III.C, and that the balance of the equities and the public interest weigh heavily in their favor. *See* Part III.D. And because of these claims' unique nature, the broad powers that the Government asserts, and the harms inflicted on the Nonprofits and similarly situated nonparties, the Court holds that a nationwide injunction is appropriate. *See* Part III.F.

The Court wants to be crystal clear: elections have consequences and the President is entitled to enact his agenda. The judiciary does not and cannot decide whether his policies are sound. In other words, "the wisdom" of his decisions "is none of our concern." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020) (cleaned up). But where the federal courts are constitutionally required to weigh in—meaning we, by law, have no choice but to do so—are cases "about the procedure" (or lack thereof) that the Government follows in trying to enact those policies. *Id.* Agencies do not have unlimited authority to further a President's agenda, nor do they have unfettered power to hamstring in perpetuity two statutes

passed by Congress during the previous administration. Chief Justice Roberts put it best:

> Justice Holmes famously wrote that "men must turn square corners when they deal with the Government." But it is also true, particularly when so much is at stake, that the Government should turn square corners in dealing with the people.

*Id.* at 24 (cleaned up). Here, the Government failed to do so.

## I.    BACKGROUND

The Court begins with a preliminary statement of facts.

### A.    The Infrastructure Investment and Jobs Act and the Inflation Reduction Act

At the heart of this case are two laws passed by both chambers of Congress and signed by the President. *See* U.S. Const., art. I, § 7, cl. 2–3. The first is the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, passed in 2021. (ECF No. 21 ¶ 25.) The IIJA appropriated huge sums of money for an array of initiatives; since its passage, it has funded a "wide variety of critical projects and initiatives that are administered by different agencies." *Id.* ¶ 25. For instance, the Environmental Protection Agency ("EPA") has already awarded nearly $69 billion in IIJA funds "to create jobs, lower energy costs, save families money, support clean energy manufacturing, and help communities burdened by pollution." *Id.* ¶ 26. And the Department of Interior has doled out IIJA funds to "close open mine portals (protecting homes from landslides), clean up orphaned oil and gas wells, and support the federal wildland firefighting workforce." *Id.*

The second law is the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818, passed in 2022. Like the IIJA, the IRA authorized and appropriated "billions

of dollars in funding for grants, loans, and other forms of federal financial assistance in order to advance these goals." *Id.* ¶ 23. And like the IIJA, its programs "are administered by various agencies." *Id.* ¶ 24. The Department of Agriculture ("USDA"), for instance, handles billions of IRA dollars. *Id.* That includes nearly $20 billion for the Natural Resources Conservation Service to "help farmers, ranchers, and other landowners protect natural resources and enhance production, and $13.2 billion to build electrification infrastructure." *Id.*

### B.    Agencies' administration of IIJA and IRA funds

Following the IIJA and the IRA's respective enactments, agencies began working with states and private organizations to execute the statutes' goals.

Take the Childhood Lead Action Project ("CLAP"). (ECF No. 26-7.) It is an award-winning nonprofit that works with state and local officials to eliminate childhood lead poisoning in Rhode Island. *Id.* ¶ 1, 6. EPA awarded CLAP a $500,000 grant of IRA money "to fund a multi-pronged, multi-year campaign to address lead poisoning in Providence." *Id.* ¶ 7. It began drawing down funds from this grant in December 2024 and January 2025. *Id.* ¶ 11.

Or consider the Green Infrastructure Center ("GIC"), a conservation-focused nonprofit. (ECF No. 26-4.) In 2023 and 2024, GIC received several multi-year grants through the IRA. *Id.* ¶ 9. More specifically, the IRA provided $1.5 billion in funding for the Urban and Community Forestry Program, run by the U.S. Forest Service, and the GIC—as a subgrantee of several states—uses IRA grant funds "to help towns and localities plan and carry out plans for planting more trees and managing the forests that they have." *Id.* ¶ 8–11.

7

Similarly, the Codman Square Neighborhood Development Corporation ("CSNDC") applied for a grant through the Green and Resilient Retrofit Program, run by the Department of Housing and Urban Development ("HUD"). (ECF No. 26-3 ¶ 6.) CSNDC is a nonprofit community development corporation that focuses on housing initiatives. *Id.* ¶ 2. And the Green and Resilient Retrofit Program "is meant to support investments in energy efficiency, greenhouse gas reductions, and healthy housing" in HUD-run housing. *Id.* ¶ 6. The IRA provides the money for it, and CSNDC sought the grant "to help fund a rehab and renovation project on a 31-unit affordable housing development for elderly residents here in Dorchester." *Id.* ¶ 7. Last November, HUD awarded CSNDC a $750,000 grant, and it soon received the award letter. *Id.* ¶ 9.

These are only three examples of the numerous organizations whose missions and projects depend on congressional funding—as well as effective agency administration of that funding. The record shows that agencies were generally effective in administering these funds for several years following the IIJA and the IRA's passages. *See, e.g.*, ECF No. 26-5 ¶¶ 9–12; ECF No. 26-3 ¶ 9; ECF No. 26-4 ¶ 6; ECF No. 26-6 ¶¶ 6, 14; ECF No. 26-7 ¶ 6; ECF No. 26-9 ¶ 4.

### C.    The *Unleashing American Energy* executive order

That all changed on January 20, 2025, when the President issued an executive order titled *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8343 (Jan. 20, 2025) (the "*Unleashing* EO").

The order provided that all "agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022

(Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." *Id.* § 7(a). While the funds were paused, the *Unleashing* EO required the agencies to "review their processes, policies, and program for issuing grants, loans, contracts, or any other financial disbursement of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order."[2] *Id.*

And "within 90 days," all agency heads must "submit a report to the Director of the NEC and Director of OMB "detailing their findings." *Id.* Going forward, "no funds identified in this subsection" could "be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt." *Id.*

### D.  Memorandum M-25-11

The next day, Matthew J. Vaeth, Acting Director of the Office of Management and Budget ("OMB"), and Kevin Hassett, Assistant to the President for Economic Policy and Director of the National Economic Council ("NEC"), issued a memorandum to the heads of departments and agencies titled, "Guidance Regarding Section 7 of the Executive Order Unleashing American Energy" ("*Unleashing* Guidance"), numbered M-25-11. (ECF No. 21-1.)

---

[2] Section 2, in turn, describes nine policy goals, including encouraging "energy exploration and production on Federal lands and waters … in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future" and protecting the country's "economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the nation." § 2(a), (c).

It explained that the *Unleashing* EO "requires agencies to immediately pause disbursement of funds appropriated under" the IRA and the IIJA, but that the pause "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in Section 2 of the order." *Id.* "This interpretation" of the *Unleashing* EO, it explained, "is consistent with section 7's heading ('Terminating the Green New Deal') and its reference to the 'law and the policy outlined in section 2 of th[e] order.'" *Id.* So, "for the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2," but "agency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget." *Id.* (cleaned up).

### E.    The "freeze"

After that, agencies broadly paused funding. For instance, on January 27, EPA issued a memo explaining that "all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the [IIJA and the IRA] are paused" and that, in accordance with the *Unleashing* EO, "unobligated funds (including unobligated comments) appropriated by the [IRA and IIJA] are paused." (ECF No. 21-2 at 2). "All related actions" were paused, too. *Id.* EPA grant recipients soon received notice of the same. (ECF No. 21-3.) And similar freezes occurred at the other Agencies. *See, e.g.*, ECF No. 21-7 (Interior); ECF No. 21-8 (USDA); ECF No. 21-9 (Energy); ECF No. 21 ¶ 24 n.3 (article describing HUD's funding freeze).

What did this about-face look like for the Government's partners on the ground? The record suggests a combination of confusion and silence. Organizations soon started to notice that their funding became inaccessible. CSNDC said that "HUD stopped communicating with us after the change in administration." (ECF No. 26-3 ¶ 10.) Weeks later, HUD told CSNDC that it was not able "to approve closings or disbursements at that time," blaming it "on an executive order called *Unleashing American Energy*." *Id.* Another nonprofit, the Woonasquatucket River Watershed Council ("WRWC"), had a grant of $1 million frozen. (ECF No. 26-4 ¶ 7.) It learned from the U.S. Forest Service that "the money was inaccessible because it was funded under the Inflation Reduction Act." *Id.*

Since the freeze, another organization has had "intermittent trouble accessing federal funding" thorough their already-awarded grants from several agencies. (ECF No. 26-6 ¶ 9.) In early February, they suddenly "became unable to access the 'ASAP' portal, which is an online system that the federal government uses for disbursing funds on grants." *Id.* ¶ 10. The result? They "couldn't make any draw downs of three grants." *Id.* CLAP—the lead nonprofit—faced similar issues. (ECF No. 26-7 ¶ 12.) It explained that sometimes, it was "blocked entirely" from accessing ASAP; other times, it "could log into the portal, but our grant was missing." *Id.* The portal tottered between functioning and not, but the point is that CLAP's grant was "missing" and "EPA [had] not explained why." (ECF No. 26-7 ¶ 15.)

### F.     This case

Enter WRWC and its co-plaintiffs: the Eastern Rhode Island Conservation District, CLAP, CSDNC, GIC, and the National Council of Nonprofits ("NCN"). They allege that the funding freeze orders issued by OMB and Director Hassett and the Agencies' actions in furtherance of the orders violated the APA. In particular, the Nonprofits have sued:

- the U.S. Department of Agriculture and its Secretary, Brooke Rollins;

- the U.S. Department of Energy and its Secretary, Chris Wright;

- the U.S. Department of the Interior and its Secretary, Doug Burgum;

- the U.S. Environmental Protection Agency and its Secretary, Lee Zeldin;

- the U.S. Department of Housing and Urban Development and its Secretary, Scott Turner;

- the U.S. Office of Management and Budget and its Director, Russell Vought; and

- the Director of the National Economic Council, Kevin Hassett.

On March 17, the Nonprofits moved for a preliminary injunction. (ECF No. 26.) Following a shortened briefing schedule, the Court held a hearing on their motion on April 3, 2025.

## II.     STANDARD

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). "To secure a preliminary injunction, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable

balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (cleaned up). Here, the last two factors merge because the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The first two factors" here "are the most critical." *Id.* at 434. "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Loc. 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (cleaned up). In evaluating whether the Nonprofits have shown a likelihood of success on the merits, the Court must keep in mind that the merits need not be "conclusively determine[d]"; instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (cleaned up).

## III.    DISCUSSION

### A.    Jurisdiction

To start, the Government makes two jurisdictional arguments trying to narrow the case's scope. The first is about standing while the second concerns claim splitting. Before addressing the preliminary injunction factors, the Court considers these arguments.

#### 1.    Defendant-specific standing

The Government first argues that the Nonprofits have not shown any injuries attributable to Energy, OMB, or the NEC Director. (ECF No. 31 at 15.) Of course,

the Nonprofits "bear the burden of demonstrating that they have standing" and must do so "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (cleaned up). And they "must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431. "To establish standing," they "must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, No. 22-58, 599 U.S. 670, 676 (2023). The upshot of the Government's standing argument is that any relief should be directed "only against USDA, Interior, EPA, and HUD—and not the three other Agency Defendants for which Plaintiffs have failed to prove any ongoing injuries."[3] (ECF No. 31 at 17.) The Court addresses the standing arguments individually.

### a.    Energy

As for Energy, the Government contends first that, as a matter of fact, "there is no ongoing pause of funding for the Weatherization Assistance Program since at least February 2025." (ECF No. 31 at 15.) And in any event, the alleged harm is to "a subrecipient (not a direct grantee) of DOE funding," so the entity "should contact the direct grantee to raise any concerns about any alleged improper pause of funding." *Id.* at 16.

---

[3] Aside from the same subgrantee issue raised against Energy, the Government does not contest that the Nonprofits have standing for claims against EPA, HUD, Interior, and USDA. (ECF No. 38 at 50–51.) Upon an independent review of the record, the Court is satisfied that the Nonprofits have standing as to those four agencies and their heads, at least for purposes of resolving this motion.

The Nonprofits respond that Energy has "continued to block access to IRA and IIJA funding even after February 24, when its claims to have resumed processing payments." (ECF No. 32 at 17.) Further, the Government's subgrantee argument is a red herring, the Nonprofits say, because the record shows that "there is no concern that the direct grantee (the state in which the declarant's organization is located) is failing to pass funds on to the subgrantee." (ECF No. 32 at 16 n.5.) In other words, the blame still lies at Energy's feet.

At this stage, the Nonprofits have adequately shown an injury-in-fact against Energy. To start, the declarant in the Nonprofits' Exhibit T, an executive director of a nonprofit member of NCN, reported on March 11 that their IIJA funding had been frozen since January 30 and that they "have not received any communications about the cause of this freeze or if or when it will end." (ECF No. 26-11 ¶ 12.) For now, that is enough to show that an injury caused by Energy existed at the time the Nonprofits filed their Complaint.

True, the Government has provided conflicting testimony: a signed declaration from an Energy official stating that, "since February 24, 2025, for obligations with ongoing work, DOE is proceeding with payments in the normal course." (ECF No. 31-2 ¶ 5.) That contrary evidence, though, does not bear on the standing analysis. Under the Government's theory, if simply offering contrary evidence always defeated standing, then few cases would ever get very far.

And the declarant's status as a subgrantee is not fatal to standing against Energy. To start, nothing in the testimony suggests that the state "is failing to pass

funds on," as the Government suggests.  *See, e.g.*, ECF No. 32-3 ¶¶ 5–6.  And at argument, the Government cast this subgrantee argument as a "sort of zone of interest or rights to enforce" argument.  (ECF No. 38 at 51–52.)  The APA authorizes suit to challenge a federal agency by any "person" who was "adversely affected or aggrieved ... within the meaning of a relevant statute."  5 U.S.C. § 702.  The Supreme Court has explained:

> We have held that this language establishes a regime under which a plaintiff may not sue unless he falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.  We have described the "zone of interests" test as denying a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177–78 (2011) (cleaned up). Because, as explained below, the Government's actions implicate a breadth of statutory schemes and regulations, the exact statutory analysis is difficult to pin down.  But that is a problem of the Government's making, and the Nonprofits' interests in their already-awarded funds being frozen by the Agencies, even as subgrantees, at the behest of OMB and the NEC Director, are not "so marginally related to or inconsistent with the purposes implicit" in all the statutory schemes implicated here as to defeat standing.  *Id.*  After all, the Nonprofits' already-awarded funds are themselves "the subject of the contested regulatory action."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Nor does the fact that some funding under Energy's purview has been temporarily unfrozen, *see* ECF No. 32-3 ¶¶ 4–7, moot the Nonprofits' case against Energy.  A case only becomes moot, the First Circuit has explained, if "the defendant

meets the heavy burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010) (cleaned up). Put differently, "to show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its old ways." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up). "That much holds for governmental defendants no less than for private ones." *Id.* The Government has failed to make that showing.

All that is to say: the Nonprofits have adequately demonstrated standing against Energy.

### b.   OMB

As for OMB, the Government argues that the Nonprofits' declarations "fail to identify any injury attributable specifically to OMB's actions," so they "have not proven any injuries specifically attributable to OMB itself." (ECF No. 31 at 16.) The Nonprofits reply that OMB was "responsible for issuing OMB Memo M-25-11," which "directed executive agencies to freeze certain IRA and IIJA funding," and since then, "other agencies relied on it in withholding funds." (ECF No. 32 at 17–18.)

An injury-in-fact must be "fairly traceable to the challenged conduct of the defendant." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025). So there must be a "causal connection between the injury and the conduct complained of," but the standard "does not require a tort-like showing of proximate causation." *Id.* (internal quotations omitted). And a plaintiff "can satisfy traceability

by showing that the defendant's conduct is one among multiple causes of the alleged injury." *Id.* (cleaned up).

The Nonprofits' injuries arising from the freeze are clearly traceable to OMB's issuance of M-25-11 and the memorandum's influence over the Agency Defendants. There are at least two reasons why. First is the Agencies' actual, cited reliance on M-25-11 as the reason for the pause. One internal memo from EPA ordering the pause stated that it was "being provided based on instruction from OMB." (ECF No. 21-2 at 2.) Another message from Interior to a grantee who was trying (and failing) to access their funding cited Memo M-25-11 "regarding the funding pause." ECF No. 21-7 at 2; *see also* ECF No. 26-9 ¶ 13 ("I understand from our government partners that they believe our IRA funds are still frozen under the authority of OMB Memo M-25-11."). That is a sufficient causal connection.

Another reason is equally illuminating: the Agencies' sudden about-face on pausing funds soon after issuance of the memo. Either release of the memo led to the pause of the Agencies' already-awarded IRA and IIJA funding or five "federal agencies, none of which had acted to cut off financial assistance" before the freeze "suddenly began exercising their own discretion to suspend funding across the board at the exact same time." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025). As between these two options, the latter "would be a remarkable—and unfathomable—coincidence." *Id.* And that "this uniform freeze occurred" in the days right "after the memorandum's issuance would be quite the happenstance, too." *Id.* In short, the Government asks

18

the Court "to overlook the simplest, most logical explanation" for what happened.  *Id.*
The Court declines.

### c.    NEC Director

The Government raises the same traceability arguments for the NEC Director
as it did OMB.  (ECF No. 31 at 17.)  These arguments fail for the same reasons, given
the NEC Director's co-authorship of the memorandum.  (ECF No. 21-1 at 2.)

Only in a footnote, the Government separately argues that Director Hassett is
not an "agency" under the APA.  (ECF No. 31 at 17 n.2.)  But the First Circuit has
"repeatedly held that arguments raised only in a footnote" are "waived."  *Nat'l
Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n. 17 (1st Cir. 1999); *see also
Modeski v. Summit Retail Sols., Inc.*, 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (same).

### 2.    Claim splitting

Next, the Government argues that the doctrine of claim splitting precludes this
suit, because NCN (one of several Plaintiffs here) "and its members are already
litigating a case in the United States District Court for the District of Columbia
(D.D.C.) challenging the same alleged harms from the 'federal funding freeze.'"  (ECF
No. 31 at 18.)  In its view, this case involves the same plaintiff, "represented by the
same counsel, in yet another challenge to an alleged categorical pause in grant
funding—with yet another request for emergency, expedited relief."  *Id.* at 18–19.
And even if some Nonprofits here were not NCN members, "that would at most allow
those three entities' claims to proceed—not the claims of NCN or the other two
Plaintiffs who are participants in the D.D.C. action."  *Id.* at 21–22.

The Nonprofits reply that they are here challenging "entirely separate agency actions, by a much broader set of defendants, to freeze a different category of funds—i.e., funding appropriated under the IRA and IIJA." (ECF No. 32 at 11.) And they say that their challenge here does not relate to OMB Memo M-25-13, the agency action at issue in the D.D.C. litigation. *Id.*

The doctrine precluding claim splitting relates to—but differs from—the doctrine of res judicata. *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000); The main difference is that claim splitting, unlike res judicata, applies where the second suit has been filed before the first suit has reached a final judgment. *See* 18 Fed. Prac. & Proc. Juris. § 4406 (3d ed.) (discussing "principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment").

Still, the doctrines serve similar policies. First, "the power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation." *Curtis*, 226 F.3d at 138 (cleaned up). Claim splitting is "concerned with the district court's comprehensive management of its docket," while "res judicata focuses on protecting the finality of judgments." *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017).

And second—more relevant here—the claim splitting doctrine "is also meant to protect parties from the vexation of concurrent litigation over the same subject matter." *Curtis*, 226 F.3d at 138 (cleaned up); *see also Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 328 (9th Cir. 1995) ("A main purpose behind the rule preventing claim splitting is to protect the defendant from being harassed by

repetitive actions based on the same claim."). The point is that a "litigant with multiple related claims must not separate, or split, the claims into multiple, successive cases, but must include in the first action all of the claims that fall within the Court's jurisdiction." *Perry v. Alexander*, 2:15-cv-00310-JCN, 2017 WL 3084387, at \*3 (D. Me. July 19, 2017) (cleaned up).

Federal courts borrow from the res judicata test to determine whether the claim splitting doctrine applies. So the Government must show that the first suit, if it were final, would preclude the subsequent suits. *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("Claim preclusion, like issue preclusion, is an affirmative defense" that the defendant must "plead and prove."); *Vanover*, 857 F.3d at 841.

The First Circuit employs the "transactional approach" to determine whether successive causes of action are the same as the first. *See Mass. Sch. of Law at Andover, Inc., v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998). "Under this approach, a cause of action is defined as a set of facts which can be characterized as a single transaction or series of related transactions." *Id.* The essential inquiry, then, is whether "the causes of action arise out of a common nucleus of operative facts." *Id.* "In mounting this inquiry, we routinely ask whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." *Id.* (cleaned up); *Curtis*, 226 F.3d at 139 (holding that claim splitting will apply if "the same or connected transactions are at issue and the same proof is needed to support the claims in both suits").

The Government has not met its burden here.  To start, the universe of agency action in these two cases is distinct enough that the Court struggles to see them as arising "out of a common nucleus of operative facts" or especially as forming "a convenient trial unit."  142 F.3d at 38.  The D.D.C. plaintiffs challenged a different agency action: OMB Memo M-25-13.  *Nat'l Council of Nonprofits*, 2025 WL 597959, at *6 (D.D.C. Feb. 25, 2025).  The Nonprofits here challenge another memo, M-25-11, along with five Agencies' funding freezes arising from that memo.  (ECF No. 21 ¶¶ 82, 86–87, 92–95, 101–103.)

That some overlap occurs—mainly the complicated interplay between different OMB memos—is not enough.  The cases are fundamentally different in their factual and legal analysis, even if some legal issues appear in both cases.  *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8–*9 (D.R.I. Mar. 6, 2025) (separately analyzing an OMB directive and the "Agency Defendants' acts implementing funding pauses" under the guidance).  Most persuasive on this point is, as the Nonprofits describe it, the "fact that the district court in *NCN v. OMB* has enjoined the directive in that memo" and "the government has purportedly withdrawn it."  (ECF No. 32 at 11 (citing *NCN II*, 2025 WL 597959, at *3, 19–20)).  The Nonprofits suggest that this fact "only confirms that Defendants' ongoing freezes of IRA and IIJA funding are factually distinct" from the withdrawn memo challenged in the D.D.C. litigation.  (ECF No. 32 at 11.)  The Court agrees: the fact that Memo M-25-13 is withdrawn and yet the freezes at issue in this case continue illustrates why the claim-splitting doctrine is unavailing here.

### B.     Likelihood of success on the merits

The Court now turns to the Nonprofits' likelihood of success on the merits of their three APA claims.  First, they argue that the Government's funding freeze is arbitrary and capricious.  (ECF No. 26 at 14–22.)  The freeze, they contend, is neither "reasonable" nor "reasonably explained," and each is independently fatal to its viability.  *See Ohio v. EPA*, 603 U.S. 279, 292 (2024).  Second, the Nonprofits submit that the funding freeze exceeds the statutory authority that any of the Defendants possess.  (ECF No. 26 at 22–25.)  No statutes allow OMB or the NEC Director to issue guidance to freeze funds or allow the five Agencies to freeze any funding appropriated by the IRA and IIJA, goes the argument, so their actions were necessarily overreach.  Finally, the Nonprofits argue that the funding freeze is contrary to law: both the IRA and the IIJA as well as regulatory procedures setting out specific procedures for suspending and terminating grants.  (ECF No. 26 at 25–28.)

At this stage, the Nonprofits need only show a substantial likelihood of success on one of their three claims.  *See, e.g.*, *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 215 (D. Mass. 2023) (collecting cases).

### 1.     Threshold APA issues

Before reaching the merits, though, the Court must determine several threshold issues arising under the APA.  Most pressing is whether the Nonprofits are likely to show that the funding freeze constitutes a "final agency action" under the APA.  5 U.S.C. § 704.  If the freeze is not, then it cannot be subject to judicial review.

The Government identifies four additional threshold issues. First is that the Nonprofits do not really "identify the agency actions" they seek to challenge; the freeze is instead "comprised of many different actions by numerous different agencies," the ultimate scope being unclear. (ECF No. 31 at 22–25.) This matters, argues the Government, because it "realistically" cannot "be expected to defend the statutory basis for an undefined universe of agency decisions, let alone explain the reasoned decision-making behind each of those unknown decisions." *Id.* at 24.

The Government insists that three further defects are fatal. The claims, in the Government's view, masquerade as a challenge to an executive order, which is unreviewable under the APA. (ECF No. 31 at 26–29). They are also "tantamount to impermissibly broad, programmatic challenges to entire agency operations." *Id.* at 25, 29–32. And even viewed in their narrowest form, they are grant-specific challenges that this Court lacks the jurisdiction to adjudicate. *Id.* at 32–37. Instead, in the Government's view, the Tucker Act requires that these claims be asserted in the Court of Federal Claims. *Id.* at 33–35.

### a.    Failure to identify agency action

First, the Court disagrees that the Nonprofits have not identified any agency actions. In fact, the Nonprofits make it clear: they are challenging "Defendants' ongoing holds on IRA and IIJA funding." (ECF No. 32 at 5.) The First Circuit recently recognized the concrete nature of similar challenges. *New York v. Trump*, No. 25-1236, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) ("The Plaintiff-States' opposition does identify specific agency actions. The Plaintiff-States make clear that

they challenge the Agency Defendants' 'actions -- following the executive orders and [OMB] Directive -- to implement categorical funding freezes without regard and contrary to legal authority.'")

True, the Nonprofits are challenging "many different actions by numerous different agencies" all at once. (ECF No. 31 at 24.) But that does not defeat an APA claim. The First Circuit is "not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once." *New York*, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025). Nor does the Government identify any. *Id.* And the Nonprofits' broad challenges only arise because OMB, the NEC Director, and the five Agency Defendants froze all the funding in concert. So the Government's actions here are hardly an "undefined universe of agency decisions." (ECF No. 31 at 24.)

The Court can be more specific. The universe boils down to five agencies (Energy, EPA, HUD, Interior, and USDA) deciding summarily to withhold already-awarded funds appropriated by Congress under two laws, the IIJA and the IRA, based on compliance with a directive from OMB and the NEC Director. Or more simply, there are seven agency actions here: OMB and the NEC Director's decisions to issue the *Unleashing* Guidance mandating a pause (one action from each) and Energy, EPA, HUD, Interior, and USDA's decisions to follow that guidance by summarily freezing IIJA and IRA funds (one action from each of these five agencies).[4]

---

[4] Whether these agency decisions are "final" is discussed below at Part III.B.1.e.

Record evidence makes the Government's feigned confusion on this point particularly puzzling. When one grantee logged onto the ASAP portal, for instance, the code for the pause to their funds was "IRA/BIL Hold," abbreviations for the Inflation Reduction Act ("IRA") and the Infrastructure Investment and Jobs Act (also known as the Bipartisan Infrastructure Law, or "BIL"). (ECF No. 32-4 ¶ 8.) How difficult could it really be for the Government to figure out which actions are challenged if there is already a specific computer code for these universal pauses?

### b.    Backdoor challenge to an executive order

Second, the Court does not see the Nonprofits' claims as a backdoor challenge to an executive order. The Government recognizes that the Nonprofits "do not seek relief directly against the President's Executive Order," (ECF No. 31 at 26 n.3), and in any event, the Nonprofits can challenge the implementation of an order without challenging the order itself—particularly when they cast the *Unleashing* EO as a "narrow" one and make a compelling argument that the Government has in fact failed to comply with it to the letter. *See* ECF No. 26 at 18; *see also Nat'l Council of Nonprofits*, 2025 WL 368852, at \*11 (D.D.C. Feb. 3, 2025) ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases.")

### c.    Programmatic attack

Third, the Nonprofits' claims are not the improper programmatic attack that the Government paints them to be. The Government's argument is unconvincing in part for the same reasons as its argument about the Nonprofits' failure to identify any agency action.

26

Further guidance from the First Circuit bolsters the Court's conclusion. It recently, roundly rejected a similar argument in *New York*, 2025 WL 914788, at *12–13, and that reasoning applies equally here. The Supreme Court previously made clear that an agency's action in "applying some particular measure across the board" could "of course be challenged under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). And as in *New York*, that is what happened here. The First Circuit explained:

> The District Court determined here, by contrast, that the Plaintiff-States' APA claims do challenge discrete final agency actions. To be sure, those claims, like the motion for the preliminary injunction, describe those actions, collectively, as the 'Federal Funding Freeze.' The District Court at points uses that nomenclature as well. But the claims themselves, like the motion, assert that the discrete final agency actions are the decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds.

*New York*, 2025 WL 914788, at *12 (1st Cir. Mar. 26, 2025). So too here.

The Court finds the Government's alternate characterization of its actions as "thousands of individual decisions made by agencies about whether particular grants or other funding should be paused" unconvincing. (ECF No. 31 at 31.) Of course, in reviewing the record, a court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up); *New York*, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) (same). And, as explained above, the contention that these agencies "suddenly began exercising their own discretion to suspend funding across the board at the exact same time" is truly doubtful, because it requires "unfathomable," "coincidental assumptions" and

"contradicts the record." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025).

After all, it "is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them." *Id.* at *15 (cleaned up); *see also New York*, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025) ("To suggest that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the *Unleashing* Guidance is disingenuous.").

### d.    Tucker Act

And fourth, the Court disagrees that these APA claims are outside the scope of its jurisdiction. Most relevant to this argument, the Tucker Act does not apply here, either to the *Unleashing* Guidance or the Agencies' freezes. *See Massachuetts v. Nat'l Institutes of Health*, No. 25-CV-10338, 2025 WL 702163, at *4–*8 (D. Mass. Mar. 5, 2025) (laying out the framework for an APA-Tucker Act analysis).

The Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). It vests jurisdiction there with respect to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). And in suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the

federal district courts. *See Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983). So plaintiffs wishing to file "a suit against the United States involving a contract" where the "relief [sought is] over $10,000" must do so in the Court of Federal Claims. *Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 138 (D.R.I. 2009).

The "jurisdictional boundary" between the Tucker Act and the APA is well-traversed by litigants seeking relief against the federal government. *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117 (Fed. Cir. 2007). Still, the boundary's precise contours remain elusive. *See id.* at 1124 (listing cases treading the jurisdictional line); *Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 6 (D.D.C. 2004) (noting "[t]he bright-line rule" between monetary and equitable relief in the Tucker Act–APA context "turns out to be rather dim ...."). Plaintiffs sometimes attempt to "avoid Tucker Act jurisdiction by converting complaints which at their essence seek money damages from the government into complaints requesting injunctive relief or declaratory actions." *Martin v. Donley*, 886 F. Supp. 2d 1, 8 (D.D.C. 2012) (cleaned up).

The Supreme Court has made clear that "not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (cleaned up). Indeed, not every "failure to perform an obligation" by the federal government "creates a right to monetary relief." *United States v. Bormes*, 568 U.S. 6, 16 (2012). When traversing the Tucker Act–APA jurisdictional boundary, courts "must look beyond the form of the pleadings to the substance of the claim," *Suburban Mortg.*, 480 F.3d at 1124, to

29

determine whether "the essence of the action is in contract." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978).  The "essence" of the action encompasses two distinct aspects: the "source of the rights upon which the plaintiff bases its claim" and "the type of relief sought (or appropriate)." *Piñeiro v. United States*, No. 08-CV-2402, 2010 WL 11545698, at \*5 (D.P.R. Jan. 26, 2010) (cleaned up); *see also R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138.

While the First Circuit has not formally adopted the "rights and remedies" test that is used by several other circuits, district courts within it have adopted the test to determine whether the "essence" of an action is truly contractual.  *See Massachusetts*, 2025 WL 702163, at \*4–\*8; *R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138; *Piñeiro*, 2010 WL 11545698, at \*5.  This Court adopts the same framework, derived from *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), and discusses each element in turn.

First, the Court considers the source of the Nonprofits' rights.  After examining the Complaint, the Court finds that, like in *Massachusetts v. NIH*, "the gravamen" of the Nonprofits' allegations "does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress" and the agencies. *Massachusetts*, 2025 WL 702163, at \*6; *see, e.g., K-Mar Indus., Inc. v. U.S. Dep't of Def.*, 752 F. Supp. 2d 1207, 1214 (W.D. Okla. 2010) ("The source of the rights alleged in this action is not contractual, it is the procedures put in place by the defendants.")

The Government largely seems to agree.  As it explained in its brief, "Determining whether a pause on disbursement is lawful necessarily requires

examining the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program." (ECF No. 31 at 24.)[5] Throughout their briefing, neither the Nonprofits nor the Government have pointed the Court to specific terms and conditions in the grant agreements.

To be clear: the fact that there are underlying contractual relationships between the Nonprofits and the Government does not automatically "convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim." *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009) (cleaned up). As in *Massachusetts*, the Nonprofits "have not requested the Court to examine any contract or grant agreement created between the parties." *Massachusetts*, 2025 WL 702163, at *6. Instead, they "have asked this Court to review and interpret the governing federal statute and regulations." *Id.*

Having recognized that the source of the Nonprofits' rights is federal law rather than contract, the Court now turns to the relief sought. There is a "distinction between an action at law for damages," which provides monetary compensation, and "an equitable action for specific relief," which might still require monetary relief. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see Great-W. Life & Annuity Ins.*

---

[5] True, the Government suggests, in that same quote, that it is "potentially" necessary to examine "the specific terms and conditions included in the grant agreement for that program." (ECF No. 31 at 24.) But that caveat does not defeat its clear recognition that federal statutes and regulations largely control the analysis here.

*v. Knudson*, 534 U.S. 204, 213 (2002) ("Whether [restitution] is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought.") (cleaned up).  Simply because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as money damages."  *Bowen*, 487 U.S. at 893.  A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships.  *Compare Bowen*, 487 U.S. at 905 (holding that the district court had jurisdiction because declaratory or injunctive relief was appropriate to clarify petitioner state's ongoing obligations under the Medicaid plan), *with Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020) (holding that petitioners properly relied on the Tucker Act to sue for damages in the Court of Federal Claims because plaintiffs were strictly concerned with "specific sums already calculated, past due, and designed to compensate for completed labors").

The Nonprofits' primary purpose in bringing their claims is to seek equitable, not monetary, relief.  They do not bring claims for past pecuniary harms.  Rather, like the plaintiffs in *Bowen* and *Massachusetts*, "their claims are to preserve their ongoing and prospective" agreements with the Government.  *Massachusetts*, 2025 WL 702163, at *7.  And the various harms the Nonprofits identified correspond to that relief.  The Nonprofits indicate that the blanket IIJA and IRA funding freezes will result in lost jobs, a suspension of research and community initiatives, and a loss of goodwill.  *See infra,* Part III.C (discussing these irreparable injuries, among others).  Ultimately, these harms are the ones for which the Nonprofits are pleading

relief.  It would be legal error to construe the claims as couched pleas for monetary relief for which the Nonprofits never asked.

Since the Court finds that the proper source of the Nonprofits' rights is federal statute and regulations and because the relief sought is injunctive in nature, the Court determines that the "essence" of the action is not contractual in nature.  *R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138.  So the Nonprofits' claims cannot properly be brought under the Tucker Act in the Court of Federal Claims and this Court retains jurisdiction.

The Supreme Court's recent order in *Department of Education v. California*, 145 S.Ct. 966 (Apr. 4, 2025), is not to the contrary.  The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages, but also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds."  *Id.* at 968 (quoting *Bowen*, 487 U.S. at 910).  The Government overreads the three-page stay order.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (explaining that the issuance of a stay "is dependent upon the circumstances of the particular case").  The Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here, despite the Government's arguments to the contrary.[6]

---

[6] The Court digresses briefly to note something funny.  At oral argument following the First Circuit's decision in *California*, but prior to the Supreme Court's decision, the Government argued that *California* was not "binding at this stage given the stay

Instead, *Bowen* mandates that a careful examination of the Nonprofits' claims and the relief sought—as the Court has done here—are necessary. To the extent that the Court's order "engenders" the result of payment to the Nonprofits, "this outcome is a mere by-product" of the Court's "primary function of reviewing the [Government's] interpretation of federal law." *Bowen*, 487 U.S. 879, 910. And "even if" the Court's orders "are construed in part as orders for the payment of money by the Federal Government" to the Nonprofits, *Bowen* makes clear that those "payments are not 'money damages,'" and that the "orders are not excepted from § 702's grant of power by § 704." *Id.* Put differently, "since the orders are for specific relief (they undo the [Government's freeze of funds]) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within" the Court's jurisdiction. *Id.* That is especially clear for any relief against OMB and the NEC Director, because the Nonprofits' claims against them rest solely on their lack of authority to direct other agencies to freeze funds.

In short, the Court cannot disregard *Bowen*. Even if it looks like *California* may have "implicitly overruled" it, the Supreme Court has repeatedly made clear that

---

posture of that decision" and was also "fundamentally different" and "distinguishable because that case involved actual termination of the relevant grants." (ECF No. 39 at 83–84.) But now the Government insists that *California* divests the Court of jurisdiction and says that the Nonprofits' effort "to portray [*California*] as 'readily distinguishable' ring hollow." (ECF No. 41 at 3.) What changed? The Court's best guess: a result that the Government now favors. Its change in tune—and, to be fair, the Nonprofits' as well, in their new efforts to distance themselves from *California*— highlights the challenges of pinning down the precedential effects of emergency decisions. That is part of why the Court declines to hold that the Supreme Court overruled *Bowen* and its progeny via stay order.

lower courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023).  That is true even if the lower court "thinks the precedent is in tension with some other line of decisions"—or here, rather than an entire competing "line of decisions," a single three-page per curiam order granting a stay. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target.  The stay will allow this Court to decide the merits in an orderly fashion— after full briefing, oral argument, and our usual extensive internal deliberations— and ensure that we do not have to decide the merits on the emergency docket.  To reiterate: The Court's stay order is not a decision on the merits"); *accord id.* at 883 (Roberts, C.J., dissenting) (critiquing the Supreme Court's emergency orders for necessitating decisions without the opportunity for "full briefing and argument— based on the scanty review this Court gives matters on its shadow docket").  And the case that "directly controls," the one that the Court must follow, is *Bowen*.

Other district courts facing similar issues have similarly held that *California* did not divest them of jurisdiction.  *Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025).  In addition to the reasons already provided, the Court agrees and adopts their reasoning in full to the extent it applies here.

### e.    "Final agency action" test

All that aside, the Court must determine whether there was "final agency action" under 5 U.S.C. § 704.  A final agency action has two essential qualities.  First, it "marks the consummation of the agency's decisionmaking process."  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (cleaned up).  And second, it either is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (cleaned up).

To the first point, the Nonprofits argue that the "sweeping halts to the ordinary payment and processing" of appropriated funds mark "the consummation" of the decision-making process because "there are no further steps the agencies need to take to determine whether they will freeze that funding."  (ECF No. 26 at 13.)  And to the second, they argue that "legal consequences" have flowed from the decisions, because their "direct result (and express purpose)" was "to cut off access to funding for grantees and others who would otherwise have a right to apply for, draw on, or otherwise access these funds."  *Id.* at 14.

The Government declines to engage with that test.  Along with the threshold issues discussed above, it instead argues that, rather than a reviewable "final agency action," the funding freeze decisions are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2) and thus unreviewable under the APA.  (ECF No. 31 at 35–36.)  In its view, the Agency Defendants' "decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable."  *Id.* at 36. (quoting *Pol'y & Rsch.,*

*LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, J.)).

The Nonprofits have a strong likelihood of proving that the funding freezes constitute final agency action for precisely the reasons they spell out. The decisions to issue the *Unleashing* Guidance (for OMB and the NEC Director) and to pause all IIJA and IRA funding (for Energy, EPA, Interior, HUD, and USDA) indeed mark the "consummation" of each agency's decision-making process. 603 U.S. at 808. That is because, as the Nonprofits put it, "there are no further steps the agencies need to take to determine whether they will freeze that funding," or, with OMB and the NEC Director, to order them to do so. (ECF No. 26 at 13.) And "legal consequences" surely flow, given that grant recipients cannot access previously awarded funds. *Id.*

A breadth of caselaw supports this conclusion. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting more than a dozen cases where temporary stops and pauses constituted final agency action for APA purposes). As does an emerging consensus of district courts recently hearing cases about different aspects of federal funding freezes. *See, e.g.*, *New York*, 2025 WL 715621, at *8–*9 (D.R.I. Mar. 6, 2025) (finding that "the implementation of those IIJA and IRA funding pauses likely marked the consummation of each agency's decision to comply with the *Unleashing* EO, the *Unleashing* Guidance, or both"); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (finding that the OMB Pause Memorandum constituted final agency action).

Nor is it clear that the pause is the unreviewable type of agency decision "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Decisions about appropriated but not-yet-awarded funds likely fall into that bucket. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.") But this case is different: because the funds at issue here were already awarded to the Nonprofits, more obligations apply. *See, e.g.*, 2 C.F.R. §§ 200.300–200.346.

Then-Judge Jackson's decision in *Policy & Research, LLC*, shows why. After noting that many funding decisions are "presumptively unreviewable," she explained that there were two caveats:

> Congress can, of course, circumscribe agency discretion to allocate resources through its statutory provisions. What is more, agencies themselves frequently cabin their own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA.

*Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 76 (cleaned up). The decision ultimately held that the Department of Health and Human Services, in suddenly halting funds to a longstanding project, "violated the APA, because it failed to explain its reasoning and acted contrary to its regulations when it terminated the Plaintiffs' grants." *Id.* at 83 (cleaned up). This case closely tracks that one—the main difference being, instead of one program's termination, that the Government's actions here involve summarily, indefinitely freezing already-awarded money affecting many more.

Having held that the Nonprofits are likely to establish that the funding freeze constitutes a "final agency action" under the APA and seeing no other threshold flaws with their APA claims, the Court moves to the merits.

### 2.    Count I: "Arbitrary and capricious" claim

The Nonprofits first assert that the funding freeze was unlawfully arbitrary and capricious.  The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024).  The Court cannot "substitute its judgment for that of the agency," but it must take care to "ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up).  And "an agency cannot simply ignore an important aspect of the problem." *Id.* (cleaned up).

The Nonprofits make a host of arguments explaining why the freeze is arbitrary and capricious, but they can be boiled down to six main points.  First, the funding freeze is "likely substantively unreasonable" because it arises "seemingly for no reason other than hostility to the statutes at issue."  (ECF No. 26 at 15–16.)  Second, even if it were reasonable, it was never "reasonably explained," because "none of the Defendant Agencies has ever offered an adequate explanation for their actions." *Id.* at 16–17.  Their public statements lack reasoning and do not explain how "intentional blanket freezes on funding that Congress appropriated for specific ends

that it judged important could possibly improve the agencies' alignment with congressional authorization." *Id.* at 17.

Third, the Nonprofits separately argue that there is a disconnect between the *Unleashing* EO and the broad agency actions here. *Id.* at 17–19. "Very little—if any—IRA and IIJA appropriations contravene" the goals stated in the *Unleashing* EO, and "significant portions actively further those goals," so a blanket freeze on all IRA and IIJA funds is unlawfully overinclusive. *Id.* at 18. Fourth, the Agencies failed to consider the practical consequences of the freeze, showing a lack of reasoned decision-making. *Id.* at 19–20. Fifth, they also failed to consider reasonable alternatives and provide a reasoned explanation for why they rejected the alternatives, another indicium of a dearth of reasoned decision-making. *Id.* at 20. Sixth and finally, the freezes improperly failed to account for the Nonprofits' "weighty reliance interests in receiving already awarded funds." *Id.* at 20–22.

The Government responds with a host of its own points. First is that arbitrary and capricious review is inappropriate. That is so, the Government argues, for three reasons: because the Nonprofits' claims are an "amorphous, broad-based programmatic attack" impossible to adequately review, because review would improperly constitute "a backdoor attempt to obtain arbitrary and capricious review" of the *Unleashing* EO itself, and because without knowing which agency actions are challenged, the Government cannot "raise all possible defenses." (ECF No. 31 at 49–

50.)[7]  And even if arbitrary and capricious review were appropriate, the Government argues that the freeze was not arbitrary, because "it is perfectly rational to pause funding pending a further determination whether to continue that funding or redirect it elsewhere."  *Id.* at 50–55.

The Nonprofits have made a strong showing that the funding freeze was arbitrary and capricious.  "In arbitrary and capricious cases, we distinguish substantive unreasonableness claims from lack-of-reasoned-explanation claims." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.).  "A substantive unreasonableness claim ordinarily is an argument that, given the facts, the agency exercised its discretion unreasonably," and a "decision that the agency's action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision."  *Id.*  Meanwhile, "a lack-of-reasoned-explanation claim in this context ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it."  *Id.*

The Court begins with the "more modest claim" that the Agencies' funding freezes were not reasonably explained.  *Id.*  A decision is not reasonably explained if, among other things, "the agency has relied on factors which Congress has not

---

[7] For the same reasons previously described in Part III.B.1, these arguments are unavailing.

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). The starting place is the reasoning that the agencies employed in executing the freeze. After all, "it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983).

The Court finds that the Government failed to provide a rational reason that the need to "safeguard valuable taxpayer resources" justifies a sweeping pause of all already-awarded IIJA and IRA funds with such short notice. Again, the *New York* Court's analysis is instructive:

> Rather than taking a deliberate, thoughtful approach to finding these alleged unsubstantiated "wasteful or fraudulent expenditures," the Defendants abruptly froze billions of dollars of federal funding for an indefinite period. It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences.

2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025). And "the desire to review programs for efficiency or consistency" does not "have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid." *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *10 (D.D.C. Mar. 10, 2025).

To be clear: there is "nothing inherently arbitrary and capricious" about an agency conducting a review of its spending under the IIJA and the IRA and trying to

root out waste, fraud, or excess.  *Id.*  "But these assertions alone do not provide a rational explanation for why such a review required an immediate and wholesale suspension" of all funding for an indefinite period.  *Id.*  Nor do those assertions "bear on the failure to consider the reliance interests of small and large" organizations "that would have to shutter programs or close altogether and furlough or lay off swaths of Americans in the process."  *Id.*

And the Government cannot just rest on the *Unleashing* EO as its justification. That is true for at least two reasons.  First, the Nonprofits persuasively argue that the Agencies' actions were overbroad based on the *Unleashing* EO's text and subsequent guidance.[8]  (ECF No. 21 ¶¶ 34–35.)  After all, M-25-11 states that the freeze "only applies to funds supporting programs, projects, or activities that may be implicated by the policy established in section 2 of the order."  (ECF No. 21-1.) Further, for "the purposes of implementing section 7 of the Order, funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2."  *Id.*  In freezing any and all funding already awarded under the IIJA and the IRA, the Agencies failed to explain why all those appropriations "contravene the policies established in section 2."  *Id.*

---

[8] The Court disagrees with the Government that this argument is "foreclosed to Plaintiffs" just because "the EO specifically states that it does not create any private right of enforcement."  (ECF No. 31 at 54.)  True, it does not, but it does not need to for the Nonprofits to argue that the fit between the EO and subsequent agency action was "arbitrary and capricious."  That is what the APA sets out to do.  The result of the Government' alterative theory is that agencies can do whatever they please in service of an EO, even if the agency's action is otherwise arbitrary and capricious.

The second reason is equally important: an agency cannot avert the "arbitrary and capricious" analysis by simply deferring to the relevant EO. After all, "furthering the President's wishes cannot be a blank check" for the Agencies to do as they please. *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025). "The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Id.* Here, there is none.

The Government also ignored significant reliance interests. "When an agency suddenly changes course, it must recognize 'that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). And here, the Government "entirely failed to do so." [9] *Nat'l Council of Nonprofits*, 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025). Nothing from OMB, the NEC Director, or the five Agency Defendants shows that they considered the consequences of their broad, indefinite freezes: projects halted, staff laid off, goodwill tarnished. *See infra* Part III.C. Instead, they "essentially adopted a 'freeze first, ask questions later' approach." *Nat'l Council of Nonprofits,* 2025 WL 597959, at *15.

---

[9] The Government suggests that "the Administration reached a policy judgment that safeguarding taxpayer dollars was a higher priority than providing uninterrupted funding to the IRA and IIJA recipients." (ECF No. 31 at 52.) Fair enough, but that does not entitle agencies to do anything and everything in furtherance of it. None of the Defendant Agencies explained much at all, despite the "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec.*, 591 U.S. at 20.

Having found no rational connection between the sweeping actions taken and the vague justifications proffered, the Court holds that the Nonprofits have a strong likelihood of success on their arbitrary and capricious claims against all the Defendants. The Nonprofits have made a strong showing that the seven actions here were neither "reasonable" nor "reasonably explained," two independent reasons that they were arbitrary and capricious. *Ohio v. EPA*, 603 U.S. at 292. Separately, the Court holds that the Nonprofits have shown a strong likelihood of success on their theory that the Defendants' failure to consider reliance interests led to an arbitrary and capricious action. *Dep't of Homeland Sec.*, 591 U.S. at 30. Given that the Court has identified three strong "arbitrary and capricious" theories, it need go no further on the question.

### 3. Count II: "Exceeds statutory authority" claim

The Nonprofits' second APA claim is that the Government's funding freeze was "in excess of statutory jurisdiction, authority, or limitations," under 5 U.S.C. § 706(2)(C). (ECF No. 21 ¶¶ 89, 92–93.) More specifically, the Agency Defendants "lack statutory authority to broadly halt the disbursement of funding appropriated by the IRA and IIJA." (ECF No. 26 at 22–24.) And the OMB and Director Hassett lack statutory authority "to direct agencies to freeze these funds (or to achieve the same result by withholding purportedly necessary approvals to the disbursement of funds …)." *Id.* at 23. This exercise of "sweeping and unprecedented" power is especially problematic, the Nonprofits insist, because of the major questions doctrine. *Id.* at 24.

The Government responds that "each of the IRA and IIJA grant programs identified by Plaintiffs affords the relevant Defendant agency with significant discretion over allocating funding among eligible recipients." (ECF No. 31 at 38.) And the Nonprofits, in turn, fail to identify "any statutory language requiring that Defendants fund their particular programs, let alone that Defendants do so on any particular timeline." *Id.* Finally, the Government suggests that there "is no need for the Court to search for a statute specifically authorizing Defendants to pause funding and redirect it to a different recipient," because the authority to do so "is implicit in the grant programs and appropriations laws themselves." (ECF No. 31 at 45.)

The Government's last point is actually the starting point for the analysis. It is well-established that an agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). And "where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022). It is probably true that, as the Government suggests, that the greater power to administer the funds includes some lesser power to pause individual grants.

But the power that the Agency Defendants have actually asserted is a much broader one. It is not to pause individual, already-awarded funds for failure to comply with a grant agreement or because of a change in policy, but rather to freeze any

access to all already-awarded funds under two statutes indefinitely, based solely on the fact that the funds came from those two statutes. ECF No. 21-2 at 2; ECF No. 32-4 ¶ 8. In doing so, the Defendant Agencies have summarily tied up a significant subset of the billions of dollars already awarded under those acts.

The Court cannot see how they can claim that power. "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (cleaned up). And based on the Supreme Court's past applications of the "major questions doctrine," this case seems to involve similarly vast questions. *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (applying the doctrine where the CDC implemented a nationwide eviction moratorium affecting up to 17 million tenants); *NFIB. v. OSHA*, 595 U.S. 109, 117–18 (2022) (applying the doctrine where OSHA required all federal employees to obtain COVID-19 vaccinations).

The Government seems to recognize that they lack the power to pause all IIJA and IRA funding at once. It argues, at another point in its brief, that determining "whether a pause on disbursement is lawful necessarily requires examining the underlying statutes governing a program, the appropriations measures providing funding for the program, and potentially the specific terms and conditions included in the grant agreement for that program." (ECF No. 31 at 24.) From that premise, the Government suggests that the Court needs to "evaluate the specifics of each

alleged withholding, which cannot be done in the abstract or in an across-the-board manner." *Id.*

But what the Government says the Court cannot do is exactly what the Agencies did here. Each froze all available IIJA and IRA funding that it administers "in the abstract" and "in an across-the-board manner," just based on the fundings' origins in the IIJA and the IRA. *Id.* If the Court must evaluate the specifics of each withholding to determine its lawfulness, it follows naturally that the Agencies likely exceeded their statutory authority in freezing them in totality, without regard to that same analysis. Because there is no clear statutory hook for this broad assertion of power, the Nonprofits are likely to succeed on the merits of this claim against the five Agency Defendants.[10]

The "major questions" case against OMB and Director Hassett is even more straightforward. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *16 (applying the doctrine to OMB Memo M-25-13). The Government hardly seems to resist it. OMB's organic statute is 31 U.S.C. § 503. Under subsection (a)(2), OMB may "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements." *Id.* § 503(a)(2). But providing overall direction and establishing financial management policies do not clearly confer the power to halt all funding

---

[10] The Government's two other arguments about broad threshold discretion and funding timelines are irrelevant. The Court is not requiring the Government to do anything over than maintain their current obligations or, alternatively, pause or terminate them in an individualized way consistent with law.

arising from the IIJA and IRA, full-stop, on a moment's notice and to create a new pre-clearance regime centered around OMB.  Indeed, the structure and provisions of Section 503 strongly suggest that OMB occupies an oversight role.  Neither appears to grant the expansive authority that OMB tried to exercise here, and the Government has not pointed to specific authority that allows it to unilaterally pull the plug on nearly all federal monetary flows under the IIJA and the IRA.

Subsection (a)(5) further indicates that OMB's role is mainly supervisory, rather than directly active.  That subsection permits OMB to "monitor the financial execution of the budget in relation to actual expenditures."  *Id.* § 503(a)(5).  The language falls well short of actively deciding whether agencies "must temporarily pause" all federal financial assistance.  The Government cannot convincingly argue that "monitor" rises to that level of affirmative control described in M-25-11.  *See* Monitor, *The Oxford English Dictionary* (2d ed. 1989) (defining "monitor" as "to observe, supervise, or keep under review").[11]

The scope of power that OMB and Director Hassett seek to claim is "breathtaking," and its ramifications are massive: an indefinite pause of all money awarded under two of the largest spending statutes that Congress has passed in recent memory.  *See Ala. Ass'n of Realtors*, 594 U.S. at 764.  Because there is no clear

---

[11] The Government did not identify any statutory authority for the NEC Director to issue M-25-11, but elsewhere in its brief recognizes that its office was "not statutorily created" and its "sole function is to advise and assist the president."  (ECF No. 31 at 17 n.2.)  Given the NEC Director's attempt to assert direct power over the Agencies here, a step far beyond advising or assisting the president, the major questions case against the NEC Director is even clearer.

statutory hook for this broad assertion of power, the Nonprofits are likely to succeed on the merits of this claim against OMB and Director Hassett.

### 4.    Count III: "Contrary to law" claim

Finally, the Nonprofits argue that the Government's funding freeze was contrary to law, in violation of 5 U.S.C. § 706(2)(A).  (ECF No. 26 at 25.)  They argue that the funding freeze was contrary to the IRA and the IIJA, "to the statutes governing programs that are funded by the IRA and the IIJA, and to Defendants' own regulations governing the administration of federal grants."  *Id.*

But having found that the Nonprofits have shown a likelihood of success on two of their three claims, the Court declines to analyze the third claim for purposes of resolving this motion for preliminary relief.  *See Worthley*, 652 F. Supp. 3d at 215.

### C.    Irreparable injury

Likelihood of success on the merits is necessary but not sufficient for a preliminary injunction.  Proof of irreparable harm "constitutes a necessary threshold showing," too.  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."  *Id.*  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  *Id.*  It "most often exists where a party has no adequate remedy at law."  *Id.*  Put differently, "the necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.  The two are flip sides of the same coin: if money damages will fully

alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). And the Court has "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Id.*

The Nonprofits offer five forms of irreparable harm: (1) reducing hiring, (2) furloughing and laying off staff, (3) shuttering planned projects, (4) curtailing or ending current projects, and (5) incalculable damage to the relationship between the Nonprofits and the communities they serve. (ECF No. 26 at 29–35.)

The Government offers three responses. First, "even if the temporary pause might hypothetically result in a delay in Plaintiffs' ability to perform certain work under the grant, Plaintiffs have not proven that it would undermine their grant work as a whole." (ECF No. 31 at 56.) Second, the harms are "speculative" because the Government retains "the undisputed authority to terminate Plaintiffs' grants under their own authorities." *Id.* at 56–57. Finally, "even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding denials." *Id.* at 57.

The Nonprofits have more than adequately demonstrated irreparable harm. Like the States in *New York*, the Nonprofits "laid out scores of examples of obligated funding and the harm that withholding such funding has caused." *New York*, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025). The court's analysis there is on-point and bears repeating:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and

reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid . . . services stop, and budgets are upended.  And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*Id.*

A few examples show the myriad irreparable harms.[12]  First, "new obstacles," like work stoppages arising from indefinite funding pauses, that "unquestionably make it more difficult" for the Nonprofits to "accomplish their primary mission[s]" are a form of irreparable harm.  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).  One grantee's testimony is illustrative: over 8,300 hours of planning wasted on invasive management projects "that just won't happen now," another 10,000 hours of work for a Mississippi Park project down the drain, and the looming threat of terminating employees' service terms.  (ECF No. 26-10 ¶¶ 6–10.)  Or consider CLAP, whose work in fighting childhood lead exposure has been significantly disrupted.  The challenges arising from the funding freeze "have resulted in a delay in the progress" that CLAP "reasonably expected to make towards improving lead hazard awareness, increasing local compliance with lead safety rules, and ultimately preventing childhood lead exposure during recent months."  (ECF No. 26-7 ¶ 28.)  And even if CLAP's access "to grant funding is fully restored today, as an organization and a community, we can never get this time back."  *Id.*

---

[12] The harms described above the line are only a sample.  More examples are available in the record and the Nonprofits' briefing.  *See, e.g.*, ECF No. 26-4 ¶ 11; ECF No. 26-10 ¶¶ 7–9; ECF No. 26-11 ¶¶ 14, 21; ECF No. 26-9 ¶¶ 17–18, 20; ECF No. 26-6 ¶¶ 15–18; ECF No. 26-5 ¶¶ 15, 17, 20; ECF No. 26-12 ¶¶ 7, 20–22; ECF No. 26-3 ¶¶ 12–13; ECF No. 26-13 ¶¶ 6, 11–12, 15.

The record also shows that the critical pauses in the Nonprofits' work has caused issues for which "there can be no do over and no redress." *Newby*, 838 F.3d at 9. One NCN members' postponement of a planned project monitoring bark beetle attacks on vulnerable, "irreplaceable" giant sequoia trees will lead to environmental harms clearly not redressable in the long-run. (ECF No. 26-9 ¶ 7 ("We can't afford to lose any more of these trees: every single one matters.")). And again, CLAP's testimony shows how delays in its work leave no window for a do-over. "Childhood lead exposure can cause permanent damage in a single-day, and only gets worse the longer it continues." (ECF No. 26-7 ¶ 24.) But because of the freeze and the subsequent effects on CLAP's ability to work with community partners, "lead-safe repairs on local homes" in Providence will likely be "delayed." *Id.* ¶ 26.

Finally, the Nonprofits' standing in the communities that they serve has suffered. By "its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages," so this "kind of harm is often held to be irreparable." *Ross-Simons of Warwick, Inc., v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (finding a "significant and irreparable" injury where, even if an organization's affiliates survived, "the community connections they have developed are likely to erode"); *see also K-Mart Corp.*, 875 F.2d at 915 (noting that "harm to goodwill, like harm to reputation," is not readily measurable and thus likely to be found irreparable).

The uncertainty surrounding the pause has caused these harms. For example, GIC's work helping Choctaw Indians in Mississippi with their forests has been

disturbed. ECF No. 26-5 ¶ 22 ("We had multiple meetings with the tribe and tribal council in the process of getting an agreement drafted to show we were serious and would be helping with them in coming years to manage their forest. And now we can't follow through. If you think about America's history with the tribes—it was hard to overcome. And then at the eleventh hour, we disappear. That whole relationship and the trust we built won't recover if this continues."). Other similar examples are clear from the record. *See, e.g.*, ECF No. 26-6 ¶¶ 14–16.

On the other side of the ledger, the Government's arguments against irreparable harm are unconvincing. The Nonprofits have shown how the pauses undermine their grant work "as a whole," mainly because of the wasted hours of labor and planning, the impending loss of staff, and the harms that the pauses have done to the Nonprofits' relationship with their communities. As for the Government's other arguments, the Court need not delve into whether and how the Government retains the authority to end the termination agreements, because that question is not before it. But conducting an individualized termination under federal regulations is worlds away from the sudden, indefinite, across-the-board, and likely unlawful freezes that happened here.

And again, the U.S. Supreme Court's reasoning in its recent *California* stay order is not to the contrary. In staying the TRO, the majority relied on the fact that the state challengers "represented in this litigation that they have the financial wherewithal to keep their programs running" without the terminated federal grants. *California*, 145 S.Ct. at 969.

Here, the opposite is true.  The Nonprofits have represented that they largely lack "the financial wherewithal to keep their programs running" without the grants. (ECF No. 38 at 2–3.)  One grantee member of the NCN made clear that if funding "from the IRA and BIL gets held up, the consequences" for it "could be devastating," because federal funds make up more than one-third of their 2025 budget and more than 90% of their regional partnership's funding.  (ECF No. 26-6 ¶ 17.)  Without the funding, the group "would have to let go of most of our shared staff and cancel contracts with local businesses." *Id.*  Another, writing in mid-March, stated that they were "in a crisis," because they were "45 days away from having to lay off staff at this point," and the "only reason it's not sooner is thanks to what little reserve we have and the fact that Rhode Island and South Carolina have continued to pay us for work, even while they themselves still can't draw on their federal grants."  (ECF No. 26-5 ¶ 18.)

So the Nonprofits have adequately demonstrated irreparable harm arising from the Government's actions here.

### D.    Balance of the equities and the public interest

As with irreparable harm, the balance of the equities and the public interest weigh heavily in favor of injunctive relief.  The Nonprofits were left adrift as they scrambled to make sense of the Government's actions here.  The pause placed critical climate, housing, and infrastructure projects in serious jeopardy, while also threatening the livelihoods of the Nonprofits' employees as well as their fundamental missions.  *See supra*, Part III.C.

55

The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded. The Court's order does not prevent the Government from making funding decisions in specific cases according to processes like those established in 2 C.F.R. § 200.340; it simply enjoins sweeping agency action that was likely arbitrary and capricious and in excess of statutory authority. And an agency is not harmed by an order prohibiting it from violating the law.

On the other hand, without injunctive relief to pause the categorical freeze of IIJA and IRA funds, the funding that the Nonprofits are owed (based on the Agencies' own past commitments) creates an indefinite limbo. While some funding has begun to flow, the Nonprofits continue to face substantial uncertainty about whether the Government will comply with federal law. The public interest lies in maintaining the status quo and enjoining any categorical funding freeze.

### E.    Bond

Federal Rule of Civil Procedure 65(c) states that the court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Government asks the Court to require the Nonprofits to "provide as security a bond commensurate with the dollar value of grant funds required to be released by any preliminary injunction the Court may enter." (ECF No. 31 at 63–64.) The Court declines.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation omitted). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"). In a case where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic—and contravene the very basis of this opinion—to hold the Nonprofits hostage for the resulting harm.

## F.    Scope of the remedy

Having decided that the Nonprofits have made the requisite showing under the four-factor test for a preliminary injunction, the Court must next decide the injunction's scope. The Nonprofits argue that this is a case where a nationwide injunction is "not only appropriate, but necessary," for three reasons. (ECF No. 26 at 37.) First, the relief could not so easily be limited to the Nonprofits here, and it would require more work for the Government "to somehow identify which funding streams were going to NCN members." *Id.* Second, there are similarly situated

nonparties harmed just like the Nonprofits here. *Id.* at 38. Third, the nature of this case, a successful APA challenge, favors broad relief: vacatur of the rule and its applicability to all who would have been subject to it. *Id.*

The Government responds first that there is "no basis" for extending relief to nonparties or funding streams "for which Plaintiffs have not shown harm." (ECF No. 31 at 59.) Second, it posits that 7 U.S.C. § 705 does not require the broad remedy that the Nonprofits seek, in large part because it only requires the Court to "postpone the effective date of an agency action," and that cannot be done here because the agency action has happened. *Id.* at 60–61. Third, the order should be narrow to mitigate "the significant harms it would cause to Defendants and to the Executive Branch's abilities to exercise their lawful statutory authority and discretion." *Id.* at 61–62.

While federal district courts have issued nationwide or "universal" injunctions and they have been acknowledged by the Circuit courts, the Supreme Court has not directly addressed the issue despite concerns expressed by some justices over their use. *See Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) (expressing skepticism); *Dep't. of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

But there are appropriate circumstances during which nationwide injunctions are not only appropriate, but necessary. *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281–82 (11th Cir. 2021). Those include the need "to protect similarly situated nonparties," to "avoid the 'chaos and confusion' of a patchwork of

injunctions," or "where the plaintiffs are dispersed throughout the United States." *Id.* (cleaned up). To this end, in drafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017).

After finding that the Government's sweeping actions were likely unlawful, the Court cannot see why similarly situated nonparties should remain subject to them. *See Massachusetts*, 2025 WL 702163, at *33 (D. Mass. Mar. 5, 2025). Nonparties in exactly the same circumstances should not be forced to suffer the harms just because there was not enough time or resources for them to join the suit. "[N]ationwide injunctions provide a mechanism for courts to protect all those who could be harmed by a federal policy when only a few have the ability to quickly bring their case before a court." Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1094–95 (2018) ("Nationwide injunctions are at times the only way to prevent irreparable injury to individuals who cannot easily or quickly join in litigation."). After all, as the Supreme Court has explained, "one of the 'principles of equity jurisprudence' is that 'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Moreover, the nature of the action itself supports a nationwide injunction. The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it. *Victim Rts. L. Ctr. v. Cardona*,

20-CV-11104-WGY, 2021 WL 3516475, at *1 (D. Mass. Aug. 10, 2021) (citing 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action ... found to be ... arbitrary [and] capricious ....")); William Baude et al., *The Federal Courts and the Federal System* 1354 (8th ed. 2025) (describing how the APA's providing "for the vacatur of federal agency action may confer" a power analogous to universal injunction "by statute"); *see also Gailius v. INS*, 147 F.3d 34, 47 (1st Cir. 1998) (finding that vacation and remand is appropriate when an agency has failed to give adequate explanation for its conclusions); *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1026 (9th Cir. 2008) ("We affirm the district court's decision to vacate the regulation and to remand for further proceedings as a valid exercise of its remedial powers."); *Lovely v. FEC*, 307 F. Supp. 2d 294, 301 (D. Mass. 2004) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately." (quoting *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) (cleaned up)).

Put differently, it would be anathema to reasonable jurisprudence that only the named Nonprofits should be protected from the irreparable harms of the likely unlawful agency actions. That is because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up). So considering the likelihood of success on the merits as to these APA claims, the nature of this case favors a nationwide injunction.

# IV.   ORDER

Upon consideration of the Nonprofits' Motion for a Preliminary Injunction (ECF No. 26), it is hereby:

1. ORDERED that the Nonprofits' Motion for a Preliminary Injunction (ECF No. 26) is GRANTED; it is further

2. ORDERED that Defendants Energy, EPA, HUD, Interior, and USDA are ENJOINED from freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act and (2) has already been awarded; it is further

3. ORDERED that Defendants Energy, EPA, HUD, Interior, and USDA take immediate steps to resume the processing, disbursement, and payment of already-awarded funding appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act, and to release awarded funds previously withheld or rendered inaccessible; it is further

4. ORDERED that Defendants OMB and NEC Director Hassett provide written notice of the Court's preliminary injunction to all agencies to which Memorandum M-25-11 was addressed.  The written notice shall instruct those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in Memorandum M-25-11 with respect to the disbursement of all open awards under the Inflation Reduction Act or the Infrastructure

Investment and Jobs Act.  It shall also instruct those agencies to continue releasing any disbursements on open awards that were paused due to or in reliance on Memorandum M-25-11; it is further

5. ORDERED that Defendants Energy, EPA, HUD, Interior, and USDA provide written notice of the Court's preliminary injunction to all grantees who have been awarded funds under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act; it is further

6. ORDERED that all Defendants are ENJOINED from implementing, giving effect to, or reinstating under a different name the directive in Memorandum M-25-11 to unilaterally freeze awarded funding appropriated under the Inflation Reduction Act or the Infrastructure Investment and Jobs Act; it is further

7. ORDERED that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706; it is further

8. ORDERED that all Defendants shall file a status report on or before April 16, 2025, at 5:00 p.m. EST, apprising the Court of the status of their compliance with this Order and providing a copy of all directives that Defendants provided pursuant to this Order.

IT IS SO ORDERED.


Mary S. McElroy
United States District Judge
April 15, 2025