```
1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF RHODE ISLAND

3


4
     * * * * * * * * * * * * *   C.A. No.  1:25-cv-00097-MSM
5                            *
     WOONASQUATUCKET RIVER      *
6    WATERSHED COUNCIL, et al. *
                             *
7         VS.                *   APRIL 23, 2025
                             *
8    DEPARTMENT OF AGRICULTURE,*
     et al.                   *
9                            *   VIA VIDEOCONFERENCE
     * * * * * * * * * * * * *   PROVIDENCE, RHODE ISLAND

10


11           BEFORE THE HONORABLE MARY S. McELROY,

12                       DISTRICT JUDGE

13                      Status Conference

14   APPEARANCES:

15   FOR THE PLAINTIFFS:   JESSICA ANNE MORTON, ESQUIRE
                           ROBIN F. THURSTON, ESQUIRE
16                         KEVIN FRIEDL, ESQUIRE
                           DEMOCRACY FORWARD FOUNDATION
17                         P.O. Box 34553
                           Washington, DC  20043
18
     FOR THE PLAINTIFFS:   MIRIAM WEIZENBAUM, ESQUIRE
19                         DELUCA, WEIZENBAUM, BARRY & REVENS
                           199 North Main Street
20                         Providence, Rhode Island  02903

21   FOR THE DEFENDANTS:   DANIEL SCHWEI, AUSA
                           DEPARTMENT OF JUSTICE - CIV
22                         1100 L St., N.W., Room 11532
                           Washington, DC  20530

23


24   Court Reporter:       Denise A. Webb, RPR
                           One Exchange Terrace
25                         Providence, RI  02903
```

1    VIA VIDEOCONFERENCE

2    23 APRIL 2025 -- 4:00 P.M.

3         THE COURT:  We're on the record in the

4    Woonasquatucket River Watershed Council, et al. versus the

5    Department of Agriculture, et al., and it's Civil Action

6    25-97.

7         We're here for an on-the-record status conference about

8    the Government's compliance with this Court's preliminary

9    injunction order issued on March 15th.  We put it in this

10   format instead of a private conference because things were

11   filed on the record, and I didn't want people to feel that

12   they could not see or that we were doing things in secret.

13   So I know that my case manager reached out to you, and I

14   don't believe she heard any objections back.

15        So I just want to sort of go through where we're at and

16   see -- let you know how I sort of see things as they are

17   right now.  So the parties seem to be worlds apart right

18   now.  And, Mr. Schwei, the allegations against the

19   Government in the Plaintiff's filing is pretty serious in

20   their version of events and possibly even nearing contempt,

21   but I really don't want to jump the gun on anything.

22        Carefully moving through the different agencies as,

23   Mr. Schwei, you have proposed is probably the best way of

24   figuring this out.  So I want make the record incredibly

25   clear about where the parties agree, where they disagree,

1    and then we can chart the best course forward from here.  I

2    want the parties to have the chance to make the record

3    clear, too.

4        So we're going to proceed in this order:  First, we're

5    going to talk about issues of notice and compliance for HUD,

6    then Energy, Interior, USDA and finally EPA.  After that,

7    we're going to iron out everyone's next steps.  And we may

8    take a few minute recess just to make sure I have a minute

9    to gather my notes and make sure that I know what I'm

10   talking about, and then we can lay out the next steps so I

11   can keep everything clear.

12       We're going to plan to have another check-in this

13   Friday.  Once again, status reports are due at 9 a.m. and a

14   hearing at 11:00 to tie up any loose ends, if there are any,

15   unless I hear from the parties that everything is resolved,

16   which I am hopeful about.  Does that make sense?  Everybody

17   is nodding.

18       Since you're all muted and you're all nodding, can we

19   have counsel for the Plaintiffs identify themselves for the

20   record and then counsel for the Government.

21       MS. WEIZENBAUM:  Good afternoon, your Honor.

22   Miriam Weizenbaum for the Plaintiffs.  And I was nodding

23   yes.

24       THE COURT:  Okay.

25       MS. MORTON:  Good afternoon, your Honor.  Jessica

1    Morton for the Plaintiffs.  And Kevin Friedl and Robin

2    Thurston are here as well.

3              MR. SCHWEI:  Good afternoon, your Honor.  Daniel

4    Schwei from the Department of Justice on behalf of the

5    United States, and I believe I'm the only one on the line.

6              THE COURT:  Yeah, you're a man on his own, I guess,

7    again.  Okay, Mr. Schwei.  Nice to see all of you.

8         I want to start with HUD, because I think that's

9    probably the easiest.  So does everyone agree that the Green

10   and Resilient Retrofit Program is the only IRA/IIJA

11   appropriated grant funding at issue in this case?

12             MS. MORTON:  Based on the representations, that's

13   my understanding, your Honor.

14             THE COURT:  Mr. Schwei, is that your understanding

15   as well?

16             MR. SCHWEI:  Yes, your Honor, that's my

17   understanding.

18             THE COURT:  And is everyone on the same page about

19   noticing?  I know we had some issues with it a couple of

20   days ago, but the parties' briefings seemed to show no

21   notice issues with respect to HUD; is that correct?

22             MS. MORTON:  That's correct, your Honor.

23             THE COURT:  Ms. Morton, now that communications

24   have begun between HUD and Codman Square based on both

25   parties' filings, is there anything else about compliance

1    with HUD that you want address at this hearing?

2            MS. MORTON:  I just wanted to note, your Honor,

3    that we have heard from at least one other GRRP grantee.  As

4    of yesterday evening, nothing had been moving quiet yet on

5    their own processing, and so we're hopeful that HUD will

6    continue to process their awards as well, given that it was

7    only after Codman Square reached out to HUD that HUD

8    continued the processing.  Our view is that it shouldn't be

9    on the grantees to prod HUD in taking the next steps and the

10   ball is in HUD's court as it was for Cogman Square.  But as

11   to Cogman Square, it appears that they did take that next

12   step.

13           THE COURT:  Okay.  Mr. Schwei, do you know how many

14   grants are frozen at HUD that are grants through the IRA and

15   IIJA that remain frozen, if any?

16           MR. SCHWEI:  My understanding is none, that there's

17   only this one program, and for projects that have, you know,

18   reached the point where money can go out the door, like all

19   of the closing documents and everything are in order, that

20   HUD is continuing to disburse that money.  And for projects

21   that are earlier in the process where some of the paperwork

22   still needs to be exchanged between the grantee and HUD,

23   that HUD is processing those.  And so I'm not aware of any

24   ongoing pause.  And, you know, I think we've confirmed that

25   HUD understands the order to apply due processing as well.

```
1              THE COURT:  Okay.  And you've spoken to whoever at

2     HUD, and you're confident that they understand it.

3         Ms. Morton, if there's an issue, instruct your clients

4     to prod the agency along -- HUD is making the representation

5     that they have unfrozen funds under the IRA and the IIJA,

6     and so they shouldn't have a problem.  Okay?

7              MS. MORTON:  Yes, your Honor.

8              THE COURT:  Is there anything else on HUD from

9     anyone?

10             MS. MORTON:  Nothing from Plaintiffs, your Honor.

11             MR. SCHWEI:  No, your Honor.

12             THE COURT:  I'm going to move on to Energy.  As to

13    notice, everyone seems to agree that written notice on the

14    payment portal is good; is that correct?

15             MS. MORTON:  Plaintiffs have no objections on the

16    current notice for Energy, your Honor.

17             THE COURT:  Okay.  Now, as to compliance, it seems

18    that based on the Plaintiffs' updates, Energy is also

19    complying, and the only specific note I saw was Declarant T

20    who had received their funds on April 1; is that accurate?

21             MS. MORTON:  That is accurate, your Honor.  We

22    haven't seen any further concerns from that declarant.  I

23    did have a few questions about the Government's status

24    report as to Energy that I was hoping we could clarify, if

25    that's all right.
```

1           THE COURT:  Let me clarify my questions and then we

2     can see if we can get to everybody else's issues.  So I

3     didn't see any specific grant freezes identified by

4     Plaintiffs in their update as they relate to Energy; is that

5     correct?

6           MS. MORTON:  No, your Honor.  The only declarant we

7     have as to Energy is the one who had received her funding

8     before the Court entered its order.

9           THE COURT:  Okay.  Mr. Schwei, the Defendant Energy

10    represented that there have been more than 50 million in

11    IIJA funds and more than 56 million in IRA appropriated

12    grants since the Court entered its April 15th order; is that

13    correct?

14          MR. SCHWEI:  That's my understanding, yes.

15          THE COURT:  Okay.  All right.  Ms. Morton, is there

16    something else that you want to flag for the Court on

17    compliance for Energy?

18          MS. MORTON:  I was a bit concerned about the

19    statement in the status report, your Honor, that said that

20    Energy is still evaluating to the extent to which

21    conditional awards are already awarded.  I confess, I was

22    not really clear what that meant precisely about how to

23    evaluate whether or not they're being processed.  And so to

24    the extent that there are awards that have been awarded that

25    are not being processed, that did flag a potential

1    compliance issue for me.

2         THE COURT:  Can you point us to the line on the

3    Defendant's status report that you're referring to?

4         MS. MORTON:  It's on page three, your Honor, at the

5    very top.  It starts at the end of page two.  (Reading) For

6    conditional awards that do not yet have approved, allowable

7    costs, Energy is still evaluating the extent to which those

8    awards are currently being processed and whether they

9    constitute already awarded funding within the meaning of the

10   Court's injunction.  And I assume either an award is being

11   processed or it's not.  I'm not sure what it means to be

12   evaluating whether an award is being processed.

13        THE COURT:  Mr. Schwei, could you shed some light

14   on that?

15        MR. SCHWEI:  Yes, your Honor.  So that sentence I

16   think is best read in conjunction with the prior one, which

17   says, Currently, Energy is continuing to pay invoices for

18   allowable costs submitted by recipients of

19   IIJA/IRA-appropriated awards.  So where there's a grant

20   agreement that's been finalized and all the paperwork is

21   done and in order, Energy is continuing to pay invoices for

22   allowable costs.

23        There is a separate group of conditional awards that,

24   my understanding, and this is admittedly a complex and

25   nuanced area, so I'm trying to best capture my

1    understanding, but conditional awards, they do involve a

2    specific entity that has been selected for an award, but the

3    award is not yet final because there are lots of conditions

4    that all need to occur before any money can flow out the

5    door.  And it's -- you know, there's a lot that still needs

6    to happen.

7         And so at the time of noon today when we filed this

8    status report, there were sort of two open questions.  One

9    is a factual question, is Energy still processing those

10   awards, and then, separately, there's a legal question of,

11   does Energy consider them to be, quote, already awarded

12   funding just given the high number of contingencies and

13   conditions that still need to occur before anything would be

14   finalized.

15        My current understanding as of this afternoon,

16   subsequent to the filing of this status report, is that

17   those conditional awards are being processed in the ordinary

18   course, and that can vary because there are all types of

19   different awards at different stages.  But my current

20   understanding is that they are being processed, which I

21   think sort of eliminates the compliance issue without ever

22   even needing to resolve, are these highly contingent

23   documents, even within the scope of the Court's injunction.

24   But just given what I knew at noon when this filing was due,

25   we thought it best to flag this issue in the status report.

```
1           THE COURT:  Is this group of sort of conditional
2    grantees sort of analogous to the Cogman Square group's
3    posture?
4           MR. SCHWEI:  I think it is even more contingent
5    than Cogman Square, but I think there's a variety of
6    different types of awards.  And so I hesitate to generalize,
7    especially when I am not an expert in sort of what these
8    technical nuanced grants may look like.
9           THE COURT:  We're all going to become experts.
10   Ms. Morton, what do you say to that?
11          MS. MORTON:  It does sound to me, your Honor, quite
12   analogous to the Codman Square situation.  And I, obviously,
13   haven't seen this particular conditional award that issued
14   it, but it sort of made it a bright-line rule, which is the
15   bright-line I understood from the Court's order, to be
16   whether or not the award had been awarded or not, and that
17   whatever processing may follow from that should continue in
18   the usual course.
19          THE COURT:  Right.  And that sounds like what
20   Mr. Schwei says that Energy is currently doing.  So unless
21   we have something that says that somehow he's being misled
22   by Energy, because I don't think that Mr. Schwei is
23   misleading us, then I think that for now at least that's
24   what we're going to get from Energy.  Okay.  If you have
25   something specific, then you can bring that forward later.
```

1    Is there anything else that you want to flag for

2    compliance on this?

3        MS. MORTON:  Nothing else at Energy, your Honor.

4        THE COURT:  Mr. Schwei, what about you for Energy?

5    Anything else you want to note?

6        MR. SCHWEI:  Nothing other than to say, if I do end

7    up needing to correct my statements today, I would not

8    assume that's because Energy misled me; I just think there's

9    a lot of complexity and details here.

10       THE COURT:  Right.  I shouldn't have spoken so

11   cavalierly.  I understand that there's a gap in

12   understanding between lawyers and actuaries, between lawyers

13   and great scientists.  I understand that, and I'm not -- I

14   didn't mean to assign any, you know, nefarious conduct.  I

15   just assumed that you're giving us all the -- what I want to

16   say is, you're giving us the information that you have

17   available.  I think that's correct.

18       MR. SCHWEI:  Absolutely, your Honor.  Thank you.

19       THE COURT:  I think we can move on from Energy and

20   move on to Interior.  Is that okay?  So written notice is on

21   the website, and it's available; is that correct?

22       MS. MORTON:  From my understanding, your Honor, it

23   is on the website.  I understood from Mr. Schwei's filing

24   that Interior is, I believe, investigating a possibility of

25   providing notice on the Government portal and has still not

1    concluded that investigation.

2         THE COURT:  Okay.  I kind of want to know what the

3    holdups are regarding payment portals.  So while there

4    weren't any problems for Energy on its payment portal, what

5    is the Defendant -- what is Interior doing?  Why are they

6    having such difficulty?

7         MR. SCHWEI:  So I'm not sure exactly who

8    administers Energy's payment portal at sam.gov, I think it

9    was.  You know, for Interior, there was a suggestion that

10   the ASAP payment portal should be the place where notice is

11   posted.  Interior does not control that system, and so they

12   are looking into whether there's an alternative sort of

13   grant management platform that grantees log into and use,

14   where notice could be posted in a way that the grantees

15   would likely see it.  And I think it just, you know,

16   requires, you know, frankly, attorneys at Interior

17   familiarizing themselves with how do grantees actually log

18   into various platforms and document systems and what do they

19   see when they do that.  So I think it's just a technical

20   process of figuring out, do these websites exist, and, if

21   so, how and what can be posted on them.

22        THE COURT:  Okay.  The Plaintiffs' filing at the

23   bottom of page four, they talk about declarant from

24   Exhibit S, which engages youth and young adults in programs

25   to approve access to outdoor recreation, and they're saying

1    that some of the funds were unfrozen before the Court issued

2    the order, but as of this morning, they have about 412,000

3    of grant funding frozen, and they haven't received any

4    notice that the frozen funds -- that its partners were

5    planning on using it and have become available.

6         So, I mean, they do make a good point.  What is the

7    notice plan for Interior?  I don't want to get bogged down

8    in notice; I want to get bogged down in unfreezing and

9    compliance.

10        But, Ms. Morton and Mr. Schwei, does somebody have any

11   kind of suggestion about the notice?  I know they're working

12   on it on the portal.

13             MS. MORTON:  I have a clarification, your Honor,

14   and a suggestion, if I may.  I just wanted to clarify that

15   when we use the word "notice" in that paragraph, we weren't

16   really necessarily speaking of notice that the Court has

17   ordered to provide, but just trying to recount that the

18   declarant has heard and understood from its partners that

19   their funds also remain frozen and their experience is not

20   isolated.

21        But as to the suggestion, I understand that Interior

22   does not control the ASAP portal, but I was curious if they

23   had requested of the people who do control the ASAP portal,

24   would it be possible to include such a notice there?

25             THE COURT:  Who does control the ASAP portal?

1          MR. SCHWEI:  I believe it is the Treasury

2     Department, but I am not positive about that.  And, you

3     know, I think Interior is investigating a grant platform

4     that they do control and has posted notice on its website.

5     And, you know, I think, frankly, it's possible that a lot of

6     time and energy could be focused on sort of the notice part

7     to the determent of more of the substantive part of actually

8     having money go out the door.

9          THE COURT:  Right.  I agree.  That's the -- you

10    know, I don't want the tail wagging the dog, so to speak.

11    But is there anything anybody else wants to say about

12    notice, or can we move on to compliance with respect to

13    Interior?

14          MS. MORTON:  Nothing further, your Honor.

15          THE COURT:  Okay.  So the Defendants say that 464

16    grants are covered by the order.  How many have been

17    unfrozen, Mr. Schwei?

18          MR. SCHWEI:  I don't know.  I know that they are

19    actively in the process of doing that.  I think we know that

20    the number is not zero, because even Plaintiffs agree that

21    some Interior funding has become available, and that's their

22    entity in Exhibit R they say that now has access to funding.

23        So I don't know the exact number.  I think it's

24    probably changing on an ongoing basis, because my

25    understanding is that it requires a manual process to make

1    these funds accessible.  But Interior has now identified

2    these 464 grants and is in the process of making the funding

3    available and disbursing the appropriate payments on them.

4            THE COURT:  Okay.  Were they frozen manually or all

5    at once?

6            MR. SCHWEI:  I don't know.

7            THE COURT:  Because it would seem that -- it seems

8    that what the agencies are saying is, we can cut off the

9    funding pretty easily, but complying with the Court's order

10   when it's ordered to be turned back on, we have less ability

11   to manage and to do.  That's what I'm hearing, and so that

12   gives me some concern about compliance.

13       And I know Ms. Morton in her filing, Declarant R is the

14   bark beetles and sequoias, and that seems to be all set.

15   But is that the only one that's set that you know of,

16   Ms. Morton?

17           MS. MORTON:  To my knowledge, your Honor.  And we

18   haven't seen any change for the declarant in Exhibit O and

19   the declarant in Exhibit S since the conference we held on

20   Monday.

21           THE COURT:  From your filing, it appears that when

22   the -- as of April 22nd, which was yesterday, when they were

23   back on the ASAP portal, they're still getting reason for

24   review as a BIL/IRA hold, and that seems to be in violation

25   of this Court's order.  I specifically noted the hold as an

```
1    easy way to identify agency action, so why has that not been

2    settled, Mr. Schwei?

3            MR. SCHWEI:  So I think the agency is actively in

4    the process of accomplishing that.  I don't think the agency

5    was, you know, willfully sitting back and defying the order.

6    I think what the reality is is that Interior is a big agency

7    with lots of subcomponents and different grants administered

8    by those subcomponents, so the process of unfreezing these

9    grants has required them to collect information from

10   different subcomponents within the broader entity and then

11   work to unfreeze them, which they are now doing.

12        And I'm not, you know, disagreeing that there is more

13   work to be done.  I guess my point is, they are actively

14   doing that, and they have been in the process of doing that,

15   so I don't think that constitutes a violation of the

16   injunction.

17            THE COURT:  Well, they've been actively involved in

18   doing that for about a week now, more than a week, and they

19   have a sorting code so that you've been able to say there's

20   464 grants.  It doesn't seem to me like that's a process

21   that should take this long.  I don't know what I'm missing,

22   and I know I'm asking you to explain that, and maybe this is

23   where we need to have people from the agency here.  Do you

24   want to just tell me what you're thinking about that?

25            MR. SCHWEI:  My understanding is that it's not a
```

1    sorting code.  It's not like there was a spreadsheet that

2    they could easily go into and say, okay, here are the 464.

3    Identifying that universe of 464 is, on my understanding,

4    what has occupied Interior's time for, you know, most of the

5    time since entry of the injunction.  And now that they have

6    this identified universe, it's just the process of actually

7    unpausing those grants and allowing the money out the door,

8    which they are now doing.

9          So I think we are hopefully now at the tail end of

10    these holds being in effect, and I think the agency having

11    lots of different components and needing to identify what's

12    the universe of grants affected are all necessary steps in

13    pursuit of compliance and reflect that the agency is seeking

14    to comply.

15          THE COURT:  It seems, you know -- I don't know

16    their computer system, but it seems difficult to understand

17    why they could freeze these grants quickly and they can't

18    unfreeze them quickly.  So it is difficult to understand why

19    these grants are still frozen more than a week after this

20    Court's order.  So is there anything else that you want to

21    say about that, Mr. Schwei or Ms. Morton?

22          MS. MORTON:  Your Honor, I just would say that each

23    of these grants is extremely important to the recipient, but

24    400 or so does not seem to me to be an insuperable number.

25    What I haven't heard from the Government so far is an

1    explanation for the rate at which they expect they can

2    process these.  I would hope and expect it would be a fairly

3    rapid rate.  But I think that information would be extremely

4    helpful to us in understanding and to be able to communicate

5    to our clients when we can expect that the payments may be

6    unfrozen.

7            THE COURT:  Mr. Schwei, do you have a sense from

8    them of how long this will take?

9            MR. SCHWEI:  I think -- I think the answer is

10    roughly 24 to 36 hours.  My concern about committing to that

11    is that if we have a status report due at 9 a.m. on Friday,

12    and, you know, the agency is not able to verify by then

13    either completeness or the Plaintiffs still say there are

14    some holds that they are experiencing, that that

15    representation is, you know, construed as being untrue or

16    misleading in any way.

17        So I guess the -- I guess what I would like to say is I

18    think that Interior is working as expeditiously as possible.

19    I would hope that something in the next couple of days is

20    possible, but I am concerned about, you know, committing to

21    anything or having any perception that if it's not done by

22    9 a.m. Friday that they are dragging their feet in any way.

23            THE COURT:  So what I am inclined to do is -- and I

24    understand what you're saying.  But they've identified 464

25    grants, and what I would like, if they are not unfrozen by

1    Friday for those that are still frozen and for any other

2    additional grants that they add to that list, if that's the

3    case, I'd like to require them to give us a log of those

4    cases so that we know how many grants are frozen still and

5    how many remain unfrozen.

6        I understand that you're saying 24 to 36 hours, that

7    could put us to 9 a.m. on Friday with it all being undone.

8    I'm not going to hold you to that.  If you come back and

9    report at 9 a.m. and say that of the 464, 450 are done,

10   we're going to get the other 14 done today, that's different

11   than saying, we've done eight.

12       I don't know -- so for ones that are still frozen as of

13   Friday, my inclination is to ask for a log of those that are

14   still frozen, and I'm going to require that they immediately

15   remove the BIL/IRA hold on those 464 grants and any other

16   grant that it determines are covered by this Court's order.

17       I'm inclined to require Interior to make accessible

18   those 464 grants.  If you want to pause them for another

19   reason, you need to demonstrate to the Court that the pause

20   is lawful based on preorder reasons.

21       The presumption here is that the funds be unfrozen, and

22   my job is to determine whether that's been done or not.  So

23   the first order of business is comply with this Court's

24   order.  They can go back and they can review things later.

25   Does that make sense?

1          MR. SCHWEI:  I'm not sure I fully understand, your

2     Honor, just because if the Court is ordering that the

3     BIL/IRA hold be removed, that is effectively ordering that

4     all 464 be unfrozen.

5          THE COURT:  Okay.

6          MR. SCHWEI:  That is what they are working to do

7     and --

8          THE COURT:  Okay.  I understand what you're saying.

9     So by Friday at 9 or Friday at 11, we should have, if not

10    all of them unfrozen, almost all of them unfrozen and an

11    idea from the agency specifically how many are still

12    unfrozen and what they're doing do get that done by the end

13    of the day Friday.  And to that end, maybe there needs to be

14    somebody from Interior on standby to come to the hearing in

15    case we need to hear from them.  Does that make sense?

16         MR. SCHWEI:  Respectfully, your Honor, I don't

17    think it's warranted to have a live witness from Interior.

18    I think what we've demonstrated is that they are working to

19    comply.  I don't think there's any showing justifying that

20    type of measure.  And I think, you know, the Friday status

21    report and hearing at 11 a.m. can be an effective interim

22    measure to see where we are on Friday.  I'm not sure that

23    it'll be possible for almost all to be frozen by 9 a.m. --

24    or unfrozen by 9 a.m.  But I don't think it's necessary if

25    Interior does succeed in that to nonetheless require an

1   Interior official to be possibly prepared to give sworn

2   testimony before the Court.

3           THE COURT:  Ms. Morton, what do you say?  What are

4   the next appropriate steps for the Court?

5           MS. MORTON:  Well, your Honor, I agree entirely

6   with what the Court laid out.  I do think that if there are

7   new questions that remain it would be most efficient for the

8   Court to have someone from Interior who's able to answer

9   them.  Hopefully that doesn't materialize because everything

10  is unfrozen by then.  But I do think that, you know,

11  obviously, as Mr. Schwei has indicated, he's relaying

12  information from others, and for more expert it may be

13  helpful to go straight to the source.

14      I also wanted to just clarify briefly.  I understood

15  you, Mr. Schwei, saying 464 grants in FAI and the statute

16  report says it's covered by the order, and it wasn't clear

17  to me whether there are any other Interior grants

18  appropriated that the IRA or IIJA that are continuing to be

19  frozen that aren't in that count of 464.

20          THE COURT:  Mr. Schwei, do you understand?  I'm not

21  sure I understand the question.  I thought that what they

22  had identified was 464 grants that fall under the IRA or the

23  IIJA and that had been frozen.  Am I missing something?

24          MR. SCHWEI:  I'm not a hundred percent sure.

25          THE COURT:  Okay.  Perhaps we can have an answer to

1    that by Friday.  Because if they're saying, well, we have a

2    thousand grants but only 464 have you ordered unfrozen

3    because we have these independent reasons for freezing them,

4    then that brings them into sort of the issues with the next

5    two agencies.

6             MR. SCHWEI:  Right.  And I guess it's not clear to

7    me whether that's what is being said or whether it's 464

8    full stop, or whether it's, you know, we have a thousand

9    grants but only 464 were ever paused and so it's only that

10   universe affected by the injunction.  That's why I'm

11   hesitating.  I guess I don't want to --

12            THE COURT:  That's why I'm suggesting that maybe

13   somebody from Interior would be able to answer those

14   questions without putting you on the spot to have to do

15   that.  Let's move on and see where we are at the end of

16   this.  I understand your argument about wasting somebody's

17   time.  I certainly don't want to do that.

18       Okay.  USDA as to notice, they report that they have

19   begun the individualized notice process, and then following

20   our conference on Monday, they began to look into website

21   alternatives.  And now USDA says if it's unable to complete

22   individualized process by this Friday, it will post notice

23   on the agency website or payment portals.  I think this is a

24   reasonable path.  Any objection to that?

25            MS. MORTON:  While, your Honor, I appreciate that

1    they're attempting to give individual notice, but it seems

2    to us that -- and Interior would appropriate for them to go

3    ahead and post on their website, which seems like it would

4    not be burdensome based on the (inaudible) other agencies

5    were able to do so.  I'm not sure it's necessary to wait

6    until Friday to do that.

7              THE COURT:  I just don't know what's required and

8    what's, you know, the status of who owns or controls what

9    payment website for what federal agency.  So for now I'm

10   going to agree that the USDA's notice compliance is

11   sufficient, as long as they continue to do what they're

12   supposed to do.  I don't want to get bogged down in notice

13   when we have compliance issues.

14       So as to compliance, a couple are all set it looks

15   like, the Woonasquatucket River Watershed Council and the

16   Green Infrastructure Project.  A couple are frozen, Eastern

17   Rhode Island Conservation District.  That's the

18   declarant for -- also the declarant from Exhibits O and Z,

19   and they both report that their funds are still frozen.

20       Mr. Schwei, what can you tell me about why these funds

21   are still frozen?  And please be as specific as you possibly

22   can.

23             MR. SCHWEI:  So for Eastern Rhode Island

24   Conservation District, I would note that my reading of the

25   Plaintiff status report is that for the USDA grant, the

1    entity has been told they will be reimbursed for expenses,

2    it's just that they have not received the money in their

3    bank account yet, which I think is, you know, a separate

4    question from, is the money frozen, especially given on my

5    understanding that they are a sub-grantee, which I think may

6    create additional timing delays between when they actually

7    receive the money in their bank account.

8        So I guess that particular entity I'm not sure is

9    properly lumped in with the frozen category.  The other

10   specific entities I believe are anonymous ones, so it's not

11   like I can ask the agency, why is this specific funding

12   frozen, but, you know, USDA I think is actively working

13   through the pending payment requests and disbursing funds.

14       I would note that Plaintiffs, their Exhibit 1 to their

15   status report is a filing from a separate case, but that

16   filing actually makes clear that many USDA grants are going

17   forward and grantees do have access to them.  So I think

18   USDA is making progress.  There may still be some payment

19   requests that need to be approved and disbursed, but that's

20   what USDA is actively doing now.

21           THE COURT:  So one of the notes, and I realize this

22   comes from the South Carolina case filing, one of the notes

23   for USDA, sort of at the bottom of the second page or up

24   from the bottom of the second page, is presently paused

25   because previously identified on DEIA list, payments made

1     through January 19th.  Do we have grants with the USDA that

2     are in that category?

3            MR. SCHWEI:  I think that touches on what we

4     discussed on Monday about one of the clarifications that the

5     Court provided about the pause would need to be, you know, a

6     preexisting determination from before entry of the

7     preliminary injunction for it, on an individualized

8     independent basis, apart from the fact that it was

9     appropriated under the IRA or the IIJA.

10        I think there may be some in that category here.  I

11    don't know exactly what this particular grant on that sheet

12    was referencing, but if there is anything in that category,

13    I think we would -- my understanding is that it would fall

14    within the scope of that clarification for Monday that we

15    try to capture in our status report, at least how I

16    understood sort of the discussion to unfold on Monday.

17           THE COURT:  So I think that the problem here is

18    that we get into that sort of reasoning where now I'm

19    micromanaging, you know, compliance with the Order because

20    people are looking for a loophole in the order of the Court.

21    I think my order was clear.  Everything needs to be

22    unfrozen.  If you need to go back and look at things and

23    refreeze them because you think you have an independent

24    preexisting authorization to refreeze them, then you can do

25    that.  But to say, well, you know, some of these were, I

1  forget, DEIA frozen, I mean, that's just sort of, you know,

2  how do we know and how many and which ones.

3      And so what I'm inclined to do is to order -- to

4  clarify my order if it wasn't already crystal clear, which I

5  think it was, everything needs to be unfrozen.  If you have

6  an independent basis, then -- individualized independent

7  basis, not, we're freezing everything now because we

8  couldn't do it under the IIJA and we couldn't do it under

9  the IRA, now we're going to try to do it under something

10  else, then I think what I'm going to need -- I'm going to

11  require USDA to immediately make these grants accessible.

12      If you want to pause the grant for another reason, you

13  can demonstrate to the Court that the pause is lawful and

14  consistent with this order, as opposed to, you know, I'm

15  supposed to take it on faith.

16      I'm not coming down on you, Mr. Schwei, but it feels

17  like the agencies are saying, how can we best read this to

18  interpret it so we don't actually have to comply with it.

19  And as I pointed out earlier in the week, there are lots of

20  things that people can do if they don't agree with a Court's

21  order, but disobeying isn't one of them.  They're welcome to

22  appeal.

23      MR. SCHWEI:  And I hear you, your Honor.  I think

24  the problem is -- not a problem, but our position is that,

25  as I understood the conversation on Monday, it was the

1     Court's concern about these post hoc rationalizations, and

2     the agencies seeing the Court's order and then saying, okay,

3     we cannot keep it paused for this reason, can we keep it

4     paused for some other reason.  So we had the discussion

5     about, if there was a preexisting determination to pause

6     from before the preliminary injunction on an individualized

7     basis separate from the IRA/IIJA status, and that's my

8     understanding of these USDA, the grants that would remain

9     paused that may be within this category, and the EPA

10    declaration starts to make it a bit more concrete.

11        I think these are preexisting determinations from

12    before the injunction, not the type of post hoc

13    rationalization that I understood the Court to be concerned

14    with on Monday.

15        THE COURT:  And you understand it correctly, but I

16    think you need to show your work.  So I think to the degree

17    this exists, there would be a document trail that, like,

18    from someone to someone, this is going to be frozen based on

19    this and separately frozen based on this.  And so for the

20    grants that are still frozen, my inclination is to order you

21    to provide the documentation.

22        I think we're going to move on.  The case is about

23    showing your work, right?  Like, I mean, the whole idea is

24    that you can't just do things and then decide later how to

25    justify them.  I mean, it is a little frustrating.  You

1      know, there's many mechanisms, go to Congress, go to the

2      Appellate Court.  But to just to sort of parse, mince words

3      is frustrating.  It's frustrating for me, and I'm sure it's

4      frustrating for you, Mr. Schwei, and for all the other

5      lawyers in this case, as well as the public and the grant

6      recipients.

7           So I'm going to move from that.  I'm going to require

8      USDA to immediately make accessible the grants, and if they

9      have some that they believe that they are able to continue

10     to freeze as a result of prior, existing documentation that

11     shows an independent, individualized basis for a freeze,

12     then they can provide that to the Court and to the parties.

13          So with that in mind, what do you think is the next

14     appropriate step, Ms. Morton?

15          MS. MORTON:  Well, your Honor, I agree entirely

16     with that requirement about showing the work.  And I also

17     would just add, again, that it's really about individualized

18     basis, and having the same DEI list over and over suggests

19     that it may not have been on an individualized basis, and,

20     of course, they can only rely on their actual documented

21     reasons at the time.

22          Everything I want to point out about a next step to

23     suggest was, I was concerned to read in the status report

24     the statement that USDA is just working through a large

25     number of payment requests, which I'm sure is true, but

1    there weren't really any quantifiable metrics around that

2    like there were for Interior.  So I'm at a loss as to how

3    many a large number is, what percent have been gone through,

4    what percent remain, what the estimated time to completion

5    is.  And as for Interior, I think it would be extremely

6    helpful to understand the rate at which we can expect that

7    these will be gone through going forward.

8              THE COURT:  Mr. Schwei.

9              MR. SCHWEI:  So a couple of things, your Honor.

10   One is just, if the Court's order is unfreeze everything and

11   you can come back to me and show your work if you wanted to

12   keep it frozen, we object to that.  We respectfully think

13   that's the type of preclearance framework that Judge

14   McConnell disavowed and that the First Circuit at least

15   expressed some concerns about.  So I think that is an

16   inappropriate way of proceeding, in particular, because it

17   effectively expands this case, which is singularly about

18   IRA/IIJA pauses into, can agency pause DEIA funds and other

19   things and it just dramatically expands the scope.

20             THE COURT:  Based on my understanding that there

21   are more than a hundred cases going on, I'm sure somewhere,

22   some way there is a court hearing argument about why they

23   can pause all of these things.  But you make a good point

24   about preclearance.  I don't want to be in the position of

25   managing these, but I do think that to the degree that the

1    USDA has determined that funds should remain frozen under

2    something else, they need to show their work.  So they need

3    to provide the documentation, the backup to show, okay, this

4    was already paused, was going to be paused under something

5    else as well, and this documentation preexisted -- existed

6    prior to April 15th.

7         We'll get into that at the end.  I want to get through

8    the last agency first, which is the EPA.

9         I mean, I don't mean to keep going back, but if you can

10   suggest some other way that I can guarantee that the agency

11   is complying, I don't have anybody from the agency under

12   oath, I have one affidavit from one person from one agency

13   today saying what they think they're doing to comply.  I

14   don't know how else the Court is supposed to verify that

15   they're actually complying.  So I want to move on -- go

16   ahead.  Unless you can come up with something, Mr. Schwei.

17        MR. SCHWEI:  I think these expose inherent flaws in

18   the scope of relief that's been ordered, and I guess it

19   would be quite manageable if, you know, the agencies could

20   get through this initial period and then the Plaintiffs

21   could identify, are there still things they are concerned

22   about.  But at this point, it's essentially a roving

23   commission of, is there something out there that may still

24   be frozen with Plaintiffs demanding particular metrics on

25   particular time frames.

1    And I think, you know, it is incumbent upon the

2    agencies to implement the Court's order, we're not disputing

3    that, and they're in the process of doing that.  And I think

4    it's reasonable to require further status reports about the

5    progress of that.  But it sounds like now it's going beyond

6    that and actually dictating how things need to unfold and

7    what documentation needs to be submitted before particular

8    funding decisions can be made, which I don't think is what

9    compliance here should require.

10        THE COURT:  And I don't think I've said anything

11   like that.  I just don't know -- I mean, the scope of this

12   is set by the Defendants who froze everything under these

13   two statutes.  I've ordered that they be unfrozen, and I

14   clarified unless they preexisted some conditions where, you

15   know, a preexisting condition under which they had already

16   determined that that same grant could be frozen.  I don't

17   know how else we can guarantee agency compliance.  If you

18   can suggest something, I'm all ears.

19        MR. SCHWEI:  I think that's effectually what EPA

20   has done by submitting that declaration, saying we -- it's

21   from an official under oath saying, we decided to terminate

22   these and pause them prior to the Court's preliminary

23   injunction, and it was the result of individualized review.

24   And it's only a portion of the grant.  There is 60 plus

25   billion dollars of IRA/IIJA appropriated funding still going

1    out the door, but now we're talking about a particular slice

2    of money that they made a determination to pause.

3        And I think that is how we understand the Court's order

4    from Monday's clarification.  If we misinterpreted it, I

5    think, you know, that's why in part why we submitted the

6    declaration and tried to flag this issue.  But the sworn

7    declarations saying, we decided this prior to the

8    preliminary injunction based on an individualized

9    independent review, I think that meets the criteria and all

10   the Court needs to assure itself of compliance for those

11   grants.  And none of that cuts off any individual grantee's

12   ability to challenge the eventual termination in the

13   appropriate forum.  But having it become part of this

14   compliance proceeding I think just highlights how we're

15   getting far afield from the Plaintiffs' underlying claim and

16   how it really starts to look more like individual grant

17   micromanagement.

18       THE COURT:  Right.  I don't want to -- we're going

19   to go over the EPA in a moment.  But for USDA and for

20   Interior, can we get an affidavit from an official,

21   specifically much like Mr. Coogan's affidavit that we got

22   from the EPA?

23       MR. SCHWEI:  I'm certainly not opposed to

24   submitting a declaration from them.  I think getting

25   something, you know, it's just a question of what -- you

1    know, in the limited time between now and Friday 9 a.m. what

2    we'll be able to put together, I think.  But we can submit a

3    declaration of some type from those agencies and for USDA

4    analogously explaining that for any terminations, that those

5    were based on decisions prior to the preliminary injunction,

6    not post hoc reasons after the preliminary injunction.

7         THE COURT:  So I just want to be clear -- we're

8    going to move on to the EPA, so maybe I should wait until

9    we're there.  So with respect to the EPA, any problems with

10   the notice?

11        MS. MORTON:  Not from Plaintiffs, your Honor.

12        THE COURT:  Okay.  And then with compliance, we

13   have plenty of examples of funds still frozen.  The

14   Childhood Lead Action Project, Eastern Rhode Island

15   Conservation District, National Council of Nonprofits.  So

16   is it your understanding, Mr. Schwei, that the only grants

17   still paused are the 781 grants that are noted in

18   Mr. Coogan's paragraph five, which are the 377 grantees that

19   have already received termination notice and the 404 that

20   will receive termination notice, and that all of those

21   decisions were made prior to this Court's initial order?

22        MR. SCHWEI:  Yes, that's how I understand

23   paragraphs five and six.

24        THE COURT:  Are there any of these grants -- so

25   it's the Government and Mr. Coogan is saying, this was all

1    decided before this.  Was any of it as a result of the

2    filing of this lawsuit?

3            MR. SCHWEI:  Not to my knowledge.  I think it was

4    all part of the review process that was ongoing as described

5    in, I think, paragraphs two, three and four, that, my

6    understanding is, began before the filing of this lawsuit

7    and was proceeding on its own path independent of what

8    happened here.  I think the decisions to terminate, I

9    believe he says were the result of that review process.

10           THE COURT:  His last date that that concluded was

11   April 14th, which is the date before this order was issued.

12   So the termination decisions were made prior to the

13   injunction in this case; is that your understanding?

14           MR. SCHWEI:  That's my understanding based on

15   paragraph five, yes.

16           THE COURT:  And that's Mr. Coogan's under oath

17   affidavit.  So we shouldn't expect that anybody would have

18   been terminated after April 15th under the EPA IRA/IIJA

19   grants?

20           MR. SCHWEI:  Well, that is -- so I guess future

21   terminations could happen, but my understanding is there's

22   no pause aside from the ones listed here.

23           THE COURT:  And all of the grants that are being

24   terminated have been terminated prior to this Court's order,

25   right?  What I need to know is that people are not being

1    retaliated against.  I mean, there's an indication that one

2    of the people have reached out to the agency, and his money

3    was terminated promptly after he reached out and cited this

4    Court's order.  I just want to make sure that that

5    termination was made before this Court's order and not a

6    result of being informed of this Court's order.

7            MR. SCHWEI:  That is my understanding, that per

8    paragraph five, all of those dates, you know, are ones that

9    occurred before the Court's order and are when the

10   terminations relevant here, when those decisions were made.

11   And, you know, Plaintiffs', I think, characterization of

12   those events is not actual evidence of any real retaliation

13   here.  It suggests a potential overlap in chronology, but as

14   Mr. Coogan has said, this review process was ongoing, so

15   it's not surprising that there would be an overlap in

16   chronology.

17           THE COURT:  And it was concluded on April 14th,

18   according to my reading of his affidavit.

19           MR. SCHWEI:  I think there may still be other

20   reviews or review processes ongoing, but my understanding is

21   that no IRA/IIJA money remains paused, except for this

22   universe that EPA decided to terminate, and all of the

23   termination decisions were prior to April 15th.

24           THE COURT:  That answers it.  Thank you.

25           So let me ask you another question.  Are these

1    terminations lawful?  I mean, there is a difference between

2    changing recipients, and we talked at the oral argument

3    about the *Smith versus The Jones Tree Planting Company*.

4    There's a difference between changing recipients or changing

5    recipient sort of priorities and terminating the programs.

6    And this is money that was appropriated by Congress.  Don't

7    we get back into, is this a violation?

8         As I -- I thought I was pretty clear.  I understand

9    that different administrations have different priorities.

10   That's sort of our Electoral System, and I think it's a good

11   one.  But in this case, Congress, one of them is called The

12   Bilateral Infrastructure Investment whatever Act.  So can

13   they just not reappropriate this money?  Is that what

14   they're playing on doing, saying EPA -- they terminated a

15   lot in grants, what's going on with that money?  What's

16   going to happen with that money?

17        MR. SCHWEI:  I guess at the outset I'll say, I'm

18   not a hundred percent sure, because, obviously, this is

19   all -- you know, this is moving pretty quickly and none of

20   these issues have been briefed and none of those types of

21   claims are really at issue.  But I guess it's not really

22   clear to me that terminating recipients within these

23   programs necessarily equates to a refusal to spend

24   Congressional money as opposed to being analogous to the

25   *Smith V. Jones* example of saying, we don't like -- so

1    there's a pot of money that is appropriated, we don't like

2    an existing program that's doing this thing, so we're going

3    to terminate recipients in that program and choose a new

4    program or design a new program that still falls within the

5    terms of the appropriation.  So I don't think terminations

6    equate to Impoundment by any means.  I think that's far

7    afield from sort of the core claims that have been litigated

8    so far.  And, you know, obviously our position would be any

9    challenges to individual termination decisions, that's

10   more --

11            (Overspeaking)

12            THE COURT:  Got it.  And I'm not worried about that

13   so much as I'm looking at -- I think there is a difference

14   between terminating -- firing the Smith Tree Planting

15   Company and moving to the Jones Tree Planting Company or to

16   the Jones Tree whatever Company because the priorities of

17   the Administration more align with that, then there is

18   between saying, Congress appropriated this money under the

19   IRA and the IIJA, and we don't approve of these two acts,

20   and so, therefore, we're not spending the money.  Those are

21   two different things.  One violates clearly, I think, the

22   Impoundment Act and the agency doesn't have the authority to

23   usurp Congress, which has the spending power, and the other

24   is if it complies with the conditions of the grants

25   themselves is an issue of agency priorities.  Am I -- are we

1       agreed on that?

2           MR. SCHWEI:  I agree there's a conceptual

3       difference, but my point is that terminating here does not

4       necessarily equate to a refusal to spend

5       Congressionally-appropriated money.  It may be possible to

6       terminate recipients here and design a new program and give

7       the money to other recipients that still fulfills Congress's

8       appropriations.  So I hear the Court's conceptual

9       difference, but I'm not sure that termination necessarily

10      moves it into Impoundment as opposed to in *Smith V. Jones*.

11      And in any event, it's not relevant here.

12          THE COURT:  Fair enough.  That's another case for

13      another day and hopefully for another Judge.  So we'll move

14      on from that.

15          Okay.  So, Ms. Morton, what do you have to say at this

16      point about that?

17          MS. MORTON:  Two main points, your Honor.  First,

18      this is a matter of clarification, although it may be

19      possible that a decision to terminate occurred before the

20      Court Order, some of these terminations themselves have not.

21      Under the Federal regulations at 2 CFR 200.341(a), a grant

22      is really not terminated until they've notified the grantee.

23      So for these grantees that have not been notified, it is not

24      actually terminated yet, although it may be possible that a

25      decision to terminate has been made.

1          THE COURT:  And that's 2 CFR 200. --

2          MS. MORTON:  341(a).  More importantly, your Honor,

3     I think Mr. Coogan and I have quite different understandings

4     of what the word "individualized" means based on the

5     declaration.  I understood paragraph six to say that each of

6     these programs were slated to be terminated, not that there

7     was individualized assessment for every grant awarded under

8     those programs.  And doing this broad programmatic

9     termination feels to me like the antithesis of an

10    individualized assessment and really inconsistent with

11    paragraph two of the Court's order, which enjoins halting on

12    a non-individualized basis, processing and payment of

13    funding appropriated in the statutes that was already

14    awarded.

15         It really -- individualized has to mean something more

16    than it falls within this particular programmatic category,

17    which is really what we've been arguing all along just

18    because it was under the IRA, because it fell into this

19    particular bucket is not individualized assessment.

20         And to the extent that the Government is arguing that

21    it was an individualized assessment of every individual

22    grant, it seems shocking to me that every single grant under

23    that program each happens to come out precisely the same way

24    given the diversity of grantees that we've been seeing.

25         I think, you know, one example of this is, you know,

```
 1    the Childhood Action Project, which we learned this
 2    afternoon was we thought the Government's report is one of
 3    the programs listed to be terminated.  The grant is under
 4    the Environmental Justice Collaborative Problem Solving
 5    Cooperative Agreement Program, and they have not received a
 6    termination notice yet.
 7        And it's quite difficult to understand how an
 8    organization that keeps children safe from irreversible
 9    brain damage from lead exposure is out of the
10    Administration's priorities given everything that's been
11    said about how important it is to keep our children healthy
12    and safe.  So I think --
13            THE COURT:  That's not my job, respectfully.  It's
14    not my job to assess whether or not this Administration has
15    good priorities or bad priorities or whether I agree with
16    them or not.  It is irrelevant to a legal determination.
17            MS. MORTON:  Absolutely, your Honor.
18            THE COURT:  I don't want to get into whether the
19    Smith Tree Company is better than the Jones Tree Company,
20    and I know I'm oversimplifying, or what their priorities
21    are.  That's -- as long as they comply with the statute and
22    doing it in a way that doesn't violate, you know, either the
23    Impoundment Act or the Administrative Procedures Act, then
24    it's out of my jurisdiction.  I don't have to make policy
25    decisions, thankfully.
```

1          MS. MORTON:  I absolutely agree, your Honor.  And I

2     am not asking the Court to make a determination on whether

3     this is an appropriate policy.  I'm merely pointing out, the

4     Government has to actually make that individualized

5     determination if it is going to rely on that as an excuse

6     for termination.  And there's no evidence that the

7     Government has done that and no evidence that has actually

8     made a determination that that is not an agency priority

9     that is a credible termination.  I think the fact that every

10    grant across these programs was terminated at once and in

11    one fell swoop really underscores their lack of evidence of

12    any individualized assessment.

13         THE COURT:  So I think paragraph six of

14    Mr. Coogan's affidavit gives it a more of an individualized

15    sort of flavor.  They're saying these specific grants

16    don't -- or grant programs don't comply with the agencies',

17    whatever, you know, priorities.  And I think giving --

18    articulating specifics, 700 grants out of 3,000, does seem

19    more individualized than what the Plaintiffs were

20    complaining about in this case to begin with.

21         MS. MORTON:  I respectfully disagree, your Honor,

22    because it's sort of the same thing on a different scale.

23    The original complaint really is the idea that, oh, this

24    grant is not a priority because it was appropriated by the

25    IRA or IIJA and not a different statute, without looking to

1    see where the actual grant addressed itself.

2        And this is really the same sort of issue, you know,

3    was it falling under Environmental Justice Small Grant

4    Program, was it falling under a separate program without

5    looking to see what the grant actually itself was.  And the

6    CFRs around terminations talk about terminations of awards,

7    not terminations of programs.

8        I think this gets to what we discussed at the PI

9    hearing, your Honor, which is that, as you said, certainly

10   not your job to go grant by grant, but it is the

11   Government's job to look grant by grant.  And there's no

12   indication that terminating across the board in a

13   programmatic way without looking at those individualized

14   grants is really sort of individualized assessments.

15   They're not -- they didn't terminate grants, they terminated

16   grant programs that were created by Congress.  And so --

17           THE COURT:  Wait.  Are you suggesting that the

18   specifics of the programs were created as part of these

19   acts?

20           MS. MORTON:  Your Honor, I believe that -- I could

21   be incorrect.  I believe that some of the allocations of

22   money for different pots were required, that Congress had

23   allocated specific funding for, you know, specific

24   grant-making programs.  I don't know if that's true of all

25   of these, but I believe that at least some were.

```
 1            THE COURT:  All right.  So looking at paragraph
 2    six, he's saying (reading), the Environmental Justice
 3    Collaborative Problem Solving Cooperative Agreement Program.
 4    Your allegation is that that's not an individualized
 5    assessment because more than one grant falls under that?  It
 6    seems to me that the EPA did exactly what I ordered them to
 7    do, but what you're asking, I think, is that they show their
 8    work.  Is that essentially it?
 9            MS. MORTON:  I certainly am asking that they show
10    their work, your Honor.  But I also say that a decision to
11    terminate 700 grants, say it's 700, part of that program
12    without looking at the actual individual grant is not
13    terminating a grant on an individualized basis.
14            THE COURT:  Okay.  But didn't the lawsuit, the
15    Court's order, all of the briefings talked about pauses and
16    freezes and not about terminations.  This isn't our case
17    anymore, if you're talking about terminations.
18        Certainly, you can challenge terminations, but the
19    question becomes, where is my -- the case that's before me,
20    I can only decide what's in front of me.  And it's not
21    appropriately in front of me to say, well, no, they can't
22    terminate this because it's a Congressionally-mandated
23    program.  That's a separate lawsuit.  Right?  I mean, am I
24    wrong on that?  I don't want to run the EPA.
25            MS. MORTON:  I don't want you to.  We certainly are
```

1    not asking you to run the EPA or any other agency.  But to

2    the extent that a termination is effectively an indefinite

3    pause by another name is concerning to us that some of these

4    are continuing to be addressed on a non-individualized

5    basis.

6        Of course EPA has the authority to take a truly

7    individualized assessment of a grant, determine whether or

8    not the grant agreement provides for termination under the

9    grounds they'd like to do so and to terminate it.  We're not

10   arguing that at all.  It's really continuing a pause

11   indefinitely on these broad swards in a programmatic manner

12   that we think is inconsistent with the Court's order.

13        THE COURT:  I understand what you're arguing, and

14   you certainly can file another suit about the 700

15   terminations, but I really don't think that that's this case

16   and this order.  So I understand what you're saying, and,

17   certainly, the EPA is required to comply with the law and

18   with this Court's order, but it is not -- I cannot just make

19   some sort of determination that, you know, all these other

20   things that weren't before me in this lawsuit may or may not

21   be lawful.  Unfortunately, that's a separate case.  Correct?

22   Mr. Schwei, do you have anything you want to say on that?

23        MR. SCHWEI:  We agree with your Honor.  Those are

24   issues for a separate lawsuit.

25        THE COURT:  Anything else on the EPA?

1          MS. WEIZENBAUM:  Your Honor, if I may.  And you may

2    only want to hear from one Plaintiff's counsel.

3          THE COURT:  That's okay.

4          MS. WEIZENBAUM:  I would like to underscore the

5    request to check their work and see which are those ones

6    that the Government is now saying or determined prior to

7    this Court's order and look at those particulars.

8       I understand Mr. Schwei is dealing with a number of

9    agencies here and doesn't know all of the particulars.  We

10   would like to check those particulars with our clients,

11   because, to be frank, we haven't heard this from clients

12   that they've been given notice of other reasons.

13      So we would like to -- and I understood that that was

14   what the Court was -- the direction the Court was going, but

15   we would like to know, what are these other grants that have

16   been -- that the Government is claiming were terminated

17   prior to the Court's order.

18          THE COURT:  Mr. Schwei, what do you say to that?

19          MR. SCHWEI:  I guess a couple of responses.  Number

20   one is, if the terminations themselves are the subject of a

21   separate lawsuit, I'm not sure what the basis is for

22   continuing to probe the Government's actions in connection

23   with those terminations as part of this lawsuit.  I think

24   that is essentially the same as having it become part of

25   this lawsuit.

1       And, second, I don't think there's any real basis or

2   need to, quote, check the Government's work here.  There's

3   no reason to doubt what Mr. Coogan has put in his

4   declaration.  It seems like this is nothing more than

5   speculation about some nefarious action within the

6   Government.  But the declaration speaks for itself.  There's

7   no reason to doubt it.  And having this inquiry continue,

8   particularly here in the posture of compliance and

9   enforcement of Court orders, and as the Court alluded to at

10  the outset, potential contempt proceedings, I think that is

11  totally inappropriate and unwarranted here.

12       THE COURT:  Clearly there's a difference between

13  terminations and freezes, right?  This case wasn't about

14  terminations.  So why don't you take a moment each and tell

15  me what you think we should be doing in the next couple of

16  days.  I'd like to get an update from the Government as to

17  their compliance with unfreezing the money between -- you

18  know, between now and Friday.  I understand, Mr. Schwei,

19  that when you tell a client 24 to 36 hours, to them you mean

20  three weeks.  So I just want to know where we're at by

21  Friday.  What is it more that you think we should do, what I

22  should be doing, what you guys should be doing in the next

23  couple of days?

24       MR. SCHWEI:  My position, your Honor, would be, I

25  think it is reasonable to want to know what is the status of

1    unfreezing funds at Interior and perhaps USDA.  I think if

2    the Court would like sworn declaration from those agencies,

3    respectfully, I think it would be more productive for

4    everyone to extend a bit beyond Friday at 9 a.m. and perhaps

5    do Friday at 5 p.m. and then a hearing some time on Monday,

6    or even Monday at 9 a.m. with a hearing.  I just think the

7    quality and detail of the declarations will be more

8    informative for everyone if we take a little bit longer

9    rather than rushing to schedule more proceedings as soon as

10   possible.

11        And I think omitting a requirement for an official to

12   be on call to testify about unknown topics, you know, I

13   think is also helpful.  I think things will be clearer if we

14   submit a declaration from Interior and USDA, and, you know,

15   at that point there will be a much more solid foundation for

16   argument about whether some sort of sworn testimony is

17   necessary.  But I don't think it's candidly productive to

18   have the threat of live testimony hanging over a hearing

19   that can otherwise be straightforward about what does this

20   declaration mean and provide.

21             THE COURT:  Ms. Morton?

22             MS. MORTON:  First, your Honor, I think what we

23   would love to see between now and Friday is real movement on

24   seeing grants being unfrozen, particularly at Interior and

25   USDA.  It sounds like we're all in agreement that it's

1    appropriate for the agencies to share an update of where

2    they are if they have not fully complied by then.

3        I would say, my prior representations, we would greatly

4    appreciate those updates including quantifiable metrics

5    about what has been done and what remains.  I really do

6    think that pushing that until next week when it's almost two

7    weeks from the Court's order is unnecessary.  I hope the

8    Government would be able to provide at least an update on

9    where things stand by Friday, if not at 9 a.m., by noon or

10   some point that day.

11       And then to the point that the Court made earlier, to

12   the extent that there isn't anything that's being frozen on

13   an individualized basis, if the Government intends to

14   continue freezing, showing the work would be quite helpful

15   there as well.

16       THE COURT:  So I'm going to take a two-minute

17   recess now just to talk to my law clerk to see what we can

18   reasonably do, based on my calendar in the next week.  So

19   give it a minute, and I'll be back.

20       (Brief recess)

21       THE COURT:  Okay.  Is everybody back who we expect

22   to have back?  Okay.  So this is what I think makes the most

23   sense going forward.  So I think I would like an undate from

24   Interior and the USDA, sort of akin to -- similar to

25   Mr. Coogan's affidavit.  That's helpful.  I understand that

1    you're working with limited time, Mr. Schwei, but I'm hoping

2    that we can get some more detail as to what they're doing

3    and what's been done and what's been undone.  I am going to

4    ask that you provide that by noontime on Friday instead of

5    by 9.  I don't think it makes much sense to suggest you do

6    it by 9.

7         So I'm also -- as for the terminations, so, obviously,

8    if something is terminated it's terminated; if it's frozen,

9    it falls within our case.  By Ms. Morton has made the

10   argument here that the terminations aren't predating the

11   order because they weren't conveyed, and she's referenced to

12   CFR 200.341(a).  I don't know that section, and I will look

13   it up.  But I would like a short memo whether that applies

14   to any of these terminations, and that's -- we can figure

15   that out.

16       I don't want live witnesses.  I think we can have a

17   conference at 1:00 on Friday just by phone, even if you

18   can't do Zoom or we can do it by Zoom, just to see where

19   we're at and where everyone is with respect to the

20   unfreezing of the funds.  And we can always figure out if we

21   need a live witness, we can do it next week.

22       But if we can get those things from the two agencies.

23   I don't think we need anything else from HUD or Energy.  I

24   think we're set on those agencies.  So we can focus on the

25   two agencies that remain, and then the issue of what's a

1    termination of a grant, which really isn't something that I

2    should be involved in.  But if the argument is, as I

3    understand it from Ms. Morton, that these are not

4    terminations, these are really freezes because the

5    termination notice didn't happen, then we can address that

6    if we have to.  It seems like the terminations might be a

7    separate lawsuit, but let's address that if we can.

8         So get me what you can get me by noon on Friday, and

9    then let's try to talk on Zoom.  Is 12 on Friday a problem?

10   I realize that everybody has other cases.  Does that work

11   for everybody?  Mr. Schwei?

12        MR. SCHWEI:  Yes, your Honor.  We appreciate the

13   few more hours past 9 a.m.

14        THE COURT:  It's not many.  I have to go to the

15   First Circuit conference next Wednesday morning at 6 a.m. my

16   flight leaves, so I'm trying to hopefully put this to bed

17   before that.  If that can't happen, that can't happen.

18        MR. SCHWEI:  I was being serious.

19        THE COURT:  I know you were.  But I feel bad,

20   because I know getting something done on that time frame

21   isn't really fair, and I know you have other cases, as do

22   the Plaintiffs attorneys.  So, Ms. Morton and

23   Ms. Weizenbaum, is that okay for now?  We can figure out

24   what that is.

25        MS. MORTON:  That's fine for me, your Honor, if

1    it's fine for Ms. Weizenbaum.

2              MS. WEIZENBAUM:  Yeah, I can make that work.

3              THE COURT:  If you're making specific requests for

4    what I'm interpreting when we say show your work, what

5    you're interpreting is discovery, put specifics in writing

6    as to what you're looking for and we can talk about those on

7    Friday.  And I'm going to give Mr. Schwei some time to see

8    them and respond to them, but at least we can preliminary

9    talk about specifically, what are you looking for.

10             MS. WEIZENBAUM:  Thank you.

11             THE COURT:  Is there anything else for today?

12             MS. MORTON:  Nothing from Plaintiffs, your Honor.

13   Thank you.

14             MR. SCHWEI:  Nothing from Defendants.  Thank you.

15             THE COURT:  All right.  Everybody have a good day.

16   Thank you.

17             (Proceedings Adjourned)

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Denise A. Webb, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Dated this 25th day of April, 2025

/s/ Denise A. Webb_____

Denise A. Webb, RPR
Federal Official Court Reporter