UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|   |   |
|---|---|
| WOONASQUATUCKET RIVER WATERSHED COUNCIL, *et al.*, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | C.A. No. 1:25-cv-00097-MSM-PAS |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, ) ) ) ) | |
| Defendants. ) ) | |

ORDER

On Monday, May 5, the Court held another status conference—the fourth in three weeks—about the Government's compliance with the preliminary injunction. After reviewing the parties' status reports and hearing from them, the Court determined that all agencies were complying.

I. U.S. ENVIRONMENTAL PROTECTION AGENCY

Most importantly, the Court found that EPA's decision to terminate roughly 800 grants did not violate the preliminary injunction. There are several reasons why.

To start, the Court's order granting relief to the Nonprofits was fundamentally about pauses, not terminations. As the order noted, the Court "need not delve into whether and how the Government retains the authority" to terminate agreements, "because that question is not before it." (ECF No. 45 at 54.) And "conducting an

individualized termination under federal regulations is worlds away from the sudden, indefinite, across-the-board, and likely unlawful freezes that happened here." *Id.*

The Nonprofits have previously—and consistently—argued as much, too. *See, e.g.*, ECF No. 26 at 2 ("This case concerns . . . the freeze on billions of dollars in funding appropriated by two laws passed by Congress during the prior administration . . . ."); ECF No. 38 at 4 ("Here, of course, Plaintiffs do not challenge individual terminations and do not seek grant-specific remedies. Rather, Plaintiffs here bring an APA challenge to programmatic policies to freeze all IRA and IIJA funding administered across numerous defendant agencies, without regard for any particular grant agreement."); ECF No. 42 at 3 ("While the *California* majority concluded that the claims over individual terminations were, in essence, contract claims, the same plainly is not true of Plaintiffs' challenges to the broad freeze policies and to Memo M-25-11."). So everyone agrees: freezes and terminations are different.

Recognizing that, the Nonprofits argued (1) that these roughly 800 terminations were not individualized and (2) that they instead serve as a mass "permanent freeze." (ECF No. 65 at 4–6.) The Court is unconvinced on either point.

As to the "individualized terminations" argument: EPA has terminated (or slated for termination) only about 800 of the approximately 3,000 IIJA and IRA grants that were previously frozen. *See* ECF No. 51-1 ¶¶ 4–6. That suggests to the Court that a more thoroughgoing individualized review had taken place between the mass freeze and the Court's order enjoining it. Sworn testimony from a longtime EPA official confirmed as much. *See id.* ¶¶ 3–6 (describing an "individualized, grant-by-

grant review to determine which grants should continue, which should be modified, and which should be terminated").

Of course, the Court did not determine that the review was sufficiently individualized just because the declaration said so. The Court has rejected "magic words" theories from the Government since the case began. (ECF No. 39 at 65–66, 77, 94.) And courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up). But within the broader context of the case, the Court sees it as plausible that these 800 termination decisions were individually made over several months. Had it been the case that all 3,000 were conveniently slated for termination following the freeze, the Court would likely have viewed the situation with much greater skepticism.

To be sure, there can be reasonable differences of opinion about what constitutes an individualized review. But the Court determined that EPA's explanation was sufficiently specific in this context: compliance proceedings about an injunction forbidding a much broader pause.[1] Going under the hood and looking for more—and thus calling into question a sworn declaration based on little more than vague, unsubstantiated suspicions—would bring the case far afield from the original

---

[1] To be clear, the Court's determination that these were sufficient individualized should only be read in the context of compliance with the Court's injunction about that much broader pause. A separate lawsuit with these terminations as the central agency actions might require a closer look or a different analysis. But this Court, in this case, cannot undertake either without inappropriately expanding the injunction.

issues. Put differently, the Nonprofits' position would turn Section 2 of the Court's order into much more than it was.

As to the "permanent freeze" argument: the Court disagrees with that characterization of EPA's actions. Its termination letters explain that grantees can dispute the lost funds via processes laid out in federal regulations. (ECF No. 65-1 at 2.) That is different than how the Nonprofits correctly described EPA's previous pauses-pending-termination—a "kind of pre-termination limbo in which neither their funding nor these processes are available to them." (ECF No. 55 at 7.)

Recognizing that limbo, the Court ordered those pauses-pending-termination to end. (ECF No. 58 at 4–5.) That fixed both problems. For a short while, it freed up their funding. *See, e.g.*, ECF No. 65 at 2 ("As to Plaintiff Childhood Lead Action Project: on April 28, EPA restored its grant drawdown access, and CLAP processed its drawdown backlog. CLAP received those funds the following day.") And now the Nonprofits have access to processes to dispute the terminations. (ECF No. 65-1 at 3.) Of course, that is not the only process available to them. Even though the Court finds that these terminations do not violate the preliminary injunction, the Nonprofits are free to file another lawsuit challenging what they see as a mass termination.

All that is to say: on this record, EPA's termination of roughly 800 grants does not violate the preliminary injunction. An agency's decision to suddenly, indefinitely freeze all IRA and IIJA funding creates fundamentally different legal issues than its

4

decision (or rather, its decisions) to cut about one-fourth of those grants following what it described as a months-long individualized review.

## II. NEXT STEPS

At the end of the conference, the Government suggested that it would move to stay further proceedings in this case pending the First Circuit's resolution of its appeal of the preliminary injunction.

The Court directs the Government to file that motion by the end of the day on Monday, May 19. Any opposition should be submitted by the end of the day on Monday, May 26. If the Government ultimately decides not to move for a stay of further proceedings, or if the Court denies the motion, the Court will then schedule a conference for the parties to discuss appropriate next steps.

Meanwhile, the Court welcomes status reports from the parties if further compliance issues arise. Otherwise, no further action—beyond briefing the motion to stay—is necessary for now.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

Date: May 6, 2025