## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

WOONASQUATUCKET RIVER
WATERSHED COUNCIL, *et al.*,

                        Plaintiffs,

            v.                                    Civil Action No. 1:25-cv-97 (MSM)

DEPARTMENT OF AGRICULTURE,
*et al.*,

                        Defendants.

## DECLARATION OF THOMAS R. DAVIS

I, Thomas R. Davis, declare as follows:

1.      I am employed by the U.S. Department of Housing and Urban

Development (the "Department" or "HUD") as the Director of the Office of

Recapitalization, within the Office of Multifamily Housing Programs, within the

Office of Housing.  I have served in this capacity for over ten years.

2.      The Office of Recapitalization was tasked with implementing the grant

and direct loan program pursuant to Section 30002(a)(1) of the Inflation Reduction

Act of 2022 (Public Law 117-169) (the "IRA").  The Department elected to refer to all

activities under Section 30002 of the IRA as the Green and Resilient Retrofit

Program (the "GRRP").

3.      To implement the grants and loans portion of the GRRP, HUD issued

three Notices of Funding Opportunity ("NOFOs"), allocating funds among three

"cohorts."  The cohorts were designated the "Elements," "Leading Edge," and

"Comprehensive" cohorts.  Each cohort was designed to serve a different profile of applicants and properties within the pool of properties eligible under the IRA.  The NOFOs established eligibility and selection procedures and awardees were selected pursuant to the terms of the NOFOs.  Selected awardees received award letters which obligated funding to specific projects.

4.    As a companion to the NOFOs and pursuant to the authority granted to HUD in IRA Section 30002(e) to establish "any requirements that the Secretary determines are necessary for timely and effective implementation of the program and expenditure of funds appropriated," HUD published Housing Notice 2023-05 (May 11, 2023), as amended by Housing Notice 2024-01 (January 8, 2024) (collectively, the "Notice"), which established the procedures for implementation of the GRRP awards and other relevant program requirements.  The Notice (combining Notice H 2023-05 and Notice H 2024-01 in one text for the convenience and ease of readers) is attached hereto as Exhibit A.

5.    HUD's Office of Recapitalization uses the terms "closing" and "closed" to refer to the finalization and execution of documents confirming that a transaction proponent has submitted all due diligence materials required by HUD prior to disbursement of funds, including execution of the GRRP award grant agreement or loan agreement, all pursuant to the terms of the Notice and the obligation documents.

6.    On January 21, 2025, Office of Recapitalization staff were instructed to halt obligations, disbursements, and closings with respect to GRRP awards in

response to the Executive Order Unleashing American Energy, dated January 20, 2025, pending a review of the program for alignment with Administration priorities.

7.     On February 13, 2025, Office of Recapitalization staff were informed that the program was being terminated, and Office of Recapitalization staff ceased processing pre-closing GRRP activity.

8.     On or before February 17, 2025, Office of Recapitalization staff were informed that payments of contract invoices for work performed and payments on valid draw requests on closed GRRP awards could resume.  To my information and belief, actual disbursements on closed awards resumed prior to February 27, 2025.

9.     Pursuant to Section 5.3 of the Notice, the process for implementing a Comprehensive award begins with HUD or its contractors commissioning a series of property assessments.  The text of Section 5.3 of the Notice reads, in part, as follows:

> *HUD shall commission and/or perform all necessary assessments following the Kick-Off Call and associated costs will be covered through available GRRP funding. In addition to the required assessments, HUD may commission other reports or studies, if a need for additional due diligence is identified through the Assessment Suite. An integrative design process will be led by HUD, using appropriate professionals as needed. Owners must provide access to the Property and requested information as necessary for HUD to complete the Assessment Suite. Each assessment must be conducted by a qualified specialist in the applicable subject matter….*

10.     Following completion of the suite of property assessments, Section 5.4 of the Notice requires HUD to develop the scope of work for investment in the property.  The text of Section 5.4 of the Notice reads, in part, as follows:

3

> *Informed by the Owner's objectives, feedback from any resident engagement including the Planning Meeting described in Section 8.2(B), and by the Assessment Suite, HUD will develop a recommended Scope of Work for discussion with the Owner….*

11.     The grants and loans program of the GRRP was designed around the use of "Multifamily Assessment Contractors" to act on HUD's behalf to commission the required assessments and to work with the owners to develop the scope of work. Section 5 of the Notice reads, in part, as follows:

> *HUD intends to procure Multifamily Assessment Contractors (MACs) to assist HUD with carrying out the Comprehensive Awards. HUD may assign a MAC to work with the Owner and HUD throughout the assessment of the Property, the development of the Scope of Work through integrative design, due diligence, Closing, construction, and the commissioning process and to carry out any or all of HUD's roles as described below on behalf of HUD. The MAC will engage appropriate professionals as needed throughout the integrative design and implementation process.*

12.     Exhibit A of the Notice sets forth the Definitions governing the Notice which includes the following:

> *"MAC" refers to a Multifamily Assessment Contractor, an entity engaged by HUD to conduct or review the Assessments, to make recommendations regarding the Comprehensive Scope of Work, and to conduct certain oversight activities on HUD's behalf with respect to the implementation of the Scope of Work, as specified in this Notice.*

13.     At no time during the development and implementation of the GRRP has HUD had or contemplated having the staff, capacity, or expertise to implement directly the full range and scope of actions contemplated to be performed by the MACs in the implementation of the Comprehensive awards.

14.     HUD procured five organizations to serve as MACs. Funding to pay for the assessments and for the services of the MACs was provided under Section

30002(a)(3) of the IRA.  HUD issued task orders assigning approximately half of the Comprehensive awards to the MACs in late 2024 or early 2025.  To my information and belief, HUD issued the task order solicitations for the remaining Comprehensive awards to the MACs on or around January 15, 2025.

15.    To my information and belief, on or around February 12, 2025, HUD terminated the MAC contracts by issuing to the MACs stop work orders and termination notices regarding the task orders.  To my information and belief, unspent funds that had been obligated to the terminated MAC task orders were de-obligated in March 2025, following the payment of final invoices for work performed prior to the stop work orders.  The task order solicitations for the second half of the Comprehensive awards were also terminated.  Funds under Section 30002(a)(3) of the IRA had not yet been obligated to the MACs for the task orders which were subject to the then-pending solicitations.

16.    On April 15, 2025, the Court in this matter issued a preliminary injunction ordering already-awarded funding to be unpaused and all processing of GRRP awards to resume.

17.    Immediately following April 15, 2025, HUD resumed processing GRRP awards.

18.    Since April 15, 2025, HUD has reviewed GRRP awardee submissions for Elements awards, has executed closing documents for Elements awards pursuant to Section 3.4 of the Notice, and has disbursed funds on closed Elements awards pursuant to Section 3.5 of the Notice.

19.     Since April 15, 2025, HUD has reviewed GRRP awardee submissions for Leading Edge awards, has executed Leading Edge Commitments pursuant to Section 4.4 of the Notice, has executed closing documents for Leading Edge awards pursuant to Section 4.5 of the Notice, and has disbursed funds on closed Leading Edge awards pursuant to Section 4.6 of the Notice.

20.     When the Court's order was issued on April 15, 101 Comprehensive awards were obligated but not closed, meaning that several additional steps remained to be completed before funding could be disbursed to the awardees. The first of these steps was for the MACs to commission the property assessments specified in Section 5.3 of the Notice on HUD's behalf.  However, with the MACs having been terminated, it was no longer possible for HUD to complete this step. Thus, HUD had two options to allow these awards to continue advancing in processing: either re-establish contractual relationships with the MACs (i.e., new task orders with the prior MACs or procure new MACs) or amend the Notice so that the MACs were no longer necessary for the assessment of properties' needs and the development of scopes of work.

21.     A draft amended Notice has been prepared.  This proposed draft would revise the process to eliminate the need for the MACs and would make other program modifications necessary to align with the Administration's priorities.

22.     In my experience, the process for publishing a HUD notice typically requires that, after the applicable Office leadership (in my case, the Office of Housing) completes their review, the draft notice is submitted to "Departmental

6

clearance." Departmental clearance is a process through which the draft is distributed to various offices within HUD for comment, then to be revised in response to those comments and negotiations with the commenting offices, then to be approved by Office and HUD leadership. In some cases, a HUD notice is also sent to the Office of Management and Budget ("OMB") for review and again modified to address any comments from OMB before publication. The timing of this process can vary widely depending on multiple factors including how much feedback is received from other Offices within HUD, the extent of negotiation required to reconcile differences, and whether the notice must be reviewed by OMB. With respect to the original publication of the Notice, which was at the time considered a high priority for accelerated attention, but which also required OMB review and included policy judgments of interest to the White House, the draft Notice was submitted into clearance following Office of Housing leadership review on February 23, 2023, and published on May 11, 2023.

23. In July, 2025, all unobligated funds under Section 30002 of the IRA were rescinded through the passage and execution into law of the One Big Beautiful Bill Act (Section 30002, Public Law No: 119-21 (07/04/2025)) (the "OBBBA"). To my information and belief, this rescission impacted funds including the funds de-obligated from the terminated MAC task orders and all funds available for any future engagement with MACs. As a result, to my information and belief, the option to assign new task orders to the MACs or to procure new MACs is no longer available to the Department.

24.    Accordingly, amending the Notice to eliminate the role of the MACs in assessing properties' needs and developing the scopes of work is now, to my knowledge and belief, the only option available to allow the obligated funds to awardees to move on to the next steps required for closing, as HUD staff has neither the capacity nor the expertise to perform these tasks in the absence of the MACs.

25.    While the MAC contracts are terminated and funds for the prior MACs or any future MACs have been rescinded by Congress, the Comprehensive awards themselves are fully obligated, and the award of funds is not impacted by the rescission in the OBBBA.  The Comprehensive awards have advanced in processing as far as possible under the terms of the current Notice.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and under the laws of the United States of America that the foregoing is true and correct to my information and belief.

Executed this 13th day of August 2025, in Washington, DC.


_____
THOMAS R. DAVIS
Director, Office of Recapitalization

Exhibit A

*This document combines Notice H 2023-05 and Notice H 2024-01 for the convenience and ease of readers.*



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

ASSISTANT SECRETARY FOR HOUSING
FEDERAL HOUSING COMMISSIONER

| | |
|---|---|
| Special Attention of: | Notice H 2023-05 as amended by Notice H 2024-01(GRRP Supplemental Notice) |
| All Eligible Owners | |
| All Purchasers of Eligible Properties | Issued: January 8, 2023 |
| All Multifamily Housing Staff | |
| All Multifamily Assessment Contractors | Expires: This Notice remains in effect until amended, superseded, or rescinded. |

_____

Cross References

---

**Green and Resilient Retrofit Program for Multifamily Housing (GRRP)**

**Purpose**

This Notice implements the Green and Resilient Retrofit Program. This Notice describes program requirements, processes, and monitoring after participant selection. Information about eligibility, application and selection procedures will be contained in various Notice of Funding Opportunity (NOFO) publications.

**Background**

Section 30002 of the Inflation Reduction Act of 2022, (Public Law 117-169) (the "IRA"), titled "Improving Energy Efficiency or Water Efficiency or Climate Resilience of Affordable Housing", provided funds for HUD to implement a new program to improve the housing quality and resilience of certain existing HUD-assisted multifamily properties for residents through loans, grants, and a variety of other actions to facilitate utility-saving and climate hazard-mitigating investments. These investments in American communities will also help combat the climate crisis and support equitable economic development.

HUD has designed the Green and Resilient Retrofit Program ("GRRP") to implement Section 30002 of the IRA with three goals:

1. To reduce energy and water use in HUD-assisted multifamily properties,

2. To make HUD-assisted multifamily properties more resilient to extreme weather events and natural disasters, and

3. To reduce greenhouse gas emissions from HUD-assisted multifamily properties, both directly and by using materials with less Embodied Carbon.

Meeting these goals will reduce utility bills, greenhouse gas emissions, and the cost of property operations, thereby benefitting tenants, Owners, and communities at large. GRRP retrofits will modernize properties to improve residents' quality of life and provide safer living environments by improving indoor air quality, maintaining comfortable living temperatures, and preparing buildings to keep residents safe through extreme weather events and natural disasters. Improved properties must execute a new use restriction that extends the affordability period between 15 and 25 years, preserving high-quality, efficient housing for HUD-assisted residents. This Notice uses the terms "Green and Resilient Retrofit Program" and "GRRP" to refer to the various authorities discussed above.

## Summary of Notice Changes

This Notice was supplemented and amended by Housing Notice 2024-01 in the following respects:

- Disbursement of GRRP Funds. Amends the disbursement requirements for the Elements, Leading Edge, and Comprehensive awards by revising the process for submitting draw requests, increasing the maximum amount of award funds that may be disbursed during the construction period, clarifying a condition for when remaining funds may be disbursed, and removing the requirement for an Escrow Deposit Agreement for the disbursement of Comprehensive Award funds.

- Surplus Cash Loan Terms. Provides updates to the terms for Surplus Cash Loans by clarifying when payments begin, allowing for the payment of deferred developer fees prior to calculating the Surplus Cash for the first ten years of payments, and extending the term of any Surplus Cash Loan from 15 years to up to 30 years.

- Renewable Energy Credits. Adds guidance about the purchase of renewable energy credits by the Owner to achieve a Leading Edge Qualifying Certification. Owners must continue to purchase credits for the greater of the duration required by the Certification or three (3) years.

- Davis-Bacon Wages and Project Labor Agreements. Clarifies when the Davis-Bacon wage rates should be locked in at the issuance of the Leading Edge Commitment (LEC) or Comprehensive Construction Commitment (CCC) and adds guidance for Owners that elect to submit a project labor agreement (PLA).

- Developer Fee Terms. Clarifies limits on the total developer fee.

- Other Technical and Clarifying Changes on the following items:

  - Resident Notification after Award
  - GRRP Shared Savings Retainer
  - Combining GRRP Award with Other Government Funds

- Energy Reduction Goal Methodology
- Elements Closing Package Requirements

## Notice Organization and Table of Contents

HUD will make GRRP funds available in separately published NOFOs that contain requirements for application and detail regarding the selection of applications. This Notice is organized to provide an overview of program implementation (a program description, definitions, and an overview of eligibility requirements) and a description of the requirements applicable to each funding cohort, the forms in which funds will be made available, the terms of the resulting grants and loans, the applicable cross-cutting programmatic requirements, metrics and outcome reporting requirements, and the parameters for future potential loan modifications. In addition, this Notice contains exhibits providing additional detail regarding certain steps in the GRRP process. The following is a more detailed table of contents for the Notice.

1. Program Overview. ...................................................................................................... 6
2. Definitions. ............................................................................................................... 9
3. Elements Awards. ...................................................................................................... 9
    3.1. Amount and Form of Funding. ..................................................................... 10
    3.2. Award and Commitment. .............................................................................. 10
    3.3. Scope of Work. ............................................................................................. 10
    3.4. Underwriting and Closing. ........................................................................... 10
    3.5. Disbursements and Completion Certification. .............................................. 11
4. Leading Edge Awards. .............................................................................................. 12
    4.1. Amount and Form of Funding. ..................................................................... 12
    4.2. Award and Commitment. .............................................................................. 12
    4.3. Scope of Work. ............................................................................................. 12
    4.4. Underwriting. ............................................................................................... 13
    4.5. Closing. ........................................................................................................ 14
    4.6. Disbursements and Completion Certification. .............................................. 14
5. Comprehensive Awards. ........................................................................................... 16
    5.1. Amount and Form of Funding. ..................................................................... 16
    5.2. Award, Commitment, and Kick-Off Call. ..................................................... 16
    5.3. Required Assessments (the "Assessment Suite"). ......................................... 17
    5.4. Scope of Work. ............................................................................................. 19
    5.5. Determination of GRRP Funding and Owner Contribution. .......................... 21
    5.6. Comprehensive Transaction Plan. ................................................................ 28
    5.7. Closing. ........................................................................................................ 29
    5.8. Disbursements and Completion Certification. .............................................. 29

6. GRRP Financial Products, GRRP Use Agreement, and Affordability Periods. .................... 29

  6.1. GRRP Grants. .......................................................................................................... 30

  6.2. Surplus Cash Loans. ............................................................................................... 30

  6.3. Amortizing Repayment Loan. ................................................................................ 33

  6.4. GRRP Use Agreement and Affordability Periods. ............................................... 33

7. Legal Documents. ........................................................................................................... 34

8. Resident Engagement, Continued Tenancy, and Program Relocation Requirements. ........... 35

  8.1. Resident Notification of Award ............................................................................. 35

  8.2. Meetings with Residents ........................................................................................ 35

  8.3. Additional Engagement with Residents ................................................................. 37

  8.4. Expectation of Continued Tenancy. ....................................................................... 37

9. General GRRP Requirements. ......................................................................................... 39

  9.1. Disaster Preparedness Plan. .................................................................................... 39

  9.2. Signage. ................................................................................................................... 39

  9.3. In-Unit Appliances ................................................................................................. 39

  9.4. Re-Determination of Allowances for Tenant-Paid Utilities. .................................. 39

  9.5. "Split-Incentives" and Shared Savings. ................................................................. 40

  9.6. Transfers of Assistance. .......................................................................................... 41

  9.7. Combination of Awards with Other IRA or Government Assistance Funding. .............. 42

  9.8. Annual Financial Statement Required. ................................................................... 42

  9.9. Physical Inspection Required. ................................................................................ 43

  9.10. HUD Multifamily Approvals. ................................................................................ 43

10. Cross Cutting HUD Requirements .................................................................................. 43

  10.1. Environmental Review (24 CFR Part 50). ............................................................. 43

  10.2. Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA). ..... 45

  10.3. Build America Buy America (BABA). ................................................................... 46

  10.4. Embodied Carbon Building Materials ................................................................... 47

  10.5. Davis-Bacon Prevailing Wage Requirements. ...................................................... 47

  10.6. Section 3. ................................................................................................................ 48

  10.7. Accessibility Requirements. .................................................................................. 49

  10.8. Civil Rights Requirements. .................................................................................... 49

  10.9. Record Retention and Reporting. ........................................................................... 50

  10.10. Penalties for False Claims and Statements. ........................................................... 51

11. Metrics and Outcome Measurement. ............................................................................... 51

12. Potential Future Surplus Cash Loan Modifications. ........................................................ 52

12.1.  Types of Surplus Cash Loan Modifications. ........................................................ 52

12.2.  Eligibility for Loan Modifications. ................................................................. 54

12.3.  Review Criteria for Waivers of the Due on Sale or Due on Refinance Clause. ............... 54

12.4.  Review Criteria for Modifications to the Terms of a Note. ................................. 56

12.5.  Review Criteria for Release of Security. .......................................................... 57

12.6.  Review Criteria for Other Modifications. ........................................................ 57

12.7.  Processing of Requests. .............................................................................. 58

Exhibit A Definitions ............................................................................................ 60

Exhibit B Financial Thresholds .............................................................................. 66

Exhibit C Elements Closing Package Requirements .................................................... 68

Exhibit D Leading Edge Transaction Plan Requirements ............................................. 69

Exhibit E Comprehensive Transaction Plan Requirements ........................................... 75

## Further Information

HUD is implementing GRRP through the Office of Recapitalization within the Office of Multifamily Housing Programs, within the Office of Housing. For further information regarding GRRP, please email questions to GRRP@hud.gov. All materials noted as being available from the GRRP website may be found at www.hud.gov/grrp, which will include required document forms, templates, frequently asked questions, and such other material as HUD develops from time to time.

## Paperwork Reduction Act

The information collection requirements contained in this Notice are pending final approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520) and have been assigned OMB control number 2502-0624. In accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection displays a currently valid OMB Control Number.

_____
Julia R. Gordon
Assistant Secretary for Housing
– Federal Housing Commissioner

**Green and Resilient Retrofit Program for Multifamily Housing (GRRP)**

1.    Program Overview.

GRRP provides loans and grants to support projects that improve energy or water efficiency; enhance indoor air quality or sustainability; implement the use of zero-emission electricity generation, low-emission building materials or processes, energy storage, or building electrification strategies; or improve the climate resilience of eligible HUD-assisted multifamily properties.[1] The program seeks to amplify recent technological advancements in energy and water efficiency and to bring a new focus on preparing for climate hazards by reducing residents' and properties' exposure to hazards and by protecting life, livability, and property when disaster strikes. While HUD has historically committed significant funding for green and resilient buildings in response to Presidentially-declared natural disasters through the Community Development Block Grant – Disaster Recovery Program, this is the first HUD program to simultaneously invest in energy efficiency, greenhouse gas emissions reductions, renewable energy generation, and climate resilience strategies in multifamily housing. All GRRP investments will be made in affordable housing communities serving low-income families and will require at least five years of extended affordability, and a minimum of 15 years of affordability, in alignment with the Biden-Harris Administration's Justice40 Initiative goals for benefits flowing to disadvantaged communities.

The program will achieve substantial greenhouse gas emissions reductions through improvements like renewable energy generation, increased energy and water efficiency, and construction materials that reduce Embodied Carbon. It aligns with the Administration's economy-wide target of a 50% emissions reduction by 2030. Individual awards will encourage the deepest energy savings and emissions reductions possible by funding the most impactful improvements. Most properties will undertake multi-faceted and integrated retrofits to impact multiple GRRP energy, resilience, emissions, and air quality goals.  The GRRP investments seek to reduce greenhouse gas emissions by 50% cumulatively across these properties and to reduce modeled energy consumption by at least 25% at each of these properties.[2] These properties will be required to perform initial utility consumption and emissions benchmarking to understand the property's baseline performance using EPA's Portfolio Manager and to inform projections of the energy and emissions reductions anticipated from the GRRP funded work. Further, GRRP-funded property improvements will enhance residents' quality of life and provide healthier and safer living environments by improving indoor air quality, maintaining comfortable living temperatures, and preparing buildings to keep residents safe through extreme weather events and natural disasters.

HUD is offering GRRP funding through three award cohorts designed to meet the needs of properties in different situations, implemented through three parallel NOFOs which are being released contemporaneously with this Notice. These award cohorts are the Elements Award cohort, the Leading Edge Award cohort, and the Comprehensive Award cohort. Under all three award cohorts, Owners will receive funding in the form of grants or loans to undertake retrofits, enhancements, and upgrades to improve energy and water efficiency, indoor air quality, and

---

[1] In general, eligibility is focused on properties assisted under the Section 8 Project-Based Rental Assistance (PBRA) program, the Section 202 Housing for the Elderly program, the Section 811 Housing for Persons with Disabilities program, or the Section 236 program.  Specific eligibility definitions are contained in the applicable NOFOs.
[2] The methodology for measuring these goals is described in more detail in Section 11 of this Notice.

climate hazard resilience; to reduce emissions; to use renewable energy; and/or to use low Embodied Carbon materials.

The "Elements" NOFO provides modest funding to Owners to add proven and meaningful climate resilience, energy efficiency, electrification, and renewable energy measures to the construction scopes of in-progress recapitalization transactions. Since these recapitalizations will lock in technologies for many years to come, GRRP funding will make it possible for Owners to substitute greener or more resilient building components or fixtures in their existing plans. Elements Awards are designed for properties already planning renovations so they can add green or resilient elements to existing scopes of work.

The "Leading Edge" NOFO provides funding for retrofit activities to achieve ambitious outcomes, including net zero, renewable energy generation, use of building materials with lower Embodied Carbon, and climate resilience investments. Provided during the early planning stages of a recapitalization effort, the Leading Edge Awards provide resources to complement an Owner's existing financing strategy, allowing them to design the recapitalization to the highest standards of energy efficiency, emissions reductions, and climate resilience. Leading Edge Awards are designed for Owners aiming to quickly meet ambitious carbon reduction and resilience goals without requiring extensive collaboration with HUD.

The "Comprehensive" NOFO will provide funding to initiate recapitalization investments designed from inception around both proven and innovative measures, including ambitious green building standards or measures, renewable energy generation, use of building materials with lower Embodied Carbon, and climate resilience investments. Comprehensive Awards prioritize properties with high need for investments in energy efficiency, emissions reductions and climate resilience. The construction funded by a Comprehensive Award will be informed by a series of assessments that will identify the property's specific capital needs as well as property-specific opportunities to meet GRRP objectives. Comprehensive Awards are designed for the widest range of properties, including those that have not yet developed a recapitalization plan.

## How to Apply

Within each cohort, HUD is making funding available in tranches so that Owners not ready to apply immediately are not disadvantaged in the application process. The following is a summary of the three cohorts, for which more detail, including eligibility, application requirements, and selection procedures, is available in the applicable NOFOs.

| Elements Awards | Leading Edge Awards | Comprehensive Awards |
|---|---|---|
| Maximum awards of up to $750,000 per property, with a per unit cap of $40,000 | Maximum awards of up to $10,000,000 per property, with a per unit cap of $60,000 | Maximum awards of up to $20,000,000 per property, with a per unit cap of $80,000 |
| Funding for specific impactful investments, as identified in the NOFO and selected by the Owner in the application, that will be incorporated into planned recapitalization transactions. | Funding for extensive green and resilience investments as part of planned recapitalization transactions. These investments shall be designed to achieve a high level of energy efficiency, climate resilience, and reduction of emissions. The funded project must achieve one of the identified Leading Edge Qualifying Certifications. | Funding for a comprehensive energy efficiency and resilience scope of work based on a suite of property assessments to identify each property's greatest opportunities and needs for green and resilient upgrades. The Comprehensive Award may fund a standalone initiative or be the foundation for a larger recapitalization. |
| Rolling application submission process with unfunded applications ranked for selection on three occasions, roughly two, five, and eight months after publication of this Notice. | Rolling application submission process with unfunded applications ranked for selection on three occasions, roughly three, six, and nine months after publication of this Notice. | Rolling application submission process with unfunded applications ranked for selection on three occasions, roughly four, seven and ten months after publication of this Notice. |

| | | |
|---|---|---|
| Example applicant: The property owner is well advanced in planning and financing a recapitalization transaction, and will replace the in-unit HVAC systems with higher-efficiency electric HVAC systems. | Example applicant: An experienced property owner is ready to move forward with a complete renovation to a Passive House certification financed by low-income housing tax credits, a new first mortgage, a GRRP loan, and other sources. | Example applicant: The property has high REAC scores and low capital needs, but is using older equipment dependent on fossil fuel sources. It is in an area of wildfire risk. The property owner is considering either a refinancing with rehab or a stand-alone renovation for efficiency, emissions reductions, and resilience.<br><br>Example applicant: The property owner is in the early stages of planning a low-income housing tax credit-financed renovation and needs additional funding for green and resilience improvements. |

An Owner must select which NOFO is most appropriate for each Property based on their circumstances. An Owner may submit a Property to only one of the NOFOs. If the Owner would like to switch a Property from one NOFO to another, they must withdraw any pending application prior to submitting one for a different NOFO. There is no limit to the number properties an Owner, or its Affiliates, can submit across all NOFOs, but the number of awards an Owner or its Affiliates may receive is capped as specified in each of the NOFOs.

This Section provides a general overview of the GRRP Program. In the event of a conflict between any part of the program description contained in this Section and the terms or conditions contained in the NOFOs or the specific sections of this Notice below, the terms and conditions in the NOFO or specific provisions of this Notice will control.

    2.    <u>Definitions.</u>

Capitalized terms used in this Notice shall have the definitions ascribed to them in Exhibit A or in the text.

    3.    <u>Elements Awards.</u>

An Elements Award funds specific impactful investments that an Owner will incorporate into a pre-planned recapitalization transaction to make these transactions greener and more climate resilient. The Elements funding permits the substitution of specific building components or fixtures with alternatives that provide higher energy efficiency, greater climate resilience, or reduced emissions. In some cases, the funded alternatives will provide multiple benefits (such as insulation materials which reduce heating and cooling costs and extend hours of safety, referred to as passive survivability, in the event of an extended power outage). The Elements NOFO

contains a list of investments eligible for GRRP funding. Owners seeking GRRP funding for investments not on the list must consider a different cohort of funding (Leading Edge or Comprehensive).

### 3.1.    Amount and Form of Funding.

Applicants for an Elements Award must designate in their application the investments to be funded (the "Elements Investments"). Elements Investments must conform to the specifications identified in the NOFO to be eligible for funding. Elements Awards shall fund the Elements Eligible Costs. All Elements Awards will be in the form of a GRRP Grant or a Surplus Cash Loan, the terms of which are further described in Section 6, below. The applicant shall select the form of the Elements Award in the application responding to the Elements NOFO. The form of an Elements Award may not be changed prior to Closing without prior written approval from HUD, which approval shall be given at HUD's sole discretion.

### 3.2.    Award and Commitment.

Following selection pursuant to the terms of the Elements NOFO, HUD will issue a commitment letter to each Owner. The commitment letter shall specify the maximum amount of GRRP funding available to the Property, which shall not exceed the Owner's actual Eligible Costs. The commitment letter shall outline terms and conditions of the Elements Award, consistent with this Notice and the applicable NOFO. Owners must acknowledge acceptance of the Elements Award and all conditions contained in the commitment letter and return the acknowledged commitment letter to HUD within thirty (30) Days of issuance, unless an extension is approved by HUD for good cause.

### 3.3.    Scope of Work.

The Elements Investments comprise the Scope of Work for Elements Awards. Owners are strongly encouraged to conduct energy audits to identify the most promising opportunities for reducing utility consumption and reducing emissions, to identify the feasibility of incorporating renewable energy using DOE's Energy Integration & Optimization Tool (ReOpt Tool) or other available tools, and consult resilience risk assessment tools, such as the FEMA National Risk Index, FEMA flood maps, Climate Mapping for Resilience and Adaptation (CMRA) portal, Climate Explorer, Risk Factor, ClimateCheck, NOAA Sea Level Rise Viewer, Climate Central Coastal Risk Screening Tool, and others. Owners are encouraged to incorporate applicable energy reduction, renewable energy generation, and resilience measures into their recapitalization transaction. The Scope of Work for the Elements Award does not encompass all the construction work the Owner plans to conduct at the Property in connection with their recapitalization transaction.

### 3.4.    Underwriting and Closing.

HUD requires Owners applying for an Elements Award to be well advanced in their planning for a recapitalization of the Property, as described in the applicable NOFO. HUD expects due diligence reports and other pre-development planning documents generated for the recapitalization transaction's other funders to satisfy HUD's due diligence requirements, and these documents must be submitted for review as part of the Elements Closing Package. At least sixty (60) Days before an anticipated Closing on an Elements Award, but no later than nine (9)

months following the Award Date, an Owner must submit an Elements Closing Package with material consistent with Exhibit C for HUD review, unless an extension is approved by HUD for good cause. The Elements Closing Package consists of the materials necessary for HUD to review the overall recapitalization transaction and for HUD to proceed to Closing. In its review, HUD will confirm that the recapitalization transaction will address the physical needs of the Property, validate the Elements Eligible Costs, review the demonstrated financial need for the GRRP funds consistent with the financial thresholds set forth in Exhibit B, review the projected energy and/or emissions reductions projections if requested, confirm compliance with the GRRP Requirements, and confirm appropriate documentation for Closing. The Elements Closing Package must also include draft documents to implement the Elements Award. HUD may require additional documentation not specified in Exhibit C if necessary.

Following review and acceptance of the Elements Closing Package, which acceptance will be at HUD's sole discretion, HUD will execute the applicable Legal Documents, as described in Section 7, below, and authorize the transaction to proceed to Closing. Closing shall not occur until all programmatic and legal issues are addressed to HUD's satisfaction. All Elements Awards must reach Closing within twelve (12) months of the Award Date, unless an extension is approved by HUD for good cause. Electronic copies of the fully executed Legal Documents including, if applicable, evidence of recording in the local real estate records, and an electronic copy of a final closing docket, including copies of all transaction financing and construction contracts, shall be submitted to HUD within 30 Days of the Closing.

     3.5.    <u>Disbursements and Completion Certification.</u>

The Owner must submit draw requests for funds for HUD approval after all prerequisites for disbursement have been satisfied. The Owner must follow all instructions provided by HUD in order to make draw requests and access funding. Additional information will be provided before closing.

The Elements Award shall be disbursed as set forth in the Legal Documents. After receipt and approval by HUD of the final closing docket, up to 90% of the Elements Award may be disbursed during the construction period following the submission of draw requests in a form prescribed by HUD. Draw requests must be signed by the Owner and accompanied by backup documentation acceptable to HUD evidencing the incurred Elements Eligible Costs and other items required by HUD.

After completion of construction at the Property, the Owner shall submit a Completion Certification package, in the form prescribed by HUD, containing (i) a certification by a third-party accountant of the final Elements Eligible Costs, (ii) a certification from the General Contractor, Architect, and Owner that the Elements Investments have been incorporated into the Property, (iii) a certification from the Owner that the Property, the Award, and the Owner are in compliance with the GRRP Requirements, (iv) a record of all residents that did not return to the Property, (v) Section 3 reporting, (vi) a certification from the Owner that the Property has adopted a Disaster Preparedness Plan, (vii) the post-construction resiliency survey, and (viii) other items as may be required by HUD. Upon approval of the Completion Certification, HUD shall disburse the remaining Elements Award funds, provided that in no event shall HUD disburse an amount that would be greater than the total of Elements Eligible Costs.

4.    Leading Edge Awards.

Leading Edge Awards support Owners who are highly committed to energy efficiency, emissions reductions, and resilience work and will provide examples of leading edge approaches to energy consumption and emissions reductions and climate resilience in multifamily housing. The Award will allow Owners to pursue high levels of energy efficiency, climate resilience, and emissions reductions, designed to achieve net-zero energy or emissions strategies and one of the Leading Edge Qualifying Certifications identified in the applicable NOFO.

4.1.    Amount and Form of Funding.

The Leading Edge NOFO application must contain an initial determination of feasibility from the Architect indicating that the proposed recapitalization is or can be designed to reasonably ensure the Property will meet a Leading Edge Qualifying Certification. Leading Edge Awards shall fund the Leading Edge Eligible Costs up to the award maximum as described in the NOFO. All Leading Edge Awards will be in the form of a GRRP Grant or a Surplus Cash Loan, the terms of which are further described in Section 6, below. The applicant shall select the form of the Leading Edge Award in the application responding to the Leading Edge NOFO. The form of a Leading Edge Award may not be changed prior to Closing without prior written approval from HUD, which approval will be given at HUD's sole discretion.

4.2.    Award and Commitment.

Following selection pursuant to the terms of the applicable Leading Edge NOFO, HUD will issue a preliminary commitment letter to each Owner. The preliminary commitment letter shall specify the maximum amount of GRRP funding available to the Property, which shall not exceed the Owner's actual Leading Edge Eligible Costs. The preliminary commitment letter shall outline terms and conditions of the Leading Edge Award, consistent with this Notice and the applicable NOFO. Owners must acknowledge acceptance of the Leading Edge Award and all conditions contained in the preliminary commitment letter and return the acknowledged preliminary commitment letter to HUD within thirty (30) Days of issuance, unless an extension is approved by HUD for good cause.

4.3.    Scope of Work.

Owners will have latitude in designing the Scope of Work in their building to achieve the chosen Leading Edge Qualifying Certification and may switch from one Leading Edge Qualifying Certification to another upon written notice to HUD.  The Scope of Work must result in a reduction in energy consumption of at least 25%, unless HUD grants an exception in particularly extreme or compelling circumstances.  HUD expects Owners to significantly exceed this threshold and expects any exceptions to be rare.  All work and transaction costs necessary to achieve the 25% energy consumption reduction and the Leading Edge Qualifying Certification will be considered the Leading Edge Scope of Work. The Scope of Work will typically include rehabilitation to address the Property's physical needs as identified in a Capital Needs Assessment (CNA). Additionally, the Scope of Work should be developed to improve energy efficiency, minimize energy use and emissions, replace fossil fuel consuming systems with systems and appliances that use electric power, and integrate renewable energy generation sources, all towards the goal of minimizing or eliminating the emissions of each Property and achieving the selected Leading Edge Qualifying Certification selected by the Owner.   Further, in

developing the Scope of Work, Owners must further consider including site-specific resilience measures to protect against likely hazards, using tools such as the FEMA National Risk Index, FEMA flood maps, Climate Mapping for Resilience and Adaptation (CMRA) portal, Climate Explorer, Risk Factor, ClimateCheck, NOAA Sea Level Rise Viewer, Climate Central Coastal Risk Screening Tool, www.drought.gov, www.heat.gov, the Wildfire Risk to Communities tool, and others even if not required by the Leading Edge Qualifying Certification. HUD encourages owners to include in the Scope of Work resilience measures and the use of low Embodied Carbon materials and, where the Leading Edge Qualifying Certifications include points for these activities, HUD encourages Owners to achieve these points where possible. Properties receiving Leading Edge Awards will achieve high levels of emission reductions and energy consumption reductions by virtue of securing a Leading Edge Qualifying Certification.

4.4.    Underwriting.

HUD anticipates that in most cases, a Leading Edge Award will not be sufficient to achieve the Leading Edge Qualifying Certification absent other funding. At the time of the application, HUD expects the applicant to be at least in the early stages of planning for a recapitalization transaction for the Property. Due diligence reports and other documents generated through the pre-development planning for the recapitalization transaction are expected to satisfy HUD's due diligence requirements. No later than twelve (12) months following the Award Date, unless an extension is approved by HUD for good cause, an Owner must submit for HUD review a Leading Edge Transaction Plan with the material set forth in Exhibit D. The Leading Edge Transaction Plan consists of the materials necessary for HUD to review the overall recapitalization transaction.

In its review, HUD will review the proposed work and timeline, confirm that the Owner's development team has designed the Scope of Work to achieve a Leading Edge Qualifying Certification and address resilience needs, validate the Leading Edge Eligible Costs, confirm that the recapitalization transaction will address the physical needs of the Property, project whether the Property can be sustained physically and financially for the term of the Leading Edge Award, review the proposed sources and uses and operating pro forma, verify that all necessary financing has been committed, review the demonstrated financial need for the GRRP funds consistent with the financial thresholds set forth in Exhibit B, examine completion of all required resident engagement activities, review the projected energy and/or emissions reductions, and confirm compliance with all GRRP Requirements. HUD may require additional documentation not specified in Exhibit D.

HUD will review the Leading Edge Transaction Plan and if HUD determines, in HUD's sole discretion, that a Leading Edge Transaction Plan is not feasible or that the requirements for the Leading Edge Transaction Plan have not been met, HUD will notify the Owner of the deficiencies and request a new or modified submission. If an Owner is unable to submit a complete and viable Leading Edge Transaction Plan by the deadline in HUD's deficiency letter, as such deadline may be extended by HUD, HUD may revoke the preliminary commitment for the Leading Edge Award. Owners will be notified of HUD's acceptance of the Leading Edge Transaction Plan by the issuance of a Leading Edge Commitment ("LEC"). The LEC will outline the key components of the Leading Edge transaction and outline any conditions that need to be satisfied to close on the Leading Edge Award. The Owner will have fourteen (14) Days from the date of issuance of the LEC to execute the LEC and return it to HUD.

In the event an Owner pursuing a Leading Edge Award is unable to design a Scope of Work adequate to achieve any Leading Edge Qualifying Certification, the Owner may request to have its Leading Edge Award administered under the terms of Section 5 of this Notice in lieu of Section 4 of this Notice.  HUD may approve this change in the terms governing the Owner's Leading Edge Award if HUD determines, in HUD's sole discretion, that a) the Owner undertook a good faith effort to develop a Scope of Work adequate to achieve any Leading Edge Qualifying Certification, and b) the Property conditions, the likely available financing, and/or other conditions make achieving any Leading Edge Qualifying Certification infeasible.  If HUD approves processing of the Leading Edge Award pursuant to the terms of Section 5, HUD will identify and document for the Owner which provisions of Section 5 have been substantially satisfied by the Owner's work to date and which provisions remain outstanding.[3]  The change in terms governing the Leading Edge Award shall not increase the maximum Leading Edge Award amount permitted, as set forth in the Leading Edge NOFO.  The Owner may make a request to have its Leading Edge Award administered under Section 5 at any time prior to Closing.

4.5.    Closing.

Within ninety (90) Days after the issuance of the LEC, the Owner must submit a Leading Edge Closing Package, unless extension is approved by HUD for good cause. The Leading Edge Closing Package must contain draft documents to implement the Leading Edge Award and such other materials required by HUD to determine compliance with the LEC and the GRRP Requirements and confirm appropriate documentation for Closing. Confirmation that pre-construction benchmarking has been completed, entered into the U.S. Environmental Protection Agency's (EPA) Portfolio Manager, and shared with HUD is also required prior to Closing. Following review and acceptance of the closing package, which acceptance shall be in HUD's sole discretion, HUD will execute the applicable Legal Documents, as described in Section 7 below and authorize the transaction to proceed to Closing. Closing shall not occur until all programmatic and legal issues are addressed to HUD's satisfaction. All Leading Edge Awards must reach Closing within six (6) months after issuance of the LEC, unless an extension is approved by HUD for good cause. Failure to achieve Closing in this timeframe may result in revocation of the Leading Edge Award. Electronic copies of the fully executed Legal Documents including, if applicable, evidence of recording in the local real estate records, and an electronic copy of a final closing docket, including copies of all transaction financing and construction contracts, shall be submitted to HUD within 30 Days of the Closing.

4.6.    Disbursements and Completion Certification.

The Owner must submit draw requests for funds for HUD approval after all prerequisites for disbursement have been satisfied. The Owner must follow all instructions provided by HUD in order to make draw requests and access funding. Additional information will be provided in the LEC.

---

[3] For example, HUD will determine whether the Owner has commissioned all elements of the Assessment Suite referenced in Section 5.3 and will evaluate whether the Owner-commissioned reports meet HUD's specifications as applicable to Comprehensive Awards.  If they do not, HUD will commission the missing assessments prior to finalizing the Scope of Work, determining the GRRP funding and the Owner Contribution, and implementing the other provisions of Section 5.

The Leading Edge Award shall be disbursed as set forth in the Legal Documents. After receipt and approval by HUD of the final closing docket, the Leading Edge Award may be disbursed for incurred Leading Edge Eligible Costs at the following milestones:

A)      Up to 30% of the Leading Edge Award may be funded after receipt and approval by HUD of the final closing docket.

B)      Up to 50% of the Leading Edge Award may be funded after the Owner achieves 50% construction completion as certified by the Architect.

C)      Up to 80% of the Leading Edge Award may be funded after the Owner achieves 75% construction completion as certified by the Architect.

D)      Up to 90% of the Leading Edge Award may be funded after completion of construction at the Property and HUD receipt and approval of the Completion Certification package, described below.

E)      All remaining Leading Edge Award funds may be disbursed upon receipt by HUD of evidence that the Leading Edge Qualifying Certification has been secured or other documentation of completion of the Scope of Work as may be acceptable to HUD.[4]  In no event will HUD disburse an amount that would be greater than the total of Leading Edge Eligible Costs.

Draw requests may be submitted at or following each milestone in the form prescribed by HUD. Each draw request for the milestones referenced in (A), (B), and (C), above, must be signed by the Owner and accompanied by backup documentation acceptable to HUD evidencing (i) the incurred Leading Edge Eligible Costs, (ii) a construction report from an independent third-party construction inspector certifying that construction has proceeded in accordance with the plans and specifications, (iii) a certification from the Architect of the percentage of construction completed and that the Property is on target to achieve a Leading Edge Qualifying Certification, and (iv) other items as may be required by HUD. The independent third-party construction inspector may be engaged by an investor or lender to the Property but must not share common Control with the Owner or the Architect.

The Completion Certification package referenced in (D), above, must be in the form prescribed by HUD and must contain (i) a certification by a third-party accountant of the final Leading Edge Eligible Costs, (ii) a certification from the General Contractor, Architect, and Owner that the work sufficient to secure the Leading Edge Qualifying Certification has been completed together with a certification from the Owner that the process of securing the Leading Edge Qualifying Certification is in process (or evidence that the Leading Edge Qualifying Certification has already been secured), (iii) a certification from the Owner that the Property, the Award, and the Owner are in compliance with the GRRP Requirements, (iv) a record of all residents that did not return to the Property; (v) Section 3 reporting, (vi) a certification from the Owner that the Property has adopted a Disaster Preparedness Plan, (vii) the post-construction resiliency survey, and (viii) other items as may be required by HUD.

---

[4] Some certifications require documentation of the Property's first full year of post-construction utility consumption data.  If applicable, the final 10% payment would be disbursed following this year of data collection.

If the Owner purchases renewable energy credits to achieve the Leading Edge Qualifying Certification, the Owner must continue to purchase credits required to achieve or to maintain the Leading Edge Qualifying Certification for the duration required by the Certification or three (3) years, whichever is greater, unless otherwise approved by HUD.

5.     Comprehensive Awards.

Comprehensive Awards prioritize properties with high need for investments in energy efficiency and climate resilience. HUD anticipates that a Comprehensive Award will induce Owners at all capacity levels to implement a broad scope of construction to achieve energy savings, clean energy generation, climate resilience, air quality improvements, and emissions reduction (including the use of materials with low levels of Embodied Carbon). This broad scope of construction shall be informed by a suite of assessments, as described below, to evaluate physical needs, energy and water efficiency needs, capacity for renewable energy generation, climate resilience interventions, and environmental conditions. HUD and the Owner shall collaborate to develop the Property's Scope of Work, informed by the Property assessments and the availability of funds. Integrative design approaches are encouraged to maximize energy and emissions savings, climate resilience and resident comfort, health and safety.  The process for Comprehensive Awards is designed to work with properties in a wide range of situations, from those just getting started on green and resilience improvements to those who have already done significant planning. The objective for all Comprehensive Awards is to move each Property and the portfolio substantially toward climate resilience and net zero, zero energy ready, or zero over time energy and emissions performance.

HUD intends to procure Multifamily Assessment Contractors (MACs) to assist HUD with carrying out the Comprehensive Awards. HUD may assign a MAC to work with the Owner and HUD throughout the assessment of the Property, the development of the Scope of Work through integrative design, due diligence, Closing, construction, and the commissioning process and to carry out any or all of HUD's roles as described below on behalf of HUD.  The MAC will engage appropriate professionals as needed throughout the integrative design and implementation process.

5.1.     Amount and Form of Funding.

Comprehensive Awards shall fund the Comprehensive Eligible Costs less the Owner Contribution, as specified in Section 5.5(E), below. All Comprehensive Awards will be in the form of a GRRP Grant or a Surplus Cash Loan, the terms of which are further described in Section 6, below. The applicant shall select the form of the Comprehensive Award in the application responding to the Comprehensive NOFO. The form of a Comprehensive Award may not be changed prior to Closing without prior written approval from HUD. In addition, in certain circumstances as outlined in Section 6.3, below, an Owner may seek additional financing in the form of an Amortizing Repayment Loan to meet the Owner Contribution requirements.

5.2.     Award, Commitment, and Kick-Off Call.

Following selection pursuant to the terms of the Comprehensive NOFO, HUD will issue a preliminary commitment letter to each Owner. The preliminary commitment letter shall specify the maximum amount of the Comprehensive Award available to the Property, which shall not exceed the Owner's actual Comprehensive Eligible Costs. The preliminary commitment letter

shall outline terms and conditions of the Comprehensive Award, consistent with this Notice and the applicable NOFO. The Owner must acknowledge acceptance of the Comprehensive Award and all conditions contained in the preliminary commitment letter. The Owner must submit to HUD the acknowledged preliminary commitment letter, together with the Property's most recent audited or owner-certified Annual Financial Statements (AFS), a PDF screen capture of the FEMA Flood Insurance Rate Map (FIRM) for the Property delineating the Special Flood Hazard Areas, the Base Flood Elevations and the risk premium zones applicable to the site (which can be accessed through the FEMA Flood Map Service Center), and any existing assessments the Owner proposes be used for GRRP purposes, within thirty (30) Days of issuance of the preliminary commitment letter, unless an extension is approved by HUD for good cause.

Upon receipt of the acknowledged preliminary commitment letter, a Kick-Off Call will be scheduled to provide an overview of program implementation. The Kick-Off Call will be an opportunity for the Owner to further discuss any plans or ideas the Owner is seeking to explore or implement to enhance the energy efficiency and resilience of the property, to reduce emissions, to improve indoor air quality or resident quality of life, or to meet other Owner objectives.

   5.3.    Required Assessments (the "Assessment Suite").

Properties selected for a Comprehensive Award will be subject to a series of assessments to determine the Property's needs and opportunities. The assessment process must include the Capital Needs Assessment (CNA), the Environmental Review, the Energy Audit, the Renewable Energy Assessment, and the Climate Resilience Assessment (collectively the "Assessment Suite"). The form of the Assessment Suite and the information it will capture are further detailed below.

HUD shall commission and/or perform all necessary assessments following the Kick-Off Call and associated costs will be covered through available GRRP funding. In addition to the required assessments, HUD may commission other reports or studies, if a need for additional due diligence is identified through the Assessment Suite. An integrative design process will be led by HUD, using appropriate professionals as needed. Owners must provide access to the Property and requested information as necessary for HUD to complete the Assessment Suite. Each assessment must be conducted by a qualified specialist in the applicable subject matter.

However, if Owners already have existing reports that meet the below requirements or could inform or direct the commissioning of these assessments, they can submit the reports to HUD as part of their preliminary award commitment package. Reports submitted to meet GRRP Requirements must be included with the preliminary award commitment package, dated no earlier than one year prior to the application due date, and dated no later than the Award Date to be evaluated for use as part of the Assessment Suite. Any Owner-commissioned reports will be evaluated to determine whether they meet HUD's specifications. If the submitted report(s) are found to be sufficient, the submitted report will become part of the Assessment Suite in lieu of a newly commissioned assessment. The submitted report may also be accepted subject to required modifications. (For example, a CNA may be accepted but may require that the anticipated replacement timing of some line items is revised.) HUD will not directly reimburse Owners for any costs incurred related to reports commissioned by the Owner, including costs associated with any modifications to meet GRRP specifications which HUD may require.  However, such costs may be included as a Comprehensive Eligible Cost and may be funded as part of the Transaction Costs when consistent with the requirements described in Section 5.5(D) below.

A)      Capital Needs Assessment (CNA). The CNA determines the Property's short- and long-term capital and rehabilitation needs. Informed by resident engagement and collaboration with the Owner, the CNA may include optional items designed to improve the resident experience, facilitate property operations, or implement the Owner's energy, emissions reductions, and climate resilience vision, provided the CNA clearly distinguishes which items are included pursuant to HUD guidance and which have been included at the Owner's request. The CNA shall inform the identification of short-term rehabilitation needs to be included in the Scope of Work and long-term capital needs to be addressed through a Reserve for Replacement Account. The CNA must be conducted consistent with Appendix 5, Section A.5.7 of the MAP Guide and must use HUD's Capital Needs Assessment Electronic Tool (the CNA eTool).

B)      Environmental Review. The Environmental Review includes environmental requirements covered by related federal laws and authorities, an appropriate Phase I Environmental Site Assessment (ESA) report[5] (ASTM Standard E1527-13) including a vapor encroachment screen performed in accordance with ASTM E2600-15, a Phase II ESA, if required by the Phase I (ASTM Standard E1903-19), and Phase III Clean-Up Plan or equivalent, if required by the Phase II, and any other environmental reports or testing determined necessary to inform the Scope of Work and enable HUD to complete an Environmental Review and clearance in accordance with 24 CFR Part 50, as discussed in Section 10.1, below. The Environmental Review must indicate that HUD is an authorized user of the report.

C)      Energy Audit. The Energy Audit identifies the most promising opportunities for reducing utility consumption and must estimate the utility consumption savings and utility cost savings projected for each recommendation. These recommendations must meet or exceed the requirements in the American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc. (ASHRAE) Procedures for Commercial Building Energy Audits, Second Edition 2018, Level II guidelines. Additionally, Energy Audits must provide emissions data in addition to energy data; emissions reduction opportunities and quantification; and electrification recommendations.

D)      Renewable Energy Assessment. The Renewable Energy Assessment identifies the feasibility of installing renewable energy at the Property using the U.S. Department of Energy's (DOE) Energy Integration & Optimization Tool (ReOpt Tool) or an alternative approved by HUD. For renewable energy recommendations identified as feasible, this assessment must also provide initial cost estimates and an analysis of financial feasibility for each recommendation.

E)      Climate Resilience Assessment. The Climate Resilience Assessment evaluates the Property's exposure to and risk from climate hazards, conducted using a Multifamily Climate Resilience Assessment Tool published by HUD, or an alternative approved by HUD. The assessment must address all climate hazards identified in FEMA's National Risk Index (NRI) that may impact the building. The Climate Resilience Assessment must not only consider the property's current risk to climate hazards but must also account for future risk resulting from climate change projections, as available, through tools such as

---

[5] Phase I ESAs submitted after February 13, 2024, must adhere to ASTM E1527-21. Phase I ESAs submitted prior to February 14, 2024, must adhere to either ASTM E1527-13 or ASTM E1527-21.

Climate Mapping for Resilience and Adaptation (CMRA) portal, Climate Explorer, Risk Factor, ClimateCheck, NOAA Sea Level Rise Viewer, Climate Central Coastal Risk Screening Tool, and others. The Climate Resilience Assessment will use climate projections, emission scenarios, or other suitable scenario conditions based on the Property's service life and Owner's risk tolerance, as appropriate and available. The assessment must provide Property-specific recommendations for improving Property resilience to identified current and future climate hazards.

5.4.    Scope of Work.

The Comprehensive Awards seek to ensure that the Property is improved to achieve energy and water efficiency, climate resiliency, air quality improvements, emissions reduction, and selection of materials with low Embodied Carbon consistent with GRRP program objectives, while also meeting the Property's basic capital needs. Properties with Comprehensive Awards are expected to achieve a 40% or greater reduction in emissions. The Scope of Work will be developed to improve energy efficiency, minimize energy use and emissions, replace fossil fuel consuming systems with systems and appliances that use electric power, and integrate renewable energy generation sources, all towards the goal of minimizing or eliminating the emissions of each Property. Concurrently, to protect the Property and its residents from natural hazards, the Scope of Work will integrate appropriate climate resilience strategies, particularly those that also support energy and utility savings and energy generation, and will address building resilience. Owners will be encouraged to pursue investments that bring the property towards net zero and to think about how future investments will reduce both Embodied Carbon and operational carbon emissions.

Informed by the Owner's objectives, feedback from any resident engagement including the Planning Meeting described in Section 8.2(B), and by the Assessment Suite, HUD will develop a recommended Scope of Work for discussion with the Owner, which will include a target for reductions in greenhouse gas emissions and energy consumption. The Scope of Work must result in a reduction in energy consumption of at least 25%, calculated as set forth in Section 11, below, unless HUD grants an exception in particularly extreme or compelling circumstances. HUD expects Owners to significantly exceed this threshold and expects any exceptions to be rare. The Owner will have an opportunity to propose amendments to the proposed Scope of Work based on known property conditions, resident comments, additional resources the Owner may be able to secure, and other factors. HUD approval of the planned construction activities (which may include rehabilitation, adaptive retrofits, and new construction) will establish the final Scope of Work. The Scope of Work includes any construction to be undertaken at the Property (other than routine maintenance) following the Comprehensive Construction Commitment (see 5.6 below), including GRRP-funded, Owner-funded, and jointly funded measures. HUD will ensure that the Scope of Work meets the minimum GRRP Requirements and that all items within the Scope of Work which are proposed for GRRP funding are eligible.

A)    Required Work. The Scope of Work must include, at a minimum:

(1)    Replacements or repairs for any building component or fixture at the Property identified by the CNA to be broken or past its useful life at the time of inspection or expected to exceed its useful life within the twelve (12) months following inspection, unless determined by HUD to be in good working condition;

(2)     Replacement of the Owner's non-Energy Star® air purifiers, clothes dryers, clothes washers, dehumidifiers, dishwashers, freezers, refrigerators, and of non-WaterSense® toilets, showerheads, faucets, urinals, irrigation controls, and irrigation sprinklers with appropriate Energy Star® or WaterSense® equipment or fixtures when such replacement has an expected financial payback of less than or equal to half of the fixture's standard useful life as determined by the Energy Audit and/or CNA, without regard to whether such item contributes to a tenant-paid or Owner-paid utility expense;

(3)     Replacement of exterior lighting, common area interior lighting, and in-unit hard-wired lighting with LED bulbs;

(4)     Resilience measures identified in the Climate Resilience Assessment as critical to addressing significant wildfire, wind, and flooding risks; and

(5)     Any construction required by the general requirements set forth in Section 10, including, without limitation, mitigation of any environmental concerns identified by the Environmental Assessment or required by the Environmental Review, retrofits to achieve compliance with Section 504 of the Rehabilitation Act of 1974, and repairs or work needed to achieve compliance with 24 CFR Part 35 regarding lead-based paint.

B)     <u>Additional Work</u>. The recommended Scope of Work shall include additional investments HUD determines to be appropriate for the Property based on the Assessment Suite, considering the available funding and the energy efficiency, climate resilience, carbon reduction (including the use of low Embodied Carbon materials), and air quality objectives of the GRRP. Such additional investments may include, but are not limited to:

(1)     Replacement of utility consuming appliances and equipment with high-efficiency alternatives;

(2)     Improvements to the Property's energy efficiency and passive survivability (i.e., hours of safe occupancy during an extended power outage) including, without limitation, improvements to the building envelope such as insulation and air sealing, windows, duct sealing, and roofs;

(3)     Installation of renewable energy generation infrastructure;

(4)     Installation of Level 2 electric vehicle charging stations;

(5)     Upgrades to building electrical systems necessary for the installation and operation of electrical appliances, equipment, electric vehicle charging stations, and renewable energy generation infrastructure;

(6)     Investments that enhance climate resilience;

(7)     Investments that improve indoor-air quality; and

(8)     Other investments that support GRRP objectives that HUD determines are worthwhile based on the Assessment Suite and other available reports or information.

C)    <u>Minimum Standards</u>. All construction within the Scope of Work must meet the following minimum standards:

    (1)    Appliances covered by the Energy Star® appliances list must meet the Energy Star® standard;

    (2)    Water-using products covered by WaterSense® must meet the WaterSense® standard;

    (3)    Property lighting (interior and exterior) must use LED bulbs;

    (4)    New appliances, fixtures, and equipment located within residential units must rely solely on electric energy;

    (5)    Any investments related to the building envelope, major building systems, and indoor-air quality (see "Cost-Share Items," Section 5.5(B)) included in the Scope of Work at the Owner's discretion must be the greener alternative as defined by the CNA or determined by HUD; and

    (6)    Any replacement or new mechanical system recommended to be elevated by the Multifamily Climate Resilience Assessment Tool must be elevated to at least the height recommended by the tool, unless otherwise approved by HUD.

5.5.    <u>Determination of GRRP Funding and Owner Contribution.</u>

This Section details how items in the Scope of Work will be paid for by the Comprehensive Award or Owner Contributions. GRRP funding is limited, and HUD seeks to avoid subsidizing investments which responsible owners generally make without assistance of this type. At the same time, HUD seeks to provide adequate funding to ensure the GRRP objectives are met. As a result, HUD expects the Scope of Work to be financed by a combination of an Owner Contribution and the Comprehensive Award. To determine the allocation between the Owner Contribution and the Comprehensive Award, HUD will organize the recommended Scope of Work into four categories as described below: Owner-Paid Items, Cost-Share Items, High Impact GRRP-Paid Items, and Transaction Costs.

A)    <u>Owner-Paid Items</u>. The Owner-Paid Items are those building improvements which HUD considers to be standard asset management good practice for multifamily apartment buildings, either because they correspond to repairs and replacements requiring immediate attention or because they have a short-term economic payback. Accordingly, Owners are fully responsible for costs associated with Owner-Paid Items included in the Scope of Work. These items include:

    (1)    Any building component or fixture identified by the CNA to be broken or past its useful life at the time of inspection or expected to exceed its useful life within the twelve (12) months following inspection (unless determined by HUD to be in good working condition) that are not identified as Cost-Share Items or High Impact GRRP-Paid Items (see below);

(2)     Energy Star® appliances (air purifiers, clothes dryers, clothes washers, dehumidifiers, dishwashers, freezers, refrigerators)[6], WaterSense® products (toilets, showerheads, faucets, urinals, irrigation controls, irrigation sprinklers), and LED lighting (interior and exterior); and

(3)     Any items the Owner seeks to include in the Scope of Work which are unrelated to GRRP objectives or are not recommended by HUD as the best use of GRRP funds.

B)     <u>Cost-Share Items</u>. Cost-Share Items are those building improvements in the Scope of Work which HUD considers to be the Owner's responsibility according to standard asset management good practice, but for which there is also a recommended green or more resilient alternative product or installation method that better meets the GRRP objectives. For the purposes of the GRRP, green or more resilient alternatives may be more energy or water efficient, may contribute to improved indoor-air quality, may provide greater resilience against hazards to the Property, or may reflect lower Embodied Carbon in their installation at the Property.

HUD is requiring that Owners cover the cost of the standard (not green) version of the below building components or systems, as detailed in the CNA based on RSMeans data or another cost database proposed by the CNA provider and acceptable to HUD for the Property location (the "Standard Product Cost"). HUD will cover the incremental cost associated with upgrading these items to a greener or more resilient alternative to achieve program objectives.[7] The portion of the GRRP award associated with Cost-Share Items is capped at 50% of the maximum award amount permitted under the applicable NOFO.

Cost-Share Items are generally greener or more resilient replacements of existing components or fixtures at a Property, specifically:

(1)     Windows;

(2)     Exterior doors/sliders;

(3)     Interior doors between conditioned (heated and cooled) and unconditioned or semi-conditioned space where appropriate to conserve energy, maintain habitability in the event of a power outage, or to control the spread of fire;

(4)     Skylights;

(5)     Exterior wall systems;

(6)     Roof systems;

(7)     Wildfire protection;

(8)     Domestic hot water heaters;

(9)     HVAC systems;

(10)    Ventilation systems;

(11)    Window shadings; and

---

[6] Electrification of any gas appliance shall constitute a Cost-Share Item or High Impact GRRP-Paid Item as described below.

[7] For example, if the CNA recommends the windows need to be replaced and the CNA indicates that triple pane windows would be an appropriate green alternative for the Property, the Owner would be responsible for the cost of the standard window, and the Comprehensive Award would cover the difference between the standard window and the Energy Star® certified triple pane window.

(12)    Flooring.

In cases where the Owner proposes to add any such items to the Property, HUD must recommend the incremental cost of the additional item for it to be considered a Comprehensive Eligible Cost.

For items (8), (9), and (10), the investment is considered a Cost-Share Item if either the Property's current system will be past its expected useful life within the next five (5) years according to the CNA or the greener alternative has an expected financial payback of less than or equal to half of its standard useful life. If neither is true, installation of items (8), (9), or (10) is considered a High Impact GRRP-Paid Item.

  C) <u>High Impact GRRP-Paid Items</u>. High Impact GRRP-Paid Items are those building and property improvements which HUD anticipates Owners may be unlikely to pursue absent GRRP funding. These improvements include deep energy efficiency investments, energy efficiency measures which reduce tenant-paid utilities, those that result in significant reductions of emissions, those that achieve air quality improvements, those related to renewable energy generation, and climate resilience improvements beyond the investments that are currently standard in the multifamily housing industry.

GRRP will fully cover the reasonable cost of the High Impact GRRP-Paid Items included in the Scope of Work, if recommended by HUD or justified by the Owner. Twenty-five percent (25%) of the maximum amount permitted under the applicable NOFO is reserved for High Impact GRRP-Paid Items, and the maximum GRRP funding available to the Property will be reduced if the Owner does not pursue sufficient High Impact GRRP-Paid Items to warrant this funding.

When in the Scope of Work, High Impact GRRP-Paid Items include:

  (1) Electric appliances or systems replacing gas appliances or systems, except for those listed as Cost-Share Items;

  (2) Electrical panel and/or wiring upgrades necessitated by renewable energy generation, electric vehicle charging station infrastructure, or electrification measures included in the Scope of Work, which measures may include the installation of electric stoves, heat pumps (for heating/cooling, water heating, or clothes drying), or other appliances, without regard to whether the appliance requiring the upgrade is an Owner-Paid Item, a Cost-Share Item, or a High Impact GRRP-Paid Item;[8]

  (3) Air sealing and/or insulation appropriate for the property and climate zone;

  (4) Automatic lighting controls;

  (5) Enhanced mechanical efficiency (Energy Recovery Ventilation, Heat Recovery Ventilation);

  (6) Energy Management and Information Systems;

  (7) Renewable energy generation capacity including wind, geothermal, solar, or other technologies and including investment in

---

[8] If the Property already has electric appliances but the electrical panel or wiring upgrades are necessary to ensure the Property's electrical system complies with currently applicable codes, the electrical panel or wiring upgrades are included as High Impact Costs.

<div style="margin-left:2em">

construction of off-site facilities (such as a community solar farm installation) that will offer subscriptions to the Property and Property residents at lower rates than standard electricity rates;

(8)     Renewable energy battery storage;

(9)     Backup power and potable water storage;

(10)    Resilient elevator systems;

(11)    Emergency lighting with back-up power/battery systems;

(12)    Indoor air quality sensors and purifiers;

(13)    Storm water retention strategies;

(14)    Rainwater capture systems;

(15)    Elevation of mechanicals;

(16)    Upgrades or roof replacement to increase resilience of roof systems;

(17)    Storm protection measures;

(18)    Fire protection measures;

(19)    Floodproofing strategies;

(20)    Acquisition costs associated with a transfer of budget authority, the Assistance Contract, or a use agreement, in accordance with the authorities discussed in Section 9.6, to a new property site in response to risks identified in the Climate Resilience Assessment;

(21)    Electric vehicle charging stations; or

(22)    Domestic hot water heaters, HVAC systems, and ventilation systems if neither a) the Property's current system will be past its expected useful life within the next five (5) years according to the CNA, nor b) the greener alternative has an expected financial payback of less than or equal to half of its standard useful life.

</div>

D)      <u>Transaction Costs</u>. Transaction Costs are a necessary part of Comprehensive Awards as construction cannot proceed without such activities. Transaction Costs do not need to be called out in the Assessment Suite. The Comprehensive Award will fund Transaction Costs in an amount not to exceed 30% of GRRP funding provided for Cost-Share Items and High Impact GRRP-Paid Items. Transaction Costs for the Owner's project management costs as identified in subparagraph (6) below may not exceed 15% of the total funding provided for Cost-Share Items and High Impact GRRP-Paid Items. Transaction Costs include:

<div style="margin-left:2em">

(1)     Tenant relocation, tenant counseling, and tenant supportive services necessary to mitigate the impact of the construction or transfer of assistance or budget authority on residents;

(2)     Mitigation of any environmental concerns identified by the Environmental Assessment or required by the Environmental Review;

(3)     Architectural, engineering, or specialized consultant professional services necessary to explore the feasibility of, design, and develop specifications for the construction activity;

(4)     Legal and financial advisory services in the structuring and documentation of the GRRP retrofits;

</div>

(5)    The upfront costs of training the Owner's or the property manager's staff or residents regarding proper maintenance and utilization of new equipment; or

(6)    The Owner's direct project management of the GRRP construction or the engagement of consultants to project manage the GRRP construction on the Owner's behalf, which includes items identified as "developer fee" on financial sources and uses, subject to the underwriting standards required by the Comprehensive Transaction Plan.

E)    <u>Sizing of the Comprehensive Award</u>. The size of the Comprehensive Award (and the corresponding Owner Contribution) will be estimated once HUD has approved the Scope of Work, and this amount will be finalized at Closing. The actual, reasonable cost of eligible Cost-Share Items, High Impact GRRP-Paid Items, and Transaction Costs in the approved Scope of Work shall comprise the Comprehensive Eligible Costs used to calculate the Comprehensive Award. The Comprehensive Award shall not exceed the lesser of the Comprehensive Eligible Costs or the maximum amount set forth in the applicable NOFO.

The table below summarizes the requirements set forth above regarding whether the Owner or HUD is responsible for the costs associated with the Comprehensive Scope of Work items, as well as the applicable constraints on the sizing of the Comprehensive Award.

| Owner-Funded and Comprehensive Award-Funded Costs by GRRP Cost Category | | | |
|---|---|---|---|
| | **Owner** | **Comprehensive Award** | **Applicable Constraints** |
| **Owner-Paid Items** | Responsible for the actual cost | No Comprehensive Award contribution | N/A |
| **Cost-Share Items** | Responsible for the Standard Product Cost | Up to the difference between the Standard Product Cost and the actual cost of the greener or more resilient alternative | GRRP will fund no more than fifty percent (50%) of the maximum GRRP Award amount permitted under the NOFO for Cost-Share Items |
| **High Impact GRRP-Paid Items** | No required Owner share of the cost | Up to the actual cost | Twenty-five percent (25%) of the maximum GRRP Award amount permitted under the NOFO is reserved for High Impact GRRP-Paid Items |
| **Transaction Costs** | No required Owner share of the cost | Up to 30% of the total Comprehensive Award funding for Cost-Share Items and High Impact GRRP-Paid Items | No more than 15% of the total Comprehensive Award funding for Cost-Share Items and High Impact GRRP-Paid Items may be Owner's project management costs as identified in 5.5(D)(6). No more than actual costs for costs identified in 5.5(D)(1-5). |
| **Total Development Costs** | All costs in excess of the Comprehensive Award | The Comprehensive Award amount | Up to the maximum per unit and per project caps set forth in the applicable NOFO |

| Illustrations of GRRP Comprehensive Awards (Per-unit amounts based on an $80,000 per unit maximum) | | | |
|---|---|---|---|
| | **Example 1:** Owner seeking to implement only traditional asset-management types of investments (i.e., only Owner-Paid and Cost-Share Items) | **Example 2:** Owner seeking to maximize traditional asset-management types of investments (i.e., Owner-Paid and Cost-Share Items) but willing to do some High-Impact Items | **Example 3:** Owner seeking to invest heavily in innovative measures (i.e., High Impact Items), perhaps having funded traditional asset-management types of investments through a recent transaction or because they are incorporating GRRP into a planned recapitalization transaction which will have other sources of funds |
| Cost-Share Items | $40,000 | $40,000 | $10,000 |
| High Impact GRRP-Paid Items | $0 | $21,540 | $60,000 |
| Transaction Costs | $12,000 | $18,460 | $10,000 |
| **Total GRRP Funding** | $52,000 | $80,000 | $80,000 |

F)    <u>Owner Contribution</u>. The Owner shall be required to identify and facilitate funding for all Scope of Work costs not covered by the Comprehensive Award, including the cost of the Owner-Paid Items and the Standard Product Cost of the Cost-Share Items (the "Owner Contribution"). In recommending a Scope of Work pursuant to Section 5.4, the recommendation will be adjusted to align with the anticipated GRRP funding unless the Owner is planning for additional work and will be able to demonstrate an ability to provide or secure additional funds for this work. The Owner Contribution may be made from any of the following sources (each an "Owner Contribution Source"):

(1)    The Property's reserve for replacement account, provided that the remaining balance of the reserve for replacement is sufficient to meet the 20-year needs schedule;

(2)    Any residual receipts account associated with the Property, if authorized and approved by HUD;

(3)    Owner equity;

(4)    Commercial debt, whether or not secured by the Property[9];

(5)    Federal, state, or local funds, including rebates or other sources if consistent with Section 9.7 of this Notice;

(6)    Any other external financing source;

---

[9] Any new debt must comply with the existing HUD requirements applicable to the Property.

(7)     An Amortizing Repayment Loan if the Owner and the Property meet the conditions set forth in Section 6.3, below; or

(8)     For Owners of Section 202 or Section 811 Project Rental Assistance Contract properties only and due to the restrictions in such contracts on paying debt service, Owners may allocate up to $20,000 per unit of the Comprehensive Award towards the Owner Contribution.

5.6.    <u>Comprehensive Transaction Plan.</u>

Within three (3) months of HUD approval of the Scope of Work, unless an extension is approved by HUD for good cause, the Owner must identify the Owner Contribution Sources and obtain letters of intent or relevant documentation from each Owner Contribution Source to demonstrate the availability of funds.

No later than twelve (12) months following HUD approval of the Scope of Work, an Owner must submit a Comprehensive Transaction Plan for HUD review with the material set forth in Exhibit E, unless an extension is approved by HUD for good cause. The Comprehensive Transaction Plan consists of the materials necessary for HUD to review the overall recapitalization transaction and the anticipated emissions and energy reduction outcomes. A Comprehensive Transaction Plan must be substantially complete to be considered submitted and ready for review. During this review, HUD will review the proposed work and timeline, validate the Comprehensive Eligible Costs, confirm that the recapitalization transaction will address the physical needs of the Property, project whether the Property can be sustained physically and financially for the term of the Comprehensive Award, review the proposed sources and uses and operating pro forma, verify that all necessary financing has been committed, underwrite the transaction in accordance with Exhibit E, examine completion of all required resident engagement activities, review the projected energy and emissions reductions, and confirm compliance with all GRRP Requirements. In projecting whether the Property can be sustained physically and financially, HUD must confirm that the reserve for replacement must be built up to and maintained at a level determined by HUD to be sufficient to meet the projected requirements identified in the CNA. HUD may require additional documentation not specified in Exhibit E.

If HUD determines, in its sole discretion, that the Comprehensive Transaction Plan, as submitted, is not feasible or that the GRRP Requirements have not been met, then HUD will notify the Owner of the deficiencies and request a new or modified submission. The Owner must make corrections that address these concerns to HUD's satisfaction within the timeframe specified by the deadline in the deficiency letter. If an Owner is unable to submit a complete and viable Comprehensive Transaction Plan, as such deadline may be extended by HUD, HUD may revoke the preliminary commitment for the Comprehensive Award.

Owners will be notified of HUD's acceptance of the Comprehensive Transaction Plan by the issuance of a Comprehensive Construction Commitment ("CCC"). In the CCC, HUD will outline the key components of the Comprehensive transaction and outline any conditions that need to be satisfied to close on the Comprehensive Award. The Owner will have fourteen (14) Days from the date of issuance of the CCC to execute and return it to HUD.

5.7.    Closing

Within ninety (90) Days after issuance of the CCC, the Owner must submit a Comprehensive Closing Package unless an extension is approved by HUD for good cause. The Comprehensive Closing Package must contain draft documents to implement the Comprehensive Award and such other materials as required by HUD to review the overall transaction and determine compliance with the CCC and the GRRP Requirements. HUD shall be the sole authority for determining a transaction's compliance with the CCC and the GRRP Requirements. Following review and acceptance by HUD of the Comprehensive Closing Package, HUD will execute the applicable Legal Documents, as described in Section 7 below and authorize the transaction to proceed to Closing. Closing shall not occur until all programmatic and legal issues are addressed to HUD's satisfaction. All Comprehensive Awards must reach Closing within six (6) months after execution of the CCC, unless an extension is approved by HUD for good cause. Failure to achieve Closing in this timeframe may result in revocation of the Comprehensive Award. Electronic copies of the fully executed Legal Documents including, if applicable, evidence of recording in the local real estate records, and an electronic copy of a final closing docket, including copies of all transaction financing and construction contracts, shall be submitted to HUD within 30 Days of the Closing.

5.8.    Disbursements and Completion Certification.

Owners must cooperate with HUD to ensure the construction is completed in a timely manner including, but not limited to, making required Owner Contributions. Up to 90% of the Comprehensive Award may be disbursed during the construction period on the submission of draw requests, in a form prescribed by HUD. The Owner may make draw requests no more frequently than once in each calendar month. Draw requests shall be signed by the Owner and accompanied by backup documentation acceptable to HUD evidencing the incurred Comprehensive Eligible Costs. Disbursements will be conditioned on HUD's review and approval of the progress of construction, which may include on-site inspections and/or reviews of progress reports from the Architect and General Contractor.

After the completion of construction at the Property, the Owner shall allow HUD to conduct post-rehabilitation inspection/commissioning to ensure that retrofits and property enhancements were properly installed and are functioning as designed. Owners must also provide HUD all requested documentation and data to support program evaluation. The Owner shall submit a Completion Certification containing the following items prepared by the Owner, in the form prescribed by HUD: (i) an accounting by a third-party accountant of the final Comprehensive Eligible Costs, (ii) a certification that the Property, the Award, and the Owner are in compliance with the GRRP Requirements, (iii) confirmation that pre-construction benchmarking has been completed and entered into the U.S. Environmental Protection Agency's (EPA) Portfolio Manager and shared with HUD and (iv) other items as may be required by HUD. Upon approval by HUD, the remaining Comprehensive Award funds shall be disbursed, provided that in no event shall HUD disburse an amount that would be greater than the total of Comprehensive Eligible Costs.

6.    GRRP Financial Products, GRRP Use Agreement, and Affordability Periods.

HUD is authorized to provide GRRP funds through grants, loans repayable from the Owner's annual Surplus Cash, and loans with fully amortizing debt service. Owners may accept GRRP funds in the form of a GRRP Grant or a Surplus Cash Loan. Comprehensive Owners may also be

eligible to receive an Amortizing Repayment Loan as an Owner Contribution Source. Each of these financial products is described in more detail below.

### 6.1.  GRRP Grants.

GRRP Grants will be made to the Owner of the Property. Affiliates of the Owner are not eligible to receive GRRP Grants on behalf of the Owner. The amount of the GRRP Grant may be up to the total of Eligible Costs, capped at the program maximums described in this Notice and the applicable NOFO. GRRP Grants do not have to be repaid so long as the Owner and the Property comply with all GRRP Requirements. In the Comprehensive Award context, a GRRP Grant may be used in conjunction with an Amortizing Repayment Loan when the Amortizing Repayment Loan is used as an Owner Contribution Source. GRRP Grants shall require compliance with the GRRP Use Agreement for the GRRP Affordability Period and shall be subject to such other terms as HUD may determine appropriate and include in the Legal Documents.

### 6.2.  Surplus Cash Loans.

The amount of the Surplus Cash Loan may be up to the total of Eligible Costs, capped at the program maximums described in this Notice and the applicable NOFO. In the Comprehensive Award context, a Surplus Cash Loan may be used in conjunction with an Amortizing Repayment Loan when the Amortizing Repayment Loan is used as an Owner Contribution Source. Surplus Cash Loans will be subject to the following terms:

A)  <u>Payment Terms</u>. During the term of a Surplus Cash Loan, beginning with the first Annual Financial Statement submission following HUD's acceptance of the Completion Certification, any Surplus Cash shall be distributed annually as described below:

(1)  First, to HUD, in the amount of 25% of the annual Surplus Cash for Elements Awards or 50% of the annual Surplus Cash for Leading Edge Awards and Comprehensive Awards, as a payment toward the Owner's obligation under the Surplus Cash Loan, with payments applied first to any accrued interest and then to the principal balance of the Surplus Cash Loan.

(2)  Second, any remaining Surplus Cash shall be distributed (or deposited into the residual receipts account, as applicable) in accordance with the otherwise applicable provisions of the governing documents of the Property.

(3)  Payment on any Surplus Cash Loan, regardless of the lien priority, shall be made from the Owner's share of Surplus Cash as described in this Section.

(4)  Payments toward any indebtedness other than amortizing first position senior lien debt approved by HUD, including contingent (cash flow) debt senior (if approved by HUD) or junior to the Surplus Cash Loan, or any unsecured debt, shall be paid from the Owner's share of annual Surplus Cash, if any, that is remaining after the share of Surplus Cash payable to HUD under this Section.

(5)  As noted in the definition of Surplus Cash, deferred developer fee approved in the Elements Closing Package, LEC or CCC may be

paid prior to calculating Surplus Cash for the first ten years of payments.

B)      Term. The term of any Surplus Cash Loan shall be the later of the date which is coterminous with any first lien mortgage financing or up to 30 years following the Closing. The full unpaid balance, including any accrued but unpaid interest, will be due and payable at maturity.

C)      Interest Rate. The outstanding principal balance shall accrue interest at a simple (not compounded) annual interest rate of not less than 1% per year.

D)      Security. The repayment of a Surplus Cash Loan shall be secured by a lien on the real property associated with the Property and a security interest in associated property other than real property. These obligations shall be evidenced by a recorded Security Instrument and, with respect to property other than real property, appropriate state and local Uniform Commercial Code Financing Statement filings.

  (1)   Senior Mortgage Lien. The lien securing the Surplus Cash Loan may be subordinated to a first position senior mortgage lien securing amortizing debt, including HUD insured or HUD-held mortgages, subject to HUD approval of such senior debt.
  (2)   Other Liens. The lien securing the Surplus Cash Loan may be subordinated to non-financial liens, such as easements and affordability restrictions approved by HUD.
  (3)   Subordinate Financing Liens. The lien securing a Surplus Cash Loan associated with a Comprehensive Award or a Leading Edge Award must be superior to all financing liens other than any senior mortgage lien securing amortizing debt approved by HUD. HUD may approve subordination of the lien securing a Surplus Cash Loan associated with an Elements Award to other subordinate contingent financing liens if:

(a)      The principal balance of the loan is larger than the principal of the Surplus Cash Loan;
(b)      The lender is a Federal, state, or local governmental agency, or a Federal Home Loan Bank; and
(c)      The GRRP Use Agreement survives foreclosure of the contingent debt.

  (4)   Affiliate Indebtedness. If any indebtedness (whether existing or new) is secured by the Property and is held by a party that is an Affiliate of the Owner or management agent, the lien of such indebtedness must be subordinated to the lien of the Surplus Cash Loan.

E)      Acceleration. HUD may declare the remaining balance of the Surplus Cash Loan immediately due and payable and may exercise any and all remedies provided in the Legal Documents if any of the following occurs:

(1)    <u>Failure to Maintain the Assistance Contract</u>. The Owner fails to request and/or accept an offer to renew, extend or convert an expiring Assistance Contract in order to maintain rental assistance for the term of the Surplus Cash Loan, if such renewal, extension or conversion of rental assistance is available.

(2)    <u>Acquisition of Senior Debt by the Owner or an Affiliate</u>. The Owner, property manager, or an Affiliate of the Owner or property manager, acquires the lender's interest in any financing senior to the lien of the Surplus Cash Loan, unless approved by HUD.

(3)    <u>Refinancing</u>. Any debt secured by the Property with a lien position senior to that of the Surplus Cash Loan is refinanced, terminated, accelerated, or paid in full, unless approved by HUD.

(4)    <u>Sale</u>. Ownership of the Property is transferred, and the Surplus Cash Loan is assumed by any subsequent purchaser, unless approved by HUD.

(5)    <u>Default of Business and Legal Documents</u>. The Owner is in default under the Assistance Contract, any document that evidences or secures the Surplus Cash Loan, or any other document executed by the Owner in connection with the Surplus Cash Loan or the GRRP Award including, without limitation, the GRRP Use Agreement.

F)    <u>GRRP Use Agreement</u>. The Surplus Cash Loan shall require compliance with the GRRP Use Agreement during the GRRP Affordability Period and shall be subject to such other terms as HUD may determine appropriate and include in the Legal Documents.

G)    <u>Treatment at Maturity</u>. If a Surplus Cash Note reaches maturity and the Owner has not repaid the remaining principal and accrued interest due on the Surplus Cash Note at such time, the Surplus Cash Note shall be in default pursuant to the terms of the applicable Note and associated collateral documents. Any delay by HUD in the exercise of its remedies shall be considered a forbearance, and not a waiver of such rights. The Owner may avoid or delay HUD's exercise of its remedies by repaying the Surplus Cash Note in full or requesting from HUD a work-out of the defaulted Surplus Cash Note. Full repayment of the Surplus Cash Note does not need to be evaluated by HUD and does not need any HUD approvals. The Property will remain subject to the GRRP Use Agreement and applicable rent restrictions, if applicable. In the event the Owner requests a work-out of the Note, HUD may offer options short of foreclosure for resolving defaults at maturity. The primary option shall be approval of a refinance or sale of the Property with an extension of the loan maturity, although HUD may consider other modifications as set forth in this Notice. This provision applies only to defaults caused by failure to pay the Surplus Cash Note in full upon maturity. HUD shall implement standard remedies available to it in all other instances of an event of default under the loan documents.

H)    Combination with Other HUD-Held Surplus Cash Loans.  Notwithstanding any other provision of this Section, in the event an Owner is combining a GRRP Surplus Cash Loan and another HUD-held surplus cash loan, such as a Mortgage Restructuring Note pursuant to the Mark-to-Market program, HUD may allow the subordination of the lien priority and payment of the Surplus Cash Loan to the other HUD-held note(s) in order to comply with the terms of the other HUD-held note(s) if HUD determines in HUD's sole

discretion that the expected repayment of the Surplus Cash Loan will not be meaningfully
diminished. If HUD is unable to make such a determination, then the Owner may be
required to accept GRRP funding through a GRRP Grant. HUD will make such
determinations during its review of the Elements Closing Package or the Leading Edge or
Comprehensive Transaction Plan.

6.3.    Amortizing Repayment Loan.

In some very limited circumstances, Owners receiving Comprehensive Awards may have
difficulty securing funds for the Owner Contribution. HUD is offering the Amortizing Repayment
Loan to mitigate this challenge.

A)    Availability. Owners selected for a Comprehensive Award may request an
Amortizing Repayment Loan when they submit the Comprehensive Transaction Plan.
HUD will review the request for an Amortizing Repayment Loan and consider approval if
the Property:

(1)    Has 20 units or fewer; or
(2)    Has greater than 20 units, and the Owner certifies that they have
made a good faith effort to secure financing in the amount of the
required Owner Contribution from a minimum of two lenders and
were either unsuccessful or the terms under which financing was
extended would make the GRRP transaction financially infeasible
or create undue hardship in maintaining the property as affordable.
HUD may request additional documentation of these efforts at its
discretion.

B)    Terms. Amortizing Repayment Loans shall require compliance with the GRRP
Use Agreement and shall be subject to such other terms as HUD may determine
appropriate and include in the Legal Documents. The principal of the Amortizing
Repayment Loan shall not exceed the lesser of either the required Owner Contribution or
$1,000,000. The interest rate shall be at or above market rate for comparable debt
products and the term of the loan shall not be longer than 15 years. HUD shall
periodically issue term sheets with respect to the other terms of the Amortizing
Repayment Loans, including interest rate calculations, security, lien priority, and other
underwriting requirements.

6.4.    GRRP Use Agreement and Affordability Periods.

All properties assisted with GRRP funding shall be subject to an extended affordability period
which shall be equal to: A) for GRRP Grants, the longer of twenty-five (25) years from the date
of execution of the GRRP Use Agreement or five (5) years beyond any existing use restriction
regarding affordability running in favor of HUD or B) for Surplus Cash Loans, the longer of
fifteen (15) years from the date of execution of the GRRP Use Agreement or five (5) years
beyond any existing use restriction regarding affordability in favor of HUD (the "GRRP
Affordability Period"). If the Assistance Contract expires during the term of the GRRP
Affordability Period and extension or renewal of Assistance Contract is available, the Owner
must request, and/or accept, any offer to renew or extend the Assistance Contract so that the
Assistance Contract remains in place for the duration of the GRRP Affordability Period. If

applicable, Owners may also convert the Assistance Contract to a different form of rental assistance to maintain rental assistance during the term of the GRRP Affordability Period.

At the Closing for a GRRP Grant or Surplus Cash Loan, Owners must execute a GRRP Use Agreement which shall impose a covenant running with the land that the Property shall remain affordable for and occupied by families whose incomes do not exceed the HUD Income Limit for low-income families for the GRRP Affordability Period. The GRRP Use Agreement may be subordinate to non-financial encumbrances, such as easements and affordability restrictions, which are approved by HUD considering the potential of such encumbrances to conflict with the affordability requirements of the GRRP Use Agreement and other factors. The GRRP Use Agreement must be senior to all financial liens.

    7.   <u>Legal Documents.</u>

The obligations of the Owner with respect to each of the Elements Awards, Leading Edge Awards, and Comprehensive Awards shall be memorialized in such Legal Documents as HUD determines necessary and appropriate. HUD has or will develop forms for the Legal Documents which will be available on the GRRP website, each of which will be used without modification unless HUD determines that modifications are in the best interests of GRRP, HUD, the Property, or the residents or that modifications are required to comply with applicable State or local law.[10] The Legal Documents include, without limitation, the following:

- For all Properties receiving an Award:
  - ○ GRRP Use Agreement
- For Properties receiving a Leading Edge Award:
  - ○ Leading Edge Commitment (LEC)
- For Properties receiving a Comprehensive Awards:
  - ○ Comprehensive Construction Commitment (CCC)
- For Properties receiving a GRRP Grant:
  - ○ GRRP Grant Agreement
- For Properties receiving a Surplus Cash Loan:
  - ○ Surplus Cash Loan Agreement
  - ○ Surplus Cash Loan Note
  - ○ Surplus Cash Loan Security Instrument
  - ○ Uniform Commercial Code Financing Statements (State and Local)
- For Properties receiving an Amortizing Repayment Loan:
  - ○ Amortizing Repayment Loan Agreement
  - ○ Amortizing Repayment Loan Note
  - ○ Amortizing Repayment Loan Security Instrument
  - ○ Uniform Commercial Code Financing Statements (State and Local)

Additional documents will be required to close a GRRP Grant, a Surplus Cash Loan, or an Amortizing Repayment Loan, as required by HUD or applicable state or local law. HUD may provide templates for these additional documents which include, without limitation:

---

[10] On the release date of this Notice, the Legal Documents are pending full Paperwork Reduction Act approval. The GRRP website will be updated with the final documents when available.

- Owner's certifications and attorney opinions as to authority to accept and close a GRRP Grant, a Surplus Cash Loan, or an Amortizing Repayment Loan;
- Owner's certifications regarding program compliance;
- Consent from existing lienholders, where required, and other parties whose consent is required;
- Closing and other submission checklists; and
- Addendum to the Assistance Contract to conform to HUD's financial reporting and physical inspection requirements, to provide for cross-defaults between the Assistance Contract and the Legal Documents, and to document any applicable GRRP Shared Savings Retainer.

8. <u>Resident Engagement, Continued Tenancy, and Program Relocation Requirements.</u>

8.1. <u>Resident Notification of Award</u>

Within thirty (30) Days of the Award Date, unless otherwise approved by HUD, the Owner must provide written notification to all residents of the Property that the Property has been selected for funding under GRRP. The notification must be provided pursuant to 24 CFR § 245.15. This notification is separate and apart from any notices required by the URA. The notification must include:

A) A statement that the Property will be receiving assistance from the Inflation Reduction Act of 2022;

B) A general description of the Owner's objectives in seeking the GRRP funding;

C) The timeline of planning and construction activities, including any planned relocation;

D) For Leading Edge or Comprehensive Awards, a reiteration of the resident's expectation to continued tenancy as set forth in Section 8.4;

E) Contact information for a representative of the Owner available to answer residents' questions; and

F) The name and contact information of the HUD Account Executive and any assigned HUD GRRP staff and the GRRP mailbox.

8.2. <u>Meetings with Residents</u>

A) Elements Award Properties

If the Owner receives an Elements Award and has not had a meeting with the residents regarding the underlying recapitalization transaction within the preceding six (6) months, the Owner must conduct a meeting with the residents to inform them of the underlying recapitalization, the timing of the key steps in the process, the duration of any planned construction, and any possible relocation for residents.

B)    Leading Edge and Comprehensive Award Properties

Owners receiving Leading Edge or Comprehensive Awards shall conduct, at a minimum, three meetings with the residents. The Planning Meeting is designed to provide information on the GRRP and solicit feedback, outline upcoming assessment activities, and explore opportunities regarding any potential construction at the Property. The Post-Assessment Meeting is designed to share information about and solicit feedback on the emerging plans for the Property. The Post Commitment Meeting is designed to discuss the implementation and construction plans.

(1)    Planning Meeting

Following the Award Date, Owners must conduct a meeting with residents of the Property to discuss preliminary planning and to provide opportunities for comment. For Leading Edge Awards, this meeting must occur within three months after the Award Date. For Comprehensive Awards, this meeting must occur within thirty (30) Days after the Kick-Off Call and prior to any site visit by entities commissioned by HUD to conduct parts of the Assessment Suite.

During the meeting, the Owner must present the Owner's objectives in seeking the GRRP funding (e.g., anticipated capital renovations, energy efficiency goals, what the Owner hopes to fund with GRRP assistance), the process for developing the Scope of Work, the timeline of planning and construction activities, and any potential relocation. The Owner must also provide an opportunity for residents to identify maintenance concerns and opportunities to improve the resident experience, acknowledging that this is a brainstorming opportunity and that resources may not be available to implement the offered ideas. For Comprehensive Awards, the Owner must describe the Assessment Suite including what assessments will take place, what is involved in each assessment, and how long the assessment process is likely to take. For Leading Edge Awards, the Owner must provide an equivalent description of the Owner's process for developing the Scope of Work.

(2)    Post-Assessment Meeting

Prior to submitting a Leading Edge Transaction Plan or Comprehensive Transaction Plan, Owners must conduct a meeting with residents of the Property to discuss observations from the Assessment Suite (in the case of a Comprehensive Award) or from the Owner's research and study of the Property (in the case of a Leading Edge Award) and the proposed Scope of Work. The Owner must also discuss a) whether the transaction will include a transfer of budget authority or transfer of assistance and the potential locations to which the assistance would be transferred; b) any change in the number of assisted units or any other change that may impact a household's ability to re-occupy the Property following construction; c) potential relocation scenarios; d) a projected timeline of the construction; and e) expected effects on utility costs for the Property and individual households. The Owner must provide residents the opportunity to comment on the Owner's plans. Owners must submit, as part of the Leading Edge or Comprehensive Transaction Plan a summary of all resident comments received and how those comments are addressed in the Scope of Work.

(3)    Post-Commitment Meeting

Page 36 of 79

After issuance by HUD of the LEC or CCC, as applicable, and before Closing,[11] Owners must conduct a meeting with residents of the Property to discuss the final Scope of Work, the timeline once construction begins, plans to mitigate the impact of construction on the residents, and any anticipated resident relocation.

### 8.3.    Additional Engagement with Residents

A)    HUD encourages Owners to partner with leaders of legitimate tenant organizations recognized under 24 CFR § 245.100 to help communicate information about the Award to the broader resident population through peer-to-peer engagement.

B)    Owners should also communicate regularly with residents to create awareness and understanding of the Scope of Work. Updates posted in common spaces, a Property's website, periodic email or newsletter distributions, or meetings in addition to those required by this Notice may be helpful in providing updates to residents on the progress of the construction planning, offering opportunities for residents to provide input, and creating venues for residents to raise questions and concerns. Owners should be particularly alert to good communication with respect to any transfer of budget authority or transfer of assistance; a change in the general partner, managing member, or equivalent ownership interest in the Owner; a change in the number of assisted units or any other change that may impact a household's ability to re-occupy the property following construction; a substantial change in the relocation plans; and a material change in utility allowances.

C)    Owners must develop training materials or programs in order to educate residents regarding the proper use of any in-unit technologies installed as part of the Scope of Work. Such materials and program may be written and included with the lease or other move-in materials or may be conducted in person.

### 8.4.    Expectation of Continued Tenancy.

To the extent that Owners must relocate any assisted residents to accommodate the applicable Scope of Work, Owners must do so in compliance with the requirements of this Section and in compliance with the URA as set forth in Section 10.2 below. All requirements in this Section are separate and apart from URA requirements, and all Owners must also comply with the URA. Owners must facilitate the assisted residents' return to the Property unless the resident has voluntarily agreed to relinquish the resident's Lease.  To facilitate the return of assisted residents, the following requirements apply:

A)    Owners with residents under an Assistance Contract whose units would be rendered temporarily uninhabitable due to the Scope of Work may temporarily lease units in other buildings, which are habitable under applicable program requirements (e.g., Uniform Physical Condition Standards (UPCS) or successor standards) with approval from HUD.  The Owner can sign a temporary lease on behalf of any resident. The Owner then pays the rent on the temporary dwelling until the resident's permanent rental unit has

---

[11] In certain circumstances where the Closing is anticipated to occur soon after the issuance of the LEC or CCC, the Owner may request, and HUD may permit the Owner to implement the actions required under this Section prior to issuance of the LEC or CCC.

been brought to habitable condition and the Owner notifies the resident that they may resume occupancy of the Property. The resident is still responsible for the resident's share of the temporary rent. For Owners party to an Assistance Contract, the Owner may voucher for the HUD subsidy under the Assistance Contract for that temporary unit. The Owner must provide third-party inspector reports acceptable to HUD demonstrating compliance with applicable physical inspection requirements (e.g., UPCS) with respect to all temporary units. Once the Scope of Work has advanced sufficiently that the resident may return to the Property, all Assistance Contract provisions apply. This arrangement calls for close contact and cooperation between the Owner and the resident. Owners must continue to offer residents lease renewals before and during the completion of the Scope of Work and continue to be bound by the provisions of the Leases, including those that limit the grounds for termination of the Lease to material non-compliance or other good cause. Any relocation options to be offered to residents that would prevent the Owner from maintaining existing Leases during relocation (e.g., a resident is offered a tenant-based voucher) must be included in the Closing Package for Elements Awards or the Transaction Plan for the Leading Edge and Comprehensive Awards. For any relocation option that does not continue existing Leases, the Owner must demonstrate that the residents will have the ability to return to the Property if desired by the resident under substantially the same terms and lease provisions offered prior to the relocation. Any resident temporarily relocated for more than one year may be entitled to permanent relocation assistance pursuant to the URA.

B)      When a resident voluntarily terminates the Lease, the Owner must ensure that the residents' decisions are fully informed, voluntary, and carefully documented. An Owner is permitted to offer a resident alternative housing options when a resident is considering his or her future housing plans and to accept the resident's voluntary relinquishment of their rental subsidy and Lease. An Owner may include a monetary element in an alternative housing option package, provided that no funds administered by HUD may be used for such monetary element. In connection with any offer and acceptance of alternative housing options, the Owner must inform the resident, in writing, of a) the resident's right to continue their tenancy under their existing Lease; b) the short- and long-term implications of the decision to relinquish their rental subsidy and Lease; and c) the resident's right to take at least fourteen (14) days to consider the offer. The resident must consent to and/or formally acknowledge the relinquishment of their rental subsidy and Lease in writing.

C)      In the event the Owner is reducing the number of assisted units at the Property to accomplish the Scope of Work, the Owner must explore options to transfer the assistance pursuant to Section 8(bb) of the United States Housing Act of 1937 (42 U.S.C. 1437f(bb)) or other applicable authorities. If the assistance cannot be transferred, the Owner must maintain all residents' assistance at the Property or in a temporary unit arranged consistent with the provisions of Section 8.4(A) until such time that the residents are relocated back to the Property or received permanent relocation assistance pursuant to the URA and secured permanent replacement housing.

D)      As part of the LEC or CCC Transaction Plan, or the Elements Closing Package, the Owner must submit a description of planned relocation activities, if applicable, that demonstrates compliance with this Section. As part of the Completion Certification,

Owners must provide a record of all residents that did not return to the Property. If the resident household's Lease was terminated, the Owner must provide the grounds and documentation of the termination. If the resident household voluntarily relinquished the Lease, the resident's consent and/or acknowledgement must be provided.

9.    General GRRP Requirements.

9.1.    Disaster Preparedness Plan.

Informed by the climate hazard risks identified in the NRI and in climate projection tools such as Climate Mapping for Resilience and Adaptation (CMRA) portal, Climate Explorer, Risk Factor, ClimateCheck, NOAA Sea Level Rise Viewer, Climate Central Coastal Risk Screening Tool, any Hazard Mitigation Plan developed by the local jurisdiction, and others, all Owners must create a Property-wide disaster preparedness plan including an evacuation plan that includes safe egress route(s), plans for evacuating residents with disabilities, medical needs, or other special needs, and clear communication of the evacuation plan and safety resources for residents. The plan must include effective communication for individuals with disabilities and meaningful access for individuals with Limited English Proficiency. For residents with special needs, the plan must include a strategy for emergency evacuation and relocation, including discussion of facilities of like capacity that are equipped to provide critical needs-related care and services at a level similar to the originating facility. HUD will provide a template for such disaster preparedness plan on the GRRP website, but Owners will need to tailor the template to their own situation. HUD may assign a MAC to assist Comprehensive Owners with this task. Owners must submit a certification that the Disaster Preparedness Plan has been developed and adopted in the Closing package. The Owner must make the Disaster Preparedness Plan available to residents upon request.

9.2.    Signage.

All properties assisted with GRRP funding shall include signage at the Property during any period of construction that identifies that the Property received assistance from the U.S. Department of Housing and Urban Development under the Inflation Reduction Act of 2022. Such signage shall be prominently displayed and visible to the public while any GRRP funded work is being conducted.

9.3.    In-Unit Appliances

GRRP will not fund or finance the purchase, repair, or upgrade of any in-unit fossil fuel combustion appliances or equipment such as water heaters, stoves/ranges, clothes dryers, or furnaces.

9.4.    Re-Determination of Allowances for Tenant-Paid Utilities.

For any utilities paid by tenants, Owners shall submit utility allowance projections performed by a professional engineer based on the Scope of Work that, at a minimum, consider specific factors including, but not limited to, unit size, building orientation, design and materials, mechanical systems, appliances, and characteristics of the building location. If approved by HUD, these projections will be used upon completion of the Scope of Work to calculate utility allowances following Notice H 2015-04, particularly Section VII. If utility allowances would decrease, Owners must follow the requirements described in Notice H 2015-04.

9.5.    "Split-Incentives" and Shared Savings.

Under current rental assistance program requirements, assisted property owners with tenant-paid utilities realize no financial payback for capital investments that improve the energy and water efficiency of the Property for residents. Traditionally, if an owner makes improvements to the property and tenant-paid bills decrease, the Owner would lower the utility allowance, residents would shift more of their payment from paying utility bills to rent to the Owner, and the subsidy payment HUD pays under the contract would decrease, leaving the property in a neutral financial position. Similarly, for properties with contracts where rents are determined based on an annual budget submission, as property-paid utility bills decrease, the property's approved budget-based rent in the following cycle is lowered. This phenomenon is commonly known as the "split-incentive" problem.

HUD has determined that the "split-incentive" poses a barrier to the use of GRRP funds because in many cases it would prohibit the realization of a financial payback to the Owner from water and utility efficiency improvements, which is necessary to support the financing of the GRRP capital investment (including both investments that are the responsibility of the Owner and investments that will be covered through a GRRP Grant, Surplus Cash Loan, or Amortizing Repayment Loan). Accordingly, HUD is adopting alternative requirements to facilitate the use of the GRRP funds as described below.

- For properties assisted under a Section 8 housing assistance payments contract where the Scope of Work will result in the reduction of one or more utility components (e.g., gas, water, sewer, electric) paid by tenants and used to establish the utility allowance, HUD is authorizing a GRRP Shared Savings Retainer to the housing assistance payments contract that will be equal to 75% of the projected reduction to tenant-paid utility costs. Additionally, for properties assisted under a Section 8 housing assistance payments contract renewed with rents set on a budget-based rent adjustment when the Scope of Work will result in the reduction of one or more utility components (e.g., gas, water, sewer, electric) paid from Property accounts, HUD is authorizing a GRRP Shared Savings Retainer to the housing assistance contract rent that will be equal to 75% of the projected reduction to Property-paid utility costs. To implement this provision, HUD is waiving its existing calculation of subsidy pursuant to Section 8(c)(3) as implemented in 24 CFR § 880.501(d)(1), 881.501(d)(1), 883.602(c)(1), 884.106(a), 886.109(a), 886.309(a), and 891.560(c)(1) which establishes that the amount of the housing assistance payment made to the owner of a unit being leased by an eligible family is the difference between the contract rent for the unit and the tenant rent payable by the family, and implementing an alternative calculation that includes a GRRP Shared Savings Retainer as part of the housing assistance payment.[12]

- For properties assisted under a Section 202 or Section 811 project rental assistance contract subject to a budget-based rent when the Scope of Work will result in the

---

[12] The IRA authorizes HUD to waive or specify alternative requirements for any provision of Section 8(c) of the United States Housing Act of 1937 upon a finding that the waiver or alternative requirement is necessary to facilitate the use of GRRP funds. HUD has determined that this waiver facilitates the use of GRRP funds by giving property owners tools to support their share of upfront financing of capital improvements, allowing HUD to extend GRRP grants/loans to a larger swath of HUD's multifamily assisted portfolio, without increasing HUD's anticipated future rental assistance outlays.

reduction of one or more utility components (e.g., gas, water, sewer, electric) paid by residents and used to establish the utility allowance <u>or</u> paid from Property accounts, HUD is authorizing a GRRP Shared Savings Retainer to be included in the determination of the budget-based rent that will be equal to 75% of the projected reduction to tenant-paid and Property-paid utility costs. To implement this, HUD is authorizing the GRRP Shared Savings Retainer to be included as an additional allowable line item in the consideration of Project Expenses under Section 7-30 of Housing Handbook 4350.1 (or successor provision) and HUD 92457-A so that it can be incorporated into the determination of the budget-based rent.

The amount of any applicable GRRP Shared Savings Retainer will be calculated by HUD when HUD reviews the Elements Closing Package, the Leading Edge Transaction Plan, or the Comprehensive Transaction Plan, as applicable. The GRRP Shared Savings Retainer shall be documented at Closing as an addendum to the contract and shall take effect on the first day of the month following completion of the Scope of Work. If the Owner fails to submit a Completion Certification, or HUD determines during the Completion Certification review, or any time thereafter, that the Owner failed to complete the Scope of Work items necessary to achieve the GRRP Shared Savings Retainer, HUD may terminate the addendum to the HAP Contract and revoke the GRRP Shared Savings Retainer. The GRRP Shared Savings Retainer will be in effect for 15 years and will not impact any future adjustments to the utility allowances that the property would follow under its Assistance Contract.

### 9.6. Transfers of Assistance

Eligible properties under GRRP have existing authorities to transfer the budget authority or rental assistance on a currently assisted property to a new location. Specifically, a transfer is currently available under the following authorities:

- Section 8(bb) of the United States Housing Act of 1937 (42 U.S.C. 1437f(bb)), which provides HUD with a tool for preserving budget authority for Project-Based Rental Assistance (PBRA) under Section 8. See Notice H 2015-03 or successor guidance.
- Section 8 properties previously converted under RAD are authorized to use a "Transfers of Assistance." See Notice H-2019-09 or successor guidance.
- Transfers of Multifamily Housing Project-Based Rental Assistance, HUD-Held or Insured Debt, and Income-Based Use Restrictions. See Section 209 of the Consolidated Appropriations Act, 2023, Public Law 117-328 (and similar future annual provisions) and FR-5967-N-01.

While rare, this is a particularly impactful tool when the Property is at significant and recurring risk from hazard events and there is no better alternative to improve the resilience of the Property. Under such a transfer, the Owner purchases or builds a new multifamily apartment building and transfers the budget authority or rental assistance from the existing building(s), replacing it with budget authority or rental assistance on the newly acquired or recently constructed building. To support such scenarios:

A)    The list of High Impact GRRP-Paid Items which may be funded under a Comprehensive Award includes acquisition related costs related to the transfer (see Section 5.5(C)(20) of this Notice).

B)    HUD will authorize the transfer of the GRRP award to the new Property where the budget authority or rental assistance is replacing the original Property selected under GRRP.

C)    To ensure a comprehensive and coordinated review between the GRRP activities and the transfer request, review and approval of the transfer request under any of the authorities listed above will be implemented concurrently with review of the Transaction Plan and the Closing of an Award and will be conducted by the Office of Recapitalization.

D)    HUD may approve an exception to the cap on GRRP funds that may be used for tenant relocation for a Comprehensive Award to ensure residents can move to the property where assistance has been transferred or are provided counseling services to successfully use a tenant-based voucher.  In no event shall the overall amount of funding provided under the Award be increased beyond the amounts permitted in the NOFO.

9.7.    <u>Combination of Awards with Other IRA or Government Assistance Funding.</u>

Owners receiving GRRP funds are permitted to receive rebates, incentives, grants, loans, or any other support through other IRA or Federal, state, or local assistance programs for activities at the Property, unless otherwise prohibited by the other assistance program.  Whenever multiple federal sources are proposed, HUD will complete a Subsidy Layering Review (SLR) in accordance with Section 102(d) of the HUD Reform Act, and implementing regulations at 24 CFR Part 4, unless an acceptable agency has performed one. The purpose of the subsidy layering review is to ensure that assistance made available by HUD for a specific housing project will not be more than is necessary to make the assisted activity feasible after taking into account assistance from other government sources. The subsidy layering review will ensure that costs are reasonable and cash flow is not excessive. Further, Owners are responsible for ensuring that there is no duplication of benefits and that GRRP funds are allocated to Eligible Costs in amounts that do not exceed the need and that the Eligible Costs are not allocated to another source of government assistance. A duplication of benefits is considered to have occurred when a person, household, business, government, or other entity receives financial assistance from multiple sources for the same purpose within the same time period, and the total assistance received for that purpose is more than the total need for assistance for that purpose. If a duplication of benefits for any GRRP Eligible Costs is found to have occurred, HUD may proceed with remedies including, but not limited to, reduction or repayment of such GRRP funds.  Owners receiving funds from other Federal, state, or local assistance programs are responsible for full compliance with the requirements of such funds.

9.8.    <u>Annual Financial Statement Required.</u>

GRRP-funded Properties that are not currently subject to a requirement to file annual financial statements to HUD will be required to file annual financial statements to HUD. For such Properties, the parties to the Assistance Contract shall execute an addendum, in a form prescribed by HUD, to provide that:

- The Owner shall prepare and submit audited annual financial statements to HUD.

- The Owner shall comply with the Uniform Financial Reporting Standards of 24 CFR Part 5, Subpart H, including any changes in the regulation and related directives.
- This obligation shall apply during the current term of such contract and for each successive renewal term.

### 9.9.    Physical Inspection Required.

GRRP-funded Properties that are not currently subject to a physical inspection requirement shall be subjected to inspection requirements. For such Properties, the parties to the Assistance Contract shall execute an addendum, in a form prescribed by HUD, to provide that:

- Inspection Requirements. The Owner shall comply with the Physical Condition Standards and Inspection Requirements of 24 CFR Part 5, Subpart G, including any changes in the regulation and related directives.
- Other Requirements. The Owner shall comply with HUD's Physical Condition Standards of Multifamily Properties of 24 CFR Part 200, Subpart P, including any changes in the regulation and related directives.
- Current and Successive Contracts. This obligation shall apply both during the current term of such contract and during each successive renewal term.

### 9.10.   HUD Multifamily Approvals.

Owners are responsible for working with their assigned Account Executive and/or Performance-Based Contract Administrator to obtain any required approvals that may be triggered by the Award and GRRP-funded work. Neither this Notice, nor the award of GRRP funds, alters the requirements or processes necessary to obtain such approvals. Evidence of HUD approval must be submitted prior to the Closing. Such approvals may include but are not limited to:

- Assignments of Assistance Contracts;
- Bifurcations of HAP Contracts;
- Transfers of Physical Assets;
- Approval of New Management Agent (including applicable previous participation clearances);
- Approval of new ownership or new Principals (including applicable previous participation clearances);
- Assistance Contract renewals; and
- Rent adjustments under Assistance Contracts.

### 10.    Cross Cutting HUD Requirements

### 10.1.   Environmental Review (24 CFR Part 50).

An environmental review is the process of reviewing a project and its potential environmental impacts to determine whether it meets Federal, state, and local environmental standards. The environmental review process is required for all HUD-assisted projects to ensure that the proposed project does not negatively impact the surrounding environment and that the site itself will not have an adverse environmental or health effect on end users. Projects that submitted a

preliminary environmental screen as part of the application, if required by the applicable NOFO, can build on that information for the complete environmental review submission.

All Properties must receive an Environmental Clearance pursuant to 24 CFR Part 50 before Closing. HUD cannot execute Legal Documents until the required environmental review has been completed for the proposed property and found to meet environmental review requirements. All Owners must follow the guidelines in Chapter 9 of the MAP Guide.[13] All Owners must use the HUD Environmental Review Online System (HEROS) to upload required source documentation, including the ASTM Phase I Environmental Site Assessment. The HEROS review, including source documentation, will be made available to the public for one year after HUD issues an approval. HUD staff will review and complete the submissions and may require additional information to complete their review. HUD's review will result in a determination, which may stipulate the rejection of the site for this demonstration or may require the completion of mitigation measures. Any conditions or mitigation that cannot be satisfied before Closing will survive Closing.

At a minimum, the level of review will be Categorically Excluded Subject To the Federal Laws and Authorities (CEST). HUD must consider all activities connected to the action when determining the correct level of review, not just those paid for with HUD funds. All reviews require compliance with the laws and authorities listed at 24 CFR § 50.4, Housing MAP Guide requirements such as radon, asbestos, nuisances and hazards, and HUD's and EPA's rule on lead-based paint.[14]

A)   Categorically Excluded Subject To the Federal Laws and Authorities (CEST). The work associated with the GRRP award must meet the requirements set forth in 24 CFR § 50.20(a)(2)(ii):

- Unit density is not changed more than 20 percent;
- The project does not involve changes in land use from residential to non-residential; and
- The estimated cost of rehabilitation is less than 75 percent of the total estimated cost of replacement after rehabilitation.

B)   Environmental Assessment (EA). Requests that do not meet the qualifications for CEST above and all requests involving new construction or change in land use require an EA under 24 CFR Part 50 Subpart E. In addition to the compliance steps required for CEST-level projects, EA-level projects also must comply with the National Environmental Policy Act.

C)   Reevaluation. If the existing building has a current FHA-insured mortgage or HUD assistance, the request may meet requirements for reevaluation of the existing environmental review. HUD staff will need the full existing environmental review record to consider this option and should consult with the appropriate Field or Regional Environmental Officer for further guidance.  Environmental reviews completed more than

---

[13] https://www.hud.gov/sites/dfiles/OCHCO/documents/4430GHSGG.pdf
[14] Lead Disclosure; and Lead Safe Housing (24 CFR Part 35); and Repair, Renovation and Painting; Pre-Renovation Education; and Lead Training and Certification (40 CFR Part 745)

five years prior to application will not be eligible for reevaluation, and reviews completed more recently may not be appropriate for reevaluation.

D)    Choice Limiting Actions. Owners may not engage in any Choice Limiting Activities, as defined in Section 9.2.1.C of the MAP Guide, from the submission of the application for funds until HUD notifies the Owner that the HUD environmental review is complete, and the project has received its Environmental Clearance.  Choice limiting actions include actions or commitments to acquire, repair, rehabilitate, construct, demolish, or clear the site.

E)    Mitigation. Costs authorized in Section 5.5(D) of this Notice may be used to remediate environmental issues.

10.2.    Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA).

Properties receiving GRRP awards must comply with the URA and its implementing regulations (49 CFR Part 24). Owners must ensure compliance with the URA in addition to all requirements set forth in Section 8 of this Notice.  Any resident relocation as a direct result of acquisition, demolition, or rehabilitation is subject to requirements of the URA.  URA is a Federal law that establishes minimum standards for federally-funded programs or projects that include the acquisition of real property (real estate) and/or displace persons from their homes, businesses, or farms as a direct result of acquisition, rehabilitation, or demolition.  Residents who are relocated from their units as a result of activities undertaken with GRRP awards may be entitled to relocation assistance and payments as set forth in the URA.

Owners must send proper and timely notices to residents in accordance with the URA regulations and as provided by HUD.  This includes the General Information Notice (GIN), the Notice of Relocation Eligibility, and the 90-Day Notice.  For all awards, the GIN must be sent to residents of the awarded Property within thirty days of the date of the Award Letter. Notices of Relocation Eligibility and 90-Day Notices must be sent in accordance with 49 CFR 24.203(b) and (c) respectively.  Notices of Relocation Eligibility are typically triggered by the Initiation of Negotiation (ION) date. For purposes of the URA, for Leading Edge and Comprehensive Awards, the ION date shall be the date the Owner executes the LEC or CCC, respectively.  For Elements awards, the ION date shall be the date of the submission by the Owner of the Elements Closing Package.  If an Owner is utilizing another source of funding that requires compliance with the URA and requires the URA notices to be sent or designates the ION at a different point in time, the Owner must send notices and designate the ION on the date that occurs first.

Additionally, the URA regulations recognize that there are circumstances where a person will not qualify as a displaced person under the URA because they will not be permanently displaced but may need to be moved from a project for a temporary period of time, i.e., no more than one year from the date of the resident's move.  When an owner temporarily relocates a person, the person must be provided with the following:  1) a unit that meets the decent, safe, and sanitary requirements of 49 CFR 24.2(a)(8), 2) a unit that meets the disability needs, if any, of such temporarily relocated person, and 3) all reasonable out of pocket expenses incurred in connection with the temporary relocation, including moving expenses, paid by the Owner.

Failure to comply with these requirements may lead to a determination that the resident is permanently displaced and eligible for offers of permanent relocation assistance in accordance with 49 CFR 24.2(a)(9) and Appendix A, Section 49 CFR 24.2(a)(9)(ii)(D).

10.3.    <u>Build America Buy America (BABA).</u>

The Build America, Buy America Act (BABA), enacted as part of the Infrastructure Investment and Jobs Act on November 15, 2021, established a domestic content procurement preference, also referred to as the Buy American Preference (the "BAP").  GRRP awards are governed by HUD's implementation of BABA. The BAP applies to GRRP Awards provided to Non-Federal Entities for infrastructure projects, unless the agency has waived the application of the BAP. When applicable, the BAP requires that all iron, steel, manufactured products, and construction materials used in covered infrastructure projects be produced in the United States.

In general, Owners that are "Non-Federal Entities" must comply with the requirements of BABA and the BAP. A "Non-Federal Entity" for purposes of BABA is a State, local government, Indian tribe, Institution of Higher Education, or nonprofit organization. Owners that are for-profit corporations, even if an Affiliate of a nonprofit organization, are not considered Non-Federal Entities and are not subject to the BAP.

Owners subject to the requirements of BABA and the BAP may be subject to a waiver of general applicability published by HUD and/or may request a waiver of the application of the BAP pursuant to guidance published by the Office of Management and Budget (OMB) or HUD. On February 15, 2023, HUD published a Phased Implementation Waiver[15] that sets forth the below implementation schedule for the BAP. Owners that are subject to the BAP and execute commitment letters as referenced in Section 3.2, above, or preliminary commitment letters as referenced in Section 4.2 or Section 5.2, above, for GRRP awards on or after the dates below shall be subject to compliance with the BAP as follows, unless further waived or modified by HUD:

| BAP Compliance Element | Compliance Effective Date |
|---|---|
| Iron and Steel | February 22, 2024 |
| Non-ferrous metals, lumber, composite building materials, and plastic and polymer-based pipe and tube. | August 23, 2024 |
| All other construction materials | August 23, 2024 |
| Manufactured products | August 23, 2024 |

Owners subject to the BAP must document compliance with the BAP or the specifically applicable waiver of the BAP. Owners must document their reliance on:

- a copy of the applicable waiver(s);

---

[15] Public Interest Phased Implementation Waiver for FY2022 and 2023 of Build America, Buy America Provisions as Applied to Recipients of HUD Federal Financial Assistance, February 15, 2023. 88 FR 10533.

- certification(s) from the producer/manufacturer of Covered Materials;
- certification(s) from the contractor or entity performing the Covered Activities;
- self-certification(s) as to compliance; or
- a combination of one or more of the above.

Guidance regarding HUD's implementation of BABA and any future waivers of the BAP can be found at https://www.hud.gov/program_offices/general_counsel/BABA.

### 10.4.  Embodied Carbon Building Materials

The Federal Buy Clean Initiative prioritizes the use of American-made, lower-carbon construction materials and low-emission building materials or processes in Federally-funded projects.  Low-emission building materials or processes have less climate impact associated with mining, manufacturing, and transportation. Traditionally, many building materials (including but not limited to steel, concrete, asphalt, and flat glass) contain a high quantity of Embodied Carbon due to the energy-intensive processes for extracting raw materials and converting them into the end product.  Low-emission building materials meet performance specifications but were manufactured with less Embodied Carbon.  Owners are encouraged to consider building materials with less Embodied Carbon in implementing their Scopes of Work.  Additional information can be found at www.sustainability.gov/buyclean and www.epa.gov/inflation-reduction-act/inflation-reduction-act-programs-fight-climate-change-reducing-embodied.[16]

### 10.5.  Davis-Bacon Prevailing Wage Requirements.

Davis-Bacon prevailing wage requirements (prevailing wages, the Contract Work Hours and Safety Standards Act, and implementing regulations, rules, and requirements) are not triggered by funding under the IRA. Davis-Bacon prevailing wage requirements are not applicable to Elements Awards **unless** the Owner is utilizing another source of funding that would require compliance with the Davis-Bacon prevailing wage requirements.

For Leading Edge Awards and Comprehensive Awards assisting Properties with twelve or more assisted units where the Owner is **not utilizing** another source of funding that would require compliance with the Davis-Bacon prevailing wage requirements[17], HUD has elected to apply a requirement pursuant to which the Owner may select compliance with either of the following requirements:

A)      The Owner may select that the Davis-Bacon prevailing wage requirements apply to the Scope of Work, including any new construction, that is identified in the Transaction Plan and LEC or CCC, as applicable, to the extent that such Scope of Work qualifies as development. "Development," as applied to work subject to Davis-Bacon requirements on the Properties, encompasses remodeling that alters the nature or type of housing units at

---

[16] Some manufacturers have begun to provide an Environmental Product Declaration (EPD), which provides a data source for reporting Embodied Carbon and a materials' environmental and sustainable attributes parallel to, for example, a nutrition label on food products. As EPDs become more widely available, Owners may wish to consider the EPD information in their building material selections.

[17] If the Owner is utilizing another source of funding that requires compliance with the Davis-Bacon prevailing wage requirements, the Owner shall comply under the rules and reporting procedures as set forth under the separate source of financing and shall have no compliance obligations pursuant to GRRP.

the Property, reconstruction, or a substantial improvement in the quality or kind of original equipment and materials, and is initiated within the construction period set forth in the LEC or CCC, as applicable. Development activity does not include replacement of equipment and materials rendered unsatisfactory because of normal wear and tear by items of substantially the same kind. Any contract or subcontract executed for a project subject to Davis-Bacon wage rates under this Section shall comply with all labor standards and provisions of the U.S. Department of Labor regulations in 29 CFR Parts 1, 3, and 5, (other than the provisions regarding overtime under the Contract Work Hours and Safety Standards Act) provided that regulatory provisions relating to investigations, approvals and enforcement by the U.S. Department of Labor shall not be applicable, and enforcement of Davis-Bacon labor standards shall be the responsibility of HUD. Notwithstanding U.S. Department of Labor regulations at 29 CFR 1.6, Davis-Bacon wage rates applicable under this paragraph A shall be locked in at the issuance of the LEC or CCC, as applicable, so long as construction begins within 90 days of issuance of the LEC or CCC. If construction does not begin within 90 days, the Davis-Bacon wage rates must be updated if a more recent wage determination has been issued within 90 days of construction start.

B)      Alternatively, the Owner may select to submit to HUD prior to closing a project labor agreement (PLA) executed by the local building trade unions and the General Contractor that must:

> (1) be applicable to the Scope of Work for the Property;
> (2) bind all contractors and subcontractors for the Scope of Work through the inclusion of appropriate specifications in all relevant solicitation provisions and contract documents;
> (3) allow all contractors and subcontractors performing the Scope of Work to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements;
> (4) contain guarantees against strikes, lockouts, and similar job disruptions;
> (5) set forth effective, prompt, and mutually binding procedures for resolving labor disputes arising during the term of the project labor agreement;
> (6) provide other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health; and
> (7) fully conform to all statutes and regulations,.

Any work not covered under a PLA would be subject to Davis-Bacon prevailing wage rates under paragraph A.

10.6.   Section 3.

GRRP funds shall constitute housing and community development assistance pursuant to Section 3 of the Housing and Urban Development of 1968 as codified at 12 U.S.C. 1701u ("Section 3"). Accordingly, all Owners meeting the applicable recipient thresholds of GRRP funds shall be subject to the Section 3 requirements applicable to the housing and community

development activities as set forth in 12 U.S.C. 1701u(c)(2) and (d)(2) and the regulations derived from such provisions at 24 CFR Part 75 or successor part. The Section 3 program requires that recipients of certain HUD financial assistance, to the greatest extent possible, provide training, employment, contracting, and other economic opportunities to low- and very low-income persons, especially recipients of government assistance for housing, and to businesses that provide economic opportunities to low- and very low-income persons. Owners are required to maintain documentation to demonstrate compliance with the regulations and shall report Section 3 compliance through the Completion Certifications described in this Notice.

   10.7.   Accessibility Requirements.

Federal accessibility requirements apply to all GRRP funded Properties. The laws that most typically apply to rehabilitation include Section 504 of the Rehabilitation Act of 1973 (Section 504), and in some cases, the Americans with Disabilities Act (ADA).  The Fair Housing Act also imposes accessibility requirements on certain multifamily dwellings. Although the requirements of each of these laws are somewhat different, Owners must comply with each law that applies. Section 504 and the ADA apply to substantial alterations and other alterations as defined in 24 CFR § 8.23 and to existing, unaltered facilities (24 CFR § 8.24). See also 28 CFR § 35.151(b) and 28 CFR § 36. When a Property's rehabilitation meets the definition of a "substantial alteration" under 24 CFR § 8.23, the Owner, as applicable, must comply with all applicable accessibility requirements under Section 504 and HUD's implementing regulations. Owners are encouraged to use universal design principles, visitability principles, and active design guidelines in planning any construction, wherever feasible. However, adherence to universal design principles does not replace compliance with the accessibility requirements of Section 504, the ADA, and the Fair Housing Act.

   10.8.   Civil Rights Requirements.

   A)      Generally.  GRRP Awards are governed by the same civil rights authorities that govern HUD-assisted activities generally. These authorities prohibit discrimination and impose affirmative obligations on HUD program participants. See HUD's general regulations at 24 CFR § 5.105. For example, the Fair Housing Act prohibits discrimination in housing (see 42 U.S.C. §§ 3601-19, and 24 CFR Part 100) and requires all Federal executive departments and agencies to "administer their programs and activities relating to housing and urban development … in a manner affirmatively to further" fair housing (42 U.S.C. §§ 3608(d) and (e)). All Federally assisted programs and activities are subject to Title VI of the Civil Rights Act of 1964 forbidding discrimination on the basis of race, color, and national origin (see 42 U.S.C. §§ 2000d-1, and HUD regulations in 24 CFR Part 1) and Section 504 of the Rehabilitation Act of 1973, which forbids discrimination on the basis of disability and requires that federally assisted programs make each activity "when viewed in its entirety" readily accessible to persons with disabilities and make reasonable accommodation to the needs of persons with disabilities (see 29 U.S.C. §§ 794d, and 24 CFR Part 8), as well as Titles II and III of the Americans with Disabilities Act (24 U.S.C. §§ 12131-12165, 42 U.S.C. §§ 12181-12189, and 42 CFR Parts 35 and 36).

   B)      Effective Communication for Persons with Disabilities.  Pursuant to Section 504 of the Rehabilitation Act of 1973, recipients of federal financial assistance must ensure effective communication for persons with disabilities (see 24 CFR 8.6).  This

includes employing accessible means of technology to ensure that persons with disabilities can access information about these awards. All meetings must be held in facilities that are physically accessible to individuals with disabilities, and auxiliary aids or services and reasonable accommodations must be provided to ensure equal participation by individuals with disabilities. Where physical accessibility is not achievable, Owners must give priority to alternative methods of resident involvement that are accessible to and usable by individuals with disabilities and must ensure effective communication during such meetings or during other methods of engaging the residents in accordance with Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794d) and HUD's implementing regulations at 24 CFR Part 8, Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131-12134) and the implementing regulation at 28 CFR Part 35, and Title III of the Americans with Disabilities Act (42 U.S.C. §§ 12181-12189) and the implementing regulation at 28 CFR Part 36.

C)    <u>Meaningful Access for Persons with Limited English Proficiency</u>. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d-1 and Executive Order 13166 require recipients of federal financial assistance must take responsible steps to ensure meaningful access to services, programs, and activities (including meetings) by persons with Limited English Proficiency (LEP persons). For assistance in ensuring meaningful access for individuals with limited English proficiency, Owners should consult HUD's Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons (HUD's LEP Guidance) published in the Federal Register on January 22, 2007 (72 Fed. Reg. 2732).

10.9.    <u>Record Retention and Reporting.</u>

Owners must maintain detailed supporting documentation, such as receipts and paid invoices, of all expenses funded by the Award. Documentation must be made available upon request to HUD, its duly authorized representative, the Comptroller General of the United States, or a U.S. Attorney, for purposes of audit or other compliance monitoring.

Federal regulations at 2 CFR § 200.334 require grant recipients to retain documents related to all financial management and activities supported with federal funds for a period of three (3) years from the date of submission of the final expenditure report, which in this case is the Completion Certification. However, 2 CFR § 200.333(b) allows federal agencies (including HUD) to extend the record-retention period for non-federal entities if this is done in writing. Therefore, HUD reserves the right to extend the record-retention period beyond three (3) years and will notify Owners in writing if such extensions are warranted.

Amounts received from GRRP shall be treated as restricted Property funds. GRRP funds should be deposited into a segregated account and recorded separately from Property operating funds. The Property's Certified Public Accountant should also include a footnote in the *Notes to the Annual Financial Statements* that states how much was received and how it was used. As with other Property funds, the expenditure of GRRP funds must be done in a manner that is consistent with all applicable civil rights laws, including the Fair Housing Act, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act.

10.10.  Penalties for False Claims and Statements.

HUD will seek civil, criminal, or administrative action against individuals and entities who either make, present, submit, or cause to be submitted a false, fictitious, or fraudulent statement, representation, or certification pursuant to all applicable authorities, including but not limited to 18 U.S.C. §§ 287, 1001, 1010, 1012, 1014; 31 U.S.C. §§ 3729, 3802; and 42 U.S.C. § 1437z-1.

11.    Metrics and Outcome Measurement.

HUD will collect from the Owner pre-construction and post-completion data for each Property to measure GRRP impacts on utility consumption, emissions, and/or resilience. HUD has set program-wide and Property-level targets for Properties undertaking multi-faceted and integrated retrofits to impact multiple GRRP energy, resilience, emissions, and air quality goals,[18] specifically to reduce greenhouse gas emissions by 50% cumulatively across these Properties and to reduce modeled energy consumption by at least 25% at each of these Properties.  Leading Edge Awards have a goal of minimizing or eliminating the emissions of each Property, consistent with the requirements of the Leading Edge Qualifying Certification selected by the Owner, and Properties with Comprehensive Awards are expected to achieve a 40% or greater reduction in emissions.

HUD will periodically calculate the cumulative greenhouse gas emissions reduction across all Properties.  Greenhouse gas emissions reductions will be calculated based on the Portfolio Manager benchmarking data provided by Owners, including both on-site fuel combustion (including carbon dioxide, methane, and nitrous oxide, translated into a $CO_2$-equivalent, and commonly referred to as Scope 1), and indirect emissions (commonly referred to as Scope 2).[19]

To demonstrate compliance with the 25% energy reduction requirement, Owners are required to model their post-retrofit energy consumption to determine their expected savings, which must be projected to reduce modeled site energy consumption by 25%.[20] The energy consumption model utilized must, at a minimum, consider factors including, but not limited to, unit size, building orientation, design and materials, mechanical systems, appliances, and characteristics of the building location. These utility estimates must be calculated by either (1) a properly licensed engineer or (2) a qualified professional approved by HUD.  The form of this submission should be electronic, utilizing recognized industry standard methods, and include easily verified source data, tables, and references as a basis for the model estimates.

All Owners shall be required to use EPA's Portfolio Manager to benchmark and monitor energy and water consumption. Leading Edge and Comprehensive Owners must generate, submit, and share with HUD a Portfolio Manager score with a full year of pre-construction baseline data. All

---

[18] As Elements Award recipients will often be implementing only one or two GRRP measures, which may relate to water consumption reduction, air quality improvement, and/or climate resilience retrofits, and such measures are likely to represent a small element of a much larger recapitalization plan, the Elements Awards aren't anticipated to consistently impact Property-wide energy consumption and greenhouse gas emissions outcomes.  The Elements Awards are not included in these targets.

[19] Portfolio Managers emissions reporting adheres to the Greenhouse Gas Protocol developed by the World Resources Institute and World Business Council for Sustainable Development, and is compatible with the accounting, inventory, and reporting requirements of EPA's Center for Corporate Climate Leadership, as well as other state and non-governmental organization registry and reporting programs. For additional information, please see https://www.energystar.gov/buildings/benchmark/understand_metrics/how.

[20]. Reserved.

Owners must generate, submit, and share a Portfolio Manager score with a full year of post-completion data within eighteen (18) months of submitting a Completion Certification and again each year thereafter for a total of least five post-construction years, unless excused from benchmarking by HUD due to exceptional barriers to data collection. Benchmarking done to generate a Portfolio Manager score to apply for the Comprehensive Award shall serve as the baseline benchmarking for those Properties so long as the Portfolio Manager score is shared with HUD. Owners may apply for HUD benchmarking assistance to comply with this requirement. If utilities are tenant-paid and whole-building aggregated data is not available, the Owner agrees to use best efforts to obtain tenant releases so that the Owner can obtain information about actual tenant utility consumption directly from each utility company. All Owners may also be required to complete and submit the Multifamily Building Efficiency Screening Tool (MBEST)[21] with pre-construction data prior to Closing.

All Owners receiving Comprehensive and Leading Edge Awards will be required to submit responses to a core resilience survey pre-construction, post-construction, and at other times as may be requested by HUD. For Owners receiving Comprehensive Awards, information necessary to complete the pre-construction survey will be collected during the Assessment Suite. Owners receiving Leading Edge Awards will submit the pre-construction survey in the Leading Edge Transaction Plan package. Owners receiving funding for Elements Awards shall submit the survey post-construction, and at other times as may be requested by HUD. Additionally, Owners may be required to submit responses to questions regarding utility use, resilience, resident engagement and safety, or other property related information necessary for HUD to track the implementation and impact of GRRP.

12.    Potential Future Surplus Cash Loan Modifications.

12.1.    Types of Surplus Cash Loan Modifications.

HUD may take any or all of the following actions with respect to loans governed by this Notice if HUD determines in accordance with this Section that such modifications are in the interest of HUD, in the interests of the residents, and/or in the interests of the preservation of affordable housing at the Property. Consistent with the requirements set forth in this Section, upon an Owner's request or upon a finding by HUD of breach of the terms of a Note, with or without a declaration of default under the terms of the Legal Documents, HUD may approve any of the modifications described below. Consistent with the requirements set forth in this Section, upon an Owner's request in connection with an acquisition, recapitalization, refinance, or at maturity, upon a finding by HUD of a need for a workout to stabilize the financial or physical condition of the property, or upon a finding by HUD of breach of the terms of a Note, with or without a declaration of default under the terms of the Legal Documents, HUD may approve any of the modifications described in Sections 12.1(A) through (H), below.

A)    Waiver of a Due on Sale Restriction, Assumption of the Note by a Purchaser of the Property, and Subordination to a New First Mortgage Loan. The Legal Documents contain a due on sale restriction, pursuant to which a sale of the Property triggers an

---

[21] MBEST is an excel-based tool created in partnership with the U.S. Department of Energy and the Lawrence Berkeley National Laboratory to screen multifamily buildings based on significant building features impacting energy efficiency and to understand current levels of energy efficiency and opportunities for improvement. MBEST was created specifically for the GRRP and is available on www.hud.gov/grrp.

acceleration of all debt payments due to HUD. In the event of a sale of the Property, HUD may waive such restriction, permit assumption of a Surplus Cash Loan by the purchaser, and subordinate a Surplus Cash Loan to a new first mortgage lien, which first mortgage lien may secure an increased loan amount.

B)      Waiver of a Due on Refinance Restriction and Subordination to a New First Mortgage Loan. The Legal Documents contain a due on refinance restriction, pursuant to which a refinancing of any debt on the Property in a lien position senior to the Surplus Cash Loan triggers an acceleration of all debt payments due to HUD. In the event of a refinancing of the Property, HUD may waive such restriction and subordinate the Note to a new first mortgage lien, which first mortgage lien may secure an increased loan amount.

C)      Release a Portion of the Land from Security for the Loan and from the GRRP Use Agreement. HUD may release land from the lien of the mortgage securing the Note and from the GRRP Use Agreement following a finding that the land is excess to HUD's requirements.

D)      Modification of the Payment Provisions. Section 6.2(A) above and the Legal Documents for a Surplus Cash Loan specify that repayment on the Surplus Cash Note shall be a portion of the annual Surplus Cash. On mutual agreement between the Owner and HUD, the percentage of surplus cash payable to HUD may increase by up to 25 percentage points.

E)      Extension of the Maturity Date. Such modification may be to a new date that is no more than thirty-five (35) years from the date of extension but may be a shorter extension to align with the maturity date of the first mortgage loan or to secure the long-term financial stability of the property, as determined by HUD. HUD may also require an extension of the GRRP Affordability Period and execution of a new GRRP Use Agreement or an amendment of the existing GRRP Use Agreement.

F)      Modification of the Interest Rate. A modification of the interest rate of a Surplus Cash Loan as set forth in the Legal Documents may take one of several forms, including, without limitation:

> (1)    Increasing the interest rate on mutual agreement between the Owner and HUD; or
>
> (2)    Reducing the interest rate on a Surplus Cash Loan to an interest rate as low as zero percent, as necessary to secure the financial stability of the property, as determined by HUD.

G)      Extension of the GRRP Affordability Period in Lieu of Repayment. HUD may reduce the payment obligations under a Surplus Cash Note, up to and including elimination of the ongoing obligation to pay to HUD a portion of Surplus Cash from the Property or a reduction in the outstanding balance of the Note, in exchange for an extension of the GRRP Affordability Period and execution of a new GRRP Use Agreement or extension of an existing GRRP Use Agreement. Such extension may, in HUD's discretion, take the form of an extension of time using the same affordability levels, a restriction to serve a lower-income population, or both. In such event, the debt

shall be considered repaid based on an amortization schedule equivalent to the remaining term on the revised GRRP Use Agreement.

H)    Forgiveness of the Loan. HUD may partially or wholly forgive repayment of the outstanding principal balance on a Surplus Cash Note and declare the Surplus Cash Note paid in full.

I)    Other Modifications. HUD may make any other modification to the Surplus Cash Note provided, in the event any such modification is reasonably anticipated to impact the anticipated Surplus Cash available for payments under the Surplus Cash Note, the Owner must demonstrate to HUD's satisfaction that the present value of the anticipated repayment under the Surplus Cash Note pursuant to the proposed structure will equal or exceed the present value of the anticipated repayment under the Surplus Cash Note absent the modification. The same underwriting assumptions shall be used for both analyses. The analysis set forth below allows HUD to confirm that the altered cash flows do not present a cost to HUD when analyzing the net present value to the government.

12.2.    Eligibility for Loan Modifications.

HUD may take any of the actions set forth in Section 12.1(A) and Sections 12.1(D) through (H) at any time more than five years after the origination of the Surplus Cash Note. HUD may take the actions set forth in Sections 12.1(B), (C), and (I) at any time after the origination of the Note.

12.3.    Review Criteria for Waivers of the Due on Sale or Due on Refinance Clause.

Any Owner request for a modification pursuant to Sections 12.1(A) and (B), above, must be made in conjunction with a finding by HUD that such modifications are in the interest of HUD, in the interests of the residents, and/or in the interests of the preservation of affordable housing at the Property, which interests shall be considered met upon the finding by HUD of the following:

A)    Transfer of Physical Assets or other Transfer Requirements. With respect to a Request for a waiver of the due on sale clause pursuant to Section 12.1(A), the Owner and the proposed purchaser, as applicable, must have all elements of the Transfer of Physical Assets (TPA) or other Transfer other than the Request reviewed by the applicable Multifamily Regional Center under HUD's applicable requirements. A purchaser must affirmatively assume the Note as part of a TPA or Transfer. No Property may be sold "subject to" such encumbrance(s) and absent an affirmative assumption of the Note.

B)    Property Accounts. In the case of any sale transaction, HUD may require the seller to transfer to the purchaser for the benefit of the Property the following amounts for their designated purposes:

> (1)    The replacement reserve account funded at the lesser of 1) the amount necessary to satisfy HUD requirements and other affordable housing regulatory restrictions in place prior to the Transfer which will continue after the Transfer, or 2) the current account balance.
>
> (2)    Any operating reserve account funded at the lesser of 1) the amount necessary to satisfy HUD requirements and other affordable

housing regulatory restrictions in place prior to the Transfer which will continue after the Transfer, or 2) the current account balance.

(3)     The balance in the tax and insurance escrows, unless a lesser amount is approved by HUD to align with a new lender's estimate of the tax and insurance escrow needs if the first mortgage is refinanced.

(4)     The security deposit account funded to correspond with the contractual security deposits for all occupied units.

(5)     The seller and the purchaser may dispose of the cash in the specific accounts according to their negotiated business relationship by crediting and debiting amounts from the purchase price. However, if the net effect is that the seller retains the value of any of the forgoing Property account balances, HUD will treat such funds as Proceeds to the seller.

(6)     The purchaser is required to reestablish and fund all such accounts in an amount equal to the greater of the requirements of the first mortgage lender and the Multifamily Regional Center.

C)     <u>Lien Position</u>. HUD shall require that the lien of the Note be senior to any other debt payable from cash flow or with contingent payment terms. The Note may be subordinated to any HUD-approved amortizing, non-contingent, first-mortgage-lien debt.

D)     <u>Financial Viability</u>. For any Request reviewed by the Office of Recapitalization pursuant to Section 12.7(A), the Property must be financially viable. Compliance with all the following shall be an indication of financial viability, although HUD may also consider alternative measures of financial viability proposed by the Owner:

(1)     The projected debt service coverage on any new permanent first mortgage loan as shown in a HUD-approved operating pro forma shall either (a) be equal to or greater than 1.20; or (b) be approved in a firm commitment for FHA-insured financing.

(2)     The permanent first mortgage loan must have a fixed rate of interest. There shall be no adjustable-rate loans during the term of the Note.

(3)     The permanent first mortgage loan must have a term equal to or greater than the least of (a) 15 years; and (b) the remaining term of the GRRP Use Agreement.

(4)     The permanent first mortgage loan payments must be sized to fully amortize the debt over a period of 40 years or less. A balloon payment is permitted if the mortgage term is shorter than the amortization period.

(5)     The Request must demonstrate to HUD's satisfaction that the proposed operating expense levels are adequate to maintain the property's operations and physical condition for the remaining term of the GRRP Use Agreement.

(6)     The proposed replacement reserve deposits, operating accounts, and vacancy estimates must be approved by the Multifamily Regional Center prior to a transaction being approved for closing.

E)    Pay-Down. For any Request reviewed by the Office of Recapitalization pursuant to Section 12.7(A), HUD will condition approval of the Request upon payment to HUD of a Pay-Down equal to that portion of the Net Proceeds to be paid to the Seller which corresponds to the portion of Surplus Cash paid annually to HUD under the Note. Proceeds received by a party include any indemnification or reimbursement to such party of a Pay-Down amount by the other party. The Pay-Down shall not exceed the full unpaid balance, including any accrued but unpaid interest, on the Note.

F)    Identity of Interest Operating Contracts. For any Request reviewed by the Office of Recapitalization pursuant to Section 12.7(A), HUD will require the disclosure of operating contracts and other contracts that will be established or survive after the closing of the Transfer or Refinance in which there is common Control with either the Seller or purchaser, or any relationship based on familial or other interpersonal ties or shared financial or other beneficial interests that would reasonably give rise to a presumption that the parties may not operate on an arms-length basis in establishing the price for any service contracts, including employment, participation in hiring, or material contractual relationships.

G)    Consideration for Transactions with Modest Proceeds. Where the Request involves a transaction generating total Proceeds of less than $25,000, where such transaction does not materially impact the residents or the Property, and where the transaction does not materially change the amount or payment terms of any debt senior to the Notes or otherwise materially impact the Notes, the Owner may request a streamlined review. Under such streamlined review, HUD shall receive a 50% Pay-Down of the Proceeds, and HUD may waive such review requirements under this Section as the Office of Recapitalization determines, in its sole discretion, to be appropriate to the circumstances. If applicable, the TPA or Transfer process will still be required by the Multifamily Regional Center.

H)    Program Compliance. The Owner (or proposed purchaser, if applicable) must either (a) be in full compliance with GRRP Requirements, have completed the Scope of Work agreed upon in the GRRP transaction, and have no defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note, or (b) set forth a plan acceptable to HUD to cure any current non-compliance with GRRP Requirements, any outstanding incomplete Scope of Work items, and any defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note.

12.4.    Review Criteria for Modifications to the Terms of a Note.

Any modification set forth in Section 12.1 must be made in conjunction with a finding by HUD that the Owner either (a) is in full compliance with GRRP Requirements, has completed the Scope of Work agreed upon in the GRRP transaction, and has no defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note, or (b) has set forth a plan acceptable to HUD to cure any current non-compliance with GRRP Requirements, any outstanding incomplete Scope of Work items, and any defaults (or events

which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note. Further, any modifications set forth in Sections 12.1(D) through (I), above, must be made in conjunction with a finding by HUD that such modifications are in the interest of HUD, in the interests of the residents, and/or in the interests of the preservation of affordable housing at the Property. In addition, any modifications set forth in Sections 12.1(F)(2), 12.1(G), and 12.1(H) shall require a finding by HUD that the modification is necessary to stabilize the financial or physical condition of the property and/or to significantly mitigate the risk of, or cure a breach of the terms of, the Note which breach is not and would not be due to the negligence or action of the Owner.

12.5.    Review Criteria for Release of Security.

Any modification requested pursuant to Section 12.1(C), above, must demonstrate to HUD's satisfaction that the release shall not result in a reduction in the value of the lien securing the Note unless such release advances a public purpose, such as the creation of additional affordable housing. Further, the Owner must either (a) be in full compliance with GRRP Requirements, have completed the Scope of Work agreed upon in the GRRP transaction, and have no defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note, or (b) set forth a plan acceptable to HUD to cure any current non-compliance with GRRP Requirements, any outstanding incomplete Scope of Work items, and any defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note.

An Owner shall not, without prior written approval from HUD, convey, transfer, or encumber any of the mortgaged Property. The Multifamily Regional Center will process and execute all documents concerning the partial release of land from the mortgage securing a Note and from a GRRP Use Agreement. The provisions of Chapter 16 in HUD Handbook 4350.1 (as it may be amended or replaced by future guidance) shall govern any request for a partial release of property from any instrument securing the Note and from the GRRP Use Agreement. The Multifamily Regional Center shall consult with the Office of Recapitalization in the review of a request for a partial release of the security for HUD to confirm that there is no anticipated negative impact to the Note or to the residents.

12.6.    Review Criteria for Other Modifications.

Any modification requested pursuant to Section 12.1(I), above, must demonstrate to HUD's satisfaction that, in the event the Request is approved, the present value of the anticipated repayment under the Note pursuant to the structure proposed in the Request will exceed the present value of the anticipated repayment under the Note absent the Request. The same underwriting assumptions shall be used for both of the following analyses. The analysis set forth below allows HUD to confirm that the altered cash flows do not present a cost to HUD when analyzing the net present value to the government.

A)    The anticipated repayment under the Note pursuant to the structure proposed in the Request shall be calculated by taking the sum of the following:

(1)     The Pay-Down;
(2)     The present discounted value of anticipated annual payments under the Note through maturity (which is calculated as a share of Surplus Cash pursuant to the terms of the Note), using the projected Surplus Cash as the basis for future trending;
(3)     The present discounted value of a calculated post-foreclosure value of the Note at maturity, considering an income-based valuation of the property, discounted for a distressed or foreclosure sale, transaction costs, assumed physical needs, and repayment of any senior debt; and
(4)     Any voluntary Note prepayment proposed in the Request.

B)      The anticipated repayment under the Note absent the Request shall be calculated by taking the sum of the following:

(1)     The present discounted value of anticipated annual payments under the Note through maturity (which is calculated as a share of Surplus Cash pursuant to the terms of the Note), using the average actual annual Surplus Cash amount for the three full years prior to the Request as the basis for future trending; and
(2)     The present discounted value of a calculated post-foreclosure value of the Note at maturity, considering an income-based valuation of the property, discounted for a distressed or foreclosure sale, transaction costs, assumed physical needs, and repayment of any senior debt.

Further, the Owner must either (a) be in full compliance with GRRP Requirements, have completed the Scope of Work agreed upon in the GRRP transaction, and have no defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note, or (b) set forth a plan acceptable to HUD to cure any current non-compliance with GRRP Requirements, any outstanding incomplete Scope of Work items, and any defaults (or events which, with the giving of notice and/or passage of time, would become a default) under a Note or any document that further evidences, secures, or was executed contemporaneously with the Note.

12.7.   <u>Processing of Requests.</u>

For any Requests initiated by the Owner, the necessary documentation to initiate such Request must be submitted to the Property's applicable Multifamily Regional Center. A courtesy copy of the Request may be submitted to the Office of Recapitalization simultaneously if the Request is subject to Office of Recapitalization review based on the criteria listed in subsection (A), below. A courtesy copy submission to the Office of Recapitalization may be beneficial to manage deadlines associated with the proposed transaction. Requests which are part of a portfolio of simultaneous transactions should identify the other related transactions.

A)      Requests submitted to the Multifamily Regional Center which meet any of the criteria set forth in subsections (1) through (4) below, shall be routed to the Office of

Page 58 of 79

Recapitalization for processing. The applicable Multifamily Regional Center shall process and close all other Requests without the Office of Recapitalization approval.

(1)     All Requests pursuant to Sections 12.1(A) and (B) involving Proceeds to the Owner;

(2)     All Requests pursuant to Sections 12.1(A) and (B) which increases the debt service payment of any senior lien, increases the unpaid principal balance of any senior lien by an amount greater than the loan fees and transaction costs (such as title and recording) directly attributable to the refinance, or extends the term of any senior lien;

(3)     All Requests pursuant to Sections 12.1(D) through (I); and

(4)     All Requests that are part of the transfer of a portfolio of Properties if any of the Requests within the portfolio are subject to processing by the Office of Recapitalization.

B)     Review pursuant to this Notice is in addition to, and does not replace or substitute for, any other review required under HUD guidance, such as reviews of a TPA or an assignment of a HAP Contract. HUD review shall encompass properties not encumbered by the GRRP Use Agreement to the extent such properties are anticipated to be under common ownership with the Property. The Office of Recapitalization will advise the Multifamily Regional Center of the approval, rejection, or modification of any Request subject to its review, together with any conditions associated with the determination. TPAs or other Transfers will be processed by the Multifamily Regional Center according to their established procedures.[22]

C)     Upon receipt of a Request, the reviewing office (either the Multifamily Regional Center or the Office of Recapitalization) will confirm whether HUD has received all Surplus Cash payments due on the Note, or any other HUD-held notes, for all completed fiscal years. The Owner must remit all outstanding Surplus Cash payments due to HUD in consideration of the Request. In the case of a transfer of the Property, a partial year audit or un-audited financial statement certified by the Owner shall be submitted to HUD following the closing of a Transfer, covering the period through the date of the closing. The audit, financial statement, or in-house financial statements shall calculate any required partial-year Surplus Cash payment on the Note for the current year owed to HUD. The Owner and the purchaser shall be jointly and severally liable for payment of such amount to HUD. It shall be the responsibility of the Owner and the purchaser to determine both the method and the responsible party by which the payment is remitted to HUD.

---

[22] For FHA-insured loans, such procedures include collection of a TPA transfer fee in accordance with 24 CFR § 200.40(h).

Exhibit A
Definitions

"Affiliate" refers to any entity that Controls another entity, is Controlled by another entity, or is under common Control with another entity.

"Amortizing Repayment Loan" refers to GRRP funding to be disbursed as an amortizing repayment loan and documented pursuant to Section 6.3 of this Notice.

"Architect" refers to the person or entity, which may include engineers, engaged by the Owner that has primary responsibility for the design of the plans and specifications that implement the Scope of Work.

"Assessment Suite" refers to the Property assessments described in Section 5.3, including the CNA, the Environmental Assessment, the Energy Audit, the Renewable Energy Audit, and the Climate Resilience Assessment.

"Assistance Contract" refers to the rental assistance contract for the Property entered into between the Owner and HUD.

"ASTM" refers to ASTM International, formerly known as the American Society for Testing and Materials.

"Award" refers to any preliminary or final commitment of funds under any NOFO issued with respect to GRRP funding.

"Award Date" refers to the date on which HUD issues a letter indicating the Owner's selection for participation in the GRRP.

"BABA" refers to the Build America, Buy America Act (BABA), enacted as part of the Infrastructure Investment and Jobs Act on November 15, 2021.

"BAP" refers to the domestic content procurement preference established under BABA.

"CCC" refers to the Comprehensive Construction Commitment described in Section 5.6 of this Notice.

"Climate Resilience Assessment" refers to the reports specified in Section 5.3(E) of this Notice.

"Closing" refers to the date upon which the GRRP Use Agreement and applicable GRRP Grant or Surplus Loan documents are effective.

"CNA" or "Capital Needs Assessment" refers to a detailed physical inspection of a property to determine critical repair needs, short- and long-term rehabilitation needs, market comparable improvements, energy efficiency, unmet physical accessibility requirements, and environmental concerns, including lead-based paint.

"Completion Certification" refers to the certification package provided by the Owner to HUD as described in Section 3.5, Section 4.6, or Section 5.8 of this Notice, as applicable.

"Comprehensive" or "Comprehensive Awards" refers to one cohort of funding under the GRRP as described in this Notice or, as applicable to the context, the award of funds in this cohort. The Comprehensive Award does not include the Amortizing Repayment Loan.

"Comprehensive Closing Package" refers to the submission described in Section 5.7 of this Notice.

"Comprehensive Eligible Costs" refer to all costs related to completing the Cost-Share Items, the High Impact GRRP-Paid Items, and the Transaction Costs in the Scope of Work but excluding the Owner's share of any Cost-Share Item.

"Comprehensive Transaction Plan" refers to the submission described in Section 5.6 of this Notice, containing the content described in Exhibit E.

"Control" refers to the direct or indirect power (under contract, equity ownership, the right to vote or determine a vote, or otherwise) to direct the financial, legal, beneficial, or other interests of an entity.

"Day," whether capitalized or not, refers to calendar days unless otherwise specified. If the last Day of a specified time period falls on a weekend or Federal holiday, the last Day shall refer to the first business day thereafter.

"Elements" or "Elements Awards" refers to one cohort of funding under the GRRP as described in this Notice or, as applicable to the context, the award of funds in this cohort.

"Elements Eligible Costs" refers to all costs related to the incorporation of the Elements Investments into the Property, inclusive of labor and general contractor overhead, profit and general conditions, and Elements Eligible Soft Costs. All Elements Eligible Costs must be in accordance with applicable Financial Thresholds as set forth in Exhibit B and in accordance with the NOFO the award was made under.

"Elements Eligible Soft Costs" refers to the expenses related to incorporation of the Elements Investments that do not deal with the physical construction or incorporation of the Elements Investments, including Architect's fees, financing fees, developer fee, legal costs, commissioning fees, application fees, and other due diligence costs. All Elements Eligible Soft Costs must be in accordance with appliable Financial Thresholds as set forth in Exhibit B.

"Elements Investments" refers to the investments selected for funding by the Owner in its NOFO application from list of investments eligible for funding under the Elements NOFO and approved by HUD.

"Elements Closing Package" refers to the submission described in Section 3.4 of this Notice, containing the content described in Exhibit C.

"Eligible Costs" refers to Elements Eligible Costs, Leading Edge Eligible Costs, or Comprehensive Eligible Costs, as applicable.

"Embodied Carbon" refers to the greenhouse gas emissions from the mining, manufacturing, and transportation of building materials due to the energy-intensive processes for extracting raw materials and converting them into the end product.  For purposes of GRRP, references to

materials with reduced or low Embodied Carbon also include materials with high carbon storage capacity such as structural wood.

"Energy Audit" refers to the reports specified in Section 5.3(C) of this Notice.

"Environmental Clearance" refers to the determination by HUD under 24 CFR Part 50 that the Property has undergone the required environmental review and has been found to meet all environmental review requirements.

"Environmental Review" refers to the assessment described in Section 5.3(B).

"General Contractor" refers to the entity engaged by the Owner through a construction contract that is primarily responsible for the construction or rehabilitation to achieve the Scope of Work.

"GRRP" or "Green and Resilient Retrofit Program" refers to HUD's implementation of Section 30002 of Title III of the Inflation Reduction Act of 2022, Public Law 117-169 (IRA), titled "Improving Energy Efficiency or Water Efficiency or Climate Resilience of Affordable Housing", as described in the Background section of this Notice.

"GRRP Affordability Period" refers to the period of years that a Property that receives a GRRP award must remain affordable pursuant to the GRRP Use Agreement as determined in accordance with Section 6.4.

"GRRP Grant" refers to GRRP funding to be disbursed as a grant and not expected to be repaid and documented pursuant to Section 6.1 of this Notice.

"GRRP Requirements" refers to all requirements specified in this Notice or the applicable NOFO, including any requirements cross-referenced in these documents.

"GRRP Shared Savings Retainer" refers to the adjustment in rental assistance set forth in Section 9.5 of this Notice.

"HAP Contract" refers to the Housing Assistance Payments (HAP) Contract entered into by the Owner and HUD or an entity acting under contract with HUD, that provides rental assistance payments under Section 8 of the United States Housing Act of 1937 to the Owner for eligible units, setting forth the rights and duties of the parties with respect to the Property and the payments under the contract.

"HUD" refers to the U.S. Department of Housing and Urban Development.

"IRA" refers to the Inflation Reduction Act of 2022, as defined in the Background section of this Notice.

"Kick-Off Call" refers to an initial discussion regarding the Award as described in Section 5.2 of this Notice.

"LEC" refers to the Leading Edge Commitment described in Section 4.4 of this Notice.

"Leading Edge Eligible Costs" refers to the costs related to the Owner's Scope of Work to achieve the Leading Edge Qualifying Certification, including all costs of construction or

rehabilitation and soft costs. All soft costs must be in accordance with the applicable Financial Thresholds as set forth in Exhibit B.

"Leading Edge Transaction Plan" refers to the submission described in Section 4.4 of this Notice, containing the content described in Exhibit D.

"Leading Edge" or "Leading Edge Awards" refers to one cohort of funding under the GRRP as described in this Notice or, as applicable to the context, the award of funds in this cohort.

"Leading Edge Qualifying Certification" refers to the green building certifications identified in the applicable NOFO as eligible for funding, selected by the Owner and set forth in the LEC. Leading Edge Qualifying Certifications are defined in the NOFO and may include the following:

- National Green Building Standard Green: Gold or Emerald, with Green + Net Zero Energy or Resilience designation,
- EarthCraft Multifamily Renovation Platinum, with renewable energy capacity sufficient to offset expected annual energy consumption;
- Passive House (PHIUS+) ZERO or ZERO REVIVE;
- Passive House Institute EnerPHit;
- Energy Star® Next Gen with renewable energy capacity sufficient to offset expected annual energy consumption or emissions, plus GHG intensity ($kgCO_2e/ft^2/HDD$) of 0, as measured through 12 months of actual post-retrofit Portfolio Manager benchmarking data;
- LEED v4 Gold or Platinum, with LEED Zero Carbon or LEED Zero Energy designation;
- LEED v4.1 Multifamily or Multifamily Core+Shell Silver or higher, with Zero Energy or Zero Carbon designation;
- U.S. Department of Energy Zero Energy Ready Multifamily, with renewable energy capacity sufficient to offset expected annual energy consumption;
- Enterprise Green Communities Plus 2020, complying with Criterion 5.4 Achieving Zero Energy;
- Greenpoint Gold or Platinum with Net Zero 100% offset designation;
- International Living Future Institute Zero Energy Certification; or
- International Living Future Institute Zero Carbon Certification.

"Lease" shall mean the lease executed between the resident and the Owner, which lease is either the form of the Model Lease for Subsidized Housing (HUD Form 90105a), the 202 PRAC Lease (HUD Form 90105c), or such other lease form as HUD has prescribed and/or approved for use at a Property.

"Legal Documents" refers to all documents determined necessary by HUD to effectuate the Closing of the GRRP award, as described in Section 7 of this Notice.

"LOCCS" refers to HUD's Line of Credit Control System.

"MAC" refers to a Multifamily Assessment Contractor, an entity engaged by HUD to conduct or review the Assessments, to make recommendations regarding the Comprehensive Scope of Work, and to conduct certain oversight activities on HUD's behalf with respect to the implementation of the Scope of Work, as specified in this Notice.

"MAP Guide" refers to the HUD Multifamily Accelerated Processing (MAP) Guide (4430.G), revision dated March 21, 2021, as such may be amended or superseded.

"Net Proceeds" refers to Proceeds reduced by any usual and customary expenses of the proposed transaction approved by HUD and paid at the closing of the proposed transaction. Usual and customary expenses of the proposed transaction typically include third-party brokerage fees, local and state transfer taxes, legal and title fees, and other costs of the sale or purchase of the Property. Usual and customary expenses for this purpose generally exclude, however, Property payables and payments to Affiliates.

"NOFO" refers to a Notice of Funding Opportunity, which may be issued from time to time making funds governed by this Notice available to qualifying Properties.

"Note" refers to a promissory note securing any of the loans described in Section 6 of this Notice.

"Owner" refers to the legal owner or a prospective purchaser of a Property that has accepted an Award. If the Owner or an Affiliate of the Owner is a prospective purchaser, such Owner or Affiliate of the Owner must be the legal owner of the Property no later than the Closing. In the event the Owner is a prospective purchaser of a Property, HUD may require appropriate supporting documentation signed by the legal owner and both the purchasing and selling entity must cooperate in the efforts to bring the Award to Closing.

"Owner Contribution" refers to funds the Owner must secure to support the construction at the Property, as defined in Section 5.5(F) of this Notice.

"Owner Contribution Sources" refer to the sources of funds the Owner identifies to cover the Owner Contribution, as described in Section 5.5(F) of this Notice.

"Pay-Down" refers to the payment described in Section 12.3(E). The purpose of the Pay-Down is to reduce the outstanding balance of the Notes when the transaction proposed involves Proceeds that will benefit the Seller or Purchaser. The Pay-Down represents recovery of a portion of the value created through the modification of a Note.

"Planning Meeting" refers to the resident meeting described in Section 8.2(B).

"Proceeds" refers to all cash, fees, and other consideration paid to or on behalf of a seller, purchaser, or Affiliates of either the seller or purchaser. Proceeds include, without limitation, developer and other fees, deferred payments, Property accounts (including, without limitation, operating reserves, replacement reserves, tax and insurance escrows, and security deposit accounts), allocations of accounts payable, or other reductions in the party's liabilities, whether paid as part of a transaction or following closing of a transaction. Proceeds also include any indemnification to either party of a Pay-Down amount by the other party. Proceeds do not include distributions of Surplus Cash or payment of a Note.

"Property" refers to the real property encompassing the HUD-assisted multifamily housing units. The Property may include additional residential units, such as other affordable units, market rate units, or units occupied by property management staff, as well as community amenities. Generally, the Property refers to one or more residential structures and associated facilities. In the

event the residential structures are built on ground leased property, the term "Property" does not refer to the underlying fee interest in the land.

"Request" refers to a loan modification initiated, including a waiver of the due on sale clause, by the Owner, as described in Section 12.7 of this Notice.

"Renewable Energy Assessment" refers to the reports specified in Section 5.3(D) of this Notice.

"Section 8" refers to Section 8 of the United States Housing Act of 1937.

"Section 202" refers to Section 202 of the Housing Act of 1959 (12 U.S.C. 1701q) and Section 202 of the Housing Act of 1959 (former 12 U.S.C. 1701q), as such section existed before the enactment of the Cranston-Gonzalez National Affordable Housing Act.

"Section 811" refers to Section 811 of the Cranston-Gonzalez National Affordable Housing Act (42 U.S.C. 8013).

"Scope of Work" refers to the construction activity which the Owner is committing to implement in exchange for the receipt of an Award. The Scope of Work shall be tentative until memorialized in the Legal Documents at Closing, at which time the Scope of Work becomes a contractually defined obligation of the Owner and may not be changed unless the change is authorized by HUD. In the Elements context, Scope of Work refers only to the Elements Investments. In the Leading Edge and Comprehensive context, Scope of Work refers to all work being done at the Property including both GRRP-funded and Owner-funded measures.

"Standard Product Cost" refers to the cost of a building component or fixture absent use of a greener or more resilient alternative, calculated as set forth in Section 5.5(B).

"Surplus Cash" refers to any cash remaining at the end of an annual fiscal period after 1) the payment of: a) all sums due or currently required to be paid under the terms of any first position amortizing mortgage or note approved by HUD; b) all amounts required to be deposited in the reserve for replacements; and c) all other current obligations of the Property unless funds for payment are set aside or deferment of payments has been approved by HUD; and 2) the segregation of: a) an amount equal to the aggregate of all special funds required to be maintained by the Property; and b) all tenant security deposits held.  Surplus Cash does not include any funds provided under a Project Rental Assistance Contract entered into between the Owner and HUD for rental assistance.

"Surplus Cash Loan" refers to GRRP funding to be disbursed as a loan and repaid from a portion of the Owner's Surplus Cash and documented pursuant to Section 6.2 of this Notice.

"Transaction Costs" refer to the expenses described in Section 5.5(D) of this Notice.

"URA" refers to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 as amended (42 U.S.C. 4601 et seq.) and its implementing regulations (49 CFR Part 24).

Exhibit B
Financial Thresholds

Unless otherwise approved by HUD, all Elements Awards and Leading Edge Awards must meet the Financial Thresholds set forth below at application, at submission of the Leading Edge Transaction Plan package, at Closing, and at Completion Certification.

| | |
|---|---|
| Debt Coverage Ratio | Any permanent, amortizing debt must have a debt coverage ratio (DCR) between 1.11-1.30 throughout a 15-year period. The DCR may be higher if required by the first mortgage lender (and documentation requiring such higher DCR is submitted to HUD), or if required following closing to maintain the DCR above 1.11 in later years. |
| Acquisition Proceeds/Cash-Out | Any Proceeds, exclusive of any payments of accounts payable or payments to third parties, to be paid to a seller under common Control with the Owner or any Affiliate of the Owner shall be included in the developer fee calculation. |
| Developer Fee | Total developer fee cannot exceed 15% of acquisition, hard, and soft costs, exclusive of reserves and developer fee. Further, if the Owner is proposing to utilize low-income housing tax credits and the allocating Housing Finance Agency allows a higher fee under the Qualified Allocation Plan, the deferred fee may equal the higher fee allowed by the Housing Finance Agency so long as the fee above 15% is contributed back to the Project through deferral or contribution. |
| Hard Cost & Soft Cost Contingency | Contingencies contained within sources and uses may not exceed 10% of hard construction costs (exclusive of contingency) and 5% of soft costs (exclusive of reserves, developer fee, and contingency) unless the transaction has low-income housing tax credits and a higher amount has been approved by the allocating Housing Finance Agency. |
| General Contractor Profit, Overhead, and General Conditions | Combined General Contractor fees (including profit, overhead, and general conditions) on the hard construction costs may not exceed 14% of the hard construction costs, exclusive of contingency. |
| Replacement Reserves | Initial and Annual Deposits to the Replacement Reserve must match the Replacement Reserve Analysis submitted with the final CNA and reserve balances must stay positive through year 10 and meet the requirements of the MAP Guide as they apply for years 11-20.[23] |
| Operating Reserve; Operating Deficit Reserve | Operating Reserves cannot exceed 12 months of operating expenses and debt service, unless required by the investor or first priority lender. If a higher reserve is required, then such excess may not be released for distribution to the Owner for a 15-year period. |

---

[23] For Leading Edge awards this threshold will not be evaluated at application but will be evaluated at the Leading Edge Transaction Package review, Closing and Completion Certification.

| Operating Profit Margin | If there is no amortizing debt, Net Operating Income as a percentage of the gross adjusted income may not exceed 25%. |
|---|---|

<u>Exhibit C</u>
<u>Elements Closing Package Requirements</u>

Below is a preliminary list of materials that will be required in the Elements Closing Package. HUD will issue a Closing checklist with each Elements Award commitment letter. HUD may request additional documentation not listed below or on the Closing checklist if HUD determines in its sole discretion that such information is necessary to determine compliance with GRRP Requirements:

- Closing Contact List
- Executed Commitment Letter
- Draft Legal Documents
- Evidence of Title (Deed or Ground Lease), Title Exceptions, and Title Pro Forma
- Updated Financial Information
  - Sources and Uses
  - 20-year Operating Pro Forma
  - Proposed Draw Schedule
- 20-year replacement reserve analysis
- Consolidated Owner Certifications regarding compliance with GRRP requirements
- Owner's Organizational Documents
- Counsel Opinions
- Proposed Restrictive Covenants and/or other land use restrictions
- Construction Documentation
  - Construction Contract
  - Payment and Performance Bond
  - Owner Completion Guaranty
  - Final Scope of Work including all Elements Investments
  - Schedule of Values
- Commitments for other sources of financing
- Evidence of other required HUD approvals
- Proposed Assistance Contract Amendments (for GRRP Shared Savings Retainer or to satisfy other provisions of Section 9)
- Description of Planned Relocation Activities, if applicable
- Other items as required by HUD to demonstrate compliance with GRRP Requirements

Exhibit D
Leading Edge Transaction Plan Requirements

Unless otherwise approved by HUD, below are all the required components of a complete Leading Edge Transaction Plan and the requirements of each component. HUD may request additional documentation not listed below if HUD determines in its sole discretion that such information is necessary to determine compliance with GRRP Requirements:

**A. Evidence that a CNA has been completed unless the project involves new construction.**

1. **Capital Needs Assessment (CNA).** Except in the case of new construction, each property selected for an Award will be required to perform a detailed physical inspection to determine both short-term rehabilitation needs to be included in a Scope of Work and long-term capital needs to be addressed through a Reserve for Replacement Account. A CNA must be submitted with the Leading Edge Transaction Plan and must have been completed no earlier than twelve (12) months prior to submission of the Leading Edge Transaction Plan, except with HUD approval.

   a. **CNA eTool.** The CNA must be conducted consistent with Appendix 5, Section A.5.7 of the MAP Guide and must use HUD's Capital Needs Assessment Electronic Tool (the CNA eTool). The CNA eTool contains two major components which will be used to develop the Scope of Work – the narrative description of each component and its condition, and the financial model setting forth the 20-year schedule of replacements, the associated determination of the Initial Deposit to Replacement Reserve (IDRR), and the Annual Deposit to Replacement Reserve (ADRR).

   b. **Contractor Qualifications.** The CNA must be completed by a qualified, independent third-party professional as required by the MAP Guide.

**B. Scope of Work.**

The Owner must provide a certification that the Scope of Work addresses the immediate needs of the property, and that the Replacement Reserve addresses 20-year needs. The Scope of Work must:

1. Identify and address all repairs required in the CNA (including all items identified in the CNA as not functioning at the time of the site visit) or provide a written justification why those items are not included. Briefly discuss any differences between the conclusions / recommendations of the CNA provider, the levels of immediate rehabilitation needs, and the Owner's choices for replacement components.

2. Ensure that rehabilitation or new construction estimates are based on reasonable market estimates of actual costs, confirmed either by cost estimating completed by the architect/engineer (who is typically distinct from the contractor that conducted the CNA), or through actual competitive bids for major rehabilitation or construction items, in compliance with HUD requirements.

3. Include a summary of environmental issues known at that time and a discussion of any planned environmental remediation (including post-closing Operations &

Maintenance plans). If the property was constructed before 1978, identify the need for interim controls of lead-based paint hazards based on a risk assessment or re-evaluation and discuss planned lead hazard control activities in accordance with 24 CFR Part 35. O&M plans covering properties that continue to have lead painted surfaces, even if enclosed or encapsulated, must include training and certifying property maintenance personnel who disturb paint in accordance with the EPA's Renovation, Repair and Painting Rule (40 CFR Part 745, Subpart E), training and certifying property maintenance personnel who abate the paint in accordance with the EPA's Lead Abatement Rule (40 CFR Part 745, Subpart L or Q), and training and certifying the employer of the property maintenance personnel to become a certified lead renovation firm or certified lead abatement firm, as applicable.

4. Include a summary of accessibility features that are required pursuant to the Fair Housing Act and implementing regulations at 24 CFR Part 100, Section 504 of the Rehabilitation Act of 1973 and implementing regulations at 24 CFR Part 8, and Titles II and III of the Americans with Disabilities Act and implementing regulations at 28 CFR Parts 35 and 36, respectively.

5. Include a description of how all utility consuming components that are past estimated useful life at the time of the Leading Edge application (or that are not functioning at the time of the CNA inspection) will be replaced with the most effective alternative (taking into account initial cost and utility savings), as documented in the CNA.

6. Include a narrative addressing the measures taken to account for any climate risks faced by the property. At a minimum, this narrative should address any risks identified by the National Risk Index tool as "Relatively High" or "Very High" at the census tract level, or if no risks are "Relatively High" or "Very High", then the narrative should address the two greatest risks at the property.

7. Include a reasonable timeline for completion of all rehabilitation items acceptable to HUD, depending on the scope of rehabilitation funded.

8. Include a narrative describing the rehabilitation and improvements needed to achieve the chosen Leading Edge Qualifying Certification.

9. Include modeling of post-retrofit utility consumption to determine expected consumption savings from the Scope of Work. The utility consumption model utilized must, at a minimum, consider factors including, but not limited to, unit size, building orientation, design and materials, mechanical systems, appliances, and characteristics of the building location. These utility estimates must be calculated by either (1) a properly licensed engineer or (2) a qualified professional approved by HUD. The form of this submission should be electronic, utilizing recognized industry standard methods, and include easily verified source data, tables, and references as a basis for the model estimates.

## C. Itemization of Eligible Costs.

Under Leading Edge, HUD will cover the Leading Edge Eligible Costs. Consequently, when putting together the Scope of Work, the Owner should provide an itemized list of these costs

for HUD to confirm that the work has been properly included and can be easily confirmed by a qualified third party during construction and Completion Certification.

**D. Replacement Reserve Analysis Showing that the Replacement Reserve Addresses 20-Year Needs.**

The annual deposit to the replacement reserve should be equal to that amount which, if deposited annually, will be sufficient to fund all capital needs, as identified in the CNA, arising during the first 20 years and otherwise not addressed upfront in either the rehabilitation or an initial deposit to the replacement reserve account. The Owner should use reasonable estimates in the inflation but in doing so the rate for escalating the increase in repair costs should not exceed the rate of interest on reserve deposits by more than 1%. HUD may consider alternative arrangements with respect to the initial deposit to the replacement reserve if risks to the Property can be adequately mitigated.

**E. Sources and Uses of Funds.**

The Sources and Uses must:

1. Include a reasonable, balanced, and comprehensive presentation of sources and uses of funds in accordance with all applicable HUD requirements.
2. Demonstrate that existing loans or debt will be paid off at the closing or are supported through the Property's net operating income. Demonstrate that any loans or advances provided by entities under common Control will be converted to unsecured obligations repayable from the Property's Surplus Cash unless otherwise approved by HUD. Such loans may not be paid off from the proceeds of new financing unless approved by HUD.
3. Include narrative that discusses any aspects of the planned rehabilitation that may result in an initial operating deficit during the rehabilitation period and how that deficit will be funded, including any operating deficit escrow or similar fund.
4. Meet the Financial Thresholds in Exhibit B.

**F. Operating Pro Forma.**

The Operating Pro-Forma must:

1. Include an attached discussion of the extent of energy and water savings that are anticipated as a result of the rehabilitation or construction and the basis for those estimates. The discussion must explain to what extent anticipated savings in utility costs have been included in the pro forma operating expenses.
2. Be consistent with local standards for Federally-assisted housing and otherwise comply with at least the following feasibility benchmarks:
   a. Rents shall not exceed the amounts permitted under the Assistance Contract or pursuant to any other HUD restriction.
   b. All other sources of income must be supported with a narrative or must not exceed the average for the last 3 years (other income should not include interest income on the replacement reserve account, which must remain in the reserve and is not available for other purposes).

c.  Vacancy loss shall be no less than the greater of the average over the past three years or 3 percent.

d.  Allowance for bad debt should be not less than the greater of the average over the past three years or 2 percent.

e.  Insurance costs must be documented, such as quotes from an insurance agent based on actual recent premiums for similar properties.

f.  All other operating expenses shall be no less than 85 percent of the average for the last three years, unless justified.

g.  The annual replacement reserve deposit should be equal to that amount developed in Exhibit D Section D above.

h.  Meet the Financial Thresholds in Exhibit B.

i.  If the Owner intends to purchase renewable energy credits to achieve the Leading Edge Qualifying Certification, the cost of such credits must be included in the expenses for the term required by the Leading Edge Qualifying Certification or three (3) years, whichever is greater.

## G.  Draw Schedule.

The draw schedule must include all sources and uses and show the projected draws of the Leading Edge Award in accordance with this Notice. The Leading Edge Award may be funded in accordance with this Notice without regard to the timing of contribution of other sources, provided that the Leading Edge Award shall only be disbursed after a properly submitted draw request for Leading Edge Eligible Costs. The Leading Edge Award may not be disbursed in excess of the Leading Edge Eligible Costs incurred.

## H.  Letters of Commitment for Other Financing.

For each proposed loan, equity contribution, or grant, the Owner must include:

1.  A recent lender, investor, or grant engagement letter, dated no later than 60 days prior to Leading Edge Transaction Plan submission, with key terms identified (including for each amount, repayment terms, interest rate, amortization, maturity, prepayment restrictions, and pay-in schedule) from all financing provider(s). Permanent debt financing with monthly payment amounts not conditioned on the availability of cash flow on the Property must:

    a.  Be at a fixed rate of interest, for a fixed term, fully amortized over no more than 40 years;

    b.  Not have a balloon payment until after the earlier to occur of a) expiration of the term of the Assistance Contract, or b) 17 years from the date of the permanent debt financing; and

    c.  Not have a debt service coverage less than the higher of 1.11 or lender requirements.

2.  All bridge loan or construction financing must be disclosed and approved by HUD. All debt repayable from available Surplus Cash and subordinate (or secondary) financing must be disclosed and then approved by the first-mortgage lender as well as

HUD in accordance with Section 8.9 of the Mortgage Credit and Underwriting and Processing Requirements of the MAP Guide and any subsequent revisions or updates to the MAP Guide.

3. Documentation that the first mortgage lender has consented to the GRRP Use Agreement and that the lien of the new first mortgage loan will be subordinate to the GRRP Use Agreement.

4. Estimation of projected closing date for all proposed financing. Discuss any known impediments to closing within the timeframe required under the Notice. Include a discussion of key milestones with estimated milestone completion dates. The terms for all seller take-back financing must also be disclosed.

**I. Certification from a Licensed Architect and/or Engineer.**

Owners must submit a certification from the Architect indicating that the Property will achieve the selected Leading Edge Qualifying Certification if constructed in accordance with the plans and specifications. The form of such certification will be provided by HUD prior to the Owner's submission of their Leading Edge Transaction Plan.

**J. Plans and Specifications if Required by HUD.**

If required, the Owner must submit a copy of the project plans and specifications completed by a qualified architect or licensed professional engineer.

**K. Evidence of Resident Engagement.**

The Owner must submit the dates of the resident meetings and a record of the questions, comments, and Owner responses (written or oral, or in subsequent actions) to resident comments on the proposed plans and Scope of Work that were discussed in connection with such meetings.

**L. Description of Planned Relocation Activities, if applicable.**

The following provides suggested content for the description of planned relocation activities:

1. A general description of the project and project elements that may create relocation needs;

2. Information on residents of the Property and eligibility for relocation assistance and payments;

3. Information regarding how the project will address the expectation for continued tenancies, the residents' return to the property, and the Property's re-occupancy policies;

4. A detailed discussion of plans for temporary relocation assistance, if any;

5. Detailed discussion of plans for permanent displacement, if any, and relocation assistance to be provided;

6. A detailed discussion of compliance with fair housing and civil rights requirements, including accessibility requirements;

7. The relocation budget; and

8. The appeals process.

The relocation plan as a whole should discuss the specific steps to be taken to minimize displacement and the adverse impacts of relocation on residents.

**M. Development Team.**

The Leading Edge Transaction Plan must provide information about the members of the development team and include the following information:

1. Updated list of all members of the development team, including the Owner, the General Contractor, the management agent, and all "principals" of those entities. The submission must disclose any changes that have been made since the Owner's application, as well as any identity of interest between any of the parties.
2. Evidence of recent successful experience with similar rehabilitation or construction projects. For properties requiring substantial rehabilitation or new construction, the Property Owner is required to engage a General Contractor, unless recent and comparable experience managing rehabilitation can be demonstrated.
3. Certification that members with green certification experience are on the team.

**N. Evidence of Application for other required HUD approvals (2530, TPA) (If Applicable).**

To the extent the proposed transaction will change ownership or management agent, the Owner must obtain all necessary HUD Approvals for such change including any necessary APPS clearance and TPA Approval from the HUD Multifamily Field Office.

**O.  GRRP Shared Savings Retainer, if applicable.**

When the Owner requests a GRRP Shared Savings Retainer, the Owner must submit utility projections performed by a third-party professional engineer, based on the Property's plans and specifications that, at a minimum, take into account specific factors including, but not limited to, unit size, building orientation, design and materials, mechanical systems, appliances, and characteristics of the building location. The projections must show the differential between the current utility allowances and the projected utility allowances and, for Properties subject to a budget-based rent, the differential between current utility costs and projected utility costs.

**P.  Selection of Labor Standards Compliance Method in Accordance with Section 10.5, if applicable.**

Exhibit E
Comprehensive Transaction Plan Requirements

Unless otherwise approved by HUD, below are all the required components of a complete
Comprehensive Transaction Plan and the requirements of each component. HUD may request
additional documentation not listed below if HUD determines in its sole discretion such
information is necessary to determine compliance with GRRP Requirements:

A. **Complete Assessment Suite.**
HUD will order the Assessment Suite for the submitted property unless these assessments
have been provided by the Owner and deemed acceptable by HUD as set forth in Section 5.3
of the Notice.

B. **Scope of Work.**
The Scope of Work developed by HUD, in consultation with the Owner, based on the
Assessment Suite and resident engagement activities in accordance with Sections 5.3, 5.4 and
8 of this Notice.

C. **Energy and Emissions Reduction Modeling.**
The Owner must include modeling of post-retrofit energy consumption and emissions to
determine expected consumption savings from the Scope of Work. The energy consumption
model utilized must, at a minimum, consider factors including, but not limited to, unit size,
building orientation, design and materials, mechanical systems, appliances, and characteristics
of the building location. These utility estimates must be calculated by either (1) a properly
licensed engineer or (2) a qualified professional approved by HUD. The form of this
submission should be electronic, utilizing recognized industry standard methods, and include
easily verified source data, tables, and references as a basis for the model estimates.

D. **Itemization of Eligible Costs.**
Under Comprehensive, HUD will cover the Comprehensive Eligible Costs. Consequently,
when putting together the Scope of Work, the Owner should provide an itemized list of these
costs for HUD to confirm that the work has been properly included and can be easily
confirmed by a qualified third party during construction and Completion Certification.

E. **Replacement Reserve Analysis Showing that the Replacement Reserve Addresses 20-
Year Needs.**
The annual deposit to the replacement reserve should be equal to that amount which, if
deposited annually, will be sufficient to fund all capital needs, as identified in the CNA,
arising during the first 20 years and otherwise not addressed upfront in either the
rehabilitation or an initial deposit to the replacement reserve account. Reasonable estimates in
the inflation should be used, but the rate for escalating the increase in repair costs should not
exceed the rate of interest on reserve deposits by more than 1%. HUD may consider

alternative arrangements with respect to the initial deposit to the replacement reserve if risks
to the Property can be adequately mitigated.

F. **Sources and Uses of Funds.**

The Sources and Uses must:

1. Include a reasonable, balanced, and comprehensive presentation of sources and uses of funds in accordance with all applicable HUD requirements. Include a construction contingency of 10% for rehabilitation or as otherwise allowed by a LIHTC allocating agency for new construction. Note that HUD may require a higher contingency on a case-by-case basis.

2. Demonstrate that existing loans or debt will be paid off at the closing or are supported through the Property's net operating income. Demonstrate that any loans or advances provided by entities under common Control will be converted to unsecured obligations repayable from the Property's Surplus Cash unless otherwise approved by HUD. Such loans may not be paid off from the proceeds of new financing unless approved by HUD.

3. Demonstrate that any new debt, including any Amortizing Repayment Loan, will meet the underwriting criteria as prescribed by HUD.

4. Include narrative that discusses any aspects of the planned rehabilitation that may result in an initial operating deficit during the rehabilitation period and how that deficit will be funded, including any operating deficit escrow or similar fund.

G. **Operating Pro Forma.**

The Operating Pro-Forma must:

1. Include an attached discussion of the extent of energy and water savings that are anticipated as a result of the rehabilitation or construction and the basis for those estimates. The discussion must explain to what extent anticipated savings in utility costs have been included in the pro forma operating expenses.

2. Be consistent with local standards for Federally-assisted housing and otherwise comply with at least the following feasibility benchmarks:

   a. Rents shall not exceed the amounts permitted under the Assistance Contract or pursuant to any other HUD restriction.

   b. All other sources of income must be supported with a narrative or must not exceed the average for the last 3 years (other income should not include interest income on the replacement reserve account, which must remain in the reserve and is not available for other purposes).

   c. Vacancy loss shall be no less than the greater of the average over the past three years or 3 percent.

   d. Allowance for bad debt should be not less than the greater of the average over the past three years or 2 percent.

   e. Insurance costs must be documented, such as quotes from an insurance agent based on actual recent premiums for similar properties.

     f. All other operating expenses shall be no less than 85 percent of the average for the last three years, unless justified.

     g. The annual replacement reserve deposit should be equal to that amount developed in Exhibit E Section E above.

     h. For non-leveraged transactions (i.e., transactions that will not be taking on any debt financing with monthly payment amounts not conditioned on the availability of cash flow), the stabilized cash flow should not be less than $12 per unit monthly. For leveraged transactions (i.e., transactions that will be taking on debt financing with monthly payment amounts not conditioned on the availability of cash flow), the debt-coverage ratio should not be less than 1.11 over a ten-year period using 2% growth in revenue and 3% growth in expenses. Additionally, to the extent an Amortizing Repayment Loan is used, the underwriting criteria prescribed by HUD must be adhered to.

## H. **Draw Schedule:**

The draw schedule must include all sources and uses and show the projected draws of the Comprehensive Award in accordance with this Notice. The Comprehensive Award may be funded in accordance with this Notice without regard to the timing of contribution of other sources, provided that the Comprehensive Award shall only be disbursed after a properly submitted draw request for Comprehensive Eligible Costs. The Comprehensive Award may not be disbursed in excess of the Comprehensive Eligible Costs incurred.

## I. **Letters of Commitment for Other Financing.**

For each proposed loan, equity contribution, or grant, the Owner must include:

1. A recent lender, investor, or grant engagement letter dated no later than 60 days prior to Comprehensive Transaction Plan submission, with key terms identified (including for each amount, repayment terms, interest rate, amortization, maturity, prepayment restrictions, and pay-in schedule) from all financing provider(s). Permanent debt financing with monthly payment amounts not conditioned on the availability of cash flow on the Property must:

     a. Be at a fixed rate of interest, for a fixed term, fully amortized over no more than 40 years;

     b. Not have a balloon payment until after the earlier to occur of a) expiration of the term of the Assistance Contract, or b) 17 years from the date of the permanent debt financing; and

     c. Not have a debt service coverage less than the higher of 1.11 or lender requirements.

2. All bridge loan or construction financing must be disclosed and approved by HUD. All debt repayable from available Surplus Cash and subordinate (or secondary) financing must be disclosed and then approved by the first-mortgage lender as well as HUD in accordance with Section 8.9 of the Mortgage Credit and Underwriting and

Processing Requirements of the MAP Guide and any subsequent revisions or updates to the MAP Guide.

3. Documentation that the first mortgage lender has consented to the GRRP Use Agreement and that the lien of the new first mortgage loan will be subordinate to the GRRP Use Agreement.

4. Estimation of projected closing date for all proposed financing. Discuss any known impediments to closing within the timeframe required under the Notice. Include a discussion of key milestones with estimated milestone completion dates. The terms for all seller take-back financing must also be disclosed.

J. **Plans and Specifications if Required by HUD.**
If required, the Owner must submit a copy of the project plans and specifications completed by a qualified architect or licensed professional engineer.

K. **Evidence of Resident Engagement.**
The Owner must submit the dates of the resident meetings and a record of the questions, comments, and Owner responses (written or oral, or in subsequent actions) to resident comments on the proposed plans and Scope of Work that were discussed in connection with such meetings.

L. **Description of Planned Relocation Activities, if applicable.**
The following provides suggested content for the description of planned relocation activities:

1. A general description of the project and project elements that may create relocation needs;

2. Information on residents of the Property and eligibility for relocation assistance and payments;

3. Information regarding how the project will address the expectation for continued tenancies, the residents' return to the property, and the Property's re-occupancy policies;

4. A detailed discussion of plans for temporary relocation assistance, if any;

5. Detailed discussion of plans for permanent displacement, if any, and relocation assistance to be provided;

6. A detailed discussion of compliance with fair housing and civil rights requirements, including accessibility requirements;

7. The relocation budget; and

8. The appeals process.

The relocation plan as a whole should discuss the specific steps to be taken to minimize displacement and the adverse impacts of relocation on residents.

M. **Evidence of Application for Other Required HUD Approvals (2530, TPA) (if applicable).**

To the extent the proposed transaction will change ownership or management agent, the Owner must identify obtain all necessary HUD Approvals for such change including any necessary APPS clearance and TPA Approval from the HUD Multifamily Field Office.

N. **GRRP Shared Savings Retainer.**

When the Owner requests a GRRP Shared Savings Retainer, the Owner must submit utility projections performed by a third-party professional engineer, based on the Property's plans and specifications that, at a minimum, take into account specific factors including, but not limited to, unit size, building orientation, design and materials, mechanical systems, appliances, and characteristics of the building location. The projections must show the differential between the current utility allowances and the projected utility allowances and, for Properties subject to a budget-based rent, the differential between current utility costs and projected utility costs.

O. **Multifamily Building Efficiency Screening Tool (MBEST).**

If required, the Owner must submit a completed MBEST as part of the Transaction Plan. The MBEST is an excel-based tool created in partnership with the U.S. Department of Energy and the Lawrence Berkeley National Laboratory to screen multifamily buildings based on significant building features impacting energy efficiency and to understand current levels of energy efficiency and opportunities for improvement.

P.   **Selection of Labor Standards Compliance Method in Accordance with Section 10.5, if applicable.**