# United States Court of Appeals
## For the First Circuit

---

No. 25-1428

WOONASQUATUCKET RIVER WATERSHED COUNCIL; EASTERN RHODE ISLAND CONSERVATION DISTRICT; GREEN INFRASTRUCTURE CENTER; NATIONAL COUNCIL OF NONPROFITS; CHILDHOOD LEAD ACTION PROJECT; CODMAN SQUARE NEIGHBORHOOD DEVELOPMENT CORPORATION,

Plaintiffs, Appellees,

v.

U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in the official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF ENERGY; CHRIS WRIGHT, in the official capacity as Secretary of Energy; U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in the official capacity as Secretary of the Interior; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in the official capacity as Administrator of the Environmental Protection Agency; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in the official capacity as Director of the Office of Management and Budget; KEVIN HASSETT, in the official capacity as Director of the National Economic Council; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of Housing and Urban Development,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

---

Before

Barron, Chief Judge,
Lipez and Rikelman, Circuit Judges.

---

Sean R. Janda, with whom Brett A. Shumate, Assistant Attorney General, Sara Miron Bloom, First Assistant U.S. Attorney, Eric D. McArthur, Deputy Assistant Attorney General, Daniel Tenny, and Brian J. Springer were on brief, for appellants.

Kevin E. Friedl, with whom Jessica Anne Morton, Robin F. Thurston, and Democracy Forward Foundation were on brief, for appellees.

Vincent M. Nolette, Amy E. Turner, and Sabin Center for Climate Change Law, Columbia Law School on brief for the U.S. Conference of Mayors as amicus curiae supporting appellees.

Andrea Moon Park and Massachusetts Law Reform Institute on brief for Jane Addams Senior Caucus, et al. as amici curiae supporting appellees.

———————————

August 7, 2026

———————————

**BARRON**, <u>**Chief Judge**</u>.  In this appeal, several federal agencies and agency heads challenge a district court order preliminarily blocking their actions to categorically freeze billions of dollars in federal financial assistance appropriated under the Infrastructure Investment and Jobs Act and the Inflation Reduction Act of 2022.  We affirm in part and vacate in part.

## I.

## A.

In 2021, Congress enacted the Infrastructure Investment and Jobs Act ("IIJA").  Pub. L. No. 117-58, 135 Stat. 429 (2021).  The IIJA authorized appropriations for transportation and infrastructure projects, including federal highways, highway safety programs, and transit programs.  In the following year, Congress enacted the Inflation Reduction Act of 2022 ("IRA").  Pub. L. No. 117-169, 136 Stat. 1818 (2022).  The IRA provided funding to increase energy security and reduce greenhouse gas emissions.  Various federal agencies administer grant programs pursuant to the IRA and the IIJA.

On the first day of his second term in office, President Trump issued Executive Order No. 14154, titled "Unleashing American Energy."  90 Fed. Reg. 8353 (Jan. 20, 2025).  We will refer to this executive order as the "Unleashing Executive Order."

Section 2 of the Unleashing Executive Order announced nine "polic[ies] of the United States" related to energy

production, use, and regulation.[1]  Id. § 2.  Section 7, titled

"Terminating the Green New Deal," ordered:

> All agencies shall immediately pause the
> disbursement of funds appropriated through the
> [IRA] or the [IIJA] . . . and shall review
> their processes, policies, and programs for
> issuing grants, loans, contracts, or any other
> financial disbursements of such appropriated
> funds for consistency with the law and the
> polic[ies] outlined in . . . this order.

Id. § 7(a).

The Unleashing Executive Order also directed "all agency

heads" to "submit a report to the Director of the [National

Economic Council]" ("NEC") and "Director of [the Office of

Management and Budget]" ("OMB") detailing the findings of their

review.  Id.  It further provided that "[n]o funds" appropriated

through the IRA or the IIJA were to be disbursed "until the

---

[1] Those policies are: (1) "to encourage energy exploration and production on Federal lands and waters"; (2) "to establish our position as the leading producer and processor of non-fuel minerals"; (3) "to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible"; (4) "to ensure that all regulatory requirements related to energy are grounded in clearly applicable law"; (5) "to eliminate the 'electric vehicle . . . mandate' and promote true consumer choice"; (6) "to safeguard the American people's freedom to choose from a variety of goods and appliances"; (7) "to ensure that the global effects of a rule, regulation, or action shall, whenever evaluated, be reported separately from its domestic costs and benefits"; (8) "to guarantee that all executive departments and agencies . . . provide opportunity for public comment and rigorous, peer-reviewed scientific analysis"; and (9) "to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." Unleashing Executive Order § 2.

- 4 -

Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt." Id.

The next day, Matthew J. Vaeth, Acting Director of OMB, and Kevin Hassett, Assistant to the President for Economic Policy and Director of NEC, issued a memorandum regarding the Unleashing Executive Order to the heads of federal departments and agencies.[2] We will refer to this memorandum as the "Unleashing Memorandum."

The Unleashing Memorandum stated that "[t]he directive" in the Unleashing Executive Order "requires agencies to immediately pause disbursement of funds appropriated under the [IRA] or the [IIJA]." "This pause," the Unleashing Memorandum explained, "only applies to funds supporting programs, projects, or activities that may be implicated by the polic[ies] established in [s]ection 2" of the Unleashing Executive Order.

The Unleashing Memorandum also informed recipients that, "[f]or the purposes of implementing section 7 of the [Unleashing Executive Order], funds supporting the 'Green New Deal' refer to any appropriations for objectives that contravene the policies established in section 2" of that order. "Agency heads may

---

[2] Memorandum from Matthew J. Veath, Acting Dir., Off. of Mgmt. & Budget, & Kevin Hassett, Assistant to the President for Econ. Pol'y & Dir., Nat'l Econ. Council, to Heads of Dep'ts & Agencies (Jan. 21, 2025) [https://perma.cc/Y7KB-784F].

- 5 -

disburse funds as they deem necessary after consulting with [OMB]," the Unleashing Memorandum concluded.

**B.**

In March 2025, six nonprofit organizations filed a suit in the U.S. District Court for the District of Rhode Island that challenged various alleged final agency actions pertaining to the Unleashing Memorandum, including the issuance of the memorandum itself. The organizations are Woonasquatucket River Watershed Council; Eastern Rhode Island Conservation District; Green Infrastructure Center; Childhood Lead Action Project; Codman Square Neighborhood Development Corporation; and National Council of Nonprofits, a membership organization that filed suit on its members' behalf. We will refer to the plaintiffs, collectively, as the "Nonprofits."

The Nonprofits' operative complaint[3] alleged that the individual nonprofit plaintiffs as well as other organizations that were members of the National Council of Nonprofits had "been awarded grants and other financial assistance through the IRA and IIJA" either as direct recipients or subgrantees of direct recipients. The complaint went on to allege that, following the issuance of the Unleashing Memorandum, there had been a "freeze on funding appropriated by the IRA and IIJA," which resulted in the

---

[3] The operative complaint is the Nonprofits' amended complaint.

individual nonprofit plaintiffs and member organizations of the National Council of Nonprofits being denied financial assistance pursuant to their grant awards and subawards.

The complaint named the following defendants: OMB, the Director of OMB, and the Director of NEC (collectively, the "OMB Defendants"), as well as five other agencies and their respective agency heads (collectively, the "Agency Defendants").  Those other agencies are the Department of Energy ("DOE"), the Environmental Protection Agency ("EPA"), the Department of Housing and Urban Development ("HUD"), the Department of the Interior ("DOI"), and the Department of Agriculture ("USDA").  We will refer to the defendants collectively as the "Government."

The complaint alleged that the OMB Defendants' directive in the Unleashing Memorandum to withhold financial assistance appropriated under the IRA and the IIJA, as well as the Agency Defendants' "blanket freeze[s]" of that assistance "en masse and on a non-individualized basis," violated the Administrative Procedure Act ("APA").  The complaint alleged that the directive in the Unleashing Memorandum, which was issued by the Director of OMB and the Director of NEC, constitutes final agency action.  It also alleged that each of the agency-level decisions to categorically freeze the funds in question constitutes a final agency action.  It further alleged that the challenged final agency actions are arbitrary and capricious, in excess of statutory

- 7 -

authority, and contrary to law.  See 5 U.S.C. § 706(2)(A), (C).
The Nonprofits sought declaratory and injunctive relief, including
"a stay under 5 U.S.C. § 705."

The Nonprofits thereafter filed a motion for a
preliminary injunction.  To secure such relief, a party must show
"(1) a substantial likelihood of success on the merits, (2) a
significant risk of irreparable harm if the injunction is withheld,
(3) a favorable balance of hardships, and (4) a fit (or lack of
friction) between the injunction and the public interest."
NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting
Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)).

To make the required showing, the Nonprofits submitted
declarations that attested that the individual nonprofits and
member organizations of the National Council of Nonprofits had not
received expected disbursements of IRA or IIJA financial
assistance or were unable to access the online payment portal for
their grants.  The Nonprofits then contended that the challenged
directive by the OMB Defendants and the challenged decisions by
the Agency Defendants caused them irreparable harm.  As support,
they pointed to the declarations attesting that those agency
actions led to the cutoff of funds that would force -- and in some
cases, already had forced -- the individual nonprofits and
National Council of Nonprofits members to reduce hiring, "furlough

- 8 -

or lay off staff, shutter[] planned projects[,] and curtail[]" their work.

The District Court granted the motion over the Government's opposition.  It also issued a memorandum opinion explaining its reasoning.

The District Court first addressed a number of threshold issues.  It concluded that the Nonprofits adequately demonstrated subject matter jurisdiction under Article III of the U.S. Constitution.  See U.S. Const. art. III, § 2, cl. 1.  It also rejected the Government's argument that the Nonprofits' APA claims were barred by "[t]he pendency of a prior pending action in [a] federal court" that assertedly involved the same claims. Sutcliffe Storage & Warehouse Co. v. United States, 162 F.2d 849, 851 (1st Cir. 1947) (quoting 1 Moore's Federal Practice 237 (1st ed. 1938)). That case had been filed in the U.S. District Court for the District of Columbia.  See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 775 F. Supp. 3d 100 (D.D.C.), appeal filed, No. 25-5148 (D.C. Cir. 2025).

The District Court then addressed the Government's arguments based on the APA itself.  It rejected the Government's argument that the Nonprofits had failed to identify any discrete agency actions by the defendants and so were bringing a "programmatic attack," which the APA does not permit.  See Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004).  The District

- 9 -

Court held instead that the Nonprofits had identified seven such actions: "OMB and the NEC Director's decisions to issue the [Unleashing Memorandum] mandating a pause (one action from each) and [the Agency Defendants'] decisions to follow that guidance by summarily freezing IIJA and IRA funds (one action from each of the[] five agencies)."

In addition, the District Court rejected the Government's argument that the Nonprofits' APA claims were essentially contract claims and therefore had to be brought under the Tucker Act in the U.S. Court of Federal Claims. See 28 U.S.C. § 1491(a). In rejecting this challenge to its statutory subject matter jurisdiction, the District Court explained both that the Nonprofits' APA claims did not depend on any contractual terms and that they sought a remedy that, though it may result in the disbursement of funds, was for prospective, equitable relief and not money damages.

The District Court also concluded that the seven challenged agency actions, in requiring the freezing of already-awarded funds, likely were not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And, too, the District Court concluded that they likely were final agency actions for purposes of the APA. See id. § 704; Corner Post Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 808 (2024) (explaining that a final agency action under the APA is one that "marks the

- 10 -

consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow" (citation modified)).

The District Court further determined that the Nonprofits were likely to succeed in showing that the challenged final agency actions violated the APA.  It did so on the grounds that the Nonprofits were likely to show that the challenged actions are both "arbitrary and capricious" and in excess of statutory authority.[4]  See 5 U.S.C. § 706(2)(A), (C).

Having determined that the Nonprofits satisfied the "likelihood of success" factor of the test for obtaining a preliminary injunction, the District Court went on to explain that the balance of the equities under the remaining factors of that test favored them as well.  Finally, the District Court addressed the scope of the preliminary injunction.  It observed that the "normal remedy" for unlawful agency action is vacatur, see 5 U.S.C. § 706(2), and it reasoned that a universal preliminary injunction was therefore appropriate because "similarly situated nonparties . . . should not be forced to suffer the harms [of the likely unlawful agency actions] just because there was not enough time or resources for them to join the suit."

---

[4] The District Court declined to reach the Nonprofits' claim that the challenged agency actions are contrary to law under the IRA, the IIJA, and regulations governing the administration of federal awards.  See 5 U.S.C. § 706(2)(A).

The District Court's resulting order preliminarily "ENJOINED" the Agency Defendants from "freezing, halting, or pausing on a non-individualized basis the processing and payment of [already-awarded] funding" appropriated under the IRA or the IIJA and ordered them to "take immediate steps to resume the processing, disbursement, and payment" of such funds and "to release awarded funds previously withheld or rendered inaccessible."  The order also directed the OMB Defendants to provide notice of the order to all the agencies that received the Unleashing Memorandum, informing such agencies that "they may not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives" in the Unleashing Memorandum and they must "continue releasing any disbursements on open awards that were paused due to or in reliance on" the Unleashing Memorandum.  Further, the order prohibited the Government from "implementing, giving effect to, or reinstating under a different name the directive in [the Unleashing Memorandum] to unilaterally freeze awarded funding appropriated under" the IRA or the IIJA.

The Government timely appealed.

## II.

We start with a threshold issue: whether the Nonprofits have shown, at this stage of the litigation, what they must to establish that they have Article III standing.  See Anversa v.

- 12 -

Partners Healthcare Sys., Inc., 835 F.3d 167, 174 n.5 (1st Cir. 2016). "At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)). The three elements of Article III standing are (1) an injury-in-fact, (2) that is "fairly traceable" to the defendant's challenged conduct, and (3) "that is likely to be redressed by a favorable judicial decision." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 86 (1st Cir. 2025) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). Our review is de novo. Id.

**A.**

The District Court determined that the individual nonprofit plaintiffs had Article III standing to bring their claims against the Agency Defendants after finding that they had met their burden to show that they had suffered an injury-in-fact traceable to the challenged conduct of each of those defendants. The District Court explained that the Nonprofits showed both that the Agency Defendants decided to "summarily freez[e] IIJA and IRA funds" and that the individual nonprofit plaintiffs suffered ongoing harms because of those decisions.

On appeal, the Government does not dispute the District Court's determination that the individual nonprofit plaintiffs

- 13 -

have met their burden to show that they have standing as to the Agency Defendants that administer their grants.  We agree that they have done so.

The individual nonprofit plaintiffs alleged that they were awarded IRA or IIJA grants by USDA, EPA, or HUD as either direct grantees or subgrantees.  They further alleged that they had been harmed by the actions taken by these agencies to withhold funds appropriated under those statutes.

For the direct grantees, these allegations suffice to show that each suffered an injury-in-fact, see TransUnion LLC v. Ramirez, 594 U.S. 413, 417 (2021), that is fairly traceable to the challenged conduct, see Conservation L. Found., 129 F.4th at 90. And there is no dispute that the requested relief would redress these alleged injuries by precluding the Agency Defendants from relying on the challenged decisions to impose the categorical funding freezes.

For the subgrantees, the District Court found that they did not receive their subgrant payments from the direct grantees because of the challenged funding freezes, as nothing in the record indicated that the direct grantees failed to pass on federal financial assistance that they had received.  Because this finding is not clearly erroneous, we are satisfied that the individual nonprofit plaintiffs that are subgrantees also have carried their burden of showing that their injuries are traceable to the relevant

- 14 -

Agency Defendants' decisions to impose the funding freezes.[5]  See Dep't of Com. v. New York, 588 U.S. 752, 768 (2019) (finding traceability satisfied based "on the predictable effect of Government action on the decisions of third parties").  And, again, there is no dispute that the requested relief would provide redress to these plaintiffs.

**B.**

As to the individual nonprofit plaintiffs' standing to bring their claims against the OMB Defendants, the Government does not take issue with the District Court's determination that the record supportably shows that the Agency Defendants relied on the Unleashing Memorandum in adopting their categorical funding freezes.  The Government also does not challenge the District Court's conclusion that the individual nonprofit plaintiffs therefore demonstrated a causal connection between the Unleashing Memorandum and their alleged injuries.

Given what the record shows, we see no reason for concern either.  So, here, too, we see no likely Article-III-standing bar, given that the requested relief would provide redress.

---

[5] We understand the individual nonprofits plaintiffs to have each demonstrated standing as to the specific Agency Defendant that they identify as administering their grant.

- 15 -

C.

The Government has more to say about standing when it comes to the National Council of Nonprofits. That organization premises its standing on the standing of certain of the members that it represents rather than on any injury that it has directly suffered. To establish standing on that representative basis, the National Council of Nonprofits must meet a three-part test. It must show that (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim nor the requested relief requires the participation of individual members in the lawsuit." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

The Government does not dispute that the National Council of Nonprofits would meet this test if it qualified as a membership organization. It contends, however, that the organization does not so qualify and therefore lacks what is often referred to as organizational standing.

Relying on the Fifth Circuit's nearly three-decade-old decision in Friends of the Earth, Inc. v. Chevron Chemical Co., 129 F.3d 826 (5th Cir. 1997), the Government maintains that an organization may assert standing on behalf of its members only if

- 16 -

it explains "how its members direct or control the organization" and presents "'indicia of membership' such as a 'clearly articulated and understandable membership structure' with members who 'elect[] the governing body.'" (Quoting id. at 829 (alteration in original).) The Government then contends that the National Council of Nonprofits has not done so.

In Students for Fair Admissions, however, the Supreme Court rejected the Government's position about what a membership organization must show to establish standing based on its asserted members' standing. 600 U.S. at 200-01. The Court there explained that the "indicia of membership" analysis on which the Government now relies "has no applicability" when the group advancing organizational standing is "a voluntary membership organization with identifiable members." Id. at 201. So long as such a group "has identified members and represents them in good faith," the Court explained, no "further scrutiny" into its operation is required. Id.

The National Council of Nonprofits has made that showing here. Indeed, the Government does not suggest otherwise. Thus, this ground for challenging the standing of the National Council of Nonprofits fails.

That said, the National Council of Nonprofits also must make the requisite showing under the three-part test for establishing standing set forth above. But we conclude that it

- 17 -

has, save for its claims pertaining to one of the Agency Defendants insofar as it means to bring those claims against that defendant.

As to the first part of the three-part test, the National Council of Nonprofits has identified members that receive financial assistance from USDA, EPA, DOE, and DOI through grants appropriated under the IRA and the IIJA. Because these members include two of the individual nonprofit plaintiffs that we have already determined have sufficiently demonstrated their standing to bring their claims against these agencies as well as the OMB Defendants, the National Council of Nonprofits has met its burden as to the first part of the applicable standing test.[6]

In addition, the complaint alleges that the organization's mission is to "support[] nonprofits in advancing their missions." Therefore, the National Council of Nonprofits also has satisfied the second part of that test, as the interests

---

[6] Although the Government submitted a declaration stating that DOE had restored regular approval authority for disbursements of obligated IRA and IIJA funds on February 24, 2025, a member of the National Council of Nonprofits responded with a declaration of its own, which indicated that claims for payment were not accepted by DOE until late March. Notably, the Government does not argue on appeal that the National Council of Nonprofits is unlikely to establish that, at the time the complaint was filed, DOE continued to categorically freeze disbursements for grants funded by the IRA or the IIJA. Nor does the Government advance any argument on appeal that DOE's March payments moot the case. Cf. Fed. Bureau of Investigation v. Fikre, 601 U.S. 234, 241 (2024) (stating that voluntary cessation of the challenged conduct can, on a proper showing, moot the lawsuit).

that the organization seeks to advance through this lawsuit are germane to its purpose.

As to the test's third part, we again see no problem. Given the nature of the APA claims and the universal relief sought via those claims, we see no reason why the individual members of the National Council of Nonprofits that have standing would need to participate in the suit.

The only potential wrinkle is that the National Council of Nonprofits has not identified any of its members that receive financial assistance from HUD through grants appropriated under the IRA or the IIJA.  That is the only Agency Defendant, however, for which no such showing has been made by this organization. Thus, to the extent that the National Council of Nonprofits seeks to represent its members in claims against HUD, it has not made the requisite "clear showing" that any of its members "likely" has an injury-in-fact that is traceable to that agency.  Murthy, 603 U.S. at 58 (quoting Winter, 555 U.S. at 22).  For that reason, insofar as the National Council of Nonprofits seeks to bring claims against HUD, we cannot conclude that it has established that it has standing to bring them.

**III.**

We now turn to the Government's remaining challenges on appeal to the District Court's decision to grant preliminary relief

to the Nonprofits.[7]  The parties agree that, in assessing these challenges, we must assess the District Court's decision under an abuse of discretion standard.  See Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs., 144 F.4th 9, 19 (1st Cir. 2025).  The parties further agree that, under that standard, we review questions of law de novo and factual findings for clear error.  Id.  The parties also appear to agree on one more thing -- that, in applying the abuse of discretion standard in conducting our review, our focus must be on the four-part test described above that determines whether an order granting preliminary injunctive relief is appropriate.  See NuVasive, 954 F.3d at 443.  We follow the parties' lead.

---

[7] As noted above, the District Court separately addressed an issue concerning its statutory subject matter jurisdiction -- namely, whether the sovereign immunity of the United States bars the Nonprofits' lawsuit from being brought in federal district court insofar as the "essence" of their APA claims "is in contract."  Am. Sci. & Eng'g, Inc. v. Califano, 571 F.2d 58, 63 (1st Cir. 1978).  We agree with the District Court that the "essence" of the Nonprofits' claims is not contractual.  Their APA claims do not turn on the terms of any contracts, and they sought APA remedies that included vacating the challenged agency actions.  See 5 U.S.C. §§ 705-706.  Notably, though, on appeal, the Government frames the issue of sovereign immunity as one that concerns the propriety of the scope of the relief that was ordered insofar as that relief "compel[s] continued payment of funds under grants" rather than whether the claims themselves are barred.  In light of this framing, we address this question about sovereign immunity in Part IV, when we address the propriety of the scope of the relief that was ordered.  See New York v. Trump, 171 F.4th 1, 26 n.11 (1st Cir. 2026).

**A.**

With respect to the "likelihood of success" factor, the Government advances a number of arguments as to why the Nonprofits are not likely to succeed on their APA claims. We are not persuaded.

**1.**

The Government first reprises its argument to the District Court that the Nonprofits -- or, at least, some of them -- impermissibly split their claims into two separate lawsuits: the suit in the U.S. District Court for the District of Rhode Island that gives rise to this appeal and a suit that was brought by some of the same plaintiffs in the U.S. District Court for the District of Columbia. See Nat'l Council of Nonprofits, 775 F. Supp. 3d 100. The Government rests this contention on the established understanding that when "'actions involving the same parties and similar subject matter are pending in different federal district courts' and 'the overlap between the two suits is nearly complete[,] . . . the usual practice is for the court that first had jurisdiction to resolve the issues and the other court to defer.'" Maldonado-Cabrera v. Anglero-Alfaro, 26 F.4th 523, 526 (1st Cir. 2022) (quoting TPM Holdings, Inc. v. Intra-Gold Indus., Inc., 91 F.3d 1, 4 (1st Cir. 1996)).

Under our precedent, though, "where the overlap between [the] two suits is less than complete," the decision to defer "is

- 21 -

made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." TPM Holdings, 91 F.3d at 4 (citation omitted). The Government does not dispute that the "overlap" between the two cases here is less than complete. Nonetheless, the Government points to several apparent similarities that it contends show that the Nonprofits have split their claims despite the lack of complete overlap. Those similarities are shared counsel, overlapping plaintiffs,[8] and parallel allegations challenging "a categorical [funding] freeze directed by OMB."

The only claims alleged in the suit before us are APA claims, though, and each of them requires close analysis of the specific agency action that is being challenged. Moreover, as the District Court explained, those claims challenge the OMB Defendants' "decisions to issue the [Unleashing Memorandum] mandating a pause," "along with [the Agency Defendants'] funding freezes arising from" it.

---

[8] The lead plaintiff in the action filed in the District of Columbia is the National Council of Nonprofits, and, in that capacity, it seeks relief on behalf of its members. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 44-46 (D.D.C. 2025). In their briefing to us, the Nonprofits acknowledge that four of the five individual nonprofit plaintiffs in the suit at hand are members of the National Council of Nonprofits.

By contrast, as the District Court noted, the plaintiffs in the District of Columbia case challenged a different OMB directive to pause federal financial assistance, and they did not challenge any separate agency funding freezes.  See Nat'l Council of Nonprofits, 775 F. Supp. 3d at 109-10, 124.  Furthermore, the memorandum challenged in the District of Columbia was withdrawn (at least nominally), see id. at 110-11, 117-18, while the Unleashing Memorandum was not.

We recognize that the OMB memorandum at issue in the District of Columbia proceeding directed a "temporary pause" on all activities related to obligating or disbursing federal financial assistance that may be implicated by seven executive orders issued in the first days of President Trump's second term in office.  See id. at 109-10.  We also recognize that one of those executive orders is the Unleashing Executive Order.  Id. at 109.

Even still, an assessment of the lawfulness of the Agency Defendants' actions taken pursuant to the Unleashing Executive Order and Unleashing Memorandum (as well as of the lawfulness of the Unleashing Memorandum itself) does not require an assessment of whether the OMB directive challenged in the District of Columbia lawsuit is lawful.  Therefore, our resolution of the Nonprofits' claims does not necessarily depend on the resolution of the same issues as the plaintiffs' claims in the District of Columbia lawsuit, or vice versa.  Accordingly, we do not see how the

- 23 -

pendency of the District of Columbia case suffices to show that the District Court likely abused its discretion by entertaining the Nonprofits' preliminary injunction motion.  See TPM Holdings, 91 F.3d at 4 (holding that a New Hampshire district court did not abuse its discretion by hearing a title dispute that implicated a contract claim filed in Texas because resolution of the title dispute did not require assessment of the merits of the contract claim).

**2.**

The Government next argues that the Nonprofits are unlikely to succeed on their APA claims because those claims fail to challenge a final agency action within the meaning of that statute.  See 5 U.S.C. §§ 551(13) (defining agency action), 701(b)(2) (similar), 704 (authorizing judicial review of final agency actions).  The Government argues that the Nonprofits' claims against the Agency Defendants advance only a "programmatic attack" under the APA, which "the Supreme Court rebuffed in Norton [v. Southern Utah Wilderness Alliance, 542 U.S. 55, 66-67 (2004)]" precisely because the challenge there failed to take aim at any discrete final agency action.

We recognized in New York v. Trump that "Norton does make clear that the APA permits review of only discrete final agency actions and precludes the kind of programmatic attack" rejected by the Supreme Court in Lujan v. National Wildlife

- 24 -

Federation, 497 U.S. 871 (1990).  New York v. Trump, 171 F.4th 1, 18 (1st Cir. 2026) (citation modified).  But we also explained in New York that Norton goes on to clarify that the object of the "programmatic attack" in Lujan -- the Bureau of Land Management's (BLM) so-called "land withdrawal review program" -- "was not itself an agency action."  Id. (citation modified); see also Lujan, 497 U.S. at 890 (explaining that the term "'land withdrawal review program' . . . does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations").

That latter aspect of Norton is potentially significant here.  As we pointed out in New York, Lujan itself noted that a "specific" agency action "apply[ing] some particular measure across the board to all individual" actions "can of course be challenged under the APA."  New York, 171 F.4th at 18 (quoting Lujan, 497 U.S. at 890 n.2).  So, the key issue concerns whether the Nonprofits are challenging only a broad program or instead various discrete agency actions, each of which applies "across the board."

The District Court determined that the Nonprofits' complaint challenged the following seven specific decisions -- each of which was undertaken by at least one of the defendants: "OMB and the NEC Director's decisions to issue the [Unleashing Memorandum] mandating a pause (one action from each)

- 25 -

and [DOE], EPA, HUD, [DOI], and USDA's decisions to follow [the Unleashing Memorandum] by summarily freezing IIJA and IRA funds (one action from each of these five agencies)."  The District Court then determined that each of those decisions was likely an "agency action" in its own right.  We see no reason to disagree.  See New York, 171 F.4th at 16 (reviewing a finding of the existence of an agency action for clear error).

To start, the District Court supportably found that each Agency Defendant made the decision to impose a categorical, "across the board" freeze of funding within its purview that had been appropriated under the IRA and the IIJA.  The District Court based that factual finding on record evidence of memoranda, press releases, and emails from the Agency Defendants.[9]

---

[9] These documents included: emails from USDA officers to grant recipients explaining that "payments on contracts funded through the [IRA] are currently on pause" and that reimbursement requests were rejected "due to the recent executive orders issued under the Trump Administration"; a memorandum from the Acting Chief Financial Officer of EPA stating that "all disbursements for unliquidated obligations funded by" the IRA or IIJA "are paused"; an email from EPA to a grant recipient stating that it "has paused all funding actions related to the [IRA] and the [IIJA]" to implement the Unleashing Executive Order; a memorandum from the Acting Secretary of DOE instructing that "[a]ll funding and financial assistance activities . . . shall not be . . . approved, finalized, modified, or provided until a review of such takes place"; an email from a DOI grant manager referring a grant recipient to the Unleashing Memorandum "regarding the funding pause" in response to the recipient's report that they could not "draw" from their grant; and a declaration from a grant recipient attesting that the National Park Service, a subagency of DOI,

The Nonprofits also entered into the record multiple declarations from organizations that had been awarded IRA or IIJA grants. Those declarations supportably demonstrated that the organizations' grants had been frozen by the Agency Defendants following the Unleashing Memorandum.

Taken together, this evidence supportably confirms that each of the Agency Defendants made the decision to categorically freeze IRA and IIJA funds in accordance with the Unleashing Memorandum and the Unleashing Executive Order.[10] And we agree with the District Court's conclusion that each of those agency-level "freeze" decisions also likely constitutes a final agency action within the meaning of the APA. See Texas v. Biden, 597 U.S. 785, 793, 795, 808-09, 809 n.7 (2022) (holding that an agency memorandum that "bound" agency staff by "forbidding them to continue" an agency program was a final agency action).

---

communicated that grant recipients would not be able to draw down from grants "that include [IIJA] or IRA funding."

[10] After the Government submitted its briefs in this appeal, it filed a response letter under Federal Rule of Appellate Procedure 28(j) asserting for the first time that the evidence is insufficient to support the District Court's finding that HUD adopted an agency-wide policy summarily freezing funds appropriated under the IRA and the IIJA. But a party may not use Rule 28(j) to raise new arguments that it failed to present in its briefs, Hernandez Lara v. Barr, 962 F.3d 45, 52 n.10 (1st Cir. 2020), and so, we do not consider this point further, see Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("[W]e do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief.").

The Government characterizes the District Court's findings regarding the Agency Defendants' decisions to "freeze" funding as having been based on "a hodgepodge of memos and emails." But, even if that characterization were accurate, it would not help the Government. Such evidence is not, by its nature, incapable of sufficing to show that an agency has taken final agency action. See New York, 171 F.4th at 11-12, 16 (considering email correspondence to determine whether agency action persisted); cf. Hisp. Affs. Project v. Acosta, 901 F.3d 378, 386 (D.C. Cir. 2018) (finding plausible final agency action based on declarations of regulated parties' experiences); Venetian Casino Resort, L.L.C., v. Equal Emp. Opportunity Comm'n, 530 F.3d 925, 929-31 (D.C. Cir. 2008) (identifying final agency action based on unchallenged portion of statement of undisputed facts).

We also note that the Government does not deny the Nonprofits' allegations that each of the Agency Defendants adopted a policy to pause indiscriminately all funding under the IRA and the IIJA that the agency administers. In fact, the sole declaration that the Government submitted in opposition to the Nonprofits' motion for a preliminary injunction acknowledged that DOE had implemented a categorical pause of IRA and IIJA funding.

To be sure, the Government does contend that, even if the evidence supportably shows that the challenged "freeze" decisions were made by each of the Agency Defendants, the

- 28 -

Nonprofits are still challenging "many individual decisions by several agencies across a wide array of programs." Thus, the Government argues, the Nonprofits are not challenging discrete agency actions and are instead merely advancing a "programmatic attack," which the APA prevents them from doing.

We explained in New York, however, that an across-the-board decision by an agency can itself be a discrete agency action. New York, 171 F.4th at 17-18; see also Lujan, 497 U.S. at 890 n.2 (clarifying that a "specific [agency action] applying some particular measure across the board" can be an identifiable final agency action for the purposes of APA review). Indeed, in that case, we held that the plaintiffs were likely to succeed in showing that a broad categorical freeze adopted by an agency was itself a discrete agency action. New York, 171 F.4th at 18. The Government does not explain why, given our decision in New York, the identified agency-level "freeze" decisions challenged here are any different. Thus, the programmatic-attack-based argument fares no better here than it did in New York.

That leaves only the two other asserted agency actions to address in relation to the contention that the Nonprofits are not challenging "final" agency actions -- the decisions by the OMB Defendants to issue the directive in the Unleashing Memorandum to withhold categorically obligated funding appropriated under the

- 29 -

IRA or the IIJA.  As the Government sees it, the District Court "misconstrued" the Unleashing Memorandum.  The Government insists that the Unleashing Memorandum "does not itself direct any agency to pause funding" and instead simply "provides guidance to agencies about how to interpret and implement the [Unleashing] Executive Order."

The Unleashing Executive Order does direct all agencies to "immediately pause" disbursements of funds appropriated under the IRA and the IIJA pending review for consistency with the President's priorities.  Unleashing Executive Order § 7(a).  However, the Unleashing Executive Order qualifies that directive with another instruction: to implement the Unleashing Executive Order "in a manner consistent with applicable law."  Id. § 10(b).  Thus, agencies could have understood the Unleashing Executive Order to require them to first consider their lawful authority to withhold disbursements deemed inconsistent with the policies established in that order before pausing such disbursements.

It is notable, then, that the District Court found the Agency Defendants "sudden[ly] . . . paus[ed] funds soon after [the] issuance of the [Unleashing Memorandum]."  Unlike the Unleashing Executive Order, the Unleashing Memorandum does not include an express limiting instruction.  Instead, it reads like a command in its explanation that the Unleashing Executive Order requires agencies to "immediately pause disbursements of funds

- 30 -

appropriated under the [IRA] or the [IIJA] . . . that may be implicated by the policy established in [s]ection 2 of the [Unleashing Executive Order]."

The Unleashing Memorandum further orders agencies to consult with OMB before releasing funds. And although one of the policies established in section 2 of the Unleashing Executive Order is "to ensure that no Federal funding be employed in a manner contrary to the principles outlined in [that] section, unless required by law," Unleashing Executive Order § 2(i), the Unleashing Memorandum does not explain how agencies are to simultaneously "immediately pause" IRA and IIJA disbursements "that might be implicated" by the other policies in the Unleashing Executive Order and determine which of those payments were required by law. Cf. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 51 (D.D.C. 2025) (questioning how agencies could review the legal requirements of "hundreds of thousands" of grants within twenty-four hours).

We thus see no error in the District Court's determination that the Unleashing Memorandum itself "mandate[d] a pause" of IRA and IIJA funding. To that point, the Nonprofits entered into the record emails from agency officials to affected grantees indicating that the grantees' funds were frozen "based on instruction from OMB," which shows that those agency officials understood the Unleashing Memorandum to require them to implement

- 31 -

a categorical freeze of IRA and IIJA funding.  Moreover, the Government relies on OMB's authority to "establish[] financial management policies and requirements" for the executive branch, 31 U.S.C. § 503(a)(2), as the statutory basis for issuing the Unleashing Memorandum.  Given that reliance and the evidence in the record, we cannot see -- and the Government offers no argument -- why the decisions to issue the Unleashing Memorandum, then, are not themselves final agency actions, as the Unleashing Memorandum imposes distinct obligations on federal agencies and departments to pause IRA and IIJA funding.  See Biden, 597 U.S. at 808-09, 809 n.7.

### 3.

The Government also argues, just as it did in New York, that the District Court likely "exceeded the bounds of the APA by ordering agencies to exercise or refrain from exercising their unreviewable discretion in a particular manner."  See New York, 171 F.4th at 18-19.  For support, the Government relies on § 701 of the APA, which provides that agency actions that are "committed to agency discretion by law" are not subject to judicial review. 5 U.S.C. § 701(a)(2).

The Government appears to concede that the allocation and distribution of at least some of the affected funding streams do not fall within the agencies' unfettered discretion.  But the Government goes on to identify a few scattered statutes and grant

- 32 -

programs that it contends "leave the agency to choose how to best distribute the funds."  The Government then argues that these statutes and programs are like the lump-sum appropriation at issue in Lincoln v. Vigil, 508 U.S. 182 (1993), which held that certain funding decisions under said appropriation were committed to agency discretion.

In Lincoln, however, the Supreme Court did not address an agency's discretion to categorically and indefinitely withhold obligated funds.  See New York, 171 F.4th at 19-20.  Instead, in that case, the Court determined that the Indian Health Service's decision to discontinue a program was committed to agency discretion by law -- and thus unreviewable under the APA -- on the "limited ground that the allocation of funds from a lump-sum appropriation is an administrative decision traditionally regarded as committed to agency discretion and the relevant statutes spoke about Indian health only in general terms and did not so much as mention the program at issue." New York, 171 F.4th at 19 (citation modified) (quoting Lincoln, 508 U.S. at 192, 194).  The Government therefore has failed to show that the challenged agency actions in this case are committed to agency discretion by law, such that the Nonprofits are unlikely to succeed in challenging those actions under the APA.  See Barlow v. Collins, 397 U.S. 159, 166 (1970) ("[J]udicial review of [final agency] action is the rule, and nonreviewability an exception which must be demonstrated.").

- 33 -

**4.**

The Government's remaining arguments concerning the "likelihood of success" factor take aim at the Nonprofits' ability to show that the challenged agency actions likely were either arbitrary and capricious or in excess of statutory authority. The Government does not dispute that the Nonprofits' "arbitrary and capricious" claims -- if likely to succeed -- would themselves support the preliminary relief issued by the District Court insofar as any of their claims would. We therefore can dispose of this set of arguments by the Government by focusing solely on the Nonprofits' arbitrary and capricious claims, as we conclude that the District Court did not err in determining that the Nonprofits are likely to succeed in showing that the challenged agency actions are arbitrary and capricious.

**a.**

"In assessing whether an agency action is arbitrary and capricious, a court may consider only 'the grounds that the agency invoked when it took the action.'" New York, 171 F.4th at 20 (quoting Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 20 (2020)). To survive "arbitrary and capricious" review, agency action must be "reasonable and reasonably explained." Id. (quoting Ohio v. Env't Prot. Agency, 603 U.S. 279, 292 (2024)). "When an agency changes course," Regents, 591 U.S. at 30, moreover, the requirement that agency action be

- 34 -

reasonable includes "assess[ing] whether there [are] reliance interests, determin[ing] whether they [are] significant, and weigh[ing] any such interests against competing policy concerns," id. at 33.    An agency "acts arbitrarily and capriciously by ignoring such matters."    New York, 171 F.4th at 21 (citation modified).

### b.

In determining that the Nonprofits are likely to succeed in showing that the challenged agency actions were arbitrary and capricious, the District Court explained that "[n]othing from OMB, the NEC Director, or the five Agency Defendants shows that they considered the consequences of their broad, indefinite freezes: projects halted, staff laid off, goodwill tarnished." The Government disagrees.

The Government appears to contend that the OMB and Agency Defendants did not need to consider many grantees' reliance interests and thus that the District Court erred in concluding otherwise.    As the Government sees things, grantees that receive funds under the IRA and the IIJA "can hardly claim" reliance interests.    That is so, according to the Government, because "many grant contracts authorize termination on various grounds, including if 'an award no longer effectuates the program goals or agency priorities.'"    (Quoting 2 C.F.R. § 200.340(a)(4).)    Yet, the Government points out, the District Court "identified no legal

requirement . . . that payments need to be made on a particular timetable."

In Regents, however, the Court considered and rejected the Department of Homeland Security's similar contention that it did not need to consider the potential reliance interests of recipients of the Deferred Action for Childhood Arrivals program because the memorandum establishing that program stated that it "'conferred no substantive rights' and provided benefits only in two-year increments." 591 U.S. at 31. The Court explained that "such features" of the challenged program did not "automatically preclude reliance interests" because, although those "disclaimers are surely pertinent in considering the strength of any reliance interests," reasoned agency action still requires "that consideration be undertaken by the agency in the first instance." Id. Regents therefore is at odds with the Government's position insofar as the Government means to argue that, even if the OMB and Agency Defendants did not in fact undertake consideration of the grantees' reliance interests, they were not required to do so because "many" of the grants at issue allow for termination in certain circumstances.

That leaves only the Government's distinct argument that, given the text of the Unleashing Memorandum, we must conclude that the OMB Defendants did consider the reliance interests of grantees who, in consequence of the directive in that memorandum,

- 36 -

would be denied financial assistance that they otherwise would receive pursuant to their grants. Specifically, the Government argues that the Unleashing Memorandum "made clear that the pause directed by the [Unleashing] Executive Order did not apply to all funds appropriated under the IRA and IIJA but instead applied only to 'funds supporting programs, projects, or activities that may be implicated by the policy established' in [that] Executive Order."

The Government further argues that the Unleashing Memorandum "advanced" any reliance interests that the OMB Defendants were required to consider because that memorandum "reiterated that agencies could continue to disburse funding as necessary after consulting with OMB." And, the Government also asserts, the Unleashing Memorandum, like the Unleashing Executive Order, "took steps to ameliorate any negative effects, including for funding recipients who had reasonable reliance interests in continued disbursement," such as "where such disbursement was required by law." See Unleashing Executive Order §§ 2(i), 7(a).

It is true that the Unleashing Executive Order exempts from the "immediate[] pause" of disbursements of funds appropriated under the IRA and the IIJA any disbursements "required by law."[11] It also true that the Unleashing Memorandum states that

---

[11] In relevant part, the Unleashing Executive Order stated that "[i]t is the policy of the United States . . . to ensure that no Federal funding be employed in a manner contrary to the

the "pause only applies to funds supporting programs, projects, or activities that may be implicated by the" Unleashing Executive Order. Even still, we cannot accept the Government's position that the Unleashing Memorandum did consider the reliance interests of the grant recipients.

As we have explained, the Unleashing Memorandum expressly provides that the Unleashing Executive Order "requires agencies to <u>immediately</u> pause disbursement of funds appropriated under the [IRA] or the [IIJA]." (Emphasis added.) Yet the Unleashing Memorandum does not explain how agencies are to simultaneously "immediately pause" IRA and IIJA disbursements <u>and</u> determine which of those payments were required by law. The record also supportably shows, as we have explained, that the Agency Defendants understood the Unleashing Memorandum to mandate an immediate pause of funding appropriated under the IRA and the IIJA. We therefore conclude that the record supports the District Court's determination, which is "informed by the record evidence of the consistent way that the intended recipients of the [Unleashing Memorandum] understood it," <u>New York</u>, 171 F.4th at 23, that the OMB Defendants "essentially adopted a 'freeze first, ask questions later' approach."

---

principles outlined in this section, unless required by law." Unleashing Executive Order § 2(i).

We further conclude that the District Court did not err in determining that, by ordering agencies to freeze funding in that manner, the OMB Defendants disregarded the reliance interests of the grant recipients and so likely acted in an arbitrary and capricious manner.  Accordingly, although we agree with the Government that "the mere possibility that some agency might make a legally suspect decision" pursuant to the Unleashing Memorandum does not in and of itself justify enjoining enforcement of that memorandum in every circumstance, "that principle has no relevance here."  New York, 171 F.4th at 23 (citation modified).  Rather, as we have explained, the District Court made the supportable finding that the Unleashing Memorandum itself mandated a categorical and immediate pause on disbursing funds already obligated under the IRA and the IIJA.  See Dep't of Com., 558 U.S. at 785 (observing that courts reviewing agency actions "are not required to exhibit a naiveté from which ordinary citizens are free" (citation modified)).

The Government attempts to counter this conclusion by directing our attention to the Unleashing Memorandum's instruction that agencies may resume disbursing funds "as they deem necessary after consulting with [OMB]."  The Government argues that this instruction demonstrates that the OMB Defendants considered the grantees' reliance interests.

By its nature, however, the post-hoc review process that
the instruction contemplates ignores the reliance interests
implicated by the "'freeze first, ask questions later' approach"
that, as we have explained, the District Court supportably found
that the OMB Defendants adopted.  We therefore conclude that the
Nonprofits are likely to succeed in showing that the OMB
Defendants, like the Agency Defendants, acted arbitrarily and
capriciously by failing to consider reliance interests.

**B.**

Having concluded that the Nonprofits are likely to
succeed on the merits of their claims, we still must address the
remaining factors for assessing a motion for a preliminary
injunction.  Those factors concern whether the Nonprofits have
shown that they would suffer irreparable harm, the balance of harms
that such relief would cause, and the public interest.  See
NuVasive, 954 F.3d at 443.  The Government argues that these
factors point against granting the relief that the District Court
ordered.  We disagree.

**1.**

We start with the issue of whether the Nonprofits have
met their burden to show that they would suffer irreparable harm
absent the requested relief.  The Government argues that the
Nonprofits have not met that burden because they "have no
cognizable interest in receiving federal funds to which they are

not legally entitled or on a timeline that is not legally compelled."

This argument rests on the premise that the Nonprofits are unlikely to succeed on the merits of their APA claims.  See New York, 171 F.4th at 24.  As we have explained, though, we agree with the District Court that the Nonprofits have shown that they are likely to do so.

The Government separately contends that the Nonprofits have not shown irreparable harm because "the gravamen" of their claimed injury "is monetary," which is "the classic example of reparable harm."  The Government does not dispute, however, that the District Court found that the Nonprofits face nonpecuniary harms from the funding freezes, including "wasted hours of labor and planning" for projects that the Nonprofits cannot support without federal assistance, "the impending loss of staff, and the harms that the [funding] pauses have done to the Nonprofits' relationship[s] with their communities."  And the Nonprofits have shown that these follow-on effects from their loss of funding are irreparable harms.  See Rhode Island v. Trump, 155 F.4th 35, 49 (1st Cir. 2025); cf. Dep't of Educ. v. California, 604 U.S. 650, 652 (2025) (per curiam) (holding plaintiffs did not face irreparable harm due to funding loss based on their representation "that they have the financial wherewithal to keep their programs running").

**2.**

As to the balance of harms and the public interest, the Government contends in part that the challenged District Court order "interferes with agencies' ability to exercise their lawful authorities to implement the President's policy directives" and that "there would be no guarantee that funds that the [Agency Defendants] disbursed pursuant" to the preliminary injunction "would be retrievable" if the Government were to prevail ultimately in litigation. We observed in New York, however, that the Government would endure such harms "only if the preliminary injunction barred 'lawful conduct.'" New York, 171 F.4th at 25; see also Rhode Island, 155 F.4th at 49 ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (quoting Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025)). And, as we explained above, the Government has failed to show that the Nonprofits are unlikely to succeed on the merits of their APA claims.

The Government's other asserted harm arises from what the Government contends are the "vague instructions" contained in the District Court's order. It asserts that those instructions lack "the requisite detail and precision" to provide notice of what the order prohibits and that this failure "threatens to chill agencies from taking legally permitted actions."

The Government zeroes in partly on the portion of the District Court's order that prohibits the Government "from implementing, giving effect to, or reinstating under a different name the directive in [the Unleashing Memorandum] to unilaterally freeze awarded funding appropriated under the [IRA] or the [IIJA]." The Government argues that this prohibition fails to "provid[e] guidance as to what features matter" with respect to that directive, as the Unleashing Memorandum "contains no such directive."

By its own terms, however, the challenged order identifies the "directive" set forth in the Unleashing Memorandum as the instruction in that document "to unilaterally freeze awarded funding appropriated under the [IRA] or the [IIJA]." Thus, considered in the context of the District Court's order as a whole and in light of the District Court's supporting memorandum, the "unilateral[] freeze" to which the District Court's order refers is clearly the categorical pause of "all" IRA and IIJA funding.

The Government also zeroes in on the portion of the District Court's order that prohibits the Agency Defendants from "freezing, halting, or pausing on a non-individualized basis the processing and payment of [already-awarded] funding" appropriated under the IRA or the IIJA. (Alteration in original.) The Government objects that this part of the order "contains no additional detail to make clear what sort of 'individualized'

- 43 -

analysis" would be "an appropriate basis for agencies to exercise their authority to pause disbursements."

The problem here for the Government is that the "non-individualized basis" to which the District Court referred is the categorical freeze of funding based solely on that funding's status as an IRA or IIJA appropriation.  And the District Court explained that its "order does not prevent the Government from making funding decisions in specific cases according to processes like those established in 2 C.F.R. § 200.340."  We therefore do not understand the District Court's order to prevent the Agency Defendants from exercising their discretion to pause disbursements under the relevant actual statutory, regulatory, and contractual authority that they possess.

Accordingly, we do not see how the Agency Defendants are "chilled" in their exercise of lawful authority.  Moreover, even if we were to accept the Government's premise that some agency action could be chilled, the Government fails to explain why that "possibility constitutes a harm substantial enough to outweigh the harm that [the Nonprofits] allege that they will suffer from the agency actions that they challenge."  New York, 171 F.4th at 26.  We therefore conclude that the Government has failed to show that the District Court abused its discretion by finding the equities favor the Nonprofits.

- 44 -

**IV.**

There remains to consider only the Government's challenges to the breadth of the relief that the District Court ordered. Our review is for abuse of discretion. See DraftKings Inc. v. Hermalyn, 118 F.4th 416, 423 (1st Cir. 2024).

The Government makes two distinct contentions with respect to the breadth of the relief. First, the Government argues that the District Court's order is too broad because it impermissibly directs the Agency Defendants to make monetary payments under contractual agreements. Second, the Government argues that the relief that the District Court ordered was too broad because it is "universal." We agree with the Government that the order is too broad in the first respect, but we otherwise reject the Government's challenge to the scope of the relief ordered, at least given the specific arguments that the Government has advanced.

**A.**

The District Court ordered the Agency Defendants to "take immediate steps to resume the processing, disbursement, and payment of already-awarded [IRA and IIJA] funding . . . and to release awarded funds previously withheld or rendered inaccessible." The Government contends that this portion of the District Court's order exceeds the bounds of the District Court's authority under the APA. We agree.

- 45 -

"The APA's limited waiver of sovereign immunity does not provide the [d]istrict [c]ourt with jurisdiction . . . to order relief designed to enforce any obligation to pay money pursuant to [contract-based] grants." New York, 171 F.4th at 26 (citation modified) (quoting Nat'l Insts. of Health v. Am. Pub. Health Ass'n, 145 S. Ct. 2658, 2660 (2025)). The portion of the District Court's order that directs the Agency Defendants to resume payment of funds awarded under grants appropriated under the IRA and the IIJA is, in effect, an order "to enforce a contractual obligation to pay money," Dep't of Educ., 604 U.S. at 651 (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002)). As such, it is beyond the District Court's authority under the APA. See 5 U.S.C. § 702 (providing that the APA's sovereign immunity waiver does not include money damages or "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought"); 28 U.S.C. § 1491 (granting the U.S. Court of Federal Claims jurisdiction over claims "upon any express or implied contract with the United States").[12]

The Nonprofits counter that the Tucker Act has no application here because they "do not bring contract claims." But

---

[12] Neither party contends that the remaining disbursements due under any grant would be less than $10,000. Cf. 28 U.S.C. § 1346(a)(2) (granting federal district courts jurisdiction over contract claims against the United States when those claims do "not exceed[] $10,000 in amount").

- 46 -

neither did the plaintiffs in National Institutes of Health. See Am. Pub. Health Ass'n v. Nat'l Insts. of Health, 145 F.4th 39, 50 (1st Cir. 2025). The plaintiffs in National Institutes of Health, like the Nonprofits here, alleged that the agency actions that they challenged violated the APA. See id. at 43. That the Nonprofits do not bring contract claims here "thus does not cure the likely problem with the District Court's remedy" for their APA claims. New York, 171 F.4th at 28.

The Nonprofits also gesture at another reason why there is no sovereign-immunity-based bar to the relief at issue. They suggest that some of the plaintiffs, including subgrantees and the National Council of Nonprofits, cannot assert contract claims against the federal government in the U.S. Court of Federal Claims because those plaintiffs are third parties to the federal grants.

Whether those plaintiffs can bring such claims in that forum, however, is likely irrelevant to the relief that a district court can order under the APA's "limited waiver of sovereign immunity." Nat'l Insts. of Health, 145 S. Ct. at 2660 (citation modified). That waiver does not extend to the ordering of "specific performance [of] payment" pursuant to contractual obligations. New York, 171 F.4th at 27; cf. Coggeshall Dev. Corp. v. Diamond, 884 F.2d 1, 3 (1st Cir. 1989) ("We are unaware of any waiver of sovereign immunity by the United States as to specific performance for breach of contract."); Am. Sci. & Eng'g, Inc. v.

Califano, 571 F.2d 58, 61-63, 63 n.6 (1st Cir. 1978) (explaining that § 702 does not permit district courts to enjoin a contract breach).    And it is hard to see how the relief sought here -- insofar as it takes the form of an injunction to pay the funds obligated under existing grants -- could be premised on anything other than the enforcement of a contractual obligation.

The remaining relief ordered by the District Court poses no such sovereign immunity problems.  After all, a district court may vacate unlawful agency action, "preventing the agency from using it going forward."  New York, 171 F.4th at 30 (quoting Nat'l Insts. of Health, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring)); see 5 U.S.C. §§ 705-706.  In that respect, although the remaining relief -- which prohibits the Government from implementing the challenged agency actions -- "may result in the disbursement of funds," Dep't of Educ., 604 U.S. at 651 (emphasis added), it does not exceed the District Court's authority under the APA because it "is not itself an order to enforce a contractual obligation to pay money," New York, 171 F.4th at 30 (emphasis added) (citation modified).  See also Bowen v. Massachusetts, 487 U.S. 879, 909-11 (1988) (holding that an order "reversing" an agency decision that disallowed a Medicaid reimbursement is "within the District Court's jurisdiction under § 702's waiver of sovereign immunity" because the order is not a "money judgment" even though "it is likely that the Government will abide by [the

- 48 -

order] and reimburse . . . the requested sum").  It is instead merely an order enjoining the defendants from relying on the challenged agency actions as the basis for the ongoing withholding of the funds in question.

**B.**

Concerns about sovereign immunity aside, the Government argues that the District Court ordered relief that is overbroad by ordering "universal" injunctive relief rather than relief tailored to redress only party-specific harms.  The Government contends that such "universal" relief is foreclosed by Trump v. CASA, Inc., 606 U.S. 831 (2025).

We begin by addressing the Government's contention that, insofar as the District Court ordered the challenged relief pursuant to its equitable authority under the Judiciary Act of 1789, that relief was overbroad under CASA.  However, the District Court did no such thing.  We agree with the Nonprofits that the record shows that the District Court is best understood to have ordered that relief pursuant to its independent remedial authority under the APA.  See 5 U.S.C. § 705.  Moreover, we conclude that, at least given the arguments that the Government has advanced on appeal, the Government has not shown that the District Court abused its discretion in exercising that independent APA-based authority in ordering such universal relief.

**1.**

The Government is right that, under CASA, the District Court likely lacked authority to issue a universal preliminary injunction insofar as it did so pursuant to its equitable authority under the Judiciary Act of 1789.  The District Court did not support the relief that it ordered with a finding that universal relief was necessary to provide the Nonprofits with complete relief.  Cf. CASA, 606 U.S. at 853-54 (contemplating that a universal injunction may be permissible as an application of the complete-relief principle).  Instead, the District Court reasoned -- in part -- that universal relief was proper because "[n]onparties in exactly the same circumstances [as the Nonprofits] should not be forced to suffer the harms [of the likely unlawful challenged agency actions] just because there was not enough time or resources for them to join the suit."

CASA counsels, however, that nonparty relief of that sort exceeds the equitable authority conferred by the Judiciary Act of 1789.  See id. at 853 ("Extending [an] injunction to cover all other similarly situated individuals would not render [the plaintiff's] relief any more complete.").  That said, the Nonprofits argue that the District Court did not premise that relief on the remedial authority that the Judiciary Act of 1789 confers.  They argue that the District Court instead premised that relief on the remedial authority that the APA independently confers

to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights" pending judicial review.  5 U.S.C. § 705.

The Nonprofits then point out that CASA had no occasion to address the scope of the relief that may be ordered pursuant to that independent, APA-based grant of remedial authority.  See CASA, 606 U.S. at 847 n.10 (noting that it did not "resolve[] the distinct question" of relief under the APA); id. at 873 (Kavanaugh, J., concurring) (observing that district courts may still "preliminarily set[] aside" agency action under the APA).  As a result, the Nonprofits contend, CASA cannot itself be understood to foreclose that relief.  So, we next must address this APA-grounded basis for upholding the relief that was ordered.

**2.**

Consistent with their contention that CASA is not dispositive here, the Nonprofits specifically moved for preliminary relief under § 705 of the APA.  In addition, in response to that motion, the District Court issued an order granting it that explicitly states that the relief being ordered "shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706."  (Emphasis added.)

We fail to see how, despite the statement by the District Court expressly tying the ordered relief to § 705 of the APA, we

- 51 -

could conclude that the District Court had no intention of resting its order on the authority that § 705 independently confers. Indeed, the District Court specifically stated in its opinion supporting the challenged order that universal relief was warranted because "[t]he normal remedy for a successful APA challenge is vacatur of the [challenged agency action] and its applicability to all who would have been subject to it."

The Government does respond that we cannot conclude that the District Court issued the challenged relief pursuant to its independent remedial authority under the APA.  To make that case, the Government asserts that § 705 confers "limited postponement authority."  And, the Government continues, the District Court's order not only failed to "clearly invoke that authority," but also speaks "in terms of compelling defendants to act and not act in various ways," "not in terms of suspending any specific agency action."  The Government therefore contends that we must understand the District Court to have been exercising its remedial authority solely under the Judiciary Act of 1789, which is the remedial authority that CASA expressly addressed.

We agree with the Government to this extent: The wording of the District Court's order is such that it cannot be construed to be merely postponing the effective date of the challenged agency actions.  In so concluding, we do not dispute that a postponement of an agency action's effective date pending appeal, like a stay

of such action pending appeal, "has some functional overlap" with a preliminary injunction.  See Nken v. Holder, 556 U.S. 418, 428 (2009).  Nonetheless, the two forms of relief are distinct in how they operate.  See id. at 428-29.  An injunction "direct[s] an actor's conduct[,]" id. at 429, while a postponement of the effective date of any agency action under § 705 operates only on the agency action itself, as even the Nonprofits acknowledge.

Here, the relief ordered by the District Court operates on the Government rather than the challenged agency actions.[13]

---

[13] Excepting the portion of the order that we have already determined must be vacated, see Part IV.A, the District Court:
- "ORDERED that [the Agency Defendants] are ENJOINED from freezing, halting, or pausing on a non-individualized basis the processing and payment of funding that (1) was appropriated under the [IRA] or the [IIJA] and (2) has already been awarded";
- "ORDERED that [the OMB Defendants] provide written notice of the [District] Court's preliminary injunction to all agencies to which [the Unleashing Memorandum] was addressed.  The written notice shall instruct those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in [the Unleashing Memorandum] with respect to the disbursement of all open awards under the [IRA] or the [IIJA]. It shall also instruct those agencies to continue releasing any disbursements on open awards that were paused due to or in reliance on [the Unleashing Memorandum]";
- "ORDERED that [the Agency Defendants] provide written notice of the [District] Court's preliminary injunction to all grantees who have been awarded funds under the [IRA] or the [IIJA]"; and
- "ORDERED that all Defendants are ENJOINED from implementing, giving effect to, or reinstating under a different name the directive in [the Unleashing Memorandum] to unilaterally freeze awarded funding appropriated under the [IRA] or the [IIJA]."

- 53 -

Thus, despite the Nonprofits' argument to the contrary, we cannot see how the order can be construed to be an exercise of § 705's authority to postpone the effective date of the challenged agency actions.  Indeed, the Nonprofits styled their motion for relief under § 705 as a motion for a preliminary injunction, and it was that motion that the District Court granted.

Nonetheless, as the Nonprofits point out, § 705 empowers a court to "issue all necessary and appropriate process [(1)] to postpone the effective date of an agency action or [(2)] to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705 (emphasis added).  And the District Court expressly stated that the order in question "shall apply to the maximum extent provided for by" § 705.

Thus, because the Government itself agrees that the District Court did not style its order as an exercise of the "postponement" authority that § 705 concerns, we understand the challenged relief to be an exercise of the additional remedial authority that § 705 confers to "issue all necessary and appropriate process . . . to preserve status or rights pending" judicial review.  Id. § 705.  Otherwise, it is hard to see how that order could apply -- as the District Court made clear was its intention -- to the maximum extent that § 705 allows.

Accordingly, the critical question is whether the District Court's order is overbroad even though the District Court

- 54 -

issued it pursuant to § 705's grant of authority to "issue all necessary and appropriate process . . . to preserve status or rights pending" judicial review.  And so, we must address that question as well.

### 3.

The Government appears to contend that we must resolve that question in its favor -- and so conclude that District Court's order still is overbroad -- because § 705 itself "incorporates" traditional equitable limitations on nonparty relief.  Indeed, anticipating the possibility that the order might be construed as a stay rather than as an injunction, the Government argues at some length that a postponement of the effective date of the challenged agency action "would still properly be limited to redressing [the Nonprofits'] irreparable harm."  We are not persuaded.

### a.

For starters, the Government fails to adequately defend the premise of its assertion about the limited nature of the authority that § 705 confers -- namely, that § 705 does not authorize non-party relief even in authorizing the postponement of the effective date of an agency action.  Notably, several of our sister circuits have held to the contrary as to that precise issue. See Make the Road N.Y. v. Noem, No. 25-5320, 2025 WL 3563313, at *35-36 (D.C. Cir. Nov. 22, 2025) (per curiam); Career Colls. & Schs. v. U.S. Dep't of Educ., 98 F.4th 220, 255 (5th Cir. 2024);

see also Nat'l TPS All. v. Noem, 150 F.4th 1000, 1028-29 (9th Cir. 2025) (affirming universal stay because partial postponement was unworkable due to "binary" nature of challenged agency action under the relevant statute).  But cf. Immigrant Defs. L. Ctr. v. Noem, 145 F.4th 972, 995-96 (9th Cir. 2025) (limiting universal stay issued under § 705 to the plaintiff's "current and future clients" because that was "the more equitable approach 'to preserve status [and] rights pending'" judicial review (alteration in original) (quoting 5 U.S.C. § 705)).

The text of § 705 would appear to accord with those rulings, as it refers to postponing "the effective date of an agency action."  5 U.S.C. § 705 (emphasis added).  As the District of Columbia Circuit recently well explained, "agency orders, regulations, and rules almost always have but one effective date.  If a court orders that an agency action shall not apply against certain individuals, but that the agency can apply that action against everyone else, the effective date of the action has not been postponed."  Make the Road N.Y., 2025 WL 3563313, at *35.

Moreover, these other circuits' understanding of the postponement portion of § 705 nicely aligns with § 706(2), which provides that reviewing courts may "set aside" unlawful agency actions and has long been understood to authorize vacatur of such actions.  See Corner Post, 603 U.S. at 826 (Kavanaugh, J., concurring).  The broader construction of § 705's postponement

- 56 -

authority would thus appear to enable a district court, by postponing "the effective date" of the challenged agency action, to provide the "[r]elief pending review," 5 U.S.C. § 705, that preserves the remedy -- vacatur -- to which a plaintiff, if ultimately successful, is entitled, see id. § 706(2).

Of course, as we have explained, we do not understand the District Court here to have relied on the authority that § 705 confers to postpone the effective date of an agency action in ordering the relief at issue. Instead, we understand the District Court's order to operate as an injunction because it operates directly on the agency actors by enjoining them from engaging in certain agency decision-making and does not merely vacate or set aside an agency action already taken. Cf. Nken, 556 U.S. at 529 (explaining that a stay "temporarily suspend[s] the source of the authority to act" whereas an injunction "direct[s]" the actor's conduct).

Our discussion of the postponement authority that § 705 confers is still relevant, though, to the scope-of-the-relief issue that we must resolve. It explains why we do not agree with the Government -- at least given the arguments that it has made on appeal -- that § 705 fails to contemplate any nonparty relief. Put differently, that discussion explains why we cannot accept the key premise of the Government's argument for concluding that,

- 57 -

because the District Court's order is "universal" in scope, it is overbroad even if it rests on § 705.

The upshot of our analysis to this point, then, is that the Government can succeed in showing that the challenged order is overbroad only if it can explain why, even though § 705 does not bar all such nonparty relief, the portion of § 705 that authorizes a district court to "issue all necessary and appropriate process . . . to preserve status or rights pending" judicial review does bar such relief.  But, as we will explain, the Government has offered no such explanation.

**b.**

The Government does point out that relief under § 705 may be issued only "to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  We cannot agree with the Government's contention, though, that this provision in and of itself shows that the remedial authority that § 705 confers is limited to redressing party-specific harms.

This provision appears to limit the relief that may be granted from a challenged agency action to only those parts of the agency action that are imposing an irreparable injury.  See Make the Road N.Y., 2025 WL 3563313, at *35.  For example, if an agency action contains severable components, this provision "just means that courts should [postpone] the effective date only of those portions of the agency action that are inflicting injury" and "let

- 58 -

the other portions of the [agency action] take effect as scheduled." Id. But we do not see how the "irreparable injury" constraint speaks to the scope of the relief that may be ordered to redress such an injury -- and so speaks to whether the relief that may be issued once the irreparable injury has been shown must be limited to redressing only party-specific harm or may be universal in nature to preserve the rights that could be obtained through vacatur.

Indeed, as we have explained, the power to postpone the effective date of an agency action confers the power to order a form of relief that, in its nature, appears to do more than simply redress a party-specific harm. So, it is not evident that the "to the extent necessary" language in § 705 in and of itself dictates, as to any relief that may be issued pursuant to § 705, that such relief cannot be universal.

The Government also points out that § 702 of the APA, which identifies who may bring an APA suit and contains the statute's sovereign immunity waiver, states that "[n]othing" in that provision affects "the power or duty of the court" to "deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. The Government then goes on to argue that this provision shows that the APA "requires courts to decline to enter universal relief" when a narrower remedy would provide complete relief to the plaintiffs.

- 59 -

Once again, though, this argument is premised on an understanding of the scope of the postponement authority that the Government has not shown to be correct. After all, this argument would require even that remedial authority to be party-specific. Yet the Government has not explained how the savings clause in § 702 has the asserted limiting effect as to some parts of § 705 but not others.

The Government next directs our attention to a piece of legislative history to support its position that, across the board, § 705 precludes universal relief. The Government relies on the House Report that accompanied the APA, which states that § 705 "would normally, if not always, be limited to the parties complainant." H.R. Rep. No. 79-1980, at 277 (1946).

In explaining that § 705 relief "would normally" be limited to the parties to the litigation, however, the House Report itself contemplates that relief under § 705 may, in some circumstances, extend to nonparties. We also note that the corresponding Senate Report merely describes § 705 as permitting courts "to maintain the status quo" "if the proper showing be made," and explained that it should be used "to prevent irreparable

injury or afford parties an adequate judicial remedy."  S. Rep. No. 79-752, at 213 (1945).[14]

So, given that the Government bears the burden on appeal, we conclude that it has not advanced a persuasive argument for us to hold that the District Court abused its discretion by issuing relief of the present scope.  Rather, as we have explained, its only arguments for concluding otherwise are premised on the mistaken understanding that even the postponement authority in § 705 must be so limited.[15]

_____

[14] We further observe that Congress considered and rejected several versions of § 705 that included party-specific language. See H.R. 339, 79th Cong. § 9(e) (1945) (granting equitable authority to "preserve the status or the rights of the parties" pending review and to "postpone the effective date" of a challenged action "to accord the parties a fair opportunity for judicial review" (emphasis added)), reprinted in Federal Administrative Procedure: Hearings on H.R. 184, H.R. 339, H.R. 1117, H.R. 1203, H.R. 1206, and H.R. 2606 Before the H. Comm. on the Judiciary, 79th Cong. 139, 146 (1945) [hereinafter House Judiciary Committee Hearing]; H.R. 1117, 79th Cong. § 9(e) (1945) (same), reprinted in House Judiciary Committee Hearing at 147, 154; H.R. 2602, 79th Cong. § 4(c) (1945) (same), reprinted in House Judiciary Committee Hearing at 176, 179.  The version that it enacted lacked such party-specific language.  See Administrative Procedure Act, Pub. L. No. 79-404, § 10(d), 60 Stat. 237, 243 (1946); 5 U.S.C. § 705. Though we do not afford "decisive significance to the unexplained disappearance of one word from an unenacted bill," Mead Corp. v. Tilley, 490 U.S. 714, 723 (1989), we cannot presume that such omission was inadvertent.

[15] The Government makes no argument that Article III itself would bar a district court from issuing universal injunctive relief to preserve the status quo if Congress were to have authorized its issuance in service of the vacatur remedy provided for in § 706, and we see no basis for concluding that such a grant of remedial authority would transgress the limits of Article III, given the

C.

We make one final observation concerning the scope-of-the-relief issue. Although we do not definitively resolve in this appeal the extent of the remedial authority that the non-postponement portion of § 705 confers, due to the limited nature of the arguments that the Government has advanced to us about that portion, we are aware that the District Court issued this relief before <u>CASA</u> was decided. We also are aware that the Nonprofits themselves argue on appeal that the remaining portions of the District Court's remedial order -- those that we have concluded do not exceed the APA's sovereign immunity waiver -- are best construed to be an exercise of the "postponement" authority that § 705 confers -- and so not to be a universal injunction at all.

Thus, if a party successfully were to seek -- or the District Court otherwise were to make -- a modification of the order on remand based on § 705's postponement authority alone, that modification might moot any questions about the extent of the

_____

authority indicating that vacatur is itself a remedy that Congress may authorize. <u>See</u> <u>Lujan</u> v. <u>Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 890 n.2 (1990) (noting that a successful APA suit can affect the entire challenged agency action); <u>Corner Post, Inc.</u> v. <u>Bd. of Governors of Fed. Rsrv. Sys.</u>, 603 U.S. 799, 827 (2024) (Kavanaugh, J., concurring) ("The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules . . . ."); <u>see also, e.g.</u>, <u>Dep't of Homeland Sec.</u> v. <u>Regents of the Univ. of Cal.</u>, 591 U.S. 1, 36 & n.7 (2020) (affirming vacatur of agency rule).

remedial authority that the non-postponement portion of § 705 confers. That reality, we conclude, points against our addressing any such questions in this case, given that the Government has developed no meaningful arguments about how they should be resolved.

## V.

For the foregoing reasons, we **vacate** paragraph 3 of the April 15, 2025 order and otherwise **affirm** the District Court's opinion and order of injunctive relief.